UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICOLE STEWART, SHANNON FITZGERALD and SUMMER APICELLA, on behalf of themselves and all others similarly situated, | CLASS ACTION COMPLAINT |
| *Plaintiffs*, | JURY TRIAL DEMANDED |
| v. | |
| NURTURE, INC. | |
| *Defendant.* | |

## CLASS ACTION COMPLAINT

Plaintiffs Nicole Stewart, Shannon Fitzgerald and Summer Apicella ("Plaintiffs"), by and through their counsel, on their own behalf and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Nurture, Inc. ("Nurture" or "Defendant") and allege the following facts in support of their claims against Defendant based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## I.     INTRODUCTION

1.     Parents and other caregivers, including Plaintiffs, reasonably believe that the baby food they purchase for their babies will be healthy, nutritious, and non-toxic, and that is what Defendant wanted them to think.  Alarmingly, parents and Plaintiffs were wrong.  A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("House Subcommittee") reveals that certain brands of commercial baby food – including Defendant's Happy Baby Organics food products (the "Tainted Baby Foods") – are tainted with significant and dangerous levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury.  *See Baby Foods Are Tainted with Dangerous Levels of*

1

*Arsenic, Lead, Cadmium and Mercury*, Staff Report Dated February 4, 2021, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform, U.S. House of Representatives (the "Congressional Report").[1]  Exposure to toxic heavy metals causes permanent decreases in IQ and endangers neurological development and long-term brain function, among numerous other deleterious alarming conditions and problems.

2.      Plaintiffs bring this class action against Defendant for deceptive business practices, including misrepresentations and omissions, regarding the presence of dangerous levels of toxic heavy metals and other contaminants contained within their Happy Baby foods that Plaintiffs purchased.  Plaintiffs seek injunctive and monetary relief on behalf of the proposed Class including (i) requiring full disclosure of all such substances and ingredients in Defendant's marketing, advertising, and labeling; (ii) requiring testing of all ingredients and final products for such substances; and (iii) restoring monies to the members of the proposed Class.

3.      No reasonable consumer purchasing baby foods or seeing Defendant's representations in advertising would expect the baby foods to contain dangerous levels of heavy metals or other undesirable toxins or contaminants.  Furthermore, reasonable consumers, like Plaintiffs, would consider the inclusion of dangerous levels of heavy metals or other undesirable toxins or contaminants a material fact when considering what baby food to purchase.

4.      Defendant intended for consumers to rely on its representations, and reasonable consumers did in fact so rely.  However, Defendant's business practices, representations and omissions were deceptive, misleading, unfair, and/or false because, among other things, the

---

[1] *Available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed February 9, 2021).

Tainted Baby Foods contained undisclosed dangerous levels of toxic heavy metals or other undesirable toxins or contaminants.

5.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein), who, from the applicable limitations period up to and including the present, purchased for personal/household use and not resale any of Defendant's Tainted Baby Foods.   Through this action, Plaintiffs assert claims for unjust enrichment, and violations of New York General Business Law §§ 349 and 350 and the Florida Deceptive and Unfair Trade Practices Act, §501.201, *et. seq.*, seeking monetary damages, injunctive relief, and all other relief as authorized in equity or by law.

## Parties

### *Plaintiffs*

6.     Plaintiff Nicole Stewart is a citizen and resident of the State of New York, residing in Hauppauge, New York.  During the applicable statute of limitations period, Plaintiff purchased Tainted Baby Foods that were manufactured and produced by Defendant that have been found to contain dangerous levels of toxic heavy metals, including Happy Baby Apple Rice Cakes.

7.     Plaintiff Shannon Fitzgerald is a citizen and resident of the State of Florida, residing in Fort Walton Beach, Florida.  During the applicable statute of limitations period, Plaintiff purchased Tainted Baby Foods that were manufactured and produced by Defendant that have been found to contain dangerous levels of toxic heavy metals, including Happy Baby Sweet Potato & Carrot Superfood Baby Puffs.

8.     Plaintiff Summer Apicella is a citizen and resident of the State of New York, residing in Holbrook, New York.  During the applicable statute of limitations, Plaintiff purchased

Tainted Baby Foods that were manufactured and produced by Defendants that have been found to contain dangerous levels of toxic heavy metals, including Happy Baby Banana Pumpkin Puffs.

***Defendant Nurture, Inc.***

9.     Defendant Nurture, Inc. is a Delaware corporation with its principal place of business located at 40 Fulton Street, New York, NY 10038.  Defendant is a citizen of the State of New York.

10.     Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Tainted Baby Foods throughout the United States, including New York and Florida.

11.     Defendant states on its website, "We are on a mission to change the trajectory of children's health through nutrition."  It further touts its "Quality and Safety": "We taste and thoroughly analyze every batch of food and each individual ingredient that goes into our products." Moreover, Defendant represents: "What your little one eats in the first few years of life is crucial – it's important that their diet provides the nutrients and vitamins needed for proper development." Defendant also states, "As parents, we hold ourselves to strict standards to provide your little one with products that, when part of a balanced diet, help them grow healthy and strong.  Every product we make goes through a rigorous quality and safety test so you can feel confident in what you're feeding your family."[2]

12.     Defendant sells baby food products under the brand name "Happy Baby," among others.  The Happy Baby products include pouches, jars, cereals, teethers, puffs, and yogurt drops.[3]

---

[2]www.HappyFamilyOrganics_2019_MissionReport_1.pdf (last accessed February 9, 2021).
[3]www.HappyFamilyOrganics.com/shop/?age_range=1341 (last accessed February 9, 2021).

The Congressional Report concludes that a large a large portion of such products are tainted and contain dangerous levels of toxic heavy metals.

## Jurisdiction and Venue

13.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d)(2), because at least one Class Member is of diverse state citizenship from Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

14.     The Southern District of New York has personal jurisdiction over Defendant as Defendant is headquartered in this District and conducts substantial business in this State and in this District through its headquarters, sale of products, and commercial website.

15.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant has its principal place of business in this District and because a substantial part of the events, misrepresentations and/or omissions giving rise to the conduct alleged in this Complaint occurred in, were directed to, and were emanated from this District.

## II.     FACTUAL ALLEGATIONS

### Congressional Investigation Finds Dangerous Levels of Heavy Metals in Baby Foods

16.     On February 4, 2021, the House Subcommittee issued its Congressional Report detailing its findings that heavy metals, including arsenic, cadmium, lead, and mercury ("Heavy Metals"), were present in dangerously "significant levels" in numerous commercial baby food products.

17.     The Food and Drug Administration (the "FDA") and the World Health Organization ("WHO") have declared Heavy Metals dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects.  Even low levels of

exposure can cause serious and often irreversible damage to brain development.  *See* Congressional Report at 2.  In fact, children's exposure to toxic heavy metals causes, among other things, permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior.[4]  *See id*. at 9.  The FDA cautions that infants and children are at the greatest risk of harm from toxic heavy metal exposure.[5]

18.     On November 6, 2019, following reports alleging high levels of toxic heavy metals in baby foods, the House Subcommittee requested internal documents and test results from seven of the largest manufacturers of baby food in the United States, including both makers of organic and conventional products.  *See id*. at 2.  One of those companies was Defendant, which sells baby food products under the brand name Happy Baby.  *See id*.

19.     Defendant responded to the House Subcommittee's requests and produced its internal testing policies, test results for ingredients and/or finished products, and documentation about what it did with ingredients and/or finished products that exceeded its internal testing limits. *See id*.

20.     The FDA and other organizations have set rules and/or issued guidelines and recommendations as to the maximum allowable or advisable and safe levels in various different types of products of inorganic arsenic, lead, cadmium and mercury.  *See generally id*. at Point II. In many instances, the test results of Defendant's baby foods and their ingredients eclipse those

---

[4] Miguel Rodriguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioral Disorders in Children:  A Systematic Review and Meta-Analysis* (April 9, 2013) (*available at* www.sciencedirect.com/science/article/abs/pii/S0048969713003409?via%3Dihub (last accessed February 9, 2021).

[5] Food and Drug Administration, *Metals and Your Food* (*available at* www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food (last accessed February 9, 2021).

levels for inorganic arsenic, lead, cadmium and mercury. *See id*. at Findings, at 2-5.

**Arsenic**

21.      As per the Congressional Report, arsenic is ranked as number one for "substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR)." *Id.* at 10.   Arsenic exposure has severe health risks, including damage to the central nervous system and cognitive development in children. *See id.*  Full Scale IQ is severely negatively affected in children for verbal and performance domains and memory. *See id.*  One study concluded that 5 ppb of arsenic in drinking water caused children to have significant reductions in Full Scale IQ and other related scores. *See id.*

22.      The Congressional Report further states, "There is no established safe level of inorganic arsenic consumption for babies." *Id.* at 13.  While certain organizations such as Healthy Babies Bright Futures contend that there should be a goal of no measurable inorganic arsenic in baby food, Consumer Reports suggests it should be no more than 3 ppb. *See id.*  For bottled water, the FDA has set the maximum inorganic arsenic level at 10 ppb and the EPA has set a 10 ppb cap on drinking water, as have the European Union (EU) and WHO. *See id.*  The FDA has only set one final standard to date, which is a 100 ppb limit for inorganic arsenic for infant rice cereal. *See id.* at 37.

23.      According to the Congressional Report, Defendant regularly tests its finished baby food (as opposed to just the ingredients) for inorganic arsenic levels. *See id.*  The Congressional Report concluded that Defendant "sold finished baby foods after testing showed they contained as much as 180 ppb inorganic arsenic; over 25% of the tested baby food sold by Nurture exceeded 100 ppb inorganic arsenic; on average, Nurture baby food on store shelves has nearly 60 ppb

inorganic arsenic." *Id.*

24.    The Congressional Report further stated that internal Nurture documents showed that it "sells products even after testing confirms that they are dangerously high in inorganic arsenic." *Id.* at 14.  This included products, like the Apple and Broccoli Puffs, that contained 180 ppb inorganic arsenic, which was 80% higher than its own internal goal threshold of 100 ppb.  *See id.*  In fact, 29 other products that Nurture tested and sold contained over 100 ppb inorganic arsenic. *See id.*  Notably, despite the FDA's limit of 100 ppb inorganic arsenic for infant rice cereal, Nurture set its own internal standard for cereals with more than 75% rice at 115 ppb inorganic arsenic, which is 15% higher than what the FDA allows. *See id.* at 37.

**Lead**

25.    The Congressional Report noted that lead is number two on ATSDR's list of substances that pose the most serious threat to human health.  *See id*. at 11.  Even small amounts of exposure are dangerous, especially for children, and can cause behavioral issues, decreased cognitive performance, delayed puberty, and reduced postnatal growth.  *See id.*  Early childhood lead exposure negatively affects school performance and test scores.  *See id.*  These effects can be permanent.  *See id.*

26.    As the Congressional Report states, "There is a growing consensus among health experts that lead levels in baby foods should not exceed 1 ppb." *Id.* at 21.  In other products, the FDA set a 5 ppb lead standard for bottled water; the WHO set a 10 ppb provisional guideline for drinking water; the EPA set an action level of 15 ppb in drinking water; the FDA set standards for juice at 50 ppb and candy at 100 ppb; and the EU set a maximum level of 20 ppb in infant formula. *See id.*

27.    According to the Congressional Report, Defendant regularly tests its finished baby

food (as opposed to just the ingredients) for lead levels.  *See id.* at 22.  Nurture's internal lead limit

was 100 ppb, which the Congressional Report deemed "dangerously-high."  *See id.*  Nonetheless,

Nurture sold finished baby products after confirming that they contained as much as 641 ppb of

lead, over six times its own standard.  *See id.*  Furthermore, it sold five other products after they

tested over 50 ppb lead.  *See id.*  The Congressional Report concluded:  "It is not clear that even

one of Nurture's baby food products registered at or below 1 ppb lead, which should be the upper

limit for lead content according to the health experts at Consumer Reports, the Environmental

Defense Fund, and American Academy of Pediatrics."  *Id*. at 23.

**Cadmium**

28.     The Congressional Report states that cadmium is seventh on ATSDR's list of

substances in the environment that pose the most serious threat to human health.  *See id.* at 12.

Cadmium has been associated with decreases in IQ and ADHD.  *See id.*

29.     Outside of baby foods, the EPA has a 5 ppb limit for drinking water; the FDA has

a 5 ppb limit for bottled water; and the WHO has a 3 ppb limit for drinking water.  *See id.* at 29.

Healthy Babies Bright Futures contends there should be no measurable cadmium in baby food and

Consumer Reports' position is there should be a limit of 1 ppb cadmium in fruit juices.  *See id.*

The EU set a limit from 5-20 ppb cadmium for infant formula.  *See id.*

30.      The Congressional Report concluded that 65% of Nurture's "finished baby food

products contained more than 5 ppb cadmium, the EPA's limit for drinking water."  *Id.* at 31.

Defendant's multi-grain cereal tested at 49 ppb cadmium.  *See id.*

**Mercury**

31.     According to the Congressional Report, Mercury is third on the ATSDR's list of

substances in the environment that pose the most serious threat to human health.  *See id.* at 12.

Studies have shown that higher blood mercury levels in children 2 to 3 years old were associated with autistic behaviors among preschool age children. *See id.* at 12-13.

32.     Outside of the baby food context, the EPA limits mercury in drinking water to 2 ppb. *See id.* at 32.  Healthy Babies Bright Futures contends there should be no measurable mercury in baby food. *See id.*

33.     The Congressional Report stated, "Nurture sold a finished baby food product that contained 10 ppb mercury, and two others that contained 9.8 and 7.3 ppb.  A level of 10 ppb is five times more than the EPA's 2 ppb standard for drinking water.  In total, Nurture sold 56 products that contained over 2 ppb mercury." *Id.*

34.     As to all of the Heavy Metals, the Congressional Report concluded that "Nurture created internal standards but did not follow them" and that it describes its standards only as "'goal thresholds'" that are not used for decision-making or pre-conditions to selling a product. *See id.* at 33.  As such, the thresholds "are not actually used to prevent products that contain high levels of toxic heavy metals from being sold." *Id.*  In fact, Defendant does not claim to be testing for safety and sells the products it tests no matter what the content of Heavy Metals. *See id.* at 34.

35.     Moreover, the Congressional Report concluded that Defendant "misled the Subcommittee about its testing standards" because Defendant told the Subcommittee that after January 2019, it had a goal threshold of 50 ppb for lead in all its baby foods but internal documents showed it was still using 100 ppb after that date for 53 such products.  The Congressional Report stated:  "The fact that Nurture appears to have continued using a higher standard up to nine months after it claimed to the Subcommittee to have lowered the threshold casts serious doubt on Nurture's candor in this matter." *Id.* at 35.

36.     Baby foods containing dangerous levels of toxic Heavy Metals bear no label or

warning to parents.   But the Congressional Report makes clear that this is unacceptable and deceptive.

37.     As a result of its studies of toxic Heavy Metal levels in baby food, the House Subcommittee has recommended that parents should avoid baby foods that contain ingredients testing high in toxic Heavy Metals, such as rice products.  *See id*. at Findings, Paragraph 5.

38.     Baby food manufacturers hold a special position of public trust.  Consumers believe that they would not sell products that are unsafe.  Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food.  As the House Subcommittee's Report reveals, baby food manufacturers, including Defendant, have violated the public trust.  *See id*. at Findings, Paragraph 6.

39.     Despite the dangerous levels of toxic and Heavy Metals that Defendant knows to be contained in its baby foods, as noted above, on its website, Defendant falsely represents to parents that it has a strong commitment to health and nutrition as well as the quality and safety of its baby products.  Defendant's website states: "We are on a mission to change the trajectory of children's health through nutrition."  It further touts its "Quality and Safety": "We taste and thoroughly analyze every batch of food and each individual ingredient that goes into our products."  Moreover, Defendant represents: "What your little one eats in the first few years of life is crucial – it's important that their diet provides the nutrients and vitamins needed for proper development."  Defendant also states, "As parents, we hold ourselves to strict standards to provide your little one with products that, when part of a balanced diet, help them grow healthy and strong.  Every product we make goes through a rigorous quality and safety test so you can feel confident in what you're

feeding your family." Each of these statements is materially false and misleading given Defendant's sales of its Tainted Baby Foods.

40.     Based on Defendant's decision to advertise, label, and market its Tainted Baby Foods as healthy, nutritious, and safe for consumption, it had a duty to ensure that these statements were true and not misleading, which it failed to do.

41.     The Tainted Baby Foods are available at numerous retail and online outlets. However, as discussed above, Defendant fails to disclose they contain or are at risk of containing dangerous levels of Heavy Metals or other undesirable toxins or contaminants. Defendant intentionally omitted these contaminants to induce and mislead reasonable consumers to purchase its Tainted Baby Foods.

## III.    CLASS ACTION ALLEGATIONS

42.     Pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and a nationwide Class defined as:

> **All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in the United States for personal/household use, and not for resale (the "Class").**

43.     Plaintiffs Stewart and Apicella also seek to represent a subclass (the "New York Subclass"), defined as follows:

> **All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in New York for personal/household use, and not for resale.**

44.     In addition, Plaintiff Fitzgerald also seeks to represent a subclass (the "Florida Subclass"), defined as follows:

**All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in Florida for personal/household use, and not for resale.**

45.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a), (b)(2)-(3) are satisfied.  Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

46.     **Numerosity:** All requirements of Fed. R. Civ. P. 23(a)(l) are satisfied.   The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs.  Plaintiffs believe that the identity of Class members is known or knowable by Defendant or can be discerned through reasonable means.  Class members may be identified through objective means.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

47.     **Commonality and Predominance:** All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a.     whether Defendant engaged in the deceptive and misleading business practices alleged herein;

      b.     whether Defendant knew or should have known that the Tainted Baby Foods contained dangerous levels of Heavy Metals;

c.   whether Defendant represented and continues to represent that the Tainted Baby Foods are healthy, nutritious, made from the best ingredients, and safe for consumption;

d.   whether Defendant represented and continues to represent that the manufacturing of its Tainted Baby Foods is subjected to rigorous quality standards;

e.   whether Defendant failed to disclose that the Tainted Baby Foods contained dangerous levels of Heavy Metals;

f.   whether Defendant had knowledge that those representations were false, deceptive, and misleading and were unjustly enriched by their actions;

g.   whether Defendant continues to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

h.   whether the misrepresented and/or omitted facts are material to a reasonable consumer;

i.   whether Defendant violated N.Y. Gen. Bus. Law §§ 349 and 350;

j.   whether Defendant violated Florida's Deceptive and Unfair Trade Practices Act;

k.   whether Plaintiffs and members of the Class were injured and suffered damages;

l.   whether Defendant's misconduct proximately caused Plaintiffs' and the Class members' injuries; and

m.   whether Plaintiffs and members of the Class are entitled to damages and, if so, the measure of such damages.

48.    **Typicality:** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied.  Plaintiffs are members of the Nationwide Class and New York or Florida Subclasses, having purchased for personal/household use Tainted Baby Food products that were manufactured by Defendant. Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendant's conduct.

49.    **Adequacy of Representation:** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied.   Plaintiffs are adequate Class representatives because they are members of the Nationwide Class and New York or Florida Subclasses and their interests do not conflict with the interests of the other members of the Class that they seek to represent.  Plaintiffs are committed to pursuing this matter for the Class with the Class's collective best interests in mind.  Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs, and their counsel, will fairly and adequately protect the Class's interests.

50.    **Predominance and Superiority:** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied.  As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' individual cases will also resolve them for the Class's claims.  In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.

Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

51.     **Cohesiveness:** All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied.  Defendant has acted, or refused to act, on grounds generally applicable to the Class making final declaratory or injunctive relief appropriate.

## IV.     CAUSES OF ACTION

### COUNT I
**Violations of New York Consumer Law for Deceptive Acts and Practices**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of Plaintiffs Stewart and Apicella and the New York Subclass)**

52.     Plaintiffs Stewart and Apicella, individually and on behalf of the New York Subclass, repeat and re-allege the allegations contained in paragraphs 1 through 51 as though fully set forth herein.

53.     New York General Business Law ("NYGBL") § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

54.     By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of the NYGBL § 349.  The conduct alleged herein is a "business practice" within the meaning of the NYGBL § 349, and the deception occurred in part within New York State.

55.     Defendant's baby food contains unhealthy and dangerous levels of Heavy Metals.  Defendant knew or should have known that its baby food should not contain these levels of Heavy Metals and/or at the amounts found therein and that by manufacturing and providing

for commercial sale baby food with toxic levels of Heavy Metals Plaintiffs Stewart and Apicella and the New York Subclass members were not getting healthy and/or nutritious food to help their children grow strong.

56.    Plaintiffs Stewart and Apicella and the New York Subclass members would not have purchased the baby food at issue for their children had they known the truth about the presence of dangerous levels of toxic Heavy Metals.  There is no other use for Defendant's tainted products.

57.    Defendant violated the NYGBL § 349 by using dangerous levels of toxic Heavy Metals and failing to properly represent, both by affirmative conduct and by omission, the nutritional value of Defendant's baby foods.

58.    If Defendant had not sold baby food tainted with Heavy Metals, Plaintiffs Stewart and Apicella and the other New York Subclass members would not have suffered the extent of damages caused by Defendant's sales.

59.    Defendant's practices, acts, policies and course of conduct violate NYGBL § 349 in that, among other things, Defendant actively and knowingly misrepresented or omitted disclosure of material information to Plaintiffs Stewart and Apicella and the New York Subclass members at the time they purchased the Tainted Baby Foods, including the fact that Defendant's products contained dangerous levels of toxic Heavy Metals; and Defendant failed to disclose and give timely warnings or notices regarding the presence of dangerous levels of toxic Heavy Metals in its baby food products that were purchased by Plaintiffs and the New York Subclass members.

60.    The aforementioned conduct constitutes an unconscionable commercial practice in that Defendant has, by the use of false statements and/or material omissions, failed to properly represent and/or concealed the presence of unacceptable dangerous levels of Heavy Metals in its

baby foods.

61.     Members of the public, including Plaintiffs Stewart and Apicella and the members of the New York Subclass, were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose.

62.     Such acts and practices by Defendant are and were likely to mislead a reasonable consumer purchasing baby food from Defendant.  Said acts and practices are material.  The sales of Defendant's Tainted Baby Foods in New York through such means occurring in New York were consumer-oriented acts and thereby fall under the New York consumer protection statute, NYGBL § 349.

63.     As a direct and proximate cause of Defendant's conduct, Plaintiffs Stewart and Apicella and New York Subclass members suffered damages as alleged above.  Plaintiffs Stewart and Apicella also seek injunctive relief as described herein.

64.     In addition to or in lieu of actual damages, because of the injury, Plaintiffs Stewart and Apicella and the New York Subclass members seek statutory damages for each injury and violation which has occurred.

<u>**COUNT II**</u>
**Violations of New York Consumer Law for Deceptive Acts and Practices**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiffs Stewart and Apicella and the New York Subclass)**

65.     Plaintiffs Stewart and Apicella, individually and on behalf of the New York Subclass, repeat and re-allege the allegations contained in paragraphs 1 through 51 as though fully set forth herein.

66.     NYGBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

67.     By reason of the conduct alleged herein, Defendant engaged in unlawful practices

within the meaning of the NYGBL § 350.  The conduct alleged herein is a "business practice" within the meaning of the NYGBL § 350, and the false advertising occurred in part within New York State.

68.     Defendant's baby food contains unhealthy and dangerous levels of Heavy Metals.  Defendant knew or should have known that its baby food should not contain these Heavy Metals and/or at the amounts found therein and that by manufacturing and providing for commercial sale baby food with toxic levels of Heavy Metals Plaintiffs Stewart and Apicella and the New York Subclass members were not getting healthy and/or nutritious food to help their children grow strong.

69.     Plaintiffs Stewart and Apicella and the New York Subclass members would not have purchased the baby food at issue for their children had they known the truth about the presence of dangerous levels of toxic Heavy Metals.  There is no other use for Defendant's tainted products.

70.     Defendant violated the NYGBL § 350 by failing to properly represent, both by affirmative conduct and by omission, the nutritional value and safety of Defendant's Tainted Baby Foods.

71.     If Defendant had not sold baby food tainted with dangerous levels of Heavy Metals, Plaintiffs Stewart and Apicella and the other New York Subclass members would not have suffered the extent of damages caused by Defendant's sales.

72.     Defendant's practices, acts, policies and course of conduct violate NYGBL § 350 in that, among other things, Defendant actively and knowingly misrepresented or omitted disclosure of material information to Plaintiffs Stewart and Apicella and the New York Subclass members at the time they purchased the Tainted Baby Foods, including the fact that Defendant's

products contained dangerous levels of toxic Heavy Metals; and Defendant failed to disclose and give timely warnings or notices regarding the presence of dangerous levels of toxic Heavy Metals in its baby food products that were purchased by Plaintiffs and the New York Subclass members.

73. The aforementioned conduct constitutes an unconscionable commercial practice in that Defendant has, by the use of false statements and/or material omissions, failed to properly represent and/or concealed the presence of unacceptable dangerous levels of Heavy Metals in its baby foods.

74. Members of the public, including Plaintiffs Stewart and Apicella and the members of the New York Subclass, were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose.

75. Such acts by Defendant are and were likely to mislead a reasonable consumer purchasing baby food from Defendant. Said acts and practices are material. The sales of Defendant's Tainted Baby Foods in New York through such means occurring in New York were consumer-oriented acts and thereby fall under the New York consumer protection statute, NYGBL § 350.

76. As a direct and proximate cause of Defendant's conduct, Plaintiffs Stewart and Apicella and New York Subclass members suffered damages as alleged above. Plaintiffs Stewart and Apicella also seek injunctive relief as described herein.

77. In addition to or in lieu of actual damages, because of the injury, Plaintiffs Stewart and Apicella and the New York Subclass members seek statutory damages for each injury and violation which has occurred.

<u>**COUNT III**</u>
**Violations of Florida's Deceptive and Unfair Trade Practices Act § 501.211(2)**
**(On Behalf of Plaintiff Fitzgerald and the Florida Subclass)**

78.     Plaintiff Fitzgerald, individually and on behalf of the Florida Subclass, repeats and re-alleges the allegations contained in paragraphs 1 through 51 as though fully set forth herein.

79.     In Florida, unconscionable acts or practices, and unfair or deceptive practices in the conduct of any trade or commerce are unlawful.

80.     Plaintiff Fitzgerald, individually, and the members of the Florida Subclass are "consumers" within the meaning of Florida Statute § 501.203.

81.     Defendant's baby food contains unhealthy and dangerous levels of Heavy Metals.  Defendant knew or should have known that its baby food should not contain these dangerous levels of Heavy Metals and that by manufacturing and providing for commercial sale baby food with toxic levels of Heavy Metals, Plaintiff Fitzgerald and the Florida Subclass members were not getting healthy and/or nutritious food to help their children grow strong.

82.     Plaintiff Fitzgerald and the Florida Subclass members would not have purchased the baby food at issue for their children had they known the truth about the presence of toxic Heavy Metals.  There is no other use for Defendant's tainted products.

83.     Defendant violated the FDUPTA by, among other things, using dangerous levels of toxic Heavy Metals and failing to properly represent, both by affirmative conduct and by omission, the nutritional value and safety of Defendant's baby foods.

84.     If Defendant had not sold baby food tainted with dangerous levels of Heavy Metals, Plaintiff Fitzgerald and the other Florida Subclass members would not have suffered the extent of damages caused by Defendant's sales.

85.     Defendant's practices, acts, policies and course of conduct violate FDUPTA in that Defendant actively and knowingly misrepresented or omitted disclosure of material information to Plaintiff Fitzgerald and the Florida Subclass members at the time they purchased the Tainted Baby Foods, including the fact that Defendant's products contained dangerous levels of toxic Heavy Metals. Defendant also failed to disclose and give timely warnings or notices regarding the presence of dangerous levels of toxic Heavy Metals in its baby food products that were purchased by Plaintiff Fitzgerald and the Florida Subclass members.

86.     The aforementioned conduct constitutes an unconscionable commercial practice in that Defendant has, by the use of false statements and/or material omissions, failed to properly represent and/or concealed the presence of unacceptable dangerous levels of Heavy Metals in its baby foods.

87.     Members of the public, including Plaintiff Fitzgerald and the members of the Florida Subclass, were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose.

88.     Such acts and practices by Defendant are and were likely to mislead a reasonable consumer purchasing baby food from Defendant.  Said acts and practices are material.  The sales of Defendant's Tainted Baby Foods in Florida through such means occurring in Florida were consumer-oriented acts and thereby fall under the FDUPTA.

89.     As a direct and proximate cause of Defendant's conduct, Plaintiff Fitzgerald and the Florida Subclass members suffered damages as alleged above.

90.     Defendant's conduct described above also amounts to unfair business practices, which are immoral, unethical, oppressive and unscrupulous.

91.     As a result of Defendant's conduct alleged herein, Plaintiff Fitzgerald

individually and the members of the Florida Subclass have suffered actual damages in that they have paid excessive and artificially prices for Defendant's Tainted Baby Food as a result of Defendant's unlawful, unfair, and deceptive practices and are entitled to damages.

92.     As a result of the aforementioned conduct, Plaintiff Fitzgerald individually, and the members of the Florida Subclass, are entitled to permanent injunctive relief to prevent Defendant from continuing to engage in these unfair and deceptive trade practices.

93.     Pursuant to Florida Statute § 501.2105, Plaintiff Fitzgerald, individually, and as a member of the Florida Subclass, is entitled to recover costs and reasonable attorneys' fees in this action.

## COUNT IV
### Unjust Enrichment
### (On Behalf of All Plaintiffs and the Nationwide Class)

94.     Plaintiffs, individually and on behalf of the Class, repeat and re-allege the allegations contained in paragraphs 1 through 51 as though fully set forth herein.

95.     Plaintiffs and Class members conferred a monetary benefit on Defendant. Specifically, they purchased baby food from Defendant and provided Defendant with their monetary payment.  In exchange, Plaintiffs and Class members should have received from Defendant goods and services that were healthy and nutritious and not tainted with dangerous levels of Heavy Metals.

96.     Defendant knew that Plaintiffs and Class members conferred a benefit on them and accepted or retained that benefit.  Defendant profited from Plaintiffs' purchases and used Plaintiffs and Class members' monetary payments for business purposes.

97.     Defendant failed to disclose to Plaintiffs and Class members that its baby food was unhealthy and tainted with dangerous levels of Heavy Metals and did not provide product

that Plaintiffs and Class members were promised.

98.     If Plaintiffs and Class members knew that Defendant's food was unhealthy and toxic as alleged herein, they would not have purchased Defendant's Tainted Baby Foods.

99.     Plaintiffs and Class members have no adequate remedy at law.

100.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class members conferred on them.

101.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them.  In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class members overpaid.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court:

a)      Certify the Nationwide Class, including the New York and Florida Subclasses, and appoint Plaintiffs and their counsel to represent the Nationwide Class and New York and Florida Subclasses;

b)      Find that Defendant engaged in the unlawful conduct as alleged herein and enjoin Defendant from engaging in such conduct;

c)      Enter a monetary judgment in favor of Plaintiffs and the Class, including the New York and Florida Subclasses, to compensate them for the injuries suffered, together with pre-judgment and post-judgment interest, punitive damages, and penalties where appropriate;

d)      Require Defendant to rectify all damages caused by its misconduct;

e)      Award Plaintiffs and the Class, including the New York and Florida Subclasses, reasonable attorneys' fees and costs of suit, as allowed by law; and

f)      Award such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  February 10, 2020                  Respectfully submitted,

*/s/ Janine L. Pollack*
Janine L. Pollack, Esq.
Michael Liskow
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas
9th Floor
New York, New York 10036
Phone: (917) 899-1765
Fax:  (332) 206-2073
Email:  jpollack@calcaterrapollack.com
Email:  mliskow@calcaterrapollack.com

Lori G. Feldman, Esq. (LF-3478)
**GEORGE GESTEN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, New York 10520
Phone: (917) 983-9321
Fax: (888) 421-4173
Email: LFeldman@4-justice.com
E-Service: eService@4-Justice.com

David J. George, Esq.
Brittany L. Brown, Esq.
**GEORGE GESTEN MCDONALD, PLLC**
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Phone: (561) 232-6002
Fax: (888) 421-4173
Email: DGeorge@4-Justice.com
E-Service: eService@4-Justice.com

***Counsel for Plaintiffs***