**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re NURTURE BABY FOOD LITIGATION** | Case No. 1:21-cv-01217-MKV |
| This document relates to: | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| ALL ACTIONS | |
| | **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................... 1

JURISDICTION AND VENUE ............................................................................ 15

THE PARTIES ....................................................................................................... 15

FACTUAL ALLEGATIONS ................................................................................ 29

    I.       DEFENDANT'S PRESENCE IN THE ORGANIC
             BABY FOOD MARKETPLACE .................................................... 29

    II.      REPORTS REVEAL THE PRESENCE OF HEAVY METALS
             AND PERCHLORATE IN DEFENDANT'S BABY FOODS ......... 34

            A.      Heavy Metals ......................................................................... 34

            B.      Perchlorate .............................................................................. 39

    III.     DEFENDANT FALSELY MARKETED ITS BABY FOODS
             AS HEALTHY WHILE OMITTING ANY MENTION OF
             HEAVY METALS OR PERCHLORATE ................................... 40

    IV.     DUE TO THE PRESENCE AND MATERIAL RISK OF
             HEAVY METALS AND/OR PERCHLORATE IN THE
             BABY FOODS, THE OMISSIONS ARE MISLEADING .............. 44

            A.      Heavy Metals ......................................................................... 44

            B.      Arsenic .................................................................................... 47

            C.      Lead ......................................................................................... 52

            D.      Cadmium ................................................................................. 55

            E.      Mercury ................................................................................... 57

            F.      Perchlorate .............................................................................. 58

       G.     Defendant Knew or Should Have Known the Baby
              Foods Contained and/or Had A Real Risk of Heavy
              Metals and Perchlorate ............................................................... 60

   V.    BABY FOOD PRODUCTS CAN BE MANUFACTURED
           WITHOUT MEASURABLE LEVELS OF HEAVY METALS
           AND PERCHLORATE ...................................................................... 66

   VI.   THE MATERIAL OMISSIONS ARE MISLEADING..................................... 69

THE OMISSIONS VIOLATE NEW YORK LAWS .................................................. 80

PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT .... 81

CLASS ACTION ALLEGATIONS ..................................................................... 81

COUNT I ..................................................................................................... 85

COUNT II .................................................................................................... 87

COUNT III ................................................................................................... 88

COUNT IV.................................................................................................... 90

COUNT V ..................................................................................................... 92

COUNT VI.................................................................................................... 94

COUNT VII .................................................................................................. 97

COUNT VIII.................................................................................................. 99

COUNT IX.................................................................................................... 101

COUNT X ..................................................................................................... 104

COUNT XI.................................................................................................... 106

COUNT XII .................................................................................................. 109

COUNT XIII................................................................................................. 112

COUNT XIV....................................................................................................................115

PRAYER FOR RELIEF ................................................................................................117

JURY DEMAND............................................................................................................118

1.      Plaintiffs Marie Mezile, Nicole Margiotta, Laura Barbu, Charlotte Willoughby, Diego Galeana, Chey'na Micciche, Susan Ray Lawson, Kelly McKeon, and Hilary Paris (collectively, "Plaintiffs") individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Consolidated Class Action Complaint against Defendant Nurture, Inc., d/b/a Happy Family Organics ("Nurture," "Happy Family," or "Defendant"), for its intentional, knowing, and/or reckless practice of failing to disclose the presence (or material risk) of arsenic, cadmium, lead, or mercury (collectively "heavy metals"), perchlorate, and/or other contaminants in its baby food.  The baby food sold throughout the United States does not conform to its packaging and fails to disclose information material to consumers. Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Classes (as defined herein), including requiring full disclosure of all such substances in its packaging and restoring monies to the members of the proposed Classes. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel, and as to all other matters, upon information and belief. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

2.      On February 4, 2021, the U.S. House of Representatives' Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy (the "Subcommittee"), issued a report (the "Congressional Report")[1] that  revealed Defendant's "reckless disregard for the health

---

[1] "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury" ("Congressional Report"), U.S. House of Representatives Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, February 4, 2021, available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed October 5, 2022).

of babies."[2]  The Congressional Report, a result of an investigation of the seven largest baby food

manufacturers in the United States, including Defendant, was spurred by "reports alleging high

levels of toxic heavy metals in baby foods" and the knowledge that "[e]ven low levels of exposure

can cause serious and often irreversible damage to [a baby's] brain development."[3]

3.      The Congressional Report further showed that parents' trust in Defendant and other

baby food manufacturers had been knowingly violated due to the presence of heavy metals in baby

foods.[4]

4.      The Congressional Report concluded that "[m]anufacturers knowingly sell these

products to ***unsuspecting*** parents, in spite of internal company standards and test results, and

without any warning labeling whatsoever," and recommended mandatory testing, label disclosure,

voluntary phase out of toxic ingredients and regulatory rules setting maximum standards.[5]

5.      Defendant knew that reasonable parents and other reasonable purchasers of baby

food, who hold Defendant in a special position of trust, would find the presence or material risk of

heavy metals and other toxins material. As Congressman and Subcommittee Chairman Raja

Krishnamoorthi stated:

> Baby food manufacturers hold a special position of public trust.  But
> consumers mistakenly believe that these companies would not sell unsafe
> products.  The Subcommittee's staff report found that these manufacturers
> knowingly sell baby food containing high levels of toxic heavy metals.   I
> hope companies will commit to making safer baby foods.  Regardless, it's
> time that we develop much better standards for the sake of future
> generations.[6]

---

[2] *Id*. at 43.

[3] *Id.* at 2.

[4] *See id*. at 6, 57.

[5] *Id*. at 58-59 (emphasis added).

[6] "Oversight Subcommittee Staff Report Reveals Top Baby Foods Contain Dangerous Levels of
Toxic Heavy Metals," House Committee on Oversight and Reform, February 4, 2021, available at

6.      The Congressional Report sent shockwaves throughout the parenting community.[7] Reasonable parents, like Plaintiffs, and other reasonable consumers, trust Defendant and other manufacturers to sell baby food that is healthy, nutritious, and free of contaminants, especially those that carry a risk for babies. They expect the food they feed their infants and toddlers to be free from heavy metals and perchlorate, substances known to have acute and/or long-term health consequences.

7.      Reasonable consumers lack scientific knowledge or expertise to determine whether Defendant's products do in fact contain or have a material risk of heavy metals, perchlorate, and/or other contaminants, or to ascertain the true nature of the ingredients and quality of the products.

8.      Likewise, reasonable consumers expect baby food manufacturers to use fulsome quality control protocols, including proper testing and supplier requirements.

9.      Reasonable consumers therefore must and do rely on Defendant to properly and fully disclose what its products contain. This is especially true for potentially dangerous contents (like arsenic, lead, cadmium, mercury, and perchlorate) that are material to a reasonable parent's purchasing decisions.

---

https://oversight.house.gov/news/press-releases/oversight-subcommittee-staff-report-reveals-top-baby-foods-contain-dangerous (last accessed October 5, 2022).

[7] "Congressional Report Raises Concerns Over Baby Foods and Heavy Metals," Allrecipes, March 1, 2021, available at https://www.allrecipes.com/article/baby-food-metals-report/ (last accessed October 5, 2022) ("[I]n February of 2021, a lot of rightfully concerned parents were shocked to learn that the baby foods they feed their kids likely contained high levels of toxic heavy metals according to a congressional investigation.").

3

10.     A recent consumer survey conducted by Plaintiffs' counsel ("Consumer Survey") showed 87% of parent-respondents expect a company *to disclose the presence or risk of detectable levels of heavy metals*:[8]

**13.Would you expect a company to disclose if there were detectable levels, or risk, of arsenic, cadmium, lead, and/or mercury in baby food?**



11.     Defendant, however, knew of both the presence and risk of heavy metals and chose to not disclose this material information to consumers.  This is despite the fact that reasonable consumers believe the testing results for arsenic, cadmium, lead, and/or mercury should be disclosed.  In fact, the Consumer Survey showed 93% of parent respondents believe a manufacturer should make such disclosures:

---

[8] The Consumer Survey reflected 416 parent respondents that purchased baby food within the past 6 years, including 49 respondents in New York, 54 in California, 42 in Illinois, 20 in Minnesota, and 20 in Washington.

**15.In your opinion, should a company disclose arsenic, cadmium, lead, and/or mercury testing results to consumers?**



12.     Defendant manufactures, markets, advertises, packages, distributes, and sells baby food products under the brand name Happy Family Organics, including premium products for infants and young children marketed as Happy Baby Organics ("HappyBABY") and Happy Tot Organics ("HappyTOT"), throughout the United States, including in this District.

13.     Defendant promotes "Our Happy Promise," touting its relationships with farmers and suppliers, its "high-quality organic ingredients," its "rigorous and uncompromising quality standards" and that its products are "[a]lways certified USDA organic[,]" "Non-GMO[,]" "[g]rown

without the use of toxic persistent pesticides[,]" and with "[p]ackaging made without BPA, BPS, or phthalates[.]"[9]

## Our Happy Promise

We work with trusted farmers and suppliers, source high-quality organic ingredients, and implement our rigorous and uncompromising quality standards so you can feel confident in what you're feeding your family. Our promise is to bring you peace of mind —so our products meet the following criteria:









| Always certified USDA Organic | Non-GMO | Ingredients grown without the use of toxic persistent pesticides | Packaging made without BPA, BPS, or phthalates |

14.     Reflecting its "Happy Promise," Defendant's packaging emphasizes that the Baby Foods[10] are organic, nutritious, high-quality, made with superior and clean ingredients, manufactured to high standards, appropriate for various "stages" of development, and from "happy farms" to both justify a premium price and induce reasonable consumers to believe in the quality of its Products for consumption by infants and children.

---

[9] "Our Quality Standards & Commitment to Organic," available at https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last accessed October 5, 2022).

[10] The phrases "Baby Foods" or "Products" individually and collectively refer to the Nurture products identified in Exhibit 1, attached hereto and made a part hereof.  Plaintiffs reserve their rights to include in this action any additional products identified during discovery in this case.













15.    Defendant further states it Products are "organic," "gluten free," and made with "non-GMO" ingredients.

 

16.    Defendant's Products promote its "Happy Promise" on the packaging, for example:

 




17.     Defendant also touts a variety of "Clearly Crafted™" products.




 

18.     Defendant developed its Clearly Crafted™ product lines with consideration that "'[p]arents are looking for *openness and honesty* from the companies they buy products from, especially for their baby[.]'"[11] Defendant "maintains rigorous quality standards for Clearly Crafted™, and its entire line of products, that go beyond USDA Organic certification [and] regularly audits its partners to ensure standards of safety, quality, sustainability and traceability are met."[12] In launching Clearly Crafted, Defendant "want[ed] to share every aspect of the product story, from the farms where we grow our ingredients to the recipes that we use."[13]

19.     In fact, a study published in 2017 found that "Happy Baby packages featured the most ingredient messages (3.0 per package) promoting its products as "'USDA organic,' … and

---

[11] "Happy Family Launches Clearly Crafted™, a New Line of Premium Organic Baby Food in Transparent Pouches," Cision PR Newswire, March 2, 2016, available at https://www.prnewswire.com/news-releases/happy-family-launches-clearly-crafted-a-new-line-of-premium-organic-baby-food-in-transparent-pouches-300229419.html (quoting Defendant's former CEO and Founder, Shazi Visram) (emphasis added) (last accessed October 5, 2022).

[12] *Id.*

[13] "Clearly Crafted pouches bring clarity to baby foods," Packaging Digest, March 21, 2016, available at https://www.packagingdigest.com/flexible-packaging/clearly-crafted-pouches-bring-clarity-baby-foods (last accessed October 5, 2022).

describing its quality ingredients."[14] According to the study, "Happy Baby snacks [...] featured eight or more nutrition-related messages on their packages" while "Happy Baby mixed food group products also averaged eight nutrition-related messages per package."[15]

20.    Based on the impression given by the packaging, no reasonable consumer could expect or understand that the Baby Foods did not disclose the material omissions concerning the presence or material risk of heavy metals or perchlorate.

21.    Defendant also claims that "[e]verything we bring to market is thoughtfully crafted to align with what real moms and parents would serve their own children, and this ethos starts internally with our staff of mothers and parents, including [Chief Mom and former CEO, Shazi Visram]... [D]eep listening ensures we are always creating relevant and exciting products."[16]

22.    Defendant asserts it is "a leader in the industry on rigorous methodology, routinely testing both [its] ingredients and finished products."[17]

23.    Defendant claims its "products are safe for every baby and toddler,"[18] in direct contradiction to the true monitoring and manufacturing process used by Defendant that does not

---

[14] "Baby Food FACTS Nutrition and marketing of baby and toddler food and drinks," UConn Rudd Center for Food Policy & Obesity, January 2017, at 27, available at https://uconnruddcenter.org/wp-content/uploads/sites/2909/2020/09/BabyFoodFACTS_FINAL.pdf (last accessed October 5, 2022).

[15] *Id.*

[16] "Happy Family's new CEO will stay the course to grow in baby food & adjacent categories," Food Navigator-USA, Dec. 13, 2017, available at https://www.foodnavigator-usa.com/Article/2017/12/13/Happy-Family-s-new-CEO-will-stay-the-course-to-grow-in-baby-food (quoting Shazi Visram, Happy Family's Founder, Chief Mom, and now former CEO) (last accessed October 5, 2022).

[17] Happy Family Organics 2019 Mission Report at 5, available at https://issuu.com/happyfamilyorganics/docs/20210415_hfo_missionreport_2020report?e=1582039552/91240905 (last accessed October 5, 2022).

[18] *Id.*

even consider the safety of heavy metals and/or perchlorate ingestion – short term or through accumulation – by babies or toddlers: "[b]y company policy [], Nurture's toxic heavy metal testing is not intended for consumer safety."[19]

24.    In response to the Congressional Report, Nurture defended its practices, stating "we are always looking back at our existing product portfolio, revisiting the product design, and working with our suppliers to deliver high quality ingredients for us to use in our recipes."[20] Yet, the Baby Foods have been shown to contain arsenic, cadmium, lead, mercury, and/or perchlorate, all of which are known to pose health risks to humans, and particularly to infants and children.

25.    Defendant chose to not disclose the known presence (or material risk) of heavy metals, perchlorate, and/or other contaminants. Nowhere on the Baby Foods' packaging is it disclosed that they contain (or have a material risk of containing) heavy metals, perchlorate, and/or other contaminants (hereinafter collectively referred to as the "Omissions").

26.    Nothing on the Baby Foods' packaging informs consumers of the presence (or material risk) of heavy metals or perchlorate, despite the fact that heavy metals and perchlorate are known to pose both physical and developmental issues to babies and toddlers and the fact that heavy metals and perchlorate accumulate in the human body over time.

27.    Defendant instead chose to promise reasonable consumers that its Baby Foods are organic, nutritious, high-quality, made with superior ingredients, manufactured according to high standards, and appropriate for various "stages" of development, in order to justify a premium price and attract consumers.

---

[19] Congressional Report at 4.

[20] "Our Quality Standards & Commitment to Organic," available at https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last accessed October 5, 2022).

28.    On information and belief, Defendant was intentionally, knowingly, and/or recklessly selling its Baby Foods that contained (or had a material risk of containing) arsenic, cadmium, lead, mercury, perchlorate, and/or other contaminants.

29.    Based on the Omissions, no reasonable consumer had any reason to know or expect that the Baby Foods contained (or had a risk of containing) heavy metals or perchlorate. Furthermore, reasonable consumers, like Plaintiffs, who were feeding the Baby Foods to their babies (often multiple times a day) would consider the mere presence (or material risk of the presence) of heavy metals and/or perchlorate a material fact when considering purchasing the Baby Foods.

30.    Defendant knows its customers trust the quality of its Products, expect the Baby Foods to be free of heavy metals, perchlorate, and/or other contaminants, and expect that Defendant would fully disclose the true quality and nature of the Baby Foods. It also knows that its consumers seek out and wish to purchase premium baby foods that possess high quality ingredients free of contaminants and that these consumers will pay more for baby foods they believe possess these qualities. Defendant knows reasonable consumers would not knowingly feed their children baby food that contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

31.    The Omissions are material, deceptive, misleading, unfair, and/or false because the Baby Foods contain undisclosed levels of heavy metals, perchlorate, and/or other contaminants and their packaging also fails to mention the true and real material risks of these contaminants.

32.    The Omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for the Baby Foods that omitted material information as to the Baby Foods' true quality, ingredients, and standards, and, in turn, value.

14

Defendant continues to wrongfully induce consumers to purchase its Baby Foods at premium prices.

33.     Plaintiffs bring this consumer class action individually and on behalf of all other members of the Classes (as defined herein), whom, from the applicable limitations period up to and including the present, purchased for use and not resale any of Defendant's Baby Foods.

## JURISDICTION AND VENUE

34.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value or $5,000,000, exclusive of interest and costs, and more than two-thirds of the Classes reside in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. § 1332(d)(2) do not apply.

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiffs suffered injuries as a result of Defendant's acts in this District, many of the acts and transactions giving rise to this action occurred in this District, and Defendant conducts substantial business in this District and is headquartered in this District.

## THE PARTIES

36.     Plaintiff Marie Mezile ("Plaintiff Mezile") is, and at all times relevant hereto has been, a citizen of the state of New York.  She purchased the Baby Foods for her child, including: HappyBABY Puffs (Apple & Broccoli); various flavors of HappyBABY Cereal; various flavors of HappyBABY Jars; various flavors of HappyBABY Yogis and Greek Yogis; and various flavors of HappyTOT Bowls.

37.     Plaintiff Mezile purchased these foods from ShopRite in Ulster County, New York, Tops Friendly Market grocery store in Ulster County, New York, and Walmart in Ulster County,

15

New York. Plaintiff Mezile first purchased the Baby Foods beginning in approximately December 2017 and last purchased the Baby Foods in approximately early 2020.

38.     Plaintiff Mezile believed she was feeding her child healthy, nutritious baby food. Prior to purchasing the Baby Foods, Plaintiff Mezile saw and relied upon the packaging of the Baby Foods.  During the time she purchased and fed her child the Baby Foods, and due to the Omissions by Defendant, she was unaware the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.  If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff Mezile would not have purchased any of the Baby Foods.

39.     Plaintiff Nicole Margiotta ("Plaintiff Margiotta") is, and at all times relevant hereto has been, a citizen of the state of New York.  She purchased the Baby Foods for her child, including: HappyBABY Puffs (Purple Carrot & Blueberry, Banana & Pumpkin, Apple & Broccoli, Kale & Spinach, Strawberry & Beet, Sweet Potato & Carrot); HappyBABY Cereal (Oatmeal, Oats & Quinoa); HappyBABY Yogis (Strawberry); HappyBABY Teethers (Sweet Potato & Banana); and HappyBABY Snackers (Vegan Cheddar & Broccoli, Tomato & Basil).

40.     Plaintiff Margiotta purchased these foods from Stop and Shop in Oceanside, New York and Amazon.com, beginning in approximately March 2022 and last purchased the Baby Foods in approximately August 2022.

41.     Plaintiff Margiotta believed she was feeding her child healthy, nutritious baby food. Prior to purchasing the Baby Foods, Plaintiff Margiotta saw and relied upon the packaging of the

16

Baby Foods.  During the time she purchased and fed her child the Baby Foods, and due to the Omissions by Defendant, she was unaware the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.  If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff Margiotta would not have purchased any of the Baby Foods.  Plaintiff Margiotta would be willing to purchase the Baby Foods in the future if she could be certain they do not contain (or have a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

42.     Plaintiff Laura Barbu ("Plaintiff Barbu") is, and at all times relevant hereto has been, a citizen of the state of New York.  She purchased the Baby Foods for her children, including: HappyBABY jars (Sweet Potatoes; Green Beans; Carrots & Peas; Prunes; Bananas & Strawberries; Bananas & Sweet Potatoes; Bananas, Blueberries & Beets); HappyBABY pouches (Apples, Blueberries, & Oats; Bananas, Beets, & Blueberries; Green Beans, Spinach, & Pears; Pears, Squash, & Blackberries; Pears, Kale, & Spinach; Squash, Pears, & Carrot; Squash, Pears, & Apricots; Pears, Pumpkin, Peaches, & Granola; Pears, Pumpkin, & Passion Fruit; Pears, Zucchini, & Peas; Pears, Raspberries, & Oats; Pears, Squash, & Oats; Pears, Mangos, & Spinach; Pears, Peas, & Broccoli; Apples, Pumpkin, & Carrots; Sweet Potatoes, Mangos, & Carrots; Carrots, Strawberries, & Chickpeas; Apples & Carrots; Apples, Spinach, & Kale; Pears, Pumpkin, Peaches, & Granola; Apple, Kale, & Avocado; Pears, Raspberries, & Oats; Apples & Carrots; Apples, Kale, & Oats; Pears, Squash, & Oats); HappyBABY Puffs (Banana & Pumpkin, Kale & Spinach, Strawberry & Beet); HappyBABY Yogis (Strawberry); HappyBABY Creamies

(Strawberry, Raspberry, & Carrot; Apples, Spinach, Pea, & Kiwi); and HappyBABY Teethers (Sweet Potato & Banana, Blueberry & Purple Carrot).

43.     Plaintiff Barbu purchased these foods from Target in Long Island, New York and Buybuybaby.com, beginning in approximately February 2017 and last purchased the Baby Foods in approximately January 2020.

44.     Plaintiff Barbu believed she was feeding her children healthy, nutritious baby food. Prior to purchasing the Baby Foods, Plaintiff Barbu saw and relied upon the packaging of the Baby Foods.   During the time she purchased and fed her children the Baby Foods, and due to the Omissions by Defendant, she was unaware the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.   If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff Barbu would not have purchased any of the Baby Foods.

45.     Plaintiff Charlotte Willoughby ("Plaintiff Willoughby") is, and at all times relevant hereto has been, a citizen of the state of Illinois.   She purchased the Baby Foods for her children, including: HappyBABY Creamies (Apple Spinach Pea & Kiwi; Strawberry Raspberry & Carrot); HappyBABY Teether Crackers (Mango & Pumpkin); and HappyTOT Bowls (Cheese & Spinach Ravioli with Marinara Sauce; Veggies & Wild Rice with Mushrooms and Parmesan; Beef & Quinoa Fiesta with Vegetable Salsa).

46.     Plaintiff Willoughby purchased these foods from Target in Palatine, Illinois, in or around September 2020.

47.     Plaintiff Willoughby believed she was feeding her children healthy, nutritious baby food.  Prior to purchasing the Baby Foods, Plaintiff Willoughby saw and relied upon the packaging of the Baby Foods.  During the time she purchased and fed her children the Baby Foods, and due to the Omissions by Defendant, she was unaware the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.  If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff Willoughby would not have purchased any of the Baby Foods.  Plaintiff Willoughby would be willing to purchase the Baby Foods in the future if she could be certain they do not contain (or have a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

48.     Plaintiff Diego Galeana ("Plaintiff Galeana") is, and at all times relevant hereto has been, a citizen of the state of Illinois.  He purchased the Baby Foods for his child, including: HappyBABY Teethers (Sweet Potato & Banana; Blueberry & Purple Carrot).

49.     Plaintiff Galeana purchased these foods from Mariano's in Chicago, Illinois, Jewel-Osco and Tony's Fresh Market grocery stores in Chicago, Illinois, Target in Chicago, Illinois, Walmart in Chicago, Illinois, CVS in Chicago, Illinois, and Walgreens in Chicago, Illinois. Plaintiff Galeana first purchased the Baby Foods beginning in approximately May 2020 and last purchased the Baby Foods in approximately February 2021.

50.     Plaintiff Galeana believed he was feeding his children healthy, nutritious baby food. Prior to purchasing the Baby Foods, Plaintiff Galeana saw and relied upon the packaging of the Baby Foods.  During the time he purchased and fed his child the Baby Foods, and due to the

Omissions by Defendant, he was unaware the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.  If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff Galeana would not have purchased any of the Baby Foods.  Plaintiff Galeana would be willing to purchase the Baby Foods in the future if he could be certain they do not contain (or have a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

51.     Plaintiff Chey'na Micciche ("Plaintiff Micciche") is, and at all times relevant hereto has been, a citizen of the state of California.  She purchased the Baby Foods for her children, including: HappyBABY Puffs (Purple Carrot & Blueberry; Banana & Pumpkin; Sweet Potato & Carrot); HappyBABY Pouches (Banana Beets & Blueberries; Apple Spinach & Kale; Banana Raspberry & Oats; Apple Blueberry & Oats; Apple Pumpkin & Carrot; Apple Kale & Avocado; Sweet Potato Mango & Carrots; Pears Zucchini & Peas; Broccoli Pears & Peas; Pears Kale & Spinach); and HappyTOT Pouches (Banana, Blueberries, Yogurt & Oats).

52.     Plaintiff Micciche purchased these foods from Ralph's grocery store in Los Angeles, California, Food4Less grocery store in Inglewood, California, and Target in Los Angeles, California, and Culver City, California.  Plaintiff Micciche first purchased the Baby Foods beginning in approximately August 2012 and last purchased the Baby Foods in approximately April 2018.

53.     Plaintiff Micciche believed she was feeding her children healthy, nutritious baby food.  Prior to purchasing the Baby Foods, Plaintiff Micciche saw and relied upon the packaging

of the Baby Foods.  During the time she purchased and fed her children the Baby Foods, and due to the Omissions by Defendant, she was unaware the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.  If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff Micciche would not have purchased any of the Baby Foods.  Plaintiff Micciche would be willing to purchase the Baby Foods in the future if she could be certain they do not contain (or have a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

54.     Plaintiff Susan Ray Lawson ("Plaintiff Lawson") is, and at all times relevant hereto has been, a citizen of the state of California.  She purchased the Baby Foods for her children, including various flavors of HappyBABY Jars; various flavors of HappyBABY Pouches; HappyBABY Yogis (Mixed Berry); various flavors of HappyBABY Teethers; and various flavors of HappyTOT Bars.

55.     Plaintiff Lawson purchased these foods from Target in Santa Clara, California, and Dublin, California, Walmart in Dublin, California, and Safeway grocery stores in Santa Clara, California and Dublin, California.  Plaintiff Lawson first purchased the Baby Foods beginning in approximately December 2017 and last purchased the Baby Foods in approximately January  2021.

56.     Plaintiff Lawson believed she was feeding her children healthy, nutritious baby food.  Prior to purchasing the Baby Foods, Plaintiff Lawson saw and relied upon the packaging of the Baby Foods.  During the time she purchased and fed her children the Baby Foods, and due to the Omissions by Defendant, she was unaware the Baby Foods contained (or had a material risk

of containing) heavy metals, perchlorate, and/or other contaminants.  If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff Lawson would not have purchased any of the Baby Foods.

57.     Plaintiff Kelly Jean McKeon ("Plaintiff McKeon") is, and at all times relevant hereto has been, a citizen of the state of Minnesota.  She purchased the Baby Foods for her children, including:  HappyTOT Bars (Apples & Spinach); HappyBABY Puffs (Sweet Potato & Carrot); HappyBABY Jars (Apple, Oats & Cinnamon; Bananas & Sweet Potatoes; Carrots; and Sweet Potatoes); HappyBABY Pouches (Apples, Spinach & Kale; Green Beans, Spinach, and Pears); HappyBABY Yogis (Mixed Berry; Banana & Mango); and HappyBABY Teethers (Sweet Potato & Banana; Blueberry & Purple Carrot).

58.     Plaintiff McKeon purchased these foods from Target in Plymouth, Minnesota, and Lunds & Byerlys grocery store in Minnetonka, Minnesota. Plaintiff McKeon first purchased the Baby Foods beginning in approximately Summer 2018 and last purchased the Baby Foods in approximately February 2021.

59.     Plaintiff McKeon believed she was feeding her children healthy, nutritious baby food.  Prior to purchasing the Baby Foods, Plaintiff McKeon saw and relied upon the packaging of the Baby Foods.  During the time she purchased and fed her children the Baby Foods, and due to the Omissions by Defendant, she was unaware the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.  If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate,

and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff McKeon would not have purchased any of the Baby Foods. Plaintiff McKeon would be willing to purchase the Baby Foods in the future if she could be certain they do not contain (or have a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

60.     Plaintiff Hilary Paris ("Plaintiff Paris") is, and at all times relevant hereto has been, a citizen of the state of Washington.  She purchased the Baby Foods for her child, including various flavors of HappyBABY Puffs and various flavors of HappyBABY Jars.

61.     Plaintiff Paris purchased these foods from Quality Food Centers ("QFC") in and around Seattle, Washington, and Target in and around Seattle, Washington.  Plaintiff Paris first purchased the Baby Foods beginning in approximately 2015 and last purchased the Baby Foods in approximately 2019.

62.     Plaintiff Paris believed she was feeding her children healthy, nutritious baby food. Prior to purchasing the Baby Foods, Plaintiff Paris saw and relied upon the packaging of the Baby Foods.  During the time she purchased and fed her children the Baby Foods, and due to the Omissions by Defendant, she was unaware the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.  If Defendant had disclosed that the Baby Foods contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants; that Defendant inadequately tested, or never tested, for heavy metals, perchlorate, and/or other contaminants in its ingredients and/or finished Products; or that Defendant sold Products that failed to meet its internal standards, Plaintiff Paris would not have purchased any of the Baby Foods.

63.     As a result of Defendant's intentionally, knowingly, and/or recklessly deceptive conduct as alleged herein, Plaintiffs were injured when they paid the purchase price or a price premium for the Baby Foods that did not deliver what they promised. Plaintiffs paid the purchase price on the assumption that the packaging of the Baby Foods was accurate and that the Baby Foods were free of heavy metals and perchlorate. Plaintiffs would not have paid the premium price had they known that the Baby Foods contained heavy metals and perchlorate. Further, should Plaintiffs encounter the Baby Foods in the future, they could not rely on the truthfulness of the Products' packaging, absent corrective changes. Damages can be calculated through expert testimony at trial.

64.     Defendant Nurture, Inc. was founded in 2006, is incorporated under the laws of Delaware, and maintains its principal place of business and headquarters at 1 Maple Avenue, White Plains, New York 10605. Defendant has intentionally availed itself of the laws and markets of this District, and Defendant is subject to personal jurisdiction in this District.

65.     Defendant has formulated, developed, manufactured, labelled, distributed, marketed, advertised, packaged, and sold the Products under the HappyBABY and HappyTOT brands throughout the United States, including in this District. It has done so continuously throughout the Class Period (February 4, 2015, to the present). Moreover, the decisions relating to the Baby Foods' formulations, quality control, manufacturing, and packaging occurred in New York throughout the Class Period.

66.     Defendant knowingly created, allowed, oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging and related marketing for the Baby Foods that did not disclose the presence of heavy metals, perchlorate, and/or other contaminants. Defendant is also responsible for sourcing ingredients, manufacturing the products, and conducting

all relevant quality assurance protocols, including testing of both the ingredients and finished Products.

67.     The advertising, labeling, and packaging for the Baby Foods, relied upon by Plaintiffs, were prepared, reviewed, and/or approved by Defendant and its agents in New York throughout the Class Period, and were disseminated from New York by Defendant and its agents through packaging that contained the Omissions alleged herein throughout the Class Period. The Omissions were nondisclosed material content that a reasonable consumer throughout the United States, including this District, would consider in purchasing the Baby Foods. The Omissions were designed to encourage consumers to purchase the Baby Foods and reasonably mislead the reasonable consumer, such as the Plaintiffs and members of the Classes, throughout the United States, including this District, into purchasing the Baby Foods.

68.     The Baby Foods include all flavor profiles or varieties in the following product categories (that can be further subdivided by development stage and/or product line), including but not limited to:

a)     HappyBABY Pouches, for example:



b)      HappyBABY Snacks, for example:



  

c)      HappyBABY Jars, for example:

 




d)      HappyBABY Baby Cereal, for example:




e)      HappyTOT Pouches, for example:





f)      HappyTOT Snacks, for example:

 

g)      HappyTOT Bowls, for example:

 

 

h)      HappyTOT Bars, for example:




## FACTUAL ALLEGATIONS

### I.    DEFENDANT'S PRESENCE IN THE ORGANIC BABY FOOD MARKETPLACE

69.      Defendant set out to capture the hearts, minds, and wallets of consumers with its

organic Baby Foods:

> At the turn of the century, less than 4% of baby food on the market was organic. In
> a country with more and more people inclined to scrutinize the origin and quality
> of their food, [Happy Family founder] saw an opportunity to impact consumers'
> diets from a very young age. She set out to create an organic, sustainable, and
> transparent product that would make parents comfortable with what they feed their
> children."[21]

70.      Defendant's creative advertising and marketing agency described that Defendant's

"clearly defined objective" was "to be to the millennial parents what Gerber had been to the Baby

---

[21] "How Failing Fast Led to the Perfect Baby Food Solution," William and Phyllis Mack Institute
for     Innovation     Management,     Aug.     9,     2018,     available     at
https://mackinstitute.wharton.upenn.edu/2018/baby-food-shazi-visram/ (last accessed October 5,
2022).

29

Boomers."[22]  "That is, the go-to-baby food that parents could recognize, trust, and choose over all other options."[23] The agency described how it created a "memorable, powerfully emotional campaign [...] to drive sales[]" for Defendant.[24]

71.    Defendant's HappyBABY brand advertising spending alone increased from $0.9 million in 2011 to $63.3 million in 2015.[25]

72.    Defendant's marketing dollars were well spent and effective, such that it experienced a net sales growth of 30% from 2018 to 2021.[26] In 2020, Defendant was "the market leader for organic baby food in the United States[.]"[27]

73.    Defendant claims it "strives to help parents be happier by providing '***convenient organic, nutritious meals and snacks that parents can feel confident feeding their little ones***.'"[28]

---

[22] "From the 9th Annual Shorty Awards Happy Family Organics Presents: This is Happy," Shorty Awards, available at https://shortyawards.com/9th/happy-family-organics-presents-this-is-happy (last accessed October 5, 2022).

[23] *Id*.

[24] *Id*.

[25] "Baby Food FACTS Nutrition and marketing of baby and toddler food and drinks," UConn Rudd Center for Food Policy & Obesity, January 2017, at 45, Table 19, available at https://uconnruddcenter.org/wp-content/uploads/sites/2909/2020/09/BabyFoodFACTS_FINAL.pdf (last accessed October 5, 2022).

[26] Danone Integrated Annual Report, 2021, at 47, available at https://www.danone.com/content/dam/danone-corp/danone-com/investors/en-all-publications/2021/integratedreports/danoneintegratedannualreport2021.pdf (last accessed October 5, 2022).

[27] "How The CEO Of Happy Family Organics, A $240 Million Baby Food Company, Takes a Values-First Approach To Leading in 2020," Forbes, available at https://www.forbes.com/sites/shaynaharris/2020/07/31/how-the-ceo-of-happy-family-organicsa-240-million-baby-food-companytakes-a-values-first-approach-to-leading-in-2020/?sh=556298f72ea4 (last accessed October 5, 2022).

[28] "Happy Family Organics' new campaign reassures parents that 'messy' is normal & can be joyful," Food Navigator-USA, October 21, 2019, available at https://www.foodnavigator-usa.com/Article/2019/10/21/Happy-Family-Organics-campaign-reassures-parents-messy-is-normal (quoting Erica Messina, Happy Family Organics VP of Marketing & E-Commerce) (emphasis added) (last accessed October 5, 2022).

74.     In fact, Defendant claims that food quality is its very reason for existing, asserting "[w]e launched on Mother's Day 2006 as Happy Baby, with the mission to change the trajectory of children's health through nutrition."[29]



75.     Defendant proclaims this nutrition is "on a mission for a happy & healthy start."[30]

76.     Defendant's "Happy Promise" to bring consumers "peace of mind" with products that are "[a]lways certified USDA organic," "non-GMO," "[g]rown without the use of toxic persistent pesticides," and "[p]ackaging made without BPA, BPS, or phthalates" further demonstrates its commitment to the organic baby food market.[31]

---

[29] "About Us," available at https://happyfamilyorganicsme.com/about-us/ (last accessed October 5, 2022); "Our Mission," available at https://www.happyfamilyorganics.com/our-mission/ (last accessed October 5, 2022).

[30] Happy Family Organics 2020 Mission Report at 3, available at https://issuu.com/happyfamilyorganics/docs/20210415_hfo_missionreport_2020report?e=15820 39552/91240905 (last accessed October 5, 2022).

[31] "Our Quality Standards & Commitment to Organic," available at https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last accessed October 5, 2022).



77.     Defendant "aims to make it super simple to feed kids organic, nutrient-dense snacks[.]"[32]

78.     Defendant repeatedly prioritizes its commitment to and use of organic and non-GMO ingredients in the Baby Foods.[33]



---

[32]  "Mother Essentials: Anne Laraway of Happy Family Organics," Mother, January 19, 2022, available at https://www.mothermag.com/anne-laraway-happy-family-organics/ (last accessed October 5, 2022).

[33]     Happy Family Organics 2020 Mission Report at 4, available at https://issuu.com/happyfamilyorganics/docs/20210415_hfo_missionreport_2020report?e=15820 39552/91240905 ("Mandatory Certification," "NO GMOs Allowed," "NO Toxic Persistent Pesticides," "NO Synthetic Fertilizers," "NO Sewage Sludge & Irradiation," "NO Antibiotics & Growth Hormones Used on Animals") (last accessed October 5, 2022); "Our Commitment to Organic," available at https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/ (last accessed October 5, 2022).

79.     While Defendant recognizes that consumers pay higher prices for organic products, it claims that "it seems a small price to pay" when "considered against the long-term health impacts of consuming toxic, conventionally farmed food[.]"[34]

80.     Defendant claims:

There's nothing more important to us than what we feed our children. We remain dedicated to leading the industry in best practices, as we continue to raise the bar with our strict standards and deliver high-quality organic products to all families.[35]

81.     Defendant maintains that it is committed to providing high quality food:

We partner with our suppliers to find farms around the country and the world with the highest standards of organic farming and sustainability. Happy Family has been at the forefront of rigorous safety protocols, as well as working with 3rd party specialists to ensure our products are age and stage appropriate for every milestone—from starting solids to self-feeding and beyond.[36]

82.     Defendant described receiving the "Organic stamp of approval[,]" thereby "socking it to companies that have tried to hijack Mother Nature[,]" as "[p]riceless."[37]



---

[34] "Why Organic is Best for Your Baby and Toddler," by Happy Family Organics on ParentingHub, September 8, 2020, available at https://parentinghub.co.za/why-organic-is-best-for-your-baby-and-toddler/ (last accessed October 5, 2022).

[35] "Our Quality Standards & Commitment to Organic," available at https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last accessed October 5, 2022).

[36] Id.

[37] "Why Organic is Best for your baby and toddler," by Happy Family Organics on ParentingHub, September 8, 2020, available at https://parentinghub.co.za/why-organic-is-best-for-your-baby-and-toddler/ (last accessed October 5, 2022).

83.    One consumer proclaimed, "I have fallen in love with Happy Family not only because they openly show what is in each and every product they sell, they have also proven themselves and their passion for providing nutrition for kids time and time again."[38]

84.    Another consumer exclaimed, "Happy Family Brands will give you the parent a peace of mind on what your child is eating!"[39]

## II. REPORTS REVEAL THE PRESENCE OF HEAVY METALS AND PERCHLORATE IN DEFENDANT'S BABY FOODS

### A.    Heavy Metals

85.    On February 4, 2021, the Congressional Report was published, detailing findings from its investigation that heavy metals were present in "significant levels" in numerous commercial baby food products, including Defendant's Baby Foods.[40]

86.    The investigation found the following with respect to heavy metals in Defendant's Baby Foods:

a)    **Arsenic**: Defendant "sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic."[41] Further, "[o]ver 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic," and its "typical baby food product [] sold contained 60 ppb inorganic arsenic."[42]

---

[38] "Happy Family Organic Super Foods Review: Nutrition Giveaway Day 2!" Parenting Chaos blog, available at https://parentingchaos.com/happy-family-organic-superfoods-review/ (last accessed October 5, 2022).

[39] *Id.*

[40] Congressional Report at 2.

[41] *Id.* at 3.

[42] *Id.*

b)   **Lead**: Defendant "sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead."[43] "Internal testing data from […] Nurture […] demonstrate[s] that [it] sold products or used ingredients with significant amounts of lead."[44] Defendant "sold baby foods even when they or their ingredients contained unsafe levels of lead[,]" regardless of whether it tested its final products or just their ingredients.[45]

c)   **Cadmium**: "Sixty-five percent of Nurture (Happy Baby) finished baby food products contained more than 5 ppb cadmium."[46]

d)   **Mercury**: "Nurture (Happy Baby) sold finished baby food products containing as much as 10 ppb mercury."[47]

87.   Conspicuously, the investigation found that when baby food manufacturers were left to self-regulate and establish their own heavy metals standards, they routinely failed to abide by their own standards, that the "[i]nternal company standards permit[ted] dangerously high levels of toxic heavy metals," and manufacturers, like Defendant, "often sold foods that exceeded those levels."[48] In fact, Defendant "sold all products tested, regardless of how much toxic heavy metal the baby food contained."[49]

---

[43] *Id*. at 3.

[44] *Id*. at 22.

[45] *Id*.

[46] *Id*. at 3.

[47] *Id*.

[48] *Id*.

[49] *Id*.

88.     However, contrary to the Subcommittee's findings, Defendant claims that it "never knowingly sold any products that contained levels above those set by the FDA when available."[50]

89.     Often these internal standards are above the limits sets by the U.S. Food and Drug Administration ("FDA"). For example, despite the FDA's only "finalized [] standard—100 ppb inorganic arsenic in infant rice cereal—Nurture set its internal standard for that product 15% higher than the FDA limit, at 115 ppb."[51]

90.     Indeed, while "Nurture created internal standards" (which it dubs "goal thresholds"), it does not follow them.[52] These "thresholds" are essentially meaningless because they "are not used to make product disposition decisions and are not a pre-condition to product release."[53] As the Subcommittee concluded, "[b]y company policy [then], *Nurture's toxic heavy metal testing is not intended for consumer safety*."[54] "Instead, its testing regime is limited to monitoring the supply chain."[55] "*Nurture's thresholds are not actually used to prevent products that contain high levels of toxic heavy metals from being sold.*"[56]

91.     Defendant admitted to the Subcommittee that it sells its Products regardless of testing results.[57] But the Congressional Report concluded that "*Nurture does not even claim to be testing for safety*—it made clear in its letter response to this Subcommittee that all products will

---

[50] "Frequently Asked Questions," available at https://www.happyfamilyorganics.com/faqs (last accessed October 5, 2022).

[51] *Id*. at 33.

[52] *Id*.

[53] *Id*.

[54] *Id*. at 4 (emphasis added).

[55] *Id*. at 33.

[56] *Id*. (emphasis added).

[57] *Id*. at 34.

be sold regardless of testing result: 'our heavy metal testing is performed as part of our monitoring program and not as a condition of product release, *all of the products that were tested were sold into commerce*.'"[58] As such, Nurture's testing was merely for show. Given this course of conduct, it is no surprise that "Nurture released products containing as much as 641 ppb lead and 180 ppb inorganic arsenic."[59]

92.    Below are excerpts of Defendant's heavy metal testing provided to the Subcommittee that describes the disposition of each Product as "Sell – Testing for Monitoring & Supply Chain Improvement Purposes Only[.]"[60]

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Apple & Broccoli Puffs | Baby 7+ Months | 9/7/2018 | Inorganic Arsenic | 100 | 180 | ppb | 11/01/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana & Pumpkin Puffs | Baby 7+ Months | 10/11/2018 | Inorganic Arsenic | 100 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry & Beet Puffs | Baby 7+ Months | 7/24/2018 | Inorganic Arsenic | 100 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 3/16/2019 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 11/16/2018 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Purple Carrot & Blueberry Puffs | Baby 7+ Months | 2/15/2019 | Inorganic Arsenic | 100 | 150 | ppb | 11/17/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Sweet Potato & Carrot Puffs | Baby 7+ Months | 1/19/2019 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

93.    "Nurture sells the products it tests, regardless of their toxic heavy metal content."[61]

"In total, Nurture tested 113 final products and sold *every* product tested, regardless of how much

---

[58] *Id*. (emphasis added).

[59] *Id*.

[60] *Id*. (citing to Nurture, Heavy Metal Test Results for Baby Food Products (Dec. 18, 2019) (online at  http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx))  (last accessed October 5, 2022).

[61] Congressional Report at 34.

inorganic arsenic or lead the product contained, and regardless of whether those metals exceeded its own internal standards."[62]

94.     Defendant also "appear[ed] to have misled the Subcommittee about its testing standards."[63] As seen from Defendant's goal thresholds pictured below, Defendant conveyed to the Subcommittee that, "after January of 2019, its lead threshold was 50 ppb in all baby food products[—including cereals and wet foods:]"[64]

All of our specific goal thresholds for the referenced contaminants[8] are set forth in the chart below.

| Product Type | Contaminant | Analytical Matrix | Goal Threshold | Unit |
|---|---|---|---|---|
| Infant Formula | Cadmium | As Sold | 10 | ppb |
| Infant Formula | Inorganic Arsenic | As Sold | 75 | ppb |
| Infant Formula | Lead | As Sold | 50 | ppb |
| Cereals | Cadmium | As Consumed | 50 | ppb |
| Cereals with <75% Rice | Inorganic Arsenic | As Sold | 100 | ppb |
| Cereals with >75% Rice | Inorganic Arsenic | As Sold | 115 | ppb |
| Cereals | Lead | As Consumed | 50* | ppb |
| Cereals | Mercury | As Consumed | 10 | ppb |
| Wet Foods | Cadmium | As Consumed | 50 | ppb |
| Wet Foods | Inorganic Arsenic | As Sold | 100 | ppb |
| Wet Foods | Lead | As Consumed | 50* | ppb |
| Wet Foods | Mercury | As Consumed | 10 | ppb |

*Threshold lowered from 100ppb to 50ppb in January, 2019.

---

[62] *Id*. (emphasis added).

[63] *Id*. at 35.

[64] *Id*. (Citing Letter from Nurture, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/10.pdf)) (last accessed October 5, 2022).

95.     However, test results that Nurture provided to the Subcommittee demonstrated that Nurture was still using 100 ppb as the "goal threshold" for lead.[65]

96.     "The fact that Nurture appears to have continued using a higher standard up to nine months after it claimed to the Subcommittee to have lowered the threshold casts serious doubt on Nurture's candor in this matter."[66]

97.     In its conclusion, the Subcommittee stressed the danger associated with the presence of heavy metals in baby food: "These toxic heavy metals pose serious health risks to babies and toddlers. Manufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."[67]

**B.      Perchlorate**

98.     Healthy Babies Bright Futures reported test results for perchlorate in baby food that "suggest a prevalence that could pose risks during pregnancy and infancy."[68] One lab "detected it in 19 of 25 foods tested."[69]

99.     Healthy Babies Bright Futures found perchlorates in three of the five Nurture Products that it tested.[70]

---

[65] Congressional Report at 36.

[66] *Id*. at 35.

[67] *Id*. at 58.

[68] "What's in my baby's food?" Healthy Babies Bright Futures, dated October 2019, at 8, available at: https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed October 5, 2022) ("What's in my baby's food? HBBF Report").

[69] *Id*. at 8.

[70] *Id*. at 34-35 (Appendix D).

| Brand | Food | Food type | Perchlorate (ppb) |
|-------|------|-----------|-------------------|
| Happy Baby | Oatmeal Baby Cereal, Clearly Crafted - Organic Whole Grains - for sitting baby | Cereal - oatmeal | 1.6 * |
| Happy Baby | Oats & Quinoa Baby Cereal Organic Whole Grains with Iron - Sitting baby | Cereal - mixed and multi-grain | 2.4 * |
| Happy Baby | Simple Combos Apples, Spinach & Kale – 2 | Fruit and vegetable - mixed | 3.7 |

100.    Despite the presence, or risk of presence, of perchlorate in its Baby Foods, the cornerstone of Defendant's packaging and marketing is its organic ingredients.

101.    The presence (or material risk of the presence) of heavy metals and perchlorate is directly contrary to Defendant's "Happy Promise."

## III.    DEFENDANT FALSELY MARKETED ITS BABY FOODS AS HEALTHY WHILE OMITTING ANY MENTION OF HEAVY METALS OR PERCHLORATE

102.    Defendant's Baby Foods are available at numerous retail and online outlets throughout the United States, including in this District. The Baby Foods are widely advertised, and Defendant has a Vice President of Marketing on its executive team.

103.    Defendant is aware that parents, such as Plaintiffs, care about the quality and composition of the foods they feed their children.[71]

104.    Defendant's marketing plays on the fiercely protective parenting instincts of reasonable consumers, such as Plaintiffs. It asserts that its "Founder and Chairmom […] found her

---

[71] See, e.g., "Happy Family Organics Launches Happy Baby Savory Blends," Flexible Packaging, April 13, 2021, available at https://www.flexpackmag.com/articles/91183-happy-family-organics-launches-happy-baby-savory-blends ("According to Happy Family Organics, consumer data shows that parents are seeking out veggie-forward options for their family[.]") (last accessed October 5, 2022).

40

purpose: give babies their healthiest, happiest beginning by offering parents organic, thoughtfully-made food."[72]

105.    Defendant touts its legacy of being led by "real moms[,]"[73] claiming it is "a mom-founded, parent-run company […] committed to helping families give their children the best start in life – from partnering with experts and providing personalized support, to protecting the planet for both the little ones of today and those of future generations."[74] Defendant even describes its Chief Executive Officer as its "Mom in Chief."[75]

106.    Defendant markets its Products according to a child's stage of development, with "Stage 1" products for infants to age 6 months, "Stage 2" for babies 6+ months, "Stage 3" for babies 7+ months, and later stage foods for "Tots and Tykes."

107.    Based on Defendant's decision to package its Baby Foods as appropriate for various "stages" of development, it had a duty to ensure that the statements on the packaging were true and not misleading, but it did not.

---

[72] "About Us," available at https://happyfamilyorganicsme.com/about-us/ (last accessed October 5, 2022).

[73] "Happy Family's new CEO will stay the course to grow in baby food & adjacent categories," Food Navigator-USA, Dec. 13, 2017, available at https://www.foodnavigator-usa.com/Article/2017/12/13/Happy-Family-s-new-CEO-will-stay-the-course-to-grow-in-baby-food (last accessed October 5, 2022).

[74] Happy Family Organics 2019 Mission Report at 2, available at https://issuu.com/happyfamilyorganics/docs/20200219_hfo_missionreport_2019report (last accessed October 5, 2022).

[75] "Mother Essentials: Anne Laraway of Happy Family Organics," Mother, January 19, 2022, available at https://www.mothermag.com/anne-laraway-happy-family-organics/ (last accessed October 5, 2022).

108.    Defendant asserts that it is "a leader in the industry on rigorous methodology, **routinely testing both our ingredients and finished products** to assure they are safe and healthy for baby."[76]

109.    Defendant claims, "[f]irst and foremost, we can say with the utmost confidence that all Happy Family Organics products are safe for babies and toddlers to enjoy, and we are proud to have best-in-class testing protocols in our industry."[77]

110.    Defendant emphasizes its commitment to quality: "we have strict, self-imposed quality standards and reference global best practices to inform our product development, ensuring we meet a high bar of requirements. We are also a leader in the industry on rigorous methodology and protocols to assure our products are safe and healthy for baby."[78]



---

[76] "Frequently Asked Questions," available at https://www.happyfamilyorganics.com/faqs/ (emphasis in original) (last accessed October 5, 2022).

[77] Happy Family Organics Statement to Our Valued Customers, February 2021, available at https://moonflower.coop/wp-content/uploads/2021/02/Baby-Food-Letter.pdf (emphasis in original) (last accessed October 5, 2022).

[78] "Our Quality Standards & Commitment to Organic," available at https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last accessed October 5, 2022).

111.    Defendant further states, "Quality & Food Safety is fundamental to the work we do. We work closely with our suppliers and farmer partners as well as field experts to create a valuable and effective process that ensures quality & safety from start to finish."[79]

112.    Contrary to the Congressional Subcommittee's findings that Defendant ignored its internal standards for heavy metal content,[80] Defendant claims that "[e]ach product is tested to make sure that they meet our strict standards and are safe for every baby, toddler, and adult to consume."[81]

113.    In furtherance of its commitment to quality, Defendant asserts that it "require[s] [its] suppliers to meet strict standards, validate performance through active monitoring, and proactively execute improvement projects based on areas of potential risk."[82] Defendant also states that "[m]anaging heavy metals is a core part of our product design, our ingredient qualifications processes, our auditing programs, and our continuous quality improvement initiatives."[83]

114.    Defendant's claim that it is "routinely testing [the Baby Foods]… to assure they are safe and healthy" is false and misleading, since Defendant admitted to the Congressional Subcommittee that it "sold all products tested, regardless of how much toxic heavy metal the baby food contained."[84]

---

[79] *Id*.

[80] Congressional Report at 33.

[81] "Frequently Asked Questions," available at https://www.happyfamilyorganics.com/faqs (last accessed October 5, 2022).

[82] *Id*.

[83] *Id*.

[84] Congressional Report at 4.

115.    Based on Defendant's decision to wholly omit mention of the presence (and material risk) of heavy metals, perchlorate, and/or other contaminants in the Baby Foods, and to instead advertise, package, and market its Baby Foods as organic, nutritious, high-quality, made with superior ingredients, and manufactured to high standards, they had a duty to ensure that the Baby Foods' packaging was true and not misleading. As such, Defendant knew or should have known the Baby Foods included nondisclosed heavy metals, perchlorate, and/or other contaminants and that over time, these toxins can accumulate and remain in infants' and children's bodies, to their detriment.

116.    Defendant intentionally, knowingly, and/or recklessly omitted the presence or material risk of heavy metals, perchlorate, and/or other contaminants in the Baby Foods in order to induce and mislead reasonable consumers to purchase its Baby Foods.

117.    Defendant alone possessed the knowledge of the Omissions that it knew were material to Plaintiffs and other reasonable consumers and failed to provide the information to consumers.

118.    As a result of the material Omissions, a reasonable consumer would have no reason to suspect the presence or material risk of heavy metals, perchlorate, and/or other contaminants in the Baby Foods without conducting his or her own scientific tests (which are scarcely known to ordinary consumers, time consuming, and expensive) or reviewing third-party scientific testing of the Products.

## IV.    DUE TO THE PRESENCE AND MATERIAL RISK OF HEAVY METALS AND/OR PERCHLORATE IN THE BABY FOODS, THE OMISSIONS ARE MISLEADING

### A.    Heavy Metals

119.    While federal regulations regarding levels of heavy metals in most baby foods are non-existent, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell

Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, stated, "[n]o level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[85]

120.     The FDA and the World Health Organization ("WHO") have declared arsenic, lead, cadmium, and mercury "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[86]

121.     Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its heavy metals workgroup, which looks to reduce the risks associated with human consumption of heavy metals.[87]

122.     Arsenic, lead, mercury, and cadmium—four heavy metals found in the Baby Foods—are neurotoxins, poisons that affect the nervous system. Exposures to heavy metals "diminish quality of life, reduce academic achievement, and disturb behavior, with profound consequences for the welfare and productivity of entire societies."[88]

123.     Heavy metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems, like

---

[85] "Some Baby Food May Contain Toxic Metals," U.S. Reports, available at https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html      (last      accessed October 5, 2022).

[86] Congressional Report at 2.

[87] "Metals and Your Food," FDA, available at https://www.fda.gov/food/chemical-contaminants-metals-pesticides-food/metals-and-your-food (last accessed October 5, 2022).

[88] What's in my baby's food? HBBF Report at 13.

attention-deficit hyperactivity disorder ('ADHD')."[89] Even when trace amounts are found in food, heavy metals can alter the developing brain and erode a child's intelligence quotient ("IQ").[90]

124.    Because heavy metals accumulate in the body, including in the kidneys and other internal organs, the risk they pose grows over time and can remain in one's body for years.[91]

125.    Due to their smaller physical size and still-developing brains and organs, infants and toddlers are particularly susceptible to the toxic effects of heavy metals because "[t]hey also absorb more of the heavy metals that get into their bodies than adults do."[92]

126.    Of additional concern to developing infants are the health risks related to simultaneous exposure to multiple heavy metals, as "co-exposures can have interactive adverse effects."[93] Heavy metals disturb the body's metabolism and cause "significant changes in various biological processes such as cell adhesion, intra- and inter-cellular signaling, protein folding, maturation, apoptosis, ionic transportation, enzyme regulation, and release of neurotransmitters."[94]

---

[89] *Id*. at 6.

[90] Congressional Report at 1.

[91] "Heavy Metals in Baby Food: What You Need to Know," Consumer Reports, August 16, 2018, available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed October 5, 2022).

[92] *Id*.

[93] Morello-Frosch R., Cushing L.J., Jesdale B.M., Schwartz J.M., Guo W., Guo T., Wang M., Harwani S., Petropoulou S.E., Duong W., Park J.S., Petreas M., Gajek R., Alvaran J., She J., Dobraca D., Das R., Woodruff T.J. *Environmental Chemicals in an Urban Population of Pregnant Women and Their Newborns from San Francisco*. Environ Sci Technol. 2016 Nov 15;50(22):12464-12472. doi: 10.1021/acs.est.6b03492. Epub 2016 Oct 26. PMID: 27700069; PMCID: PMC6681912. Available at https://stacks.cdc.gov/view/cdc/80511. (last accessed October 5, 2022).

[94] Jaishankar, M., Tseten, T., Anbalagan, N., Mathew, B. B., & Beeregowda, K. N. (2014). *Toxicity, mechanism and health effects of some heavy metals*. Interdisciplinary toxicology, 7(2), 60–72. Available at https://doi.org/10.2478/intox-2014-0009. (last accessed October 5, 2022).

127.    Exposure to heavy metals, even in small amounts, can lead to life-long effects. According to Victor Villarreal, Ph.D., Assistant Professor in the Department of Educational Psychology at the University of Texas at San Antonio, who has studied the effects of heavy metals on childhood development, "[t]he effects of early exposure to heavy metals can have long-lasting impacts that may be impossible to reverse."[95]

128.    Because heavy metals can bioaccumulate in the body, even regular consumption of small amounts can increase the risk of various health issues, including the risk of: bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[96]

129.    Research continues to confirm that exposures to food containing heavy metals causes "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[97]

130.    Despite the known risks of exposure to these heavy metals, Defendant has intentionally, knowingly, and/or recklessly sold the Baby Foods without disclosing the presence or material risk of arsenic, mercury, cadmium, and lead to consumers like Plaintiffs.

**B.    Arsenic**

131.    The Baby Foods contain (or have a material risk of containing) arsenic, which can cause cognitive deficits in children who are exposed early in life, and even neurological problems in adults who were exposed as infants.[98] "There is no evidence that the harm caused by arsenic is reversible."[99]

---

[95] "Heavy Metals in Baby Food: What You Need to Know," Consumer Reports, August 16, 2018, available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed October 5, 2022).

[96] *Id*.

[97] What's in my baby's food? HBBF Report at 1.

[98] *Id*. at 13.

[99] *Id*. at 13.

132.    Inorganic arsenic is highly toxic and a known cause of human cancers (a carcinogen).  Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage children's central nervous systems and cognitive development.[100]  Exposure to arsenic can also cause diabetes, atherosclerosis, and cardiovascular disease.[101]

133.    "Studies have shown that consuming products with arsenic over time can lead to impaired brain development, growth problems, breathing problems, and a compromised immune system."[102] And "even low levels of arsenic exposure can impact a baby's neurodevelopment."[103]

134.    Based on the risks associated with exposure to higher levels of arsenic, the U.S. Environmental Protection Agency ("EPA") and FDA have set 10 ppb as the maximum contaminant level in drinking water, and the FDA has provided a draft action level of 10 ppb for apple juice.[104]

---

[100] Congressional Report at 10.

[101] States J.C., Singh A.V., Knudsen T.B., Rouchka E.C., Ngalame N.O., Arteel G.E., et al. (2012) *Prenatal Arsenic Exposure Alters Gene Expression in the Adult Liver to a Proinflammatory State Contributing to Accelerated Atherosclerosis*. PLOS ONE 7(6): e38713. *Available at* https://doi.org/10.1371/journal.pone.0038713  (last accessed October 5, 2022).

[102] Letter to FDA from select U.S. Senators, June 22, 2021, available at https://www.klobuchar.senate.gov/public/_cache/files/9/9/996f2cad-5295-432b-a543-f69312988a78/37D015A1AC9DDF0E31B341F629469169.6.22.2021-formatted-letter-to-fda-on-baby-food-recall.pdf  (last accessed October 5, 2022) (citing Dartmouth Toxic Metals Superfund Research Program (2021), Arsenic and Children, https://sites.dartmouth.edu/arsenicandyou/arsenic-and-children/) (last accessed October 5, 2022).

[103] *Id.*

[104] *See* "Standards and Regulation for Arsenic Exposure," CDC Agency for Toxic Substances and Disease Registry, CDC, available at https://www.atsdr.cdc.gov/csem/arsenic/standards.html (last accessed October 5, 2022); "Arsenic in Food and Dietary Supplements," FDA, current as of April 27, 2022, available at https://www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-supplements#:~:text=In%20the%20U.S.%2C%20to%20reduce,for%20bottled%20water%20as%20well (last accessed October 5, 2022).

135.    Moreover, the FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic.[105]

136.    Baby products comprised of rice are at particular risk for arsenic. Healthy Baby Bright Future's Research Director, Jane Houlihan, stated, "[r]ice-based foods like infant rice cereal are high in inorganic arsenic, the most toxic form of arsenic."[106]

137.    The FDA set a limit in August 2020 for inorganic arsenic in infant rice cereal at 100 ppb.[107]

138.    Yet, routine testing of samples of infant rice cereal manufactured by a different U.S. baby food manufacturer found levels of inorganic arsenic above the FDA guidance level.[108] In June 2021, that company announced a recall and discontinue production of its rice cereal due to concerns related to its ability to source rice flour with levels below the FDA guidance level.[109]

---

[105] Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), available at https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/ (last accessed October 5, 2022).

[106] "HBBF Statement on Beech-Nut's Rice Cereal Recall: A Step in the Right Direction," Healthy Babies Bright Future website, June 8, 2021, available at https://www.hbbf.org/blog/2021-06/hbbf-statement-beech-nuts-rice-cereal-recall-step-right-direction (last accessed October 5, 2022).

[107] Baby Food and Heavy Metals: What Parents Should Do Now, Consumer Reports, Updated Sept. 29, 2021, available at https://www.consumerreports.org/baby-food/baby-food-and-heavy-metals-advice-for-parents-a1523214531/. "[A] quarter of finished products tested by Nurture contained more than this level, according to the report." See Baby Food and Heavy Metals: What Parents Should Do Now, Consumer Reports, Updated Sept. 29, 2021, available at https://www.consumerreports.org/baby-food/baby-food-and-heavy-metals-advice-for-parents-a1523214531/ (last accessed October 5, 2022).

[108] "Beech-Nut Nutrition Company Issues a Voluntary Recall of One Lot of Beech-Nut Single Grain Rice Cereal and Also Decides to Exit the Rice Cereal Segment," FDA, June 8, 2021, available at https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/beech-nut-nutrition-company-issues-voluntary-recall-one-lot-beech-nut-single-grain-rice-cereal-and (last accessed October 5, 2022).

[109] *Id.*

139.    Defendant lists organic white rice flour or organic jasmine rice flour as the first ingredient and organic brown rice flour within the first three ingredients in several of its snack products.[110]

140.    While both white and brown rice products contain inorganic arsenic, brown rice generally contains higher levels.[111]

141.    Defendant's use of organic rice flours does not insulate the Baby Foods from the presence of heavy metals because organic products are just as likely to contain Heavy Metals as non-organic products.[112] In fact, regarding arsenic specifically, "[a]vailable data show that certified organic rice and organic infant rice cereal have higher levels of arsenic than conventionally grown, non-organic rice and rice-based foods."[113]

142.    While Defendant tests its final products for arsenic, "[a]ccording to internal company documents, Nurture sells products even after testing confirms that they are dangerously high in inorganic arsenic."[114] In fact, "Nurture sold one such product, Apple and Broccoli Puffs,

---

[110]    *See*,    *generally*,    *e.g.*,    "Toddler    Snacks,"    available    at https://www.happyfamilyorganics.com/shop/collections/toddler-snacks/ (last accessed October 5, 2022).

[111] "Heavy Metals in Baby Food: What You Need to Know," Consumer Reports, August 16, 2018, available    at    https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/    (last accessed October 5, 2022).

[112] *Id*.

[113] *See* "Is Homemade Baby Food Better?" Healthy Babies Bright Futures, August 2022, at 57, available  at  https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2022-08/StoreVs Homemade_2022.pdf (last accessed October 5, 2022) ("Is Homemade Baby Food Better? HBBF Report") ("[t]he accumulation of arsenic happens in organically grown rice because the fields are flood for long periods of time to control weeds, and the soils tend to be richer in organic matter; both conditions increase arsenic uptake in the plant.").

[114] Congressional Report at 13-14.

despite tests [sic] results showing it contained 180 ppb inorganic arsenic[]" as published in the Congressional Report:[115]

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|---|
| Apple & Broccoli Puffs | Baby 7+ Months | 9/7/2018 | Inorganic Arsenic | 100 | 180 | 180 | ppb | 11/01/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana & Pumpkin Puffs | Baby 7+ Months | 10/11/2018 | Inorganic Arsenic | 100 | 160 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry & Beet Puffs | Baby 7+ Months | 7/24/2018 | Inorganic Arsenic | 100 | 160 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

143.    An arsenic level of 180 ppb is high by all standards, but it is 80% higher than Nurture's ***own*** internal goal threshold of 100 ppb."[116]

144.    The testing result for Apple and Broccoli Puffs was not an outlier.   "Nurture routinely sold products that exceeded its internal standards. Twenty-nine other products that Nurture tested and sold registered over 100 ppb inorganic arsenic."[117] And "[i]n total, over 25% of the products that Nurture tested for inorganic arsenic, and sold, had inorganic arsenic levels above 100 ppb."[118]

145.    "The average amount of inorganic arsenic in the baby foods that Nurture tested and sold was 59.54 ppb. That towers over existing and recommended standards, including [the] FDA's and EPA's water limits of 10 ppb."[119]

---

[115] *Id*. at 14.

[116] *Id*. (emphasis added).

[117] *Id*.

[118] *Id*.

[119] *Id*. at 15.

146.    "At least 89 of Nurture's final products—over 78% of those products tested—tested at 9 ppb inorganic arsenic or above."[120]

147.    "For results under 9.54 ppb, Nurture did not differentiate—it marked them all as '<9.54.'"[121] As a result of this "'less than' reporting format, there is no way to know if any of Nurture's products were free of inorganic arsenic."[122]

148.    In summary, as the Subcommittee investigation concluded:[123]

***Summary of Nurture's Inorganic Arsenic Results***

| |
|---|
| **180 ppb – Nurture's product with the highest amount of inorganic arsenic:  Apple & Broccoli Puffs.** |
| **>100 ppb – Over 25% of the baby food products that were tested for inorganic arsenic had over 100 ppb inorganic arsenic.** |
| **59.54 ppb – Average amount of inorganic arsenic in all baby food products tested for inorganic arsenic.** |
| **>50 ppb – Over 50% of Nurture's baby food products that were tested for inorganic arsenic contained over 50 ppb inorganic arsenic.** |

**C.    Lead**

149.    The Baby Foods contain (or have a material risk of containing) lead, which is another carcinogen and developmental toxin known to cause health problems in children.

150.    Lead exposure can seriously harm the brain and nervous system in infants and children and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

---

[120] *Id*.

[121] *Id*.

[122] *Id*.

[123] *Id*.

151.    Exposure to lead in foods builds up over time. Build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.

152.    Even minimal exposure to lead can "cause lower academic achievement, attention deficits and behavior problems. No safe level of exposure has been identified."[124]

153.    Lead is extremely toxic, and its effects cannot be reversed or remediated.[125]

154.    One study found that "children age[s] 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food."[126]  Additionally, studies have established a link between lead exposure and ADHD.[127]

155.    Although there is no federal standard for lead in baby food, health experts, including the American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports, have agreed that lead in baby foods should not exceed 1 ppb.[128]

156.    On January 15, 2021, the EPA issued Lead and Copper Rule Revisions, with a new "trigger level" for treatment of 10 ppb lead in drinking water, effective March 16, 2021.[129]

---

[124] What's in my baby's food? HBBF Report at 13.

[125] "Heavy Metals in Baby Food: What You Need to Know," Consumer Reports, August 16, 2018, available at   https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/   (last accessed October 5, 2022).

[126]  What's in my baby's food? HBBF Report at 7.

[127] Congressional Report at 12.

[128] Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), available at https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/   (last accessed October 5, 2022).

[129]  Revised Lead and Copper Rule, EPA, last updated December 16, 2021, available at https://www.epa.gov/dwreginfo/lead-and-copper-rule (last accessed October 5, 2022).

Previously, the EPA required treatment for water exceeding lead concentrations of 15 ppb. 40 C.F.R. § 141, Subpart I.

157.    Recently the FDA tightened its Interim Reference Levels ("IRLs") for lead. "The agency describes IRLs as daily maximum intake levels for lead in food and beverages."[130] "FDA uses the 'interim' label in recognition that there is no known safe level of exposure to lead and the neurotoxic harm it can cause."[131] The FDA recognized that "reducing lead exposure from food is still relevant to public health."[132]

158.    Additionally, products containing rice have been found to have higher levels of lead concentrations.[133]

159.    The Subcommittee's investigation found that baby food manufacturers, like Defendant, "are selling baby food with higher levels of lead than what is allowed by existing standards for water, juice, and candy."[134]

---

[130] "Over 7 million children exceed FDA's new daily maximum intake level of lead," Environmental Defense Fund, August 24, 2022, available at https://blogs.edf.org/health/2022/08/24/over-7-million-children-exceed-fdas-new-daily-maximum-intake-level-of-lead/ (last accessed October 5, 2022).

[131] *Id*.

[132] *Id*. (internal quotation marks and citation omitted).

[133] Hannah Gardener, Jaclyn Bowen, Sean P. Callan, *Lead and cadmium contamination in a large sample of United States infant formulas and baby foods*, Science of The Total Environment, Volume 651, Part 1, 2019, Pages 822-827, ISSN 0048-9697, https://doi.org/10.1016/j.scitotenv.2018.09.026 (last accessed October 5, 2022).

[134] Congressional Report at 22.

160.     Defendant's internal limit for lead is 100 ppb. However, it "sold products that tested as high as 641 ppb lead—over six times higher than its internal limit."[135] "Nurture also sold five other products after they tested over 50 ppb lead."[136]

| Product Name | Category | Best Before Date | Param eter | Goal Thresh old | Result | Unit | Date of Test Report | Dispos ition |
|---|---|---|---|---|---|---|---|---|
| Blueberry Purple Carrot | Baby 7+ Months | 10/25/2017 | Lead | 100 | 641 | ppb | 01/27/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Multi-Grain Cereal Canister | Baby 6+ Months | 11/16/2018 | Lead | 100 | 580 | ppb | 08/30/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Apple Spinach Kiwi Cre | Baby 7+ Months | 8/4/2018 | Lead | 100 | 86 | ppb | 07/28/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Blueberry Beet Rice Ca | Baby 7+ Months | 6/22/2018 | Lead | 100 | 61 | ppb | 07/28/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Pea Spinach Teether | Baby 7+ Months | 10/24/2019 | Lead | 100 | 55 | ppb | 12/12/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Pea Spinach Teether | Baby 7+ Months | 05/07/2019 | Lead | 100 | 50 | ppb | 12/12/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

161.     Across the board, Nurture's products registered high for lead. "Of the 206 finished products that Nurture tested for lead, 16 products registered over 20 ppb lead—exceeding the lenient EU standard," the FDA's 5 ppb standard for lead in bottled water, and the [the] EPA's 15 ppb action level of drinking water.[137] "And 39 products, or 18.9%, tested over 10 ppb lead. It is not clear that even one of Nurture's baby food products registered at or below 1 ppb lead, which should be the upper limit for lead content according to the health experts at Consumer Reports, the Environmental Defense Fund, and the American Academy of Pediatrics."[138]

**D.     Cadmium**

162.     The Baby Foods also contain (or have a material risk of containing) cadmium, which has been shown to cause anemia, liver disease, and nerve or brain damage in animals that eat or drink it.

---

[135] *Id.*

[136] *Id.*

[137] *Id.* at 23.

[138] *Id.*; *see also* "Baby Food and Heavy Metals: What Parents Should Do Now," Consumer Reports, Updated Sept. 29, 2021, available at https://www.consumerreports.org/baby-food/baby-food-and-heavy-metals-advice-for-parents-a1523214531/ (last accessed October 5, 2022) ("20 percent of Nurture's finished products contained more than 10 ppb lead...").

163.    Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage. Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children[.]"[139]

164.    Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[140] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[141] Compounding such concerns is the fact that cadmium has a prolonged half-life because it "sequester[s] in [human] tissue."[142]

165.    The EPA has set a maximum contaminant level for cadmium in drinking water of 5 ppb, 40 C.F.R. § 141.62; the FDA has set a maximum level in bottled water of 5 ppb; and the WHO set a maximum cadmium level in drinking water of 3 ppb.[143]

166.    Additionally, products containing rice have been found to have higher levels of cadmium concentrations.[144]

---

[139] What's in my baby's food? HBBF Report at 14.

[140] *Id.*

[141] "Public Health Statement for Cadmium," Agency for Toxic Substances and Disease Registry, last reviewed March 12, 2015, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed October 5, 2022).

[142] Genuis S.J., Schwalfenberg G., Siy A.-K.J., Rodushkin I. (2012) *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*, PLOS ONE 7(11): e49676, available at https://doi.org/10.1371/journal.pone.0049676 (last accessed October 5, 2022).

[143] Congressional Report at 29.

[144] Hannah Gardener, Jaclyn Bowen, Sean P. Callan, *Lead and cadmium contamination in a large sample of United States infant formulas and baby foods*, Science of The Total Environment, Volume 651, Part 1, 2019, Pages 822-827, ISSN 0048-9697, https://doi.org/10.1016/j.scitotenv.2018.09.026 (last accessed October 5, 2022).

167.    The Subcommittee investigation determined that Defendant "sold multi-grain cereal with 49 ppb cadmium," (well over the EU's lax infant formula upper limit of 20 ppb cadmium), and "125 products that tested over 5 ppb, which is the EPA's limit for drinking water."[145]

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Multi-Grain Cereal Canister | Baby 6+ Months | 11/16/2018 | Cadmium | 50 | 49 | ppb | 06/30/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 1/18/2019 | Cadmium | 50 | 36 | ppb | 12/06/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 12/4/2020 | Cadmium | 50 | 35 | ppb | 10/09/19 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 11/10/2019 | Cadmium | 50 | 31 | ppb | 10/23/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 11/10/2019 | Cadmium | 50 | 30 | ppb | 10/31/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

### E.    Mercury

168.    The Baby Foods contain (or have a material risk of containing) mercury, which increases the risk for cardiovascular disease and can cause vision, intelligence, and memory problems for children exposed in utero. Exposure to mercury has been linked to higher risk of lower IQ scores and intellectual disability.[146] Mercury exposure at two and three years of age has been positively associated with autistic behaviors among pre-school age children.[147]

169.    In fact, in as early as 1997, the EPA issued a report to Congress that detailed the health risks that mercury poses to both humans and animals. Based on the toxicity and risks of mercury, regulations have been enacted at both the Federal and state level.

---

[145] Congressional Report at 29.

[146] What's in my baby's food? HBBF Report at 14.

[147] Congressional Report at 12-13.

170.    The EPA has set a maximum contaminant level for mercury in drinking water at 2 ppb.[148]

171.    Yet, "Nurture sold a finished baby food product that contained 10 ppb mercury, and two others that contained 9.8 and 7.3 ppb. A level of 10 ppb is five times more than the EPA's 2 ppb standard for drinking water. In total, Nurture sold 56 products that contained over 2 ppb mercury."[149]

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Brown Rice Cereal Canister | Baby 6+ Months | 08/16/2019 | Mercury | 10 | 10 | ppb | 08/20/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana Sweet Potato Tee | Baby 7+ Months | 6/3/2019 | Mercury | 10 | 9.8 | ppb | 04/16/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Brown Rice Cereal Canister | Baby 6+ Months | 04/17/2019 | Mercury | 10 | 7.3 | ppb | 12/04/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

172.    However, the FDA "action levels are not binding limits."[150] Rather, the FDA "considers action levels as an important source of information for determining whether a food is adulterated within the meaning of section 402(a)(1) of the Federal Food, Drug, and Cosmetic Act."[151]

**F.    Perchlorate**

173.    The Baby Foods also contain (or have a material risk of containing) perchlorate, a neurotoxic chemical compound. Perchlorate "is a rocket fuel component used since the Cold War."[152]

---

[148] *Id*. at 32.

[149] *Id*.

[150] Final Response Letter from FDA CFSAN to Office of the Attorney General of the State of New York, Posted by the FDA, May 18, 2022, available at https://www.regulations.gov/document/FDA-2021-P-1144-0011 (last accessed October 5, 2022).

[151] *Id*.

[152] What's in my baby's food? HBBF Report at 8.

174.    Perchlorate can disrupt the function of the thyroid, which is crucial for normal growth and development of the central nervous system in infants and young children.[153]  It has also been "linked to IQ loss among children born to mothers with thyroid dysfunction."[154]

175.    Perchlorate "disrupts thyroid functions crucial to brain development," yet "[l]evels in children's food [have] increased dramatically" since 2005.[155]

176.    The dangers of perchlorate in human food are recognized by the FDA.[156] Moreover, the EPA recently "announced multiple integrated actions to ensure that public health is protected from perchlorate in drinking water."[157] As early as 2011, the EPA acknowledged that perchlorate "may have an adverse effect on the health of persons and is known to occur in public drinking water systems with a frequency and at levels that present a public health concern."[158]

177.    Still, Defendant sells certain Baby Foods that contain levels of perchlorate, such as: Oatmeal Baby Cereal, Clearly Crafted - Organic Whole Grains; Oats & Quinoa Baby Cereal

---

[153]  "Perchlorate Questions and Answers," FDA, December 27, 2017, available at https://www.fda.gov/food/chemicals/perchlorate-questions-and-answers (last accessed October 5, 2022).

[154] What's in my baby's food? HBBF Report at 8.

[155] *Id.*

[156] Exploratory Survey Data on Perchlorate in Food 2004-2005, FDA, current as of January 25, 2018, available at https://www.fda.gov/food/chemicals/exploratory-survey-data-perchlorate-food-2004-2005 (last accessed October 5, 2022) ("Human exposure to sufficient doses of perchlorate can interfere with iodide uptake into the thyroid gland, disrupting its functions and potentially leading to a reduction in the production of thyroid hormones.").

[157]  "Perchlorate in Drinking Water," EPA, last updated April 1, 2022, available at  https://www.epa.gov/sdwa/perchlorate-drinking-water (last accessed October 5, 2022).

[158] *Id.* (acknowledging that "[s]ince that time, EPA has been reviewing the best available scientific data on a range of issues related to perchlorate in drinking water including its health effects, occurrence, treatment technologies, analytical methods, and the costs and benefits of potential standards.").

Organic Whole Grains with Iron; Simple Combos Apples, Spinach & Kale; Superfood Puffs - Apple & Broccoli Organic Grain Snack; and Organic Rice Cakes Puffed Rice Snack - Apple.[159]

### G.   Defendant Knew or Should Have Known the Baby Foods Contained and/or Had A Real Risk of Heavy Metals and Perchlorate

178.   At all times during the Class Period, Defendant knew or should have known the Baby Foods contained heavy metals and perchlorate and were not sufficiently tested, monitored, and mitigated for the presence of heavy metals and perchlorate. Indeed, Defendant has admitted "that all products will be sold regardless of testing result[.]"

179.   The Baby Foods included not only the real material risk but also, undisclosed detectable levels of heavy metals and perchlorate due to Defendant's failure to adequately monitor and mitigate their presence in the ingredients and finished products.  Defendant was aware of this risk and failed to disclose it to Plaintiffs and the Classes despite its duty to do so.

180.   Defendant knew or should have known the risks associated with the presence of heavy metals and perchlorate in foods consumed by infants and children.

181.   Defendant has acknowledged a "ground-breaking" study published in 1993 that identified the risk of toxic chemicals to the diets of infants and children.[160] The study found that infants and children are at "a heightened susceptibility to [toxic] chemicals" for a number of reasons, including: because they drink and eat more than adults in relation to their body weight; their immature metabolic systems; their lack of enzymes to break down and remove the toxic "poisons;" their early developmental processes' vulnerability to disrupted organ formation and

---

[159] What's in my baby's food? HBBF Report at 34-35.

[160] "Why Organic is Best for your baby and toddler," by Happy Family Organics on ParentingHub, September 8, 2020, available at https://parentinghub.co.za/why-organic-is-best-for-your-baby-and-toddler/ (last accessed October 5, 2022).

lifelong functional impairments; and their young age giving them more time to develop chronic diseases, many of which are triggered by toxic chemical "exposures in infancy."[161]

182.    Defendant has also recognized that early exposure to toxic chemicals "has been linked to the development of a range of cancers and neurological disorders."[162]

183.    Defendant even explained that, "[b]y limiting this exposure particularly in the vulnerable early years, through feeding infants and children organically produced food, parents can give their children the best possible chance for a healthy future."[163]

184.    Defendant proclaimed:

> The detection and screening practices to keep baby food safe and healthy have never been as advanced as they are today. We agree that there should be comprehensive attention to how the levels of heavy metals can continue to be diminished in food. **This must continue to be a focus of all who are connected to the supply chain including government and the FDA, growers, scientists and the food industry**.[164]

185.    In response to a question in the Food Quality & Safety FAQ section on Defendant's website, Defendant maintains "[m]anaging naturally occurring heavy metals is a core part of our product design, our ingredient qualifications processes, our auditing programs, and our continuous quality improvement initiatives."[165]

---

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] Happy Family Organics Statement to Our Valued Customers, February 2021, available at https://moonflower.coop/wp-content/uploads/2021/02/Baby-Food-Letter.pdf (emphasis in original) (last accessed October 5, 2022).

[165] "Our Quality Standards & Commitment to Organic," available at https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last accessed October 5, 2022).

186.    In response to a question in the FAQ section on Defendant's website as to what action Defendant has taken or is taking to reduce heavy metals in its foods, Defendant states it is "dedicated to data-driven improvements across our foods to bring mineral and metal levels down to as low as reasonably achievable[.]"[166]

187.    Defendant has also asserted:

> As a company run by parents, we prioritize the health and safety of our little ones, and work with the FDA, experts, and industry on contaminants management through the Baby Food Council. We only sell products that have been rigorously tested and we do not have products in-market with contaminant ranges outside of the limits set by the FDA.[167]

188.    Notably, Defendant fails to disclose to consumers that there are no limits set by the FDA for baby food when it claims to achieve such levels or that it will sell the Baby Food regardless of test results revealing levels that exceed even its own internal thresholds.

189.    Although Defendant was "proud to be a founding member of the Baby Food Council," an "initiative [to] look to best-in-class management techniques to *reduce the levels of heavy metals in baby food products to as low as reasonably achievable*,"[168] the Baby Food Council has since dissolved because industry representatives, such as Defendant, were not cooperating.[169]

---

[166] "Frequently Asked Questions," available at https://www.happyfamilyorganics.com/faqs/ (last accessed October 5, 2022).

[167] Happy Family Organics Statement to Our Valued Customers, February 2021, available at https://moonflower.coop/wp-content/uploads/2021/02/Baby-Food-Letter.pdf (emphasis added) (last accessed October 5, 2022).

[168] Happy Family Organics Mission Report 2020, at 5, available at https://issuu.com/happyfamilyorganics/docs/20210415_hfo_missionreport_2020report?e=1582039552/91240905 (emphasis in original) (last accessed October 5, 2022).

[169] "Advocates Withdraw from Baby-Food Panel," Food Processing, Nov. 10, 2021, available at https://www.foodprocessing.com/industrynews/2021/advocates-withdraw-from-baby-food-panel/ (last accessed October 5, 2022).

190.     Defendant knew or should have known that heavy metals and perchlorate pose health risks to infants and children.

191.     Defendant knew or should have known that it owed consumers a duty of care to prevent, or at the very least, minimize the presence of heavy metals and perchlorate in the Baby Foods to the extent reasonably possible.

192.     Defendant knew or should have known it owed consumers a duty of care to adequately test for heavy metals and perchlorate in the Baby Foods.

193.     Defendant knew that monitoring for heavy metals in its ingredients and Baby Foods was not only important, but also critical.

194.     Defendant knew consumers purchased the Baby Foods based on the reasonable expectation that Defendant manufactured the Baby Foods to the highest standards. Based on this expectation, Defendant knew or should have known consumers reasonably expected that Defendant would hold the Baby Foods to the highest standards for preventing the inclusion of heavy metals and perchlorate in the Baby Foods, which would include testing the Baby Foods' raw ingredients and finished products for heavy metals and perchlorate.

195.     The Consumer Survey demonstrates such an expectation, showing 90% of respondents expect a company to test for heavy metals in baby food:

**14.Do you expect a company to test for arsenic, cadmium, lead, and/or mercury in baby food that will be fed to babies?**



196.    The Baby Foods have a risk of containing heavy metals and perchlorate due to Defendant's failure to have proper quality control procedures, including monitoring for the presence of heavy metals and perchlorate in the ingredients and finished products and rigid supplier requirements, and its use of ingredients that exceed its own lax internal guidelines for some heavy metals. Defendant was exclusively aware of this risk and yet failed to disclose it to Plaintiffs and the Classes, a disclosure that reasonable consumers would expect.

197.    The Consumer Survey results demonstrate this expectation:

**13.Would you expect a company to disclose if there were detectable levels, or risk, of arsenic, cadmium, lead, and/or mercury in baby food?**



**15.In your opinion, should a company disclose arsenic, cadmium, lead, and/or mercury testing results to consumers?**



198.     Defendant knew or should have known consumers reasonably expected that Defendant would hold the Baby Foods to the highest standards for preventing the inclusion of heavy metals and perchlorate in the Baby Foods, which would include testing the Baby Foods' ingredients and finished Products for heavy metals and perchlorate and disclosing testing results to consumers.[170]

199.     Despite these expectations and presence (or material risk of the presence of) of heavy metals and perchlorate, Defendant prominently packages, claims, features, represents, advertises, or otherwise markets the Baby Foods as organic, nutritious, high-quality, made with superior ingredients, manufactured to high standards, and appropriate for various "stages" of development, and fails to adequately monitor the presence of heavy metals and perchlorate in its Products and fails to disclose its testing results.

## V.     BABY FOOD PRODUCTS CAN BE MANUFACTURED WITHOUT MEASURABLE LEVELS OF HEAVY METALS AND PERCHLORATE

200.     In contrast to the heavy metals and perchlorate found in the Baby Foods, other baby food manufacturers have produced products that are free of heavy metals, perchlorate, and/or other contaminants or with levels that are not measurable.

201.     The Clean Label Project tests products for more than 400 contaminants, including heavy metals, chemicals, and plastics, and presents its Purity Award to companies with products with the lowest levels of the contaminants when compared to other products in a given category.[171]

---

[170] Notably, Defendant only disclosed its testing results to Congress as part of the investigation.

[171] Clean Label Project Purity Award, available at https://cleanlabelproject.org/purity-award/ (last accessed October 5, 2022); Once Upon a Farm Purity Award, available at https://cleanlabelproject.org/Once%20Upon%20A%20Farm/ (last accessed October 5, 2022).

202.    Cerebelly, a manufacturer of shelf-stable pureed baby food pouches (recognized by the Clean Label Project for manufacturing products that were free from heavy metals) and Once Upon a Farm, a manufacturer of cold-pressed, refrigerated blends for infants and children, were both recipients of the Clean Label Project's Purity Award.[172]

203.    Nature's One is another baby food manufacturer of organic pediatric nutritional products, including infant and toddler formulas, which received the Clean Label Project's Purity Award.[173] According to independent laboratory tests, its products regularly test at zero for harmful contaminants, including heavy metals and perchlorate.[174]

204.    Another baby food manufacturer and recipient of the Clean Label Project's Purity Award, Yumi, takes numerous proactive steps to ensure its products are safe for infants and children.[175] Yumi does not use ingredients such as rice and fruit juice, both known to contain high levels of arsenic.[176] Yumi also uses "heavy metal fighters," ingredients that can block the body's

---

[172]  "Cerebelly receives The Clean Label Project Purity Award confirming its products are free from heavy metals," Foodnavigator-USA.com, Feb. 8, 2021, available at https://www.foodnavigator-usa.com/Article/2021/02/08/Cerebelly-receives-The-Clean-Label-Project-Purity-Award-confirming-its-products-are-free-from-heavy-metals#:~:text=Cerebelly%20has%20received%20The%20Clean,stable%20pureed%20baby%20food%20pouches. (last accessed October 5, 2022); and "Clean Label Project Certified," Once Upon a Farm website, available at https://onceuponafarmorganics.com/pages/clean-label-project (last accessed October 5, 2022).

[173]  Nature's One Purity Award, available at https://cleanlabelproject.org/Natures-one/ (last accessed October 5, 2022).

[174]  "Part 3: As baby food industry is slow to reduce toxic metals, blueprint already exists," WJLA, May 28, 2021, available at https://wjla.com/news/spotlight-on-america/exclusive-as-baby-food-industry-is-slow-to-reduce-toxic-metals-blueprint-already-exists (last accessed October 5, 2022).

[175]  "Heavy Metals and Baby Food," Yumi website, available at https://helloyumi.com/heavy-metals/ (last accessed October 5, 2022).

[176]  Id.

absorption of heavy metals.[177] Yumi also regularly tests both the ingredients and finished products for heavy metals.[178]

205.    Manufacturers can take steps to reduce heavy metals in their products, such as: requiring growers to follow best practices; requiring suppliers to test crops; changing field flooding cycles; purchasing ingredients from locations known to produce less contaminated crops; and selecting varieties known to uptake lower amounts of heavy metals.[179]

206.    Baby food manufacturers can also "prevent contamination" by "sourcing the raw ingredients from the right place, more specifically from farmers who grow crops with natural soil additives that reduce heavy metal uptake, use strains of food that are less likely to absorb heavy metals, and alter irrigation practices."[180] Baby food manufacturers can also test both the raw ingredients and the finished products.

207.    Additionally, public health efforts have proved to decrease exposure to lead over the past 40 years.[181] These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[182] The progress towards decreasing childhood exposure to lead

---

[177] *Id.*

[178] *Id.*

[179] Is Homemade Baby Food Better? HBBF Report at 23-25.

[180] "The FDA's Slow Efforts to Minimize Heavy Metals in Baby Food is Causing a Crisis," The Environmental Magazine, September 6, 2022, available at https://emagazine.com/the-fdas-slow-efforts-to-minimize-heavy-metals-in-baby-food-is-causing-a-crisis/ (last accessed October 5, 2022).

[181] Dignam, T., Kaufmann, R. B., LeStourgeon, L., & Brown, M. J. (2019). *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure.* Journal of Public Health Management and Practice: JPHMP, 25 Suppl 1, Lead Poisoning Prevention (Suppl 1 LEAD POISONING PREVENTION), S13–S22. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed October 5, 2022).

[182] *Id.*

was so impressive that the Centers for Disease Control and Prevention ("CDC") identified "childhood lead poisoning prevention as 1 of 10 great U.S. public health achievements during 2001 to 2010."[183]

208.    The European Union has presented enforceable solutions for heavy metals in infant foods.[184] The European Union "sets the highest standards for regulating levels of unwanted contaminants in infant nutrition[,]" including limiting the heavy metals in food coming out of the manufacturing process.[185]

209.    Testing conducted by Consumer Reports showed that approximately one-third of tested products had amounts of heavy metals that were not of concern and other products had immeasurable levels of heavy metals; and none of those products were manufactured by Defendant.[186] As stated by Dr. James E. Rogers, the Consumer Reports Director of Food Safety Research and Testing, "there are ways for manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[187]

## VI.    THE MATERIAL OMISSIONS ARE MISLEADING

210.    The Omissions wrongfully convey to consumers that Defendant's Baby Foods have certain superior quality and characteristics that they do not actually possess.

---

[183] *Id.*

[184] "Are there Heavy Metals in European Baby Formula?" Feb. 15, 2021, available at https://myorganiccompany.store/blogs/news/are-there-heavy-metals-in-european-baby-formula (last accessed October 5, 2022) ("Making infant health and development the number one priority, European Union regulations for heavy metals are thoughtfully designed and strictly enforced.").

[185] *Id.*

[186] "Heavy Metals in Baby Food: What You Need to Know," Consumer Reports, August 16, 2018, available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed October 5, 2022).

[187] *Id.*

211. Although Defendant misleadingly causes consumers to believe its Baby Foods do not contain heavy metals, perchlorate, and/or other contaminants due to the material Omissions, the Baby Foods do in fact contain undisclosed heavy metals, perchlorate, and/or other contaminants, which is material information to reasonable consumers.

212. For example, the following foods were tested and found to contain undisclosed heavy metals:[188]

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|---|---|---|---|---|---|
| Oats & Quinoa Baby Cereal Organic Whole Grains with Iron - Sitting baby | 10.2 | -- | 0.9*[189] | 12.4 | < 0.14 |
| Oatmeal Baby Cereal, Clearly Crafted - Organic Whole Grains - for sitting baby | 6.3* | -- | < 0.5 | 10 | < 0.14 |
| Organics Sweet Potatoes - Stage 1 | 5.8* | -- | 1.5* | 1* | < 0.142 |
| Sweet Potatoes - Stage 1 | 27.5 | 29**[190] | 2 | 1.6* | < 0.141 |
| Organic Pears - Stage 1 | 7.4 | -- | 1* | 0.8* | < 0.138 |

---

[188] The following chart represents the levels of Heavy Metals in Defendant's products included in the Healthy Babies Bright Futures Reports, What's in my baby's food HBBF Report at 19-28 (Appendix A), and the Is Homemade Baby Food Better? HBBF Report at 30-39 (Appendix A).

[189] An asterisk ("*") indicates that test results were estimated, between the limit of detection and the limit of quantitation.

[190] "Total arsenic value is higher than inorganic arsenic value but falls within the allowable and expected analytical error. For example, this ratio of inorganic to total arsenic of 105% falls within the FDA method for arsenic speciation in rice, which allows this ratio to range from 65 – 135%." What's in my baby's food? HBBF Report at 28 (Notes to Appendix A).

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|---|---|---|---|---|---|
| Clearly Crafted Prunes Organic Baby Food, 1, 4+ months | < 2.1 | -- | 2 | < 0.5 | < 0.136 |
| Simple Combos Apples, Spinach & Kale - 2 | 3* | -- | 4.3 | 4.9 | 0.182* |
| Apples, Sweet Potatoes & Granola Clearly Crafted Organic Baby Food - 2 | 3.6* | -- | 5.2 | 1.5* | < 0.142 |
| Superfood Puffs - Apple & Broccoli Organic Grain Snack - for crawling baby | 266 | 83 | 8.2 | 11 | 2.16 |
| Superfood Puffs Organic Grain Snack - Sweet Potato & Carrot | 295 | 91 | 3.7 | 12.2 | 1.94 |
| Organic Rice Cakes Puffed Rice Snack - Apple | 455 | 47 | 1.7 | 5.4 | 3.18 |
| Organic Teethers Blueberry & Purple Carrot - Sitting baby | 67 | -- | 6 | 8.2 | 2.26 |
| Organics sweet potatoes - Stage 1 | 6* | | 2.2 | 0.8* | < 0.14 |
| Carrots - Clearly Crafted - Stage 1 | 3.1* | | 6.8 | 5.1 | < 0.9 |
| Carrots - Stage 1 | 3.2* | | 3.4 | 5.9 | < 0.8 |
| Green Beans - Organic Clearly Crafted, Stage 1 | < 1.1 | | 2.1 | 0.8* | < 0.9 |

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|---|---|---|---|---|---|
| Green Beans - Organic Stage 1 | < 1.1 | | 1.5 | 1* | < 0.8 |
| Green Beans - Organic Stage 1 | < 1.1 | | 1* | 0.8* | < 0.9 |
| Oatmeal Baby Cereal, Clearly Crafted Organic | 5.4 * | | 1* | 9.7 | < 1.6 |
| Pears - Clearly Crafted Stage 1 | 1.7 * | | 1.6 | 1.1* | < 0.8 |
| Pears - Organic - Clearly Crafted Stage 1 | < 1.1 | | 0.8* | 0.7* | < 0.9 |
| Pears - Organic - Clearly Crafted Stage 1 | < 1.1 | | 1.1* | 0.6* | < 0.8 |
| Puffs Organic Grain Snack - Sweet Potato & Carrot | 318 | 59.4 | 8.2 | 11.8 | < 1.7 |
| Sweet Potatoes - Cleary Crafted Stage 1 | 6.2 | | 3.5 | < 0.6 | < 0.8 |
| Sweet potatoes - organic - Clearly Crafted - Stage 1 | 5.9 | | 1.3* | 0.6* | < 0.8 |
| Teether Crackers - Organic, Mango & Pumpkin | 52.3 | | 4.9 | 13.9 | 1.8* |
| Teether Crackers - Organic, Strawberry & Beet | 55.2 | | 13.4 | 14.2 | < 1.7 |

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|---|---|---|---|---|---|
| Teethers - Organic, Blueberry and Purple Carrot | 51.5 | | 9.1 | 14.3 | < 1.5 |
| Teethers - Organic, Sweet Potatoes and Bananas | 95 | 53 | 2.4* | 12.6 | < 1.8 |

213.    Additionally, Consumer Reports' test results showed that Defendant's Baby Foods identified below contained heavy metals at levels that pose greater health risks to children:[191]



**Happy Baby Organics Superfood Puffs, Purple Carrot & Blueberry**

SERVING SIZE: 0.5 CUP

DAILY LIMIT: <1 SERVING



**Happy Baby Organics Superfood Puffs, Apple & Broccoli**

SERVING SIZE: 0.5 CUP

DAILY LIMIT: <1 SERVING

---

[191] Consumer Reports calculated the daily limit a child could consume of each product before it would pose potential health risks due to exposure to cadmium, arsenic, and lead. The lower the daily limit, the greater the risk from that food [products with "daily limit" noted in red are those with greater risk. *See* "Heavy Metals in Baby Food: What You Need to Know," Consumer Reports, August 16, 2018, available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed October 5, 2022).

214.    Results from the FDA's recent Total Diet Study further demonstrate the presence of toxic elements in baby foods.  Of the 1,536 analytical results for toxic elements, 35% had detectable levels.[192] Cadmium was ***not*** detected in only 35% of the baby food samples.[193]

215.    A study conducted by scientists from the University of Miami, the Clean Label Project, and Ellipse Analytics investigated lead and cadmium in U.S. baby food products.[194] They found lead in 37% of the samples and cadmium in 57%.[195] The study also found no correlation between organic and conventional foods and heavy metal levels but did conclude that products containing rice had higher levels of both lead and cadmium.[196]

216.    Yet, Defendant fails to disclose to reasonable consumers material information on the presence of (or material risk of the presence of) heavy metals, perchlorate, and/or other contaminants in its Baby Foods.

217.    Defendant alone possessed the knowledge of the Omissions that it knew were material and failed to provide the information to consumers.

218.    Based on the Omissions, a reasonable consumer would not suspect the presence of heavy metals, perchlorate, and/or other contaminants, nor would a reasonable consumer be able to detect the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods

---

[192] "Total Diet Study Report Fiscal Years 2018-2020 Elements Data," FDA, at 26, available at https://www.fda.gov/media/159745/download (last accessed October 5, 2022).

[193] *Id.* at 27 (emphasis added).

[194] Hannah Gardener, Jaclyn Bowen, Sean P. Callan, *Lead and cadmium contamination in a large sample of United States infant formulas and baby foods*, Science of The Total Environment, Volume 651, Part 1, 2019, Pages 822-827, ISSN 0048-9697, https://doi.org/10.1016/j.scitotenv.2018.09.026 (last accessed October 5, 2022).

[195] *Id.*

[196] *Id.*

without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

219.    Reasonable consumers must and do rely on Defendant to honestly report what its Baby Foods contain.

220.    Based on the packaging, reasonable consumers would not expect or understand the Baby Foods contained or risked containing heavy metals or perchlorate.

221.    Plaintiffs relied on the Products' packaging when purchasing.

222.    Plaintiffs' expectations and reliance are consistent with reasonable parents, as shown by the Consumer Survey. After reviewing packaging for Defendant's Products, 10% of respondents expected heavy metals in each Product based on the packaging. In other words, 90% of respondents *did not* expect arsenic, cadmium, lead, and/or mercury in each of Defendant's Products they were shown.

223.    Despite these expectations and presence (or material risk of the presence) of heavy metals and perchlorate, Defendant prominently packages, advertises, and markets the Baby Foods as organic, nutritious, high-quality, made with superior ingredients, manufactured to high standards, and appropriate for various "stages" of development, and fails to disclose the presence of heavy metals, perchlorate, and/or other contaminants.

224.    Reasonable consumers, like Plaintiffs, consider the inclusion (or material risk of inclusion) of contaminants a material fact when considering what baby food to purchase.

225.    The Consumer Survey demonstrates that materiality. When asked "how important, if at all, would it be to your purchasing decision if the baby food you purchased contained, or risked containing, even a small amount of arsenic, cadmium, lead, and/or mercury[,]" 98% of respondents, an overwhelming amount, indicated it was very important or important:

**12. Please select how important, if at all, would it be to your purchasing decision if the baby food you purchased contained, or risked containing, even a small amount of arsenic, cadmium, lead, and/or mercury.**



226.     In light of Defendant's claims regarding the quality standards of the Baby Foods, including its "strict, self-imposed quality standards,"[197] Defendant knew or should have known the Baby Foods contained or had a material risk of containing heavy metals, perchlorate, and/or other contaminants.

227.     Defendant had a duty to ensure the Baby Foods were not deceptively, misleadingly, unfairly, and falsely packaged and all material information was properly and fully disclosed.

---

[197]     "Our   Quality   Standards   &   Commitment   to   Organic,"   available   at https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/   (last   accessed October 5, 2022).

228.    Defendant acted intentionally, knowingly, and/or recklessly, with its deceptive packaging based on the material Omissions.

229.    Defendant knew that properly and sufficiently testing the Baby Foods for heavy metals, perchlorate, and/or other contaminants in its ingredients and finished Baby Foods was not only important, but critical.

230.    Additionally, Defendant knew or should have been aware that a reasonable consumer would be feeding the Baby Foods multiple times each day to his or her child, making it a significant source of food for the child.  This leads to repeated exposure to the heavy metals, perchlorate, and/or other contaminants to the child.

231.    Defendant knew or should have known it could control the levels of heavy metals, perchlorate, and/or other contaminants in the Baby Foods by properly monitoring their ingredients for heavy metals, perchlorate, and/or other contaminants and adjusting any formulation or diet to reduce ingredients that contained or may contain heavy metals, perchlorate, and/or other contaminants.

232.    The Omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions.  This is true especially considering the long-standing campaign by Defendant to market the Baby Foods as organic, nutritious, high-quality, made with superior ingredients, and manufactured to high standards, and to induce consumers, such as Plaintiffs, to purchase the Products.

233.    The Omissions make the Baby Foods' packaging deceptive based on the presence or risk of heavy metals, perchlorate, and/or other contaminants in the Baby Foods.  Reasonable consumers, like Plaintiffs, would consider the mere presence or risk of heavy metals, perchlorate,

and/or other contaminants in the Baby Foods a material fact when considering which baby food to purchase or whether to purchase baby food at all.

234.    At all times during and throughout the Class Period, Defendant knew it was not properly and sufficiently testing the Baby Foods or their ingredients for heavy metals, perchlorate, and/or other contaminants.

235.    Defendant knew, yet failed to disclose, its lack of adequate regular testing, monitoring, and knowledge that the Baby Foods and/or ingredients used in the Baby Foods included undisclosed levels of heavy metals, perchlorate, and/or other contaminants.

236.    Defendant's packaging was misleading due to Defendant's failure to properly and sufficiently test for and to disclose the risk of the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods.

237.    Defendant knew or should have known the Baby Foods contained or may have contained undisclosed heavy metals, perchlorate, and/or other contaminants that were inconsistent with their packaging.

238.    Defendant knew or should have known that reasonable consumers expected it to ensure the Baby Foods and ingredients were monitored and tested for heavy metals, perchlorate, and/or other contaminants to ensure compliance with their packaging.

239.    Defendant knew or should have known consumers paid premium prices and expected Defendant to regularly test for heavy metals, perchlorate, and/or other contaminants and sufficiently test the Baby Foods and ingredients for the presence of heavy metals, perchlorate, and/or other contaminants.

240.    The Omissions are material and render the Baby Food packaging deceptive because, without disclosure, reasonable consumers believe the Baby Foods are organic, nutritious,

high-quality, made with superior ingredients, and manufactured to high standards and are free of heavy metals, perchlorate, and/or other contaminants.

241.    Moreover, reasonable consumers, such as Plaintiffs and the Classes' members, would have no reason to doubt or question Defendant's statements regarding the quality of the Baby Foods.  Based on the impression given by the packaging, reasonable consumers would not expect or understand the Baby Foods contained or risked containing heavy metals or perchlorate.

242.    The Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the members of the Classes, to purchase products they would not have if the true quality, ingredients, and standards were.

243.    Likewise, the Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the members of the Classes to pay price premiums they would not have paid had they been told the truth regarding the Baby Foods' quality, ingredients and standards.

244.    As a result of Defendant's Omissions, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap enormous profits from, consumers who paid the purchase price or premium for the Baby Foods that were not as advertised.

245.    This is not surprising given that, for example, the baby food market in the United States was valued at $12.9 billion in 2018 and was expected to increase to $17.2 billion by 2026,[198] and organic baby food was valued at $1.9 billion in the United States in 2018 and is expected to reach $3.32 billion by 2024.[199]

---

[198] "U.S Baby Food Market by Product Type, and Distribution Channel: Opportunity Analysis and Industry Forecast, 2019-2026," GlobeNewswire, January 16, 2020, available at https://www.globenewswire.com/news-release/2020/01/16/1971596/0/en/U-S-Baby-Food-Market-by-Product-Type-and-Distribution-Channel-Opportunity-Analysis-and-Industry-Forecast-2019-2026.html (last accessed October 5, 2022).

[199] "North America Organic Baby Food Market Expected to Reach a Value of $3.32 Billion by 2024 with a CAGR of 9.6% - ResearchAndMarkets.com," Businesswire, January 20, 2020,

246.    The incredible rise in consumer demand for organic baby food is "driven by the growing awareness among consumers to limit that baby's exposure to the harmful chemicals used in conventional food production and the awareness of the benefits of organic products."[200] "Parents have become more aware of different food ingredients and are more concerned about what their babies and toddlers consume than what they, as an adult, consume."[201]

## THE OMISSIONS VIOLATE NEW YORK LAWS

247.    New York law is designed to ensure that a company's claims about its products are truthful and accurate.

248.    Defendant violated New York law by intentionally, knowingly, and/or recklessly deceptively claiming that the Baby Foods are nutritious, high-quality, made with superior ingredients, manufactured to high standards, and appropriate for various "stages" of development, and by not accurately detailing that the products contain heavy metals, perchlorate, and/or other contaminants.

249.    Defendant has engaged in this long-term advertising campaign omitting any mention that the Baby Foods contain (or having a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

---

available at https://www.businesswire.com/news/home/20200120005436/en/North-America-Organic-Baby-Food-Market-Expected-to-Reach-a-Value-of-3.32-Billion-by-2024-with-a-CAGR-of-9.6---ResearchAndMarkets.com (last accessed October 5, 2022).

[200] "Organic Baby Food Market – Growth, Trends, COVID-19 Impact, and Forecasts (2022-2027)," Mordor Intelligence, available at https://www.mordorintelligence.com/industry-reports/organic-baby-food-market (last accessed October 5, 2022).

[201] "Organic Baby Food Market Size, Share & COVID-19 Impact Analysis, By Type (Wet Food, Infant Milk Formula, and Dry Food), Distribution Channel (Supermarkets/Hypermarkets, Specialty Stores, Online Sales Channels, and Others), and Regional Forecast, 2021-2028," Fortune Business Insights, available at https://www.fortunebusinessinsights.com/organic-baby-food-market-106440 (last accessed October 5, 2022).

250.    Defendant alone possessed the material information that was relevant to Plaintiffs and other reasonable consumers and failed to provide the material information to consumers.

**PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT**

251.    Plaintiffs read and relied upon the packaging of the Baby Foods when making their purchasing decisions. Had they known Defendant omitted and failed to disclose the presence of heavy metals and perchlorate on its packaging, they would not have purchased the Baby Foods and certainly would not have paid a premium price for them.

252.    A reasonable consumer considers the packaging of a product when deciding whether to purchase it.

**CLASS ACTION ALLEGATIONS**

253.    Plaintiffs bring this action individually and on behalf of the following Subclasses pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who are citizens of New York who, from February 4, 2015, to the present, purchased the Baby Foods for household or business use, and not for resale (the "New York Subclass").

254.    Plaintiffs also bring this action individually and on behalf of the following Subclass pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who are citizens of Minnesota who, from February 4, 2015, to the present, purchased the Baby Foods in Minnesota for household or business use, and not for resale (the "Minnesota Subclass").

255.    Plaintiffs also bring this action individually and on behalf of the following Subclass pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who are citizens of Illinois who, from February 4, 2015, to the present, purchased the Baby Foods in Illinois for household or business use, and not for resale (the "Illinois Subclass").

256.    Plaintiffs also bring this action individually and on behalf of the following Subclass pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

All persons who are citizens of Washington who, from February 4, 2015, to the present, purchased the Baby Foods in Washington for household or business use, and not for resale (the "Washington Subclass").

257.    Plaintiffs also bring this action individually and on behalf of the following Subclass pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

All persons who are citizens of California who, from February 4, 2015, to the present, purchased the Baby Foods in California for household or business use, and not for resale (the "California Subclass").

258.    The New York Subclass, Minnesota Subclass, Illinois Subclass, Washington Subclass, and California Subclass are collectively referred to as the "Classes."

259.    Excluded from the Classes is the Defendant; any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, and employees; co-conspirators; all governmental entities; and any judge, justice, or judicial officer presiding over this matter.

260.    This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

261.    The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes in a single action will provide substantial benefits to the parties and Court.

262.    Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

a)      whether the Omissions were misleading;

b)      whether Defendant owed a duty to disclose;

c)      whether Defendant knew or should have known that the Baby Foods contained or may contain heavy metals;

    d) whether Defendant knew or should have known that the Baby Foods contained or may contain perchlorate;

    e) whether Defendant failed to disclose that the Baby Foods contained or may contain heavy metals;

    f) whether Defendant failed to disclose that the Baby Foods contained or may contain perchlorate;

    g) whether Defendant's packaging is false, deceptive, and misleading based on the Omissions;

    h) whether the Omissions are material to a reasonable consumer;

    i) whether the Omissions are likely to deceive a reasonable consumer;

    j) whether Defendant had knowledge that the Omissions were material and false, deceptive, and misleading;

    k) whether Defendant had exclusive knowledge of the Omissions;

    l) whether Plaintiffs could have reasonable discovered the Omissions;

    m) whether Defendant violated New York state laws;

    n) whether Defendant violated Minnesota state laws;

    o) whether Defendant violated Illinois state laws;

    p) whether Defendant violated Washington state laws;

    q) whether Defendant violated California state laws;

    r) whether Defendant engaged in unfair trade practices;

    s) whether Defendant engaged in false advertising;

    t) whether Defendant made fraudulent omissions;

    u) whether Defendant made fraudulent misrepresentations by omissions;

v)      whether Plaintiffs and members of the Classes are entitled to actual, statutory, and punitive damages; and

w)      whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

263.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

264.    Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

265.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, heavy metal and perchlorate contamination and false advertising litigation.

266.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

267.    Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

268.    As a result of the foregoing, class treatment is appropriate.

## COUNT I

**Violations of New York's Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, Against Defendant on Behalf of Plaintiffs Mezile, Margiotta, and Barbu and the New York Subclass**

269.    Plaintiffs Mezile, Margiotta, and Barbu incorporate by reference and reallege each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

270.    New York General Business Law ("GBL") § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

271.    In its advertising and sale of goods throughout New York, Defendant conducts business and trade within the meaning of GBL § 349.

272.    Defendant violated GBL § 349 by deceptively and misleadingly omitting that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

273.    Defendant's Omissions, concealment, and other deceptive conduct intentionally marketed that the Baby Foods were of a particular standard, grade, or quality when they in fact contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

274.    Defendant's Omissions, concealment, and other deceptive conduct described herein were directed at the consumer public at-large as they repeatedly occurred in the course of Defendant's business and were capable of deceiving a substantial portion of the consuming public.

275.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs Mezile, Margiotta, and Barbu, the New York Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Baby Foods. Had Plaintiffs Mezile, Margiotta, and Barbu and members of the New York Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had

a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods or paid a premium price.

276.    Defendant alone possessed the information that was material to Plaintiffs Mezile, Margiotta, and Barbu and the New York Subclass and failed to disclose such material information to consumers.

277.    Defendant has engaged and continues to engage in deceptive conduct in violation of GBL § 349.

278.    Defendant's Omissions and other deceptive conduct caused Plaintiffs Mezile, Margiotta, and Barbu and the New York Subclass to suffer injury in the form of actual damages when they purchased the Baby Foods that were worth less than the price paid and that they would not have purchased at all had they known the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

279.    Defendant intended for Plaintiffs Mezile, Margiotta, and Barbu and the New York Subclass to rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed material facts.

280.    As a direct and proximate result of these violations, Plaintiff Margiotta, the New York Subclass, and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from further omitting the true quality, ingredients, and standards of the Baby Foods.

281.    Pursuant to GBL § 349(h) and § 350-D, Plaintiff Margiotta and the New York Subclass seek injunctive relief and Plaintiffs Mezile, Margiotta, and Barbu and the New York

Subclass seek declaratory relief, full refund, compensatory and punitive damages, actual damages or $50 (whichever is greater), statutory and treble damages, and attorneys' fees.

## COUNT II

**Violations of New York False Advertising Law, N.Y. Gen. Bus. Law § 350, Against Defendant on Behalf of Plaintiffs Mezile, Margiotta, and Barbu and the New York Subclass**

282.    Plaintiffs Mezile, Margiotta, and Barbu incorporate by reference and reallege each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

283.    New York General Business Law ("GBL") § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

284.    Pursuant to GBL § 350, false advertising is defined as "advertising, including labeling, or a commodity… if such advertising is misleading in a material respect. … [considering] representations made by statement, word [or] design [and] the extent to which the advertising fails to reveal facts material in the light of such representations."

285.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, and standards as described above because they contained (or had a material risk of containing) undisclosed levels of heavy metals, perchlorate, and/or other contaminants.

286.    Defendant purposely concealed and did not disclose material facts regarding the presence of heavy metals, perchlorate, and/or other contaminants to consumers, such as Plaintiffs Mezile, Margiotta, and Barbu and the New York Subclass.

287.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs Mezile, Margiotta, and Barbu, the New York Subclass, and other reasonable consumers would have considered them when deciding whether to purchase the Baby Foods. Had Plaintiffs Mezile, Margiotta, and Barbu and members of the New York Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had

a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods.

288.     Defendant's conduct caused Plaintiffs Mezile, Margiotta, and Barbu and the New York Subclass to suffer actual damages when they purchased the Baby Foods that were worth less than the price paid and that they would not have purchased at all had they known the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

289.     As a direct and proximate result of Defendant's violation of GBL § 350, Plaintiff Margiotta and the New York Subclass have been injured, and that harm will continue unless Defendant is enjoined from further omitting the true quality, ingredients, and standards of its Baby Foods, including but not limited to the presence of heavy metals, perchlorate, and/or other contaminants. Pursuant to GBL § 350-D, Plaintiff Margiotta and the New York Subclass seek injunctive relief and Plaintiffs Mezile, Margiotta, and Barbu and the New York Subclass seek declaratory relief, full refund, actual and punitive damages or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

## COUNT III

**Violation of Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.09, *et seq*.,
Against Defendant on Behalf of Plaintiff McKeon and the Minnesota Subclass**

290.     Plaintiff McKeon incorporates by reference and realleges each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

291.     Plaintiff McKeon and Defendant are "persons" within the meaning of the Minnesota Unlawful Trade Practices Act (the "MUTPA"), Minn. Stat. § 325D.10(a).

292.    Defendant violated the MUTPA by knowingly omitting and failing to disclose the true quality, ingredients, and standards of the Baby Foods because they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

293.    Defendant's pattern of knowing Omissions, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff McKeon and the Minnesota Subclass with respect to the Baby Foods' quality, ingredients, and standards.

294.    Defendant intended that Plaintiff McKeon and the Minnesota Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed facts.

295.    Defendant's Omissions, concealment, and other deceptive conduct as described herein occurred repeatedly in the course of its trade or business and were capable of deceiving a substantial portion of the consuming public.

296.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff McKeon, the Minnesota Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Baby Foods.  Had Plaintiff McKeon and members of the Minnesota Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods.

297.    Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

298.    As a direct and proximate result of Defendant's conduct, Plaintiff McKeon and the Minnesota Subclass have suffered actual damages in that they purchased the Baby Foods that were worth less than the price they paid.

299.    Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325D.15, Plaintiff McKeon and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUTPA.

## COUNT IV

**Violation of Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, et seq., Against Defendant on Behalf of Plaintiff McKeon and the Minnesota Subclass**

300.    Plaintiff McKeon incorporates by reference and realleges each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

301.    Plaintiff McKeon brings this claim individually and on behalf of the members of the proposed Minnesota Subclass against Defendant for violations of the Minnesota Deceptive Trade Practices Act ("MUDTPA"), Minn. Stat. § 325D.44, *et seq*.

302.    Defendant violated the MUDTPA by representing that the Baby Foods had characteristics and ingredients they do not have; by representing that the Baby Foods are of a particular standard, quality, or grade when they are of another; by advertising goods with the intent not to sell them as advertised; and by engaging in other deceptive conduct that created a likelihood of confusion or misunderstanding. Minn. Stat. § 325D.44, subd. 1(5), (7), (9), (13).

303.    Defendant willingly engaged in deceptive trade practices by failing to disclose the true quality, ingredients, and standards of the Baby Foods because they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

304.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, or standards described above because they contained (or had a material risk of containing) undisclosed heavy metals, perchlorate, and/or other contaminants.

305.    Defendant's pattern of knowing Omissions, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff McKeon and the Minnesota Subclass with respect to the Baby Foods' quality, ingredients, and standards.

306.    Defendant intended that Plaintiff McKeon and the Minnesota Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed material facts.

307.    Plaintiff McKeon and the Minnesota Subclass relied on, and were in fact deceived by, Defendant's Omissions, concealment, and other deceptive conduct with respect to the Baby Foods' quality, ingredients, and standards.

308.    Defendant's Omissions, concealment, and other deceptive conduct as described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

309.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff McKeon, the Minnesota Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Baby Foods.  Had Plaintiff McKeon and members of the Minnesota Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods.

310.    Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

311.    Defendant was under a duty to disclose the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods because Defendant undertook the disclosure of information about the Baby Foods on the Baby Foods' packaging.

312.    Defendant failed to discharge its duty to disclose the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods.

313.    As a direct and proximate result of Defendant's conduct, Plaintiff McKeon and the Minnesota Subclass have suffered actual damages in that they purchased the Baby Foods that were worth less than the prices they paid.

314.    Pursuant to Minn. Stat. § 8.31, subd. 3a and § 325D.45, Plaintiff McKeon and the Minnesota Subclass seek injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUDTPA.

## COUNT V

**Violation of Minnesota False Statement in Advertisement Act, Minn. Stat. § 325F.67, *et seq*., Against Defendant on Behalf of Plaintiff McKeon and the Minnesota Subclass**

315.    Plaintiff McKeon incorporates by reference and realleges each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

316.    Plaintiff McKeon brings this claim individually and on behalf of the members of the Minnesota Subclass against Defendant for violations of the Minnesota False Statement in Advertisement Act ("FSAA"), Minn. Stat. § 325F.67, *et seq*.

317.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, or standards as described above because they contained (or had a material risk of containing) undisclosed levels of heavy metals, perchlorate, and/or other contaminants.

318.    Plaintiff McKeon and the Minnesota Subclass purchased the Baby Foods because of the Omissions, concealment, and other deceptive conduct asserted by Defendant and that were made, published, disseminated, circulated, and placed before the public by Defendant.

319.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff McKeon, the Minnesota Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Baby Foods. Had Plaintiff McKeon and members of the Minnesota Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods.

320.    Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff McKeon and the Minnesota Subclass with respect to the Baby Foods' quality, ingredients, and standards.

321.    Defendant's Omissions, concealment, and other deceptive conduct as described herein occurred repeatedly in the course of Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

322.    Defendant intended that Plaintiff McKeon and the Minnesota Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed material facts.

323.    Plaintiff McKeon and the Minnesota Subclass relied on, and were in fact deceived by, Defendant's Omissions, concealment, and other deceptive conduct with respect to the Baby Foods' quality, ingredients, and standards.

324. Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

325. As a direct and proximate result of Defendant's conduct, Plaintiff McKeon and the Minnesota Subclass have suffered actual damages in that they purchased the Baby Foods that were worth less than the price they paid and that they may not have otherwise purchased at all had they known the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

326. Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.67, Plaintiff McKeon and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the FSAA.

## COUNT VI

**Violation of Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69, *et seq*., Against Defendant on Behalf of Plaintiff McKeon and the Minnesota Subclass**

327. Plaintiff McKeon incorporates by reference and realleges each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

328. Plaintiff McKeon brings this claim individually and on behalf of members of the Minnesota Subclass against Defendant for violations of the Minnesota Prevention of Consumer Fraud Act ("MPCA"), Minn. Stat. § 325F.68, *et seq*.

329. Plaintiff McKeon and the Minnesota Subclass purchased "merchandise," specifically the Baby Foods discussed herein, within the meaning of Minn. Stat. § 325F.68, subd. 2.

330. Plaintiff McKeon and Defendant are "persons" within the meaning of Minn. Stat. § 325F.68, subd. 3.

331.    Defendant sold the Baby Foods to Plaintiff McKeon and members of the Minnesota Subclass, within the meaning of Minn. Stat. § 325F.68, subd. 4.

332.    Defendant's Omissions, concealment, and other deceptive conduct were made in connection with the sale of the Baby Foods to Plaintiff McKeon and the Minnesota Subclass.

333.    Defendant knowingly acted, used, and employed fraud, false pretenses, false promises, and deceptive practices in connection with the sale of the Baby Foods. Specifically, Defendant failed to disclose that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

334.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, or standards that reasonable consumers expected because they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants that do not conform to the packaging.

335.    Defendant intended that Plaintiff McKeon and the Minnesota Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed material facts.

336.    Plaintiff McKeon and the Minnesota Subclass relied on, and were in fact deceived by, Defendant's Omissions, concealment, and other deceptive conduct with respect to the Baby Foods' quality, ingredients, and standards.

337.    Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive reasonable consumers about the Baby Foods' quality, ingredients, and standards of the Baby Foods. Plaintiff McKeon and the Minnesota Subclass did in fact deceive Plaintiff McKeon and the Minnesota Subclass with respect to the Baby Foods' quality, ingredients, and standards.

338.   The facts concealed or not disclosed by Defendant were material facts in that reasonable consumers, such as Plaintiff McKeon and the Minnesota Subclass, would have considered them in deciding whether to purchase the Baby Foods.  Had Plaintiff McKeon and the Minnesota Subclass known the Baby Foods did not have the quality as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods or paid the premium price.

339.   Defendant's Omissions, concealment, and other deceptive conduct were made to Minnesota consumers, including Plaintiff McKeon and the Minnesota Subclass; thus, this cause of action serves the public benefit of informing Minnesota consumers about the presence of heavy metals, perchlorate, and/or other contaminants.

340.   Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

341.   As a direct and proximate result of Defendant's conduct, Plaintiff McKeon and the Minnesota Subclass have suffered actual damages in that they purchased the Baby Foods that were worth less than the price they paid and which they may not have otherwise purchased at all.

342.   Plaintiff McKeon and members of the Minnesota Subclass would not have purchased the Baby Foods at all had they known of the presence of heavy metals, perchlorate, and/or other contaminants.

343.   Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.69, Plaintiff McKeon and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MPCFA.

## <u>COUNT VII</u>

**Violation of Washington Unfair Business Practices and Consumer Protection Act RCW §19.86.10, *et seq*., Against Defendant on Behalf of Plaintiff Paris and the Washington Subclass**

344.    Plaintiff Paris incorporates by reference and realleges each allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

345.    Plaintiff Paris brings this claim individually and on behalf of members of the Washington Subclass against Defendant for violations of the Washington Unfair Business Practices and Consumer Protection Act ("WCPA"), RCW § 19.86.10, *et seq*.

346.    Defendant's Omissions, concealment, and other deceptive conduct were made in connection with the sale of the Baby Foods in the course of trade or commerce to Plaintiff Paris and the Washington Subclass.

347.    Defendant's Omissions, concealment, and other deceptive conduct are deceptive acts or practices in violation of the WCPA, RCW § 19.86.010, *et seq*.

348.    Defendant failed to disclose to Plaintiff Paris and the Washington Subclass that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

349.    Defendant's Omissions, concealment, and other deceptive conduct as described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

350.    Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff Paris and the Washington Subclass with respect to the Baby Foods' quality, ingredients, and standards.

351.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, or standards as described above because they contained (or had a material risk of containing) undisclosed levels of heavy metals, perchlorate, and/or other contaminants.

352.    Defendant purposely concealed and did not disclose material facts regarding the presence of heavy metals, perchlorate, and/or other contaminants to consumers, including to Plaintiff Paris and the Washington Subclass.

353.    Defendant's Omissions, concealment, and other deceptive conduct were made to consumers in Washington, including Plaintiff Paris and members of the Washington Subclass; thus, this cause of action serves the public benefit of informing Washington consumers about the presence of heavy metals, perchlorate, and/or other contaminants the Baby Foods.

354.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff Paris, the Washington Subclass, and other reasonable consumers would have considered them when deciding whether to purchase the Baby Foods. Had Plaintiff Paris and members of the Washington Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods or paid the premium price.

355.    Defendant's Omissions, concealment, and other deceptive conduct caused Plaintiff Paris and the Washington Subclass to suffer injury in the form of actual damages when they purchased the Baby Foods that were worth less than the price they paid and that they would not have purchased had they known the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

356.     As a direct and proximate result of Defendant's Omissions and other deceptive acts and practices, Plaintiff Paris and the Washington Subclass have been damaged as alleged herein and are entitled to recover actual damages and/or treble damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

357.     Further, Plaintiff Paris and the Washington Subclass seek equitable and injunctive relief against Defendant on terms the Court considers reasonable, and reasonable attorneys' fees and costs.

## COUNT VIII

### Violation of Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. § 505/1, et seq., Against Defendant on Behalf of Plaintiffs Willoughby and Galeana and the Illinois Subclass

358.     Plaintiffs Willoughby and Galeana incorporate by reference and reallege each allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

359.     Plaintiffs Willoughby and Galeana and the Illinois Subclass and Defendant are "persons" within the meaning of 815 Ill. Comp. Stat. § 505/1(c).

360.     The Baby Foods are "merchandise" within the meaning of 815 Ill. Comp. Stat. § 505/1(b).

361.     There was a sale of merchandise within the meaning of 815 Ill. Comp. Stat. § 505/1(d).

362.     Defendant's Omissions, concealment, and other deceptive conduct as described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. § 505/1, *et seq*.

363.     Defendant violated ICFA when it knowingly concealed, omitted, or failed to disclose that the Baby Foods contained (or had a material risk of containing) undisclosed heavy metals, perchlorate, and/or other contaminants.

364.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, or standards as described above because they contained (or had a material risk of containing) undisclosed levels of heavy metals, perchlorate, and/or other contaminants.

365.    Defendant intended that Plaintiffs Willoughby and Galeana and the Illinois Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when deciding to purchase the Baby Foods, unaware of the undisclosed material facts.

366.    Plaintiffs Willoughby and Galeana and the Illinois Subclass relied on, and were in fact deceived by, Defendant's Omissions, concealment, and other deceptive conduct with respect to the Baby Foods' quality, ingredients, and standards.

367.    Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive, and did in fact deceive Plaintiffs Willoughby and Galeana and members of the Illinois Subclass with respect to the Baby Foods' quality, ingredients, and standards.

368.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs Willoughby and Galeana, the Illinois Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Baby Foods.  Had Plaintiffs Willoughby and Galeana and members of the Illinois Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods or paid the premium price.

369.    Defendant's Omissions, concealment, and other deceptive conduct as described herein repeatedly occurred in the course of Defendant's trade or commerce and were capable of deceiving a substantial portion of the consuming public.

370. Defendant's Omissions and other deceptive acts or practices caused Plaintiffs Willoughby and Galeana and the Illinois Subclass to suffer injury in the form of actual damages when they purchased the Baby Foods that were worth less than the price they paid and that they would not have purchased had they known the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

371. As a direct and proximate result of Defendant's deceptive, misleading, unfair, and unconscionable practices as set forth above, Plaintiffs Willoughby and Galeana and the Illinois Subclass are entitled to actual damages, compensatory damages, injunctive relief, attorneys' fees, and costs, as set forth in Section 10a of the ICFA.

372. Defendant's deceptive, misleading, unfair, and unconscionable practices as set forth above were done willfully, wantonly, and maliciously, entitling Plaintiffs Willoughby and Galeana and the Illinois Subclass to an award of punitive damages.

## COUNT IX

**Violation of California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*., Against Defendant on Behalf of Plaintiffs Lawson and Micciche and the California Subclass**

373. Plaintiffs Lawson and Micciche incorporate by reference and reallege each allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

374. Plaintiffs Lawson and Micciche and the members of the California Subclass are "consumers" as that term is defined by Cal. Civ. Code § 1761(d).

375. The Baby Foods are "goods," as that term is defined by Cal. Civ. Code § 1761(a).

376. Defendant is a "person" as that term is defined by Cal. Civ. Code § 1761(c).

377. Plaintiffs Lawson and Micciche and each California Subclass member's purchase of the Baby Foods constituted a "transaction" as that term is defined in Cal. Civ. Code § 1761(e).

378.    Defendant's Omissions, concealment, and other deceptive conduct were made in connection with the sale of the Baby Foods to Plaintiffs Lawson and Micciche and the California Subclass.

379.    Defendant's conduct alleged herein violates at least the following provisions of California's Consumers Legal Remedies Act (the "CLRA"):

(a)    Cal. Civ. Code § 1770(a)(5), by knowingly representing the Baby Foods with characteristics, ingredients, and benefits that they do not have;

(b)    Cal. Civ. Code § 1770(a)(7), by knowingly representing that the Baby Foods were of a particular standard, quality, or grade when they were of another; and

(c)    Cal. Civ. Code § 1770(a)(9), by knowingly advertising the Baby Foods with intent not to sell them as advertised.

380.    Defendant was obligated to disclose the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods because:

(a)    Defendant had exclusive knowledge of the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods that was not known or reasonably accessible to Plaintiffs Lawson and Micciche and the California Subclass;

(b)    Defendant actively concealed the presence of heavy metals, perchlorate, and/or other contaminants from Plaintiffs Lawson and Micciche and the California Subclass;

(c)    Defendant made partial statements on the Baby Foods' packaging that gave a misleading impression to reasonable consumers without further information because the presence of heavy metals, perchlorate, and/or other contaminants had not been disclosed.

381.    Defendant intended that Plaintiffs Lawson and Micciche and the California Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the

Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed material facts.

382.    Plaintiffs Lawson and Micciche and the California Subclass relied on, and were in fact deceived by, Defendant's Omissions, concealment, and other deceptive conduct with respect to the Baby Foods' quality, ingredients, and standards.

383.    On March 5, 2021, Plaintiff Micciche sent Defendant written notice (via U.S. certified mail, return receipt requested) that its conduct is in violation of the CLRA.

384.    Defendant failed to provide appropriate relief for its violations of Cal. Civ. Code §§ 1770(a)(5), (7), and (9) within thirty days of receipt of Plaintiff Micciche's notification. In accordance with Cal. Civ. Code § 1782(b), Plaintiffs Lawson and Micciche and the California Subclass are entitled, under Cal. Civ. Code § 1780, to recover and obtain the following relief for Defendant's violations of Cal. Civ. Code §§ 1770(a)(5), (7), and (9):

(a)    Actual damages under Cal. Civ. Code § 1780(a)(1);

(b)    Restitution of property under Cal. Civ. Code § 1780(a)(3);

(c)    Punitive damages under Cal. Civ. Code § 1780(a)(4); and

(d)    Any other relief the Court deems proper under Cal. Civ. Code § 1780(a)(5).

385.    Plaintiff Micciche and the California Subclass seek injunctive relief as permitted under Cal. Civ. Code § 1780(a)(2).

386.    As a direct and proximate result of these violations, Plaintiff Micciche and the California Subclass have been harmed, and that harm will continue unless Defendant is enjoined from using the Omissions, concealment, and other deceptive conduct in any manner in connection with the advertising and sale of the Baby Foods.

387.    Plaintiffs Lawson and Micciche and the California Subclass seek an award of attorneys' fees pursuant to, *inter alia*, Cal. Civ. Code § 1780(e) and Cal. Code of Civ. Proc. § 1021.5.

## COUNT X

**Violation of California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, Against Defendant on Behalf of Plaintiffs Lawson and Micciche and the California Subclass**

388.    Plaintiffs Lawson and Micciche incorporate by reference and reallege each allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

389.    California's False Advertising Law prohibits any false or deceptive advertising in the sale of goods. Cal. Bus. & Prof. Code § 17500.

390.    Defendant's Omissions, concealment, and other deceptive conduct were made in connection with the sale of the Baby Foods to Plaintiffs Lawson and Micciche and the California Subclass.

391.    Defendant failed to disclose to Plaintiffs Lawson and Micciche and the California Subclass that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, which is untrue and misleading conduct.

392.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, and standards as described above because they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

393.    Defendant had a duty to disclose the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods, and misled consumers by omitting their presence.

394.    Defendant failed to discharge its duty to disclose the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods.

395.    Defendant intended that Plaintiffs Lawson and Micciche and the California Subclass would rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed material facts.

396.    Plaintiffs Lawson and Micciche and the California Subclass relied on, and were in fact deceived by, Defendant's Omissions, concealment, and other deceptive conduct with respect to the Baby Foods' quality, ingredients, and standards.

397.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs Lawson and Micciche, the California Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Baby Foods.  Had Plaintiffs Lawson and Micciche and members of the California Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods or paid a premium price.

398.    Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive and did in fact deceive or cause misunderstanding and did in fact deceive Plaintiffs Lawson and Micciche and the California Subclass with respect to the Baby Foods' quality, ingredients, and standards.

399.    Defendant's Omissions and other deceptive acts or practices caused Plaintiffs Lawson and Micciche and the California Subclass to suffer injury in the form of actual damages when they purchased the Baby Foods that were worth less than the price they paid and that they would not have purchased had they known of the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other undesirable toxins or contaminants.

105

400.     Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Micciche's desire to purchase the Baby Foods in the future if she can be assured that the Baby Foods' quality, ingredients, and standards are as advertised and they do not contain heavy metals, perchlorate, and/or other contaminants.

401.     Plaintiff Micciche and the California Subclass seek injunctive relief.  Plaintiffs Lawson and Micciche and the California Subclass seek equitable relief and restitution in the amount they spent on the Baby Foods as permitted.

## COUNT XI

**Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*., Against Defendant on Behalf of Plaintiffs Lawson and Micciche and the California Subclass**

402.     Plaintiffs Lawson and Micciche incorporate by reference and reallege each allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

403.     The Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.

**Fraudulent**

404.     Defendant failed to disclose to Plaintiffs Lawson and Micciche and the California Subclass that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

405.     Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs Lawson and Micciche and the California Subclass with respect to the Baby Foods' quality, ingredients, and standards.

**Unlawful**

406.     As alleged herein, Defendant's failure to disclose that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants violate at least the following laws:

(a)     The CLRA, Cal. Bus. & Prof. Code §§ 1750, *et seq*.; and

(b)     The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*.

**Unfair**

407.     Defendant's conduct with respect to the Omissions, concealment, other deceptive conduct, and sale of the Baby Foods is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to Plaintiffs Lawson and Micciche, the California Subclass, and other reasonable consumers. The utility of Defendant's conduct, if any, does not outweigh the gravity of the harm to its victims.

408.     Defendant's conduct with respect to the Omissions, concealment, other deceptive conduct, and sale of the Baby Foods is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to, the False Advertising Law and the CLRA.

409.     Defendant's conduct with respect to the Omissions, concealment, other deceptive conduct, and sale of the Baby Foods is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, themselves, can reasonably avoid.

410.     Defendant was obligated to disclose the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods because:

(a)     Defendant had exclusive knowledge of the presence of heavy metals or perchlorate in the Baby Foods that were not known or reasonably accessible to Plaintiffs Lawson and Micciche and the California Subclass;

(b)     Defendant actively concealed the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods from Plaintiffs Lawson and Micciche and the California Subclass;

(c)     Defendant made partial statements on the Baby Foods' packaging that gave a misleading impression to reasonable consumers without further information because the presence of heavy metals, perchlorate, and/or other contaminants had not been disclosed.

411.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, and standards as described above because they contained (or had a material risk of containing) undisclosed levels of heavy metals, perchlorate, and/or other contaminants.

412.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs Lawson and Micciche, the California Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Baby Foods.  Had Plaintiffs Lawson and Micciche and members of the California Subclass known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods or paid a premium price.

413.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff Micciche and the California Subclass seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising

campaign.  Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

414.    On behalf of themselves and the California Subclass, Plaintiffs Lawson and Micciche also seek an order for the restitution of all monies from the sale of the Baby Foods, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

## COUNT XII

### Fraudulent Misrepresentation by Omission Against Defendant on Behalf of Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses pursuant to State Law

415.    Plaintiffs Willoughby, Galeana, and McKeon incorporate by reference and reallege each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

416.    Plaintiffs Willoughby, Galeana, and McKeon and members of the Illinois and Minnesota Subclasses were buyers and Defendant a seller in a commercial exchange.

417.    Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses were ordinary non-business consumers who trusted Defendant to manufacture, distribute, market, and sell Baby Foods that did not contain or have a risk of containing heavy metals, perchlorate, and/or other contaminants.

418.    As a baby food manufacturer, Defendant is in a special position of trust upon which Plaintiffs Willoughby, Galeana, and McKeon, the Illinois and Minnesota Subclasses, and other reasonable consumers rely.

419.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, or standards as described above because they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

420.    Defendant knowingly and intentionally omitted and failed to disclose the true quality, ingredients, and standards of the Baby Foods because they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

421.    Defendant has admitted the presence or material risk of heavy metals in the Baby Foods. Testing also shows the presence of heavy metals in the Baby Foods.

422.    Defendant was under a duty to disclose to Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses the Baby Foods' true quality, ingredients, and standards because it, alone, possessed special knowledge regarding the truth about material facts related to the Baby Foods' quality, ingredients, and standards and knew they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, which were facts and information to which Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses did not have access and/or were not readily available.

423.    Defendant knew that Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses could not reasonably have been expected to learn or discover that the Baby Foods' packaging omitted the presence of heavy metals, perchlorate, and/or other contaminants prior to purchasing the Baby Foods.

424.    Based on Defendant's partial statements on the Baby Foods' packaging that gave a misleading impression to reasonable consumers without any disclosures regarding the presence of heavy metals, perchlorate, and/or other contaminants, Defendant assumed the obligation to make a full and fair disclosure of the whole truth.

425.    Defendant failed to disclose that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

426.    Defendant knows reasonable consumers, including Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses, expect the Baby Foods to be free of heavy metals, perchlorate, and/or other contaminants.

427.    Defendant also knows that reasonable consumers seek out and wish to purchase baby food products that are free of heavy metals, perchlorate, and/or other contaminants, and that these consumers will pay more for baby food products they believe possess such qualities.

428.    Defendant knew that Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses were unaware that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

429.    Defendant intended that Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses would rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed material facts.

430.    Defendant intended for its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards to deceive and defraud consumers, including Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses.

431.    Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive reasonable consumers about the Baby Foods' quality, ingredients, and standards. Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses relied on, and were in fact deceived by, Defendant's Omissions, concealment, and other deceptive conduct with respect to the Baby Foods' quality, ingredients, and standards.

432.    Given the materiality of the Omissions, reliance by Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses was justifiable.

433.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs Willoughby, Galeana, and McKeon; the Illinois and Minnesota Subclasses; and other reasonable consumers would have considered them when deciding whether to purchase the Baby Foods. Had Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods or paid a premium price.

434.    As a direct and proximate result of Defendant's conduct, Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses suffered actual pecuniary damages in that they purchased Baby Foods that were worth less than the price they paid and that they would not have purchased at all.

435.    Plaintiffs Willoughby, Galeana, and McKeon and the Illinois and Minnesota Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT XIII

**Fraud by Omission Against Defendant on Behalf of the Classes Pursuant to State Law**

436.    Plaintiffs incorporate by reference and reallege each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

437.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant for fraud by omission.

438.    Plaintiffs and the Classes and Defendant acted within the context of a business transaction when Plaintiffs and the Classes purchased the Baby Foods for household or business use and not for resale.

439.    Plaintiffs and the Classes were ordinary non-business consumers.

440.    Defendant knew or should have known the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

441.    Defendant knowingly concealed from and failed to disclose to Plaintiffs and the Classes that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

442.    Defendant knew or should have known the Baby Foods did not have the quality, ingredients, or standards as described above because they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

443.    Defendant has admitted the presence or material risk of heavy metals in the Baby Foods. Testing also shows the presence of heavy metals in the Baby Foods.

444.    As a baby food manufacturer, Defendant is in a special position of trust upon which Plaintiffs, the Classes, and other reasonable consumers rely.

445.    Defendant was under a duty to disclose the Baby Foods' true quality, ingredients, and standards because:

(a)    Defendant had exclusive knowledge of its test results that showed the Baby Foods contained or had a material risk of containing heavy metals, perchlorate, and/or other contaminants;

(b)    Defendant also had exclusive knowledge related to the manufacturing of the Baby Foods, including information related to quality control and its suppliers and co-manufacturers;

(c)    Defendant was aware it had superior knowledge regarding information not readily available to Plaintiffs and the Classes that the Baby Foods did not have the quality,

ingredients, and standards as advertised and that they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants without Defendant disclosing such information on the Baby Foods' packaging; and

(d)     Defendant was in a superior position to know the true facts about the Baby Foods' quality, ingredients, and standards and to know that, in fact, they contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants.

446.     Defendant failed to discharge its duty to disclose the presence of heavy metals, perchlorate, and/or other contaminants in the Baby Foods.

447.     Defendant actively concealed or failed to disclose facts about the Baby Foods' quality, ingredients, and standards and intended that Plaintiffs and the Classes would rely on its Omissions, concealment, and other deceptive conduct regarding the Baby Foods' quality, ingredients, and standards when purchasing the Baby Foods, unaware of the undisclosed material facts.

448.     Defendant's Omissions, concealment, and other deceptive conduct were made to deceive reasonable consumers about the Baby Foods' quality, ingredients, and standards. Plaintiffs and the Classes relied on, and were in fact deceived by, Defendant's Omissions, concealment, and other deceptive conduct with respect to the Baby Foods' quality, ingredients, and standards.

449.     Defendant knows its customers trust the quality of its Baby Foods and that they expect the Baby Foods to be free of heavy metals, perchlorate, and/or other contaminants. Defendant also knows that certain consumers seek out and wish to purchase premium baby foods made of superior ingredients that are free of heavy metals, perchlorate, and/or other contaminants, and that these consumers will pay more for baby foods that they believe possess these qualities.

Indeed, Defendant has intentionally and knowingly positioned itself in the market as one of the manufacturers of premium baby foods made of superior ingredients.

450.   The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs, the Classes, and other reasonable consumers would have considered them when deciding whether to purchase the Baby Foods. Had Plaintiffs and the Classes known the Baby Foods did not have the quality, ingredients, and standards as advertised by Defendant and contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants, they would not have purchased the Baby Foods or paid a premium price.

451.   Defendant knowingly concealed that the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants with the intent to defraud and deceive Plaintiffs and the Classes.

452.   As a direct and proximate result of Defendant's Omissions, concealment, and other deceptive conduct, Plaintiffs and the Classes suffered actual damages in that they purchased Baby Foods that were worth less than the price they paid and that they would not have purchased at all had they known the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants that do not conform to the Baby Foods' packaging.

453.   Plaintiffs and the Classes seek actual damages, injunctive, and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT XIV

**Unjust Enrichment Against Defendant on Behalf of the Classes Pursuant to State Law**

454.   Plaintiffs incorporate by reference and reallege each and every allegation of Paragraphs 1 through 268 above, as though fully set forth herein.

455.    Substantial benefits have been conferred on Defendant by Plaintiffs and the Classes through the purchase of the Baby Foods. Defendant knowingly and willingly accepted and enjoyed these benefits.

456.    Defendant either knew or should have known that the payments rendered by Plaintiffs were given and received with the expectation that the Baby Foods would not contain heavy metals, perchlorate, and/or other contaminants. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

457.    Defendant was obligated to disclose the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants in the Baby Foods because:

(a)     Defendant had exclusive knowledge the Baby Foods contained (or had a material risk of containing) heavy metals, perchlorate, and/or other contaminants;

(b)     Defendant actively concealed the presence of heavy metals, perchlorate, and/or other contaminants from Plaintiffs and the Classes; and

(c)     Defendant made partial statements on the Baby Foods' packaging that gave a misleading impression to reasonable consumers without further information because the presence or material risk of heavy metals, perchlorate, and/or other contaminants had not been disclosed.

458.    Defendant's acceptance and retention of these benefits of the payments from Plaintiffs and the Classes under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiffs and the Classes.

459.    Plaintiffs and the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

460.     Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, statutory damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

A.     An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendant to bear the costs of class notice;

B.     An order enjoining Defendant from selling the Baby Foods until the heavy metals and perchlorate are removed;

C.     An order enjoining Defendant from selling the Baby Foods in any manner suggesting or implying that they are healthy, nutritious, high quality, organic, made with superior ingredients, and manufactured to high standards;

D.     An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.     An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of state law, plus pre- and post-judgment interest thereon;

G.     An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

117

H.      An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

I.      An order requiring Defendant to pay punitive damages on any count so allowable;

J.      An order awarding attorneys' fees and costs to Plaintiffs and the Classes; and

K.      An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  October 7, 2022                     GEORGE GESTEN MCDONALD PLLC

By:  s/ Lori G. Feldman
Lori G. Feldman, Esq. (admitted in SDNY)
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone:      (917) 983-9321
Facsimile:      (888) 421-4173
E-Mail:         lfeldman@4-justice.com
E-Service:      eService@4-justice.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By:  s/ Rebecca A. Peterson
Rebecca A. Peterson (*Pro Hac Vice*)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:      (612) 339-6900
Facsimile:      (612) 339-0981
E-Mail:         rapeterson@locklaw.com

**Plaintiffs' Interim Co-Lead Counsel**