**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**In re NURTURE BABY FOOD LITIGATION**

This document relates to:

ALL ACTIONS

Case No. 1:21-cv-01217-MKV

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT NURTURE, LLC'S MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

**<u>TABLE OF CONTENTS</u>**

**Page**

**PRELIMINARY STATEMENT** ................................................................................1

**FACTUAL BACKGROUND** ...................................................................................5

    A.    Nurture Produces High-Quality, Organic Food for Babies and Toddlers. .............5

    B.    Trace Elements Are Present in All Foods and Cannot Be Completely Avoided..................................................................................................................5

    C.    Public Reports Scare Parents About Trace Elements in Baby Foods....................6

    D.    The FDA Reassures the Public That There Is No Immediate Health Risk to Children Consuming Baby Foods..........................................................................7

    E.    The FDA Makes Clear Its Control and Supervision of This Issue by Launching Its Closer to Zero Initiative.................................................................7

    F.    Plaintiffs' Allegations and Claims. ........................................................................9

**LEGAL STANDARD** ...........................................................................................10

**ARGUMENT** ........................................................................................................10

I.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE AN INJURY.......................................10

    A.    Plaintiffs Do Not Allege That the Products They Purchased Contained Trace Elements and What Those Levels Were. ......................................................11

    B.    Plaintiffs Do Not Allege That Their Children Suffered Any Risk of Physical Injury from Consuming Nurture's Products. .........................................12

    C.    Plaintiffs Have Also Not Suffered an Economic Injury. ......................................15

        1.    Plaintiffs Received the Benefit of Their Bargain......................................16

        2.    Plaintiffs Have Not Alleged That They Paid a Price Premium. ...............17

II.    PLAINTIFFS DO NOT HAVE STANDING...................................................................18

    A.    Plaintiffs Have Not Suffered an Injury-in-Fact. ...................................................18

    B.    Plaintiffs Lack Standing to Seek Injunctive Relief...............................................19

III.    THE FDA SHOULD DETERMINE SAFE LEVELS OF TRACE ELEMENTS UNDER THE PRIMARY JURISDICTION DOCTRINE. ...............................................20

    A.    Determining Safe Levels for Trace Elements Are Technical and Policy Questions Best Addressed Utilizing the FDA's Expertise. ...................................22

    B.    Establishing Safe and Achievable Levels for Heavy Metals Falls Squarely Within the FDA's Discretion. ...............................................................25

    C.    A Substantial Danger of Inconsistent Court Rulings Exists During and Pending the FDA's Determination of This Issue....................................................26

    D.    Closer to Zero Is Actively Evaluating and Setting Action Levels.........................27

i

IV.     PLAINTIFFS' ATTEMPT TO COMMANDEER FOOD SAFETY AND
        LABELING IS IMPLIEDLY PREEMPTED BY FEDERAL LAW. ...............................29

V.      PLAINTIFFS' OMISSION-BASED FRAUD CLAIMS FAIL FOR
        ADDITIONAL REASONS. ...................................................................................................31

        A.      Plaintiffs Cannot Allege That Any Omission Was Deceptive Because the
                Potential Presence of Trace Elements in Foods Is in the Public Domain.............32

        B.      Plaintiffs Continued to Purchase Nurture's Products Long After They
                Admit the Information Was Publicly Available. ....................................................33

        C.      The Potential Existence of Low Levels of Trace Elements Is Immaterial. ...........34

        D.      Plaintiffs Do Not Plead Fraudulent Intent. ..........................................................35

        E.      Plaintiffs Do Not Allege a Duty to Disclose.........................................................36

VI.     PLAINTIFFS' UNJUST ENRICHMENT CLAIMS FAIL................................................38

VII.    CERTAIN OF PLAINTIFFS' CLAIMS FAIL FOR ADDITIONAL STATE-
        SPECIFIC REASONS. ......................................................................................................39

        A.      The California UCL, FAL, and Unjust Enrichment Claims Fail Because
                Plaintiffs Cannot Show Legal Remedies Are Inadequate.....................................39

        B.      The Economic Loss Doctrine Bars the California Fraudulent Concealment
                Claim.....................................................................................................................39

        C.      Certain of Plaintiffs' Claims Are Untimely. .........................................................40

**CONCLUSION** ............................................................................................................................**40**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahern v. Apple Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019) ............................................................36, 37

*Al Haj v. Pfizer Inc.*,
2020 WL 1330367 (N.D. Ill. Mar. 23, 2020)............................................................33

*Alce v. Wise Foods, Inc.*,
2018 WL 1737750 (S.D.N.Y. Mar. 27, 2018) .........................................................20

*Alejandre v. Bull*,
159 Wash.2d 674 (2007)............................................................................................36

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016).........................................................................................2

*Ascente Bus. Consulting, LLC v. DR myCommerce*,
9 F.4th 839 (8th Cir. 2021) .......................................................................................33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................10

*Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*,
84 F.3d 602 (2d Cir. 1996).......................................................................................29

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ....................................................................................28

*Backus v. Nestlé USA, Inc.*,
167 F. Supp. 3d 1068 (N.D. Cal. 2016) ...................................................................30

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
57 F.3d 146 (2d Cir. 1995)........................................................................................36

*Bauer v. Giannis*,
359 Ill. App. 3d 897 (2005) ......................................................................................10

*Becerra v. Dr Pepper/Seven Up, Inc.*,
945 F.3d 1225 (9th Cir. 2019) ..................................................................................35

*Benson v. Fannie May Confections Brands, Inc.*,
944 F.3d 639 (7th Cir. 2019) ....................................................................................10

iii

*Berni v. Barilla S.p.A.*,
  964 F.3d 141 (2d Cir. 2020)....................................................................................20

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
  534 F. Supp. 3d 326 (S.D.N.Y. 2021)..............................................................10, 18

*Boysen v. Walgreen Co.*,
  2012 WL 2953069 (N.D. Cal. July 19, 2012)...................................................15, 19

*Browning v. Am. Honda Motor Co.*,
  549 F. Supp. 3d 996 (N.D. Cal. 2021) ..................................................................39

*Budhani v. Monster Energy Co.*,
  527 F. Supp. 3d 667 (S.D.N.Y. 2021)....................................................................20

*Bynum v. Fam. Dollar Stores, Inc.*,
  2022 WL 837089 (S.D.N.Y. Mar. 21, 2022) ...............................................36, 37, 38

*Canale v. Colgate-Palmolive Co.*,
  258 F. Supp. 3d 312 (S.D.N.Y. 2017)..................................................................2, 27

*Chiappetta v. Kellogg Sales Co.*,
  2022 WL 602505 (N.D. Ill. Mar. 1, 2022)..............................................................35

*Chuang v. Dr Pepper Snapple Grp., Inc.*,
  2017 WL 4286577 (C.D. Cal. Sept. 20, 2017) .......................................................38

*Cleary v. Philip Morris Inc.*,
  656 F.3d 511 (7th Cir. 2011) ...............................................................................38

*Cleveland v. Whirlpool Corp.*,
  550 F. Supp. 3d 660 (D. Minn. 2021) ..................................................................10

*Cochrane v. Am. Guar. & Liab. Ins. Co.*,
  471 F. Supp. 3d 1140 (W.D. Wash. 2020)..............................................................10

*Cohen v. Apple Inc.*,
  46 F.4th 1012 (2022)......................................................................................29, 30

*Cole v. Keystone RV Co.*,
  2021 WL 3111452 (W.D. Wash. July 22, 2021),
  *aff'd*, 2022 WL 4234958 (9th Cir. Sept. 14, 2022)................................................32

*Colella v. Atkins Nutritionals, Inc.*,
  348 F. Supp. 3d 120 (E.D.N.Y. 2018) ...................................................................22

*Davidson v. Sprout Foods Inc.*,
  2022 WL 13801090 (N.D. Cal. Oct. 21, 2022)..................................................14, 32

*Davis v. Hain Celestial Grp., Inc.*,
297 F. Supp. 3d 327 (E.D.N.Y. 2018) ...................................................................35

*Davis v. Yeroushalmi*,
985 F. Supp. 2d 349 (E.D.N.Y. 2013) ...................................................................35

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010).....................................................................................2

*Dimond v. Darden Rests., Inc.*,
2014 WL 3377105 (S.D.N.Y. July 9, 2014) ..........................................................32

*Doe v. Merck & Co.*,
803 F. App'x 559 (2d Cir. 2020) ......................................................................25, 29

*Donahue v. Ferolito, Vultaggio & Sons*,
13 A.D.3d 77 (N.Y. App. Div. 2004) .....................................................................33

*Drake v. Toyota Motor Corp.*,
2020 WL 7040125 (C.D. Cal. Nov. 23, 2020).......................................................40

*Ellis v. Tribune Television Co.*,
443 F.3d 71 (2d Cir. 2006)...................................................................21, 22, 23, 29

*Engelhardt v. Consol. Rail Corp.*,
756 F.2d 1368 (2d Cir. 1985)..................................................................................21

*Farina v. Nokia, Inc.*,
625 F. 3d 97 (3d Cir. 2010).....................................................................................31

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982)................................................................................................30

*Fladeboe v. Am. Isuzu Motors Inc*.,
150 Cal. App. 4th 42 (2007) ...................................................................................10

*Forlenza v. Dynakor Pharmacal, LLC*,
2009 WL 10698476 (C.D. Cal. Dec. 15, 2009) .....................................................34

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995)................................................................................................29

*Gaminde v. Lang Pharma Nutrition, Inc.*,
2019 WL 1338724 (N.D.N.Y. Mar. 25, 2019) .......................................................11

*Gardiner v. Walmart Inc.*,
2021 WL 2520103 (N.D. Cal. Mar. 5, 2021)..........................................................39

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)............................................................................30

*In re Gen. Mills Glyphosate Litig.*,
    2017 WL 2983877 (D. Minn. July 12, 2017) .......................................34

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*,
    2022 WL 10197651 (E.D. Va. Oct. 17, 2022) ............................... *passim*

*Giles v. Gen Motors Acceptance Corp.*,
    494 F.3d 865 (9th Cir. 2007) ......................................................... 39-40

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)................................................................2

*Haggag v. Welch Foods, Inc.*,
    2014 WL 1246299 (C.D. Cal. Mar. 24, 2014) ....................................25

*Herrington v. Johnson & Johnson Consumer Cos.*,
    2010 WL 3448531 (N.D. Cal. Sept. 1, 2010) .....................................34

*Hudock v. LG Elecs. U.S.A., Inc.*,
    12 F.4th 773 (8th Cir. 2021) .............................................................33

*Ivie v. Kraft Foods Glob., Inc.*,
    961 F. Supp. 2d 1033 (N.D. Cal. 2013) .............................................10

*Izquierdo v. Mondelez Int'l, Inc.*,
    2016 WL 6459832 (S.D.N.Y. Oct. 26, 2016) ...............................18, 20

*James v. Johnson & Johnson Consumer Cos.*,
    2011 WL 198026 (D.N.J. Jan. 20, 2011) ...........................................16

*Keeter v. Gerber Prods. Co.*,
    No. 21-cv-269 (E.D. Va.)..................................................................27

*Kimca v. Sprout Foods, Inc.* ("*Kimca I*"),
    2022 WL 1213488 (D.N.J. Apr. 25, 2022) .................................. *passim*

*Kimca v. Sprout Foods, Inc.* ("*Kimca II*"),
    2022 WL 3586095 (N.J. Super. Ct. Law Div. Aug. 5, 2022) ......... *passim*

*In re Kind LLC "Healthy & All Natural" Litig.*,
    287 F. Supp. 3d 457 (S.D.N.Y. 2018)......................................11, 23, 27

*In re KIND LLC "Healthy and Natural" Litig.*,
    209 F. Supp. 3d 689 (S.D.N.Y. 2016)................................. 23, 26-27, 28

*Kinetic Co. v. Medtronic, Inc.*,
    672 F. Supp. 2d 933 (D. Minn. 2009) ................................................................. 10

*Kumandan v. Google LLC*,
    2022 WL 103551 (N.D. Cal. Jan. 11, 2022) ....................................................... 32

*Kwikset Corp. v. Super. Ct.*,
    51 Cal. 4th 310 (2011) ....................................................................................... 33

*LaRoche v. Smith*,
    2016 WL 1365951 (W.D. Wash. Apr. 6, 2016) ................................................. 10

*Lend Lease (US) Constr., Inc. v. Tech. Ins. Co.*,
    2016 WL 147895 (N.D. Ill. Jan. 13, 2016) ........................................................ 38

*LiMandri v. Judkins*,
    52 Cal. App. 4th 326 (1997) .............................................................................. 36

*Lipton v. Chattem*,
    2012 WL 1192083 (N.D. Ill. Apr. 10, 2012) ..................................................... 10

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 18

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ............................................................................... 10

*Manuel v. Pepsi-Cola Co.*,
    763 F. App'x 108 (2d Cir. 2019) ....................................................................... 35

*McKart v. United States*,
    395 U.S. 185 (1969) ........................................................................................... 21

*Miller v. Hyundia Motor Am.*,
    2016 WL 5476000 (S.D.N.Y. Sept. 28, 2016) .................................................. 32

*Munning v. Gap, Inc.*,
    238 F. Supp. 3d 1195 (N.D. Cal. 2017) ............................................................. 39

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ............................................................................... 19

*Parks v. Ainsworth Pet Nutrition, LLC*,
    2020 WL 832863 (S.D.N.Y. Feb. 20, 2020) ..................................................... 34

*Parks v. Ainsworth Pet Nutrition, LLC*,
    377 F. Supp. 3d 241 (S.D.N.Y. 2019) ............................................................... 34

*Pels v. Keurig Dr. Pepper, Inc.*,
    2019 WL 5813422 (N.D. Cal. Nov. 7, 2019) ........................................................11

*Pichardo v. Only What You Need, Inc.*,
    2020 WL 6323775 (S.D.N.Y. Oct. 27, 2020)............................................16, 34, 35

*In re Plum Baby Food Litig.*,
    2022 WL 16552786 (D.N.J. Oct. 31, 2022)................................................. *passim*

*In re Plum Baby Food Litig.*,
    No. 21-cv-913 (N.D. Cal.) ........................................................................27

*In re Plum Baby Food Litig.*,
    2022 WL 16640802 (N.D. Cal. Jan. 12, 2022)..............................................19, 28

*Plumlee v. Pfizer, Inc.*,
    2014 WL 695024 (N.D. Cal. Feb. 21, 2014) ...................................................40

*Potter v. Firestone Tire & Rubber Co.*,
    6 Cal. 4th 965 (1993) .............................................................................38

*Puri v. Costco Wholesale Corp.*,
    2021 WL 6000078 (N.D. Cal. Dec. 20, 2021)................................................35

*Red v. Gen. Mills, Inc.*,
    2015 WL 9484398 (C.D. Cal. Dec. 29, 2015) ................................................30

*Rivera v. Wyeth-Ayerst Labs.*,
    283 F.3d 315 (5th Cir. 2002) ....................................................................19

*Robey v. PVH Corp.*,
    495 F. Supp. 3d 311 (S.D.N.Y. 2020)..........................................................15

*Roppo v. Travelers Com. Ins. Co.*,
    869 F.3d 568 (7th Cir. 2017) ....................................................................33

*Rydman v. Champion Petfoods USA, Inc.*,
    2020 WL 4347512 (W.D. Wash. July 29, 2020) ..........................................36, 37

*Simon v. Smith & Nephew, Inc.*,
    990 F. Supp. 2d 395 (S.D.N.Y. 2013)...........................................................2

*Simpson v. Champion Petfoods USA, Inc.*,
    397 F. Supp. 3d 952 (E.D. Ky. 2019) ........................................................37-38

*Song v. ChampionPetfoods USA, Inc.*,
    2020 WL 7624861 (D. Minn. Dec. 22, 2020),
    *aff'd*, 27 F.4th 1339 (8th Cir. 2022)..................................................36, 37, 38

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ............................................39

*Specialized Tours, Inc. v. Hagen*,
  392 N.W.2d 520 (Minn. 1986)............................................10

*Stephenson v. Citco Grp. Ltd.*,
  700 F. Supp. 2d 599 (S.D.N.Y. 2010)..................................10

*Stoltz v. Fage Dairy Processing Indus., S.A.*,
  2015 WL 5579872 (E.D.N.Y. Sept. 22, 2015) ......................37

*Taleshpour v. Apple, Inc.*,
  2022 WL 1577802 (9th Cir. May 19, 2022) ..........................36

*Thomas v. Beech-Nut Nutrition Co.*,
  No. 21-cv-133 (N.D.N.Y.) ..................................................27

*Tonra v. Kadmon Holdings*,
  405 F. Supp. 3d 576 (S.D.N.Y. 2019)....................................2

*In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.*,
  2009 WL 2940081 (D.N.J. Sept. 11, 2009) ..........................32

*Toulon v. Cont'l Cas. Co.*,
  877 F.3d 725 (7th Cir. 2017) ..............................................36

*In re Toyota Motor Corp.*,
  790 F. Supp. 2d 1152 (C.D. Cal. 2011) ...............................10

*Tran v. Sioux Honey Ass'n Coop.*,
  2017 WL 5587276 (C.D. Cal. Oct. 11, 2017)...............23, 25, 26

*Vavak v. Abbott Labs., Inc.*,
  2011 WL 13130493 (C.D. Cal. Mar. 7, 2011) ......................12

*Victor v. R.C. Bigelow, Inc.*,
  2014 WL 1028881 (N.D. Cal. Mar. 14, 2014).....................33, 40

*Wallace v. ConAgra Foods, Inc.*,
  747 F.3d 1025 (8th Cir. 2014) ............................................11

*Water & Sanitation Health, Inc. v. Chiquita Brands Int'l, Inc.*,
  2014 WL 2154381 (W.D. Wash. May 22, 2014).................38-39

*Wessa v. Watermark Paddlesports, Inc.*,
  2006 WL 1418906 (W.D. Wash. May 22, 2006).....................33

*White v. DaimlerChrysler Corp.*,
    368 Ill. App. 3d 278 (2006) ............................................................36

*Williams v. Tesla, Inc.*,
    2022 WL 899847 (N.D. Cal. Mar. 28, 2022) ..................................40

*Williams v. Yamaha Motor Corp., U.S.A.*,
    106 F. Supp. 3d 1101 (C.D. Cal, 2015), *aff'd*, 851 F.3d 1015 (9th Cir. 2017)......................36

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ........................................................36

*Woods v. Maytag Co.*,
    2010 WL 4314313 (E.D.N.Y. Nov. 2, 2010)..................................36

*Wullschleger v. Royal Canin USA, Inc.*,
    2022 WL 1164662 (W.D. Mo. Mar. 22, 2022)................................34

*Young v. Toyota Motor Sales, U.S.A.*,
    196 Wash. 2d 310 (2020)................................................................33

*Zachmann v. Coleman Co.*,
    2022 WL 161480 (S.D.N.Y. Jan. 18, 2022) ...................................33

*Zottola v. Eisai Inc.*,
    564 F. Supp. 3d 302 (S.D.N.Y. 2021)............................................10

## Constitutions and Statutes

U.S. Const. art. VI, cl. 2................................................................................29

21 U.S.C. § 342...........................................................................................25

21 U.S.C. § 343...........................................................................................25

21 U.S.C. § 346...........................................................................................25

21 U.S.C. § 393(b).................................................................................22, 30

Wash. Rev. Code § 4.16.080.......................................................................40

## Other Authorities

21 C.F.R. § 7.1 et seq..................................................................................22

56 Fed. Reg. 28,592 (June 21, 1991) .........................................................31

Fed. R. Civ. P. 8..........................................................................................32

Fed. R. Civ. P. 9(b) ........................................................................................................32

Fed. R. Civ. P. 12(b)(1)....................................................................................................9

Fed. R. Civ. P. 12(b)(6)...............................................................................................9, 10

## PRELIMINARY STATEMENT

Plaintiffs' Consolidated Class Action Complaint ("CAC") pleads dramatic allegations of toxicity and theoretical harm to infants and children but fails in equally dramatic fashion to state a single plausible claim that Nurture, LLC's ("Nurture") baby food products are unsafe, are inaccurately labeled, exceed any applicable regulatory standard, or have otherwise caused any harm to any consumer. The CAC fails to state even a single act or practice that could be legally cognizable under the law and, as a result, it must be dismissed.

Nurture is a mom-led company launched in 2006 and manufactures baby food under the name Happy Family Organics. Nurture thoughtfully crafts organic meals and snacks made from ingredients grown and cultivated from the earth—fruits, grains, and vegetables—that are integral to the healthy development of children. Every product is certified USDA organic, which means its food is grown without using toxic persistent pesticides, without any artificial hormones or GMOs—just ingredients harvested at organic farms directly from the earth. Some of these ingredients contain naturally occurring elements at low trace levels that cannot be completely eliminated from the food supply. For this reason, the finished products may also contain trace levels of these elements. But there is no dispute that Nurture is not adding lead, arsenic, cadmium, or mercury to any baby food product—and there is no allegation that it is.

The CAC carefully avoids the authoritative statements of the nation's foremost expert and regulator responsible for ensuring our country's food safety, the U.S. Food and Drug Administration ("FDA"), that low levels of these elements are naturally occurring, are unavoidably present in many baby food products, and, importantly, do not pose a health risk to babies and toddlers. The FDA publicly stated that it is "important to understand that toxic elements are present in the environment, including in our air, water and soil, and therefore are unavoidable in the general

1

food supply." Declaration of Colleen M. Gulliver ("Gulliver Decl.") ¶ 5, Ex. 4 at 2.[1] The FDA expressly "reassure[d] parents and caregivers that, at the levels we have found through our testing, children are not at an immediate health risk from exposure to toxic elements in [baby] foods." *Id.*

The director of the Office of Analytics and Outreach at the FDA's Center for Food Safety and Applied Nutrition confirmed this point: "The crops that are used to produce baby foods are also the crops that are used to fill the produce aisle [in the supermarket] or the crops that are used in canned goods in stores, so you're going to find contamination with lead and arsenic and the others across all of those types of foods, including organically grown foods. . . . [M]anufacturers are not able to meet [a threshold of] zero." Ex. 11 at 2. If successful here, Plaintiffs would impose on Nurture a scientifically impossible "zero tolerance" standard for unavoidable elements. No baby food manufacturer would be able to meet it, and the FDA imposes no such requirement.

The CAC fails to provide the necessary and plausible facts that would render anything about Nurture's baby foods actionable under applicable law—a finding reached by courts considering similar claims in numerous other actions. Indeed, this consolidated putative class action is one of several that have been pending throughout the United States against this country's

---

[1] The exhibits cited herein are attached to the Gulliver Declaration. Virtually all of the exhibits are publicly available government materials or statements. The lone exceptions are Ex. 34 (Nurture website), Ex. 35 (October 2019 HBBF Report), and Ex. 37 (August 2022 HBBF Report), which are incorporated into the CAC. *Compare* CAC ¶¶ 98, 113-114, 141, 184-186, *with DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (documents incorporated by reference); *Tonra v. Kadmon Holdings*, 405 F. Supp. 3d 576, 587 n.4 (S.D.N.Y. 2019) (same); *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (documents integral to the complaint).

The Court may take judicial notice of matters of public record such as the FDA materials. *See Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 & n.3 (2d Cir. 2016) (FDA guidance document); *Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 401 n.2 (S.D.N.Y. 2013) ("public records contained on the FDA website"). It is also notable that the CAC repeatedly cites, quotes, and relies on numerous "cherry-pick[ed]" FDA documents, statements, and standards. *Compare* ¶¶ 89, 121, 134-135, 137-138, 145, 157, 161, 165, 172, 174 n.153, 176, 214, *with Kimca v. Sprout Foods, Inc.* ("*Kimca I*"), 2022 WL 1213488, at *7 n.10 (D.N.J. Apr. 25, 2022) (it is "appropriate to take judicial notice of the FDA's statements regarding the toxicity of baby food" to "provide[] the Court with a more complete picture by which to evaluate Plaintiffs' claims").

Finally, "matters outside the pleadings are properly considered" on a primary jurisdiction motion. *See, e.g.*, *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 324 n.11, 326 (S.D.N.Y. 2017).

largest baby food companies. Identical claims in actions against Gerber, Plum Baby Foods, and Sprout Foods have been dismissed. *See, e.g.*, *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.* ("*Gerber*"), 2022 WL 10197651, at *15 (E.D. Va. Oct. 17, 2022); *In re Plum Baby Food Litig.* ("*Plum*"), 2022 WL 16552786, at *14 (D.N.J. Oct. 31, 2022); *Kimca I*, 2022 WL 1213488, at *2; *Kimca v. Sprout Foods, Inc.* ("*Kimca II*"), 2022 WL 3586095, at *5 (N.J. Super. Ct. Law Div. Aug. 5, 2022). A dismissal is warranted here for each of the below reasons.

*First*, this is not a personal injury case, and no Plaintiff alleges actual physical harm. This is a putative class action lawsuit primarily for money damages, seeking a return of money previously paid to purchase Nurture products. Plaintiffs claim only that Nurture's products "may" have included traces of heavy metals and—contrary to the FDA's publicly stated position—those traces "can" cause future harm. *E.g.*, CAC ¶¶ 124, 231. Plaintiffs indiscriminately sue on nearly every baby and toddler product Nurture makes, on behalf of a putative multistate class. Plaintiffs ignore that Nurture's products met the FDA's guidance on acceptable levels of heavy metals and allege instead that Nurture failed to meet Plaintiffs' own (unidentified) personal standards.

*Second*, as Plaintiffs cannot plead an injury, they cannot show the requisite injury-in-fact to allege Article III standing and standing for injunctive relief. Plaintiffs do not allege that: (a) Nurture's baby food could not be consumed, (b) failed to provide nutrition, or (c) caused any personal injury. Instead, Plaintiffs seek to manufacture an injury by alleging money damages for purportedly paying more than what the products were worth. Nor do Plaintiffs plausibly allege the presence or level of trace elements in the products they themselves purchased or any comparator products that meet their zero-tolerance threshold or less expensive competitors with the disclosures they seek here. Multiple courts addressing analogous allegations against others baby food

3

manufacturers have dismissed the claims on these grounds.[2]

*Third*, Plaintiffs' claims necessarily require this Court to determine what level of trace elements can be safely present in baby food and what, if anything, food manufacturers should say about the presence of these elements—a question the FDA is in the process of answering now. The FDA, not the courts, is the regulatory body charged with the public's food safety and the regulation of food labels. The FDA itself has described this question as "complicated and multifaceted" and rife with policy considerations to ensure access for all to safe, nutritious food for their families. Ex. 3 at 3; Declaration of Nega Beru ("Beru Decl.") ¶ 6 (noting "tremendous resources, technical expertise, feasibility analyses, and stakeholder outreach [are] required for FDA to . . . set action levels"). It has monitored and tested trace levels in baby foods for many years. Ex. 4 at 1. And for more than a year and a half, the FDA has been examining this issue anew under its "Closer to Zero Action Plan" ("Closer to Zero"). Ex. 5 at 1. It should be allowed to complete this important work rather than having courts set piecemeal and potentially conflicting standards due to meritless class action litigation. *See Gerber*, 2022 WL 10197651, at *14 ("Plaintiffs ask the Court to substitute its judgment on what levels of Heavy Metals in baby food are safe for the FDA's judgment. This type of scientific determination is particularly within the FDA's discretion and expertise.").

*Fourth*, Plaintiffs' claims are preempted by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"), as they do not allege Nurture failed to meet any FDA standards. They ask the Court to set standards based on their personal beliefs of the risk trace elements may present to children. As this would be inconsistent with FDA standards, the claims are preempted.

*Fifth*, Plaintiffs' omission-based claims fail. They do no allege that (a) any omission was

---

[2] *E.g.*, *Gerber*, 2022 WL 10197651, at *15 (dismissing complaint); *Plum*, 2022 WL 16552786, at *14 (same); *Kimca I*, 2022 WL 1213488, at *2 (same).

deceptive, (b) any omission was material, (c) they pled either reliance or causation, (d) Nurture had fraudulent intent, or (e) Nurture had a duty to disclose the potential presence of trace elements.

*Sixth*, Plaintiffs' unjust enrichment claims fail because they have not alleged that Nurture unjustly retained any benefit from them, and these claims are duplicative of their other claims.

Finally, Plaintiffs' claims fail for additional reasons: (a) their California injunctive relief claims fail because they have an adequate remedy at law; (b) their California omission claim is barred by the economic-loss doctrine; and (c) certain Plaintiffs' claims are untimely.

## **FACTUAL BACKGROUND**

### A.     **Nurture Produces High-Quality, Organic Food for Babies and Toddlers.**

Since its founding, Nurture has sold only certified USDA organic foods grown without using toxic persistent pesticides, artificial hormones or GMOs, and with fruit and vegetable ingredients sourced only from organic farms. *See* Ex. 34 at 2; CAC ¶ 13. Since 2011, Nurture has been a certified B Corporation—a for-profit corporation that meets "rigorous standards of social and environmental performance, accountability, and transparency." Ex. 34 at 10. Nurture's mission is and always has been to positively impact children's health through nutrition, setting the stage for healthy eating habits early in life. Nurture's organic infant and toddler foods include purees sold in jars and pouches, cereals, puffs (solid grain snacks), snackers (baked snacks), teethers, teether crackers, yogis (freeze-dried yogurt snacks), creamies (freeze-dried veggie and fruit snacks), bars, bowls, sticks, pudding, baking mixes, and cookies. *See id.*

### B.     **Trace Elements Are Present in All Foods and Cannot Be Completely Avoided.**

All plant-based foods—whether raw or processed—contain trace concentrations of metals. *See* Ex. 2 at 1. Trace elements are found in fruits, vegetables, and grains, whether they are sold in the supermarket produce aisle or baby food aisle or grown in backyard gardens. *See id*. According to the FDA, trace elements "are present in the environment and may enter the food supply through

soil, water or air" and thus "***cannot be completely avoided in the fruits, vegetables, or grains that are the basis for baby foods***." *Id.* (emphasis added). "[Y]ou're going to find contamination with lead and arsenic and the others across all of those types of foods, including organically grown foods. . . . [M]anufacturers are not able to meet [a threshold of] zero." Ex. 11 at 2-3.

###   C.     Public Reports Scare Parents About Trace Elements in Baby Foods.

In October 2019, HBBF, an activist group, issued a report ("HBBF Report") claiming that it found "unsafe" levels of heavy metals in prominent brands of baby foods, including Nurture's, and called on the FDA to "establish and finalize health-protective standards for heavy metals." Ex. 35 at 4; *see* CAC ¶¶ 98-99. But HBBF admitted that "the answer is not switching to homemade purees." Ex. 35 at 8. HBBF later released a second report in August 2022 that sought to assess whether "homemade baby food [was] better." Ex. 37. HBBF conceded that there was "no evidence to suggest that homemade baby food has lower heavy metal levels" because "[h]eavy metal levels varied widely by food type, not who made the food." *Id.* at 5 (emphasis omitted).

On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy issued a report (the "Staff Report")—which relied heavily on the HBBF Report—purportedly identifying the presence of naturally occurring trace amounts of heavy metals in fruits, vegetables, and grains found in certain baby and toddler foods by leading baby food manufacturers. *See* CAC ¶ 85. The Staff Report's authors did not study the risk of harm to children from exposure at the levels found nor consult with the FDA. In fact, the FDA made several public statements ***contradicting*** the conclusions drawn by the Staff Report. *See* Ex. 4 at 1. Nevertheless, the Staff Report asserted that baby food products made by most major manufacturers for decades might all be "unsafe" and called on the FDA to set action levels. *See* CAC ¶¶ 4-5, 86.

**D.     The FDA Reassures the Public That There Is No Immediate Health Risk to Children Consuming Baby Foods.**

The FDA—which has, for years, monitored the levels of trace elements—quickly responded to the Staff Report and refuted its findings. It informed the public that "testing shows that children are ***not at an immediate health risk*** from exposure to" the levels of trace elements present in baby foods. Ex. 6 at 3 (emphasis added). The FDA reassured the public that it "routinely monitors" levels of trace elements and, when necessary, will "take steps to remove" the affected foods from the market. *Id.* For example, in 2016, it proposed an action level of 100 ppb inorganic arsenic in rice cereal, which took effect in August 2020. *See* Ex. 36 at 6. The FDA explained that since 2011 "manufacturers have made significant progress in reducing arsenic in infant rice cereal products through selective sourcing and testing" of ingredients. Ex. 2 at 1.

The FDA confirmed it "takes exposure to toxic elements in the food supply extremely seriously, especially when it comes to protecting the health and safety" of children. *Id.* It seeks to "***reduce*** exposure to toxic elements . . . to the greatest extent feasible," *id.* (emphasis added), but mandating levels that are neither justified nor feasible "could result in significant reductions in the availability of nutritious, affordable foods that many families rely on," Ex. 5 at 1.

**E.     The FDA Makes Clear Its Control and Supervision of This Issue by Launching Its Closer to Zero Initiative.**

On April 8, 2021, just two months after the Staff Report, the FDA announced Closer to Zero—a comprehensive plan identifying actions the agency is taking "to help continually reduce toxic elements to the ***lowest levels possible*** in foods eaten by babies and young children," including setting action levels for various trace elements. Ex. 6 at 1 (emphasis added). Closer to Zero recognizes that "[r]educing levels of toxic elements in foods is complicated and multifaceted" and that it is "crucial" that measures taken not have unintended harmful consequences such as eliminating from the marketplace certain foods and, therefore, the nutrients in those foods. Ex. 23

at 3. The FDA is committed to its "science-driven, transparent, and inclusive process that . . . include[s] active stakeholder engagement and public sharing of data and information." *Id.*

Through its Closer to Zero Plan, the FDA is: (1) evaluating the scientific basis for action levels for arsenic, lead, cadmium, and mercury, including establishing an interim reference level for certain trace elements as appropriate; (2) proposing action levels; (3) consulting with stakeholders regarding the proposed action levels; and (4) finalizing those levels. *Id*. at 4-5. The FDA set an aggressive timeline for completing its work and has already begun setting action levels—it set an action level for lead in fruit juices and achieved substantial progress in evaluating interim reference levels for arsenic and cadmium. *Id.* at 6-8. The FDA will imminently propose a broader lead action level, and before April 2024, the FDA will have finalized action levels for lead and proposed action levels for arsenic, with cadmium and mercury consideration and decisions to follow. *Id.* at 6-7.

For the last nineteen months, since launching Closer to Zero, the FDA has worked relentlessly toward meeting its goals and timelines, and it provides the public and stakeholders with monthly progress reports on its achievements and undertakings. The FDA has already reached its Phase One goals. Below is a brief summary of the Agency's work:

- Hosting public meetings to discuss the scope of Closer to Zero and obtain stakeholder input, which includes panels on the impact of exposure to trace elements in babies and young children and the role of nutrition, and providing an opportunity for public comment on these issues (*see, e.g.*, Ex. 13 at 1);

- Issuing draft action levels for lead in fruit juices and updating interim reference levels for dietary lead (Ex. 23 at 6);

- Critically advancing its evaluation of interim reference levels for arsenic and cadmium through engaging with stakeholders, hosting advisory committees and public workshops, and consulting with scientific experts and federal agency partners (*id.*); and

- Obtaining significant additional funding of $14 million for 2022 (Ex. 12 at 6) and requesting $18 million in additional funding for 2023, which allows the agency to

"recruit risk analysts, consumer safety officers, data analysts, public health information specialists, toxicologist, and chemists" (Ex. 33 at 17).

A full chronology of the ongoing advancement of this work that the FDA is "uniquely positioned to address" is provided in Ex. 1.

### F.    Plaintiffs' Allegations and Claims.

Although the FDA is in active rulemaking on setting the standards called for by the Staff Report, *see* CAC ¶ 4, plaintiffs around the country filed more than 100 lawsuits against every major baby food manufacturer.

Plaintiffs consist of nine parents alleging that consumers "expect the food they feed their infants and toddlers to be ***free*** from" trace elements and that Nurture "fail[ed] to disclose" their mere "presence (or material risk)." *Id.* ¶¶ 1, 6 (emphasis added). They assert claims for statutory violations of consumer protection statutes of five states—New York, Minnesota, California, Illinois, and Washington—and common-law claims under the law of each of those states for fraud by omission and unjust enrichment.

Yet none of Plaintiffs alleges the specific amount of trace elements that "may" have been present in any of the products purchased. *See, e.g.*, *id.* ¶¶ 9, 231, 237. Nor do they allege that they (or anyone else) performed testing on the products they purchased. Moreover, three Plaintiffs did not even identify the specific products purchased. *See, e.g.*, *id.* ¶ 36 (Mezile purchased "various flavors" of Yogis); ¶ 54 (Lawson purchased "various flavors" of Pouches); ¶ 60 (Paris purchased "various flavors" of Puffs). And seven of the nine Plaintiffs continued to purchase Nurture's Products after the HBBF Report was publicized in 2019. *See id.* ¶¶ 37, 40, 43, 46, 49, 55, 58. Most tellingly, Margiotta purchased only in 2022—long after Plaintiffs allege that Nurture's purported omissions were made public by the HBBF and Staff Reports. *See id.* ¶ 40.

## LEGAL STANDARD

Nurture brings this motion pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "A case is properly dismissed for lack of subject-matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Courts lack jurisdiction when the plaintiff does not have Article III standing. *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 334 (S.D.N.Y. 2021). The plaintiff bears the burden of establishing standing. *Makarova*, 201 F.3d at 113. Under Rule 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting source omitted). "[A]lthough the Court must still accept factual allegations as true, it should not credit 'mere conclusory statements.'" *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 619 (S.D.N.Y. 2010) (quoting *Iqbal,* 556 U.S. at 678).

## ARGUMENT

## I.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE AN INJURY.

The Court should dismiss the CAC in its entirety because Plaintiffs do not (and cannot) allege an injury, which is an essential element of their claims.[3] Plaintiffs seek to manufacture an injury by layering speculation on top of speculation. First, Plaintiffs speculate that the largely unspecified products they purchased contained some undetermined amount of trace elements.

---

[3] All Plaintiffs' claims require an injury: *Zottola v. Eisai Inc.*, 564 F. Supp. 3d 302, 310, 316 (S.D.N.Y. 2021) (NY statutory claims); *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 675-76 (D. Minn. 2021) (MN statutory claims); *Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933, 945 (D. Minn. 2009); *Cochrane v. Am. Guar. & Liab. Ins. Co.*, 471 F. Supp. 3d 1140, 1154 (W.D. Wash. 2020) (WA statutory claim); *Benson v. Fannie May Confections Brands, Inc*., 944 F.3d 639, 647 (7th Cir. 2019) (IL statutory claim); *Ivie v. Kraft Foods Glob., Inc.,* 961 F. Supp. 2d 1033, 1046 (N.D. Cal. 2013) (CA statutory claims); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1169 (C.D. Cal. 2011); *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986) (common-law fraud); *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902-03 (2005) (common-law fraud); *LaRoche v. Smith*, 2016 WL 1365951, at *5 (W.D. Wash. Apr. 6, 2016) (common-law fraud); *Fladeboe v. Am. Isuzu Motors Inc*., 150 Cal. App. 4th 42, 65 (2007); *Lipton v. Chattem*, Inc., 2012 WL 1192083, at *4 (N.D. Ill. Apr. 10, 2012) (unjust enrichment).

They then further speculate that whatever amount of trace elements may have been present were "potentially dangerous" to the point that they "can" cause future physical harm. *See, e.g.*, CAC ¶¶ 9, 127 ("[e]xposure to heavy metals, even in small amounts, **can** lead to life-long effects" (emphasis added)). Following this chain of speculative inferences, Plaintiffs then allege, in an entirely conclusory fashion, that they must have paid less than the baby food was worth. Plaintiffs here, just like the plaintiffs in *Kimca I and II*, *Gerber*, and *Plum*, have not plausibly pled any injury.

### A.   Plaintiffs Do Not Allege That the Products They Purchased Contained Trace Elements and What Those Levels Were.

Plaintiffs do not allege that any of the Nurture Products they purchased **actually contained** any trace elements, let alone the specific levels of any of those elements. They "have not alleged that the products they each purchased were defective." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014). Plaintiffs do not allege to have performed any testing on the products they purchased. *See generally* CAC. They simply allege that these products had "potentially dangerous contents." *Id.* ¶ 9; *see id.* ¶ 1 ("material risk" of presence of heavy metals). To do so, they rely on spot testing performed by **other people** on **other samples** of certain products at issue.[4] But as the FDA explained, the level of trace elements present "depends on many factors, including: growing conditions; manufacturing and agricultural processes; past or current environmental contamination; and the genetic capacity of food crops to take up elements." Ex. 3 at 1.

Many courts dismiss claims where plaintiffs do not allege their products had the purported defect or deficiency. *See, e.g.*, *Wallace*, 747 F.3d at 1030, 1031 (plaintiffs gave "no reason to think *all* the beef marked as kosher . . . did not meet kosher standards," so it was "pure speculation to say the particular packages sold to the consumers were tainted"); *Gaminde v. Lang Pharma*

---

[4] The HBBF Report admits that "[t]his limited perchlorate testing" "is **not** necessarily **representative of perchlorate levels** across the baby food market" but simply "a snapshot of levels in . . . 25 foods." Ex. 35 at 34 (emphasis added). Only five Nurture products were tested once and trace levels of perchlorate allegedly found in three. CAC ¶¶ 98-101.

*Nutrition, Inc.*, 2019 WL 1338724, at *1-2 (N.D.N.Y. Mar. 25, 2019) (plaintiff did not allege his dietary supplement was missing the requisite level of fish oil; he failed "to allege that he tested the [fish oil] that he purchased"); *Pels v. Keurig Dr. Pepper, Inc.*, 2019 WL 5813422, at *5 (N.D. Cal. Nov. 7, 2019) (plaintiff "fail[ed] to plead the water *he* purchased contained violative arsenic levels"); *Vavak v. Abbott Labs., Inc.*, 2011 WL 13130493, at *6 (C.D. Cal. Mar. 7, 2011) (plaintiff did not allege *she* purchased infant formula that "actually contained beetles or beetle larvae").

In support of Plaintiffs' claims asserting that 142 of Nurture's products sold over the years "may" have contained trace elements, *see* CAC ¶ 14 n.10, Plaintiffs rely on a limited set of results for only 12 products tested between 2017 and 2019, or less than 9% of the products they challenge, *see id.* ¶¶ 92, 99, 142, 160, 167, 171. These 12 products are a fraction of the 49 products Plaintiffs claim to have purchased. *See id.* Yet they seek to extrapolate those sample results to the remaining 37 other products they purchased and the more than 90 other products they did not even purchase and to every batch of each product for a more than six-year period beginning in February 2015. *See id.* ¶ 14 n.10 (citing Exhibit 1 to the CAC, which lists 142 products); *id.* ¶¶ 253-257 (class period defined as "February 4, 2015 to the present"). Such extrapolation is improper. These products have different formulations and involve different ingredients, and the ingredients were grown at different times, as the FDA itself acknowledges. *See* Ex. 3 at 1.

Moreover, Plaintiff Lawson fails to allege that she purchased ***any*** of the 12 products. *Compare* CAC ¶ 54 (listing Lawson's generic classes of products), *with id.* ¶¶ 92, 99, 142, 160, 167, 171. Therefore, Plaintiffs have not plausibly pled their products contained trace elements.

### B.   Plaintiffs Do Not Allege That Their Children Suffered Any Risk of Physical Injury from Consuming Nurture's Products.

Plaintiffs also do not plausibly allege a substantially certain risk of future physical harm. At most, they allege that "potentially dangerous contents" could have potentially been present in

their baby food and "may" "over time" "accumulate" "to their detriment." *Id.* ¶¶ 9, 115. Plaintiffs' CAC is replete with references to "toxic" trace elements and asserts Nurture's products purportedly contain "dangerously high" levels of these trace elements. *Id.* ¶ 87. In direct contradiction to the FDA, Plaintiffs further allege that Nurture must meet a zero-tolerance threshold. *See id.* ¶ 6 (consumers "expect the food . . . to be ***free*** from heavy metals") (emphasis added); ¶ 152 ("no safe level"). As four courts addressing analogous allegations have already found, however, these allegations do not establish a nonspeculative risk of future adverse health consequences. *Kimca I*, 2022 WL 1213488, at *6 (dismissing complaint); *Gerber*, 2022 WL 10197651, at *10-11 (same); *Plum*, 2022 WL 16552786, at *7 (same); *Kimca II*, 2022 WL 3586095, at *4-5 (same).

In *Kimca I*, the court rejected Plaintiff's argument "that the quantities of heavy metals in the Baby Food Products pose an increased risk of injury." 2022 WL 1213488, at *6. There, like here, the plaintiffs argued that testing of Sprout's products "'exceed[ed] accepted standards' for exposure to heavy metals" by relying on water standards. *Id.* But "water and baby food are two fundamentally different products which are ingested and processed by the human body differently and consumed in different amounts." *Id.* In fact, the complaint acknowledged the FDA would set a "much higher" level "than those used for bottled and drinking water" based on the level set for inorganic arsenic in rice cereal. *Id.* Thus, "the use of water benchmarks in the baby food context is arbitrary and unexplained." *Id.* at *7; *see Gerber*, 2022 WL 10197651, at *1, *14 (same).

The *Kimca I* court also acknowledged that courts have repeatedly "declined to find injury . . . based partly" on statements by the FDA "indicat[ing] that the products at issue were safe." 2022 WL 1213488, at *7 (citing *Boysen v. Walgreen Co.*, 2012 WL 2953069, at *6 (N.D. Cal. July 19, 2012), and *Koronthaly v. L'Oreal USA, Inc*., 374 F. App'x 257, 258 (3d Cir. 2010)). Such is the case here. The FDA informed the public that "at the levels we have found through our testing

13

. . . children **are not at an immediate health risk**." Ex. 3 at 1. Such a pronouncement "[a]t the very least . . . weakens the inference that the amount of heavy metals in the Baby Food Products creates a substantial risk of danger to children." *Kimca I*, 2022 WL 1213488, at \*7. After the federal court rejected claims against Sprout, the plaintiffs re-filed in state court. *Kimca II*, 2022 WL 3586095, at \*4. That court similarly held that the plaintiffs were not injured because they "never specify at what level heavy metals become unsafe and, thus, they cannot and do not allege that any Sprout products exceeded this level," thus "render[ing] Plaintiffs' claims of injury implausible and speculative." *Id.*; *cf. also Davidson v. Sprout Foods Inc.*, 2022 WL 13801090, at \*3 (N.D. Cal. Oct. 21, 2022) (dismissing claims due to the purported "harmful" effects of sugar content because "they do not . . . describ[e] at what point 'high' sugar content crosses into harmful levels (or even why, in particular, these sugar levels are harmful)" (citation and footnote omitted)).

Similarly, the plaintiffs asserting claims against Plum failed to allege that "the levels present in the baby foods at issue are at dangerous levels and therefore are likely to cause physical harm." *Plum*, 2022 WL 16552786, at \*9. There were no allegations that the plaintiffs' children [had] suffered physical harm" by "starv[ing] or becom[ing] nutrient deficient." *Id.* at \*7. As the plaintiff had not pled a "causal link" between "the levels present in the baby foods at issue" and the resulting harm to children's health, they could not allege an injury. *Id.* at \*9.

In *Gerber*, after Gerber argued that the plaintiffs had not plausibly alleged that its products were unsafe, the plaintiffs admitted that their claims did not "turn on proving whether Gerber's products were safe." 2022 WL 10197651, at \*5 (quoting source omitted). The court characterized that admission as "rightfully" made because "Plaintiffs must plead a credible or substantial threat to their health or that of their children." *Id.* Since "fear and apprehension about a possible future physical or medical consequence . . . is not enough," Plaintiffs could not demonstrate a

nonspeculative risk of future physical harm. *Id.* (quoting source omitted).

The same result is compelled here. For example, Plaintiffs allege that Nurture's "Apple and Broccoli Puffs" "towers over existing and recommended standards." CAC ¶ 144-145. To do so, they cite inapplicable standards for inorganic arsenic in drinking and bottled water,[5] while acknowledging that the FDA's threshold for infant rice cereal (which is not Puffs) is significantly higher.[6] *See id.* Such speculative assertions of potential future harm do not establish injury. *See, e.g.*, *Boysen*, 2012 WL 2953069, at *7 ("Plaintiff . . . does not expressly allege that the levels of lead and arsenic contained in defendant's juices are likely to cause physical harm.").

### C.   Plaintiffs Have Also Not Suffered an Economic Injury.

Unable to assert a physical injury here, Plaintiffs instead assert an economic injury—that "the Baby Foods . . . were worth less than the price they paid" because "the Baby Foods contained . . . heavy metals." CAC ¶ 278. This theory of injury fails for the same reason it failed in analogous cases brought against Gerber, Sprout, and Plum: courts routinely "'reject[] misrepresentation claims based solely on a theory that the defendant's misrepresentation deprived the plaintiff of an opportunity to make a better-informed choice whether to buy the product.'" *Robey v. PVH Corp.*, 495 F. Supp. 3d 311, 321 (S.D.N.Y. 2020) (quoting source omitted); *see also Kimca II*, 2022 WL 3586095, at *5 ("Courts routinely dismiss claims where the plaintiffs alleged economic injury amounts to nothing more than buyer's remorse."); *Gerber*, 2022 WL 10197651, at *8 (plaintiffs "must do more than allege [they] did not receive the benefit [they] *thought* [they were] obtaining"). Regardless of whether Plaintiffs describe their purported injury as losing the benefit of their

---

[5] The allegations relating to other trace elements similarly fail for the same reasons. *See* CAC ¶¶ 160-161, 165-167, 170-171. And for perchlorate, Plaintiffs do not even attempt to cite any safety level. *See id.* ¶ 99.

[6] To the extent that Plaintiffs argue that Nurture did not adhere to its own goal thresholds, any requirement that is different than the FDA requirement would be preempted. *See infra* Section IV.

bargain or paying a purported premium price, they have not plausibly alleged an injury here.

### 1.    *Plaintiffs Received the Benefit of Their Bargain.*

Plaintiffs do not plausibly allege that they did not receive the benefit of their bargain for the same reason that their purported risk of injury argument fails: they received baby food that was consumed without incident and these products were not unsafe. "[W]hen a plaintiff purchases a consumable good and uses it to her benefit, there is no economic injury unless . . . the product 'failed to work for its intended purpose or was worth objectively less.'" *Gerber*, 2022 WL 10197651, at *6 (quoting *Koronthaly*, 374 F. App'x at 259).

In *Gerber*, the plaintiffs did "not allege the Baby Food Products were unsafe as to them" or that "the Baby Food Products failed to provide Plaintiffs' children with nourishment." *Id.* at *7-8. In fact, they "paid for safe and healthy food for their children and apparently received just that— the benefit of their bargain." *Id.* The court rejected the plaintiffs' theory of economic injury as "run[ning] afoul of logic" because "Plaintiffs *only* purported basis for economic injury stems from their allegation that the Baby Food Products posed a threat of future harm" and they had not demonstrated an "actual or imminent" risk of future physical harm. *Id.* at *5; *see also Kimca I*, 2022 WL 1213488, at *9 ("Plaintiffs have not adequately alleged that their children are at risk of harm from the Baby Food Products. So . . . Plaintiffs cannot establish economic injury under the benefit of the bargain theory."); *Kimca II*, 2022 WL 3586095, at *5 ("Plaintiffs have not adequately alleged that their children are at risk due to the products."); *James v. Johnson & Johnson Consumer Cos.*, 2011 WL 198026, at *2 (D.N.J. Jan. 20, 2011) (dismissing complaint alleging the presence of a toxic element in baby shampoo because, "[o]nce the product had been consumed, . . . there was no economic injury for Plaintiffs to complain of").

Similarly, in *Plum*, the court held that the plaintiffs had not pled a benefit-of-the-bargain injury because "Plaintiffs do not allege that their children have suffered physical harm" or "become

nutrient deficient." 2022 WL 16552786, at *7. To reach its holding, the court acknowledged the FDA's instruction "that parents should not throw out their supply of packaged baby foods or eliminate certain foods to avoid toxic elements because it could result in deficiencies in nutrients and poor health outcomes" as "substantially weaken[ing] and mak[ing] less plausible" the plaintiffs' argument that they did not receive the benefit of their bargain. *Id.*

As in *Kimca I and II*, *Gerber*, and *Plum*, Plaintiffs received the benefit of their bargain. They did not bargain for disclosures about trace elements. They bargained for, and Nurture sold them, baby foods that are "organic, nutritious, high-quality" foods. CAC ¶ 14. Nothing in the CAC contradicts these representations. *See Plum*, 2022 WL 16552786, at *8 (similar descriptors, such as "nutritious" and "packed with essential vitamins and minerals," do not "relate to heavy metals").

### 2. Plaintiffs Have Not Alleged That They Paid a Price Premium.

Even if characterized as a price-premium injury, *see* CAC ¶ 32 ("at premium prices"), Plaintiffs' theory still fails because they have not plausibly alleged that any alternative comparable products were available without *any* heavy metals or that products with the purported trace-element disclosures Plaintiffs seek were sold at a *lower price* than Nurture's Products. *See id.* ¶¶ 12-32. Nor could they—because no such products exist. While Plaintiffs allege in an entirely conclusory fashion that baby food can be produced with no detectable levels of heavy metals, *see id.* ¶¶ 200-209, that contradicts repeated statements by the FDA[7] that, "[b]ecause these elements occur in the environment, currently they cannot be *completely avoided*." Ex. 2 at 1 (emphasis added). The FDA has also warned that such efforts could result in significantly more expensive baby food, which would be "unaffordable for many families." Ex. 5 at 3.

---

[7] FDA's plan is titled Closer to Zero because the objective is to lower the levels of trace elements to the "lowest possible" level, not to eliminate them altogether. Ex. 5 at 1.

As in *Plum*, the CAC does "not put forward facts regarding any comparable, cheaper products to show a premium price was paid." 2022 WL 16552786, at *8; *accord Gerber*, 2022 WL 10197651, at *10 (no allegations of "comparable products"); *Kimca I*, 2022 WL 1213488, at *8 (same). Merely "recit[ing] the word 'premium' multiple times" in the Complaint is not a substitute for factual allegations from which the Court can infer that such a premium exists. *Izquierdo v. Mondelez Int'l, Inc.*, 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016).

While Plaintiffs cite a "Purity Award" certification for some other products, these ***still contain*** trace elements and so do not meet Plaintiffs' own zero-tolerance threshold. *See* CAC ¶ 201 ("lowest levels"). Nor does the CAC plausibly claim these are comparable products, as some use completely different ingredients. *See id.* ¶ 204. Plaintiffs also do not allege that these products "contain the disclosures Plaintiffs seek" or that they are sold for less than Nurture's Products. *See Gerber*, 2022 WL 10197651, at *10. "'Without any factual foundation to moor Plaintiffs' subjective estimation of the products' worth,' Plaintiffs' allegations are 'too speculative.'" *Id.* (quoting source omitted). Thus, Plaintiffs cannot plausibly plead a price-premium injury.

## II.   PLAINTIFFS DO NOT HAVE STANDING.

As Plaintiffs do not allege an injury,[8] the Court should also dismiss the CAC for lack of Article III standing. At an "irreducible constitutional minimum," Plaintiffs must show they have ***personally suffered*** some actual or threatened injury due to defendant's conduct that is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting source omitted); *see Bibox*, 534 F. Supp. 3d at 335. They have not done so here.

### A.   Plaintiffs Have Not Suffered an Injury-in-Fact.

Plaintiffs do not have an injury-in-fact because they do not allege either a certainly

---

[8] Evaluating injury under failure to state a claim "is a more stringent requirement than Article III standing." *Kimca II*, 2022 WL 3586095, at *4 (citing *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008)).

impending risk of future physical harm or any economic injury. As the courts assessing analogous allegations against Sprout, Plum, and Gerber have repeatedly held, speculative assertions of potential future health consequences do not suffice. *See, e.g.*, *Kimca I*, 2022 WL 1213488, at *9 (no standing where plaintiffs failed to allege that baby food products "exposed their children to the risk of future harm"); *Gerber*, 2022 WL 10197651, at *10-11 (no standing where plaintiffs failed to plead a "credible or substantial threat to their health or that of their children" that is actual or imminent); *Plum*, 2022 WL 16552786, at *9 (no standing where allegations of future harm were "speculative" in the absence of standards or "comparable measurements" applicable to baby food).

Similarly, courts routinely hold that manufactured economic injuries based on a speculative risk of future physical harm also do not confer standing. As the Fifth Circuit explained,

> the plaintiffs' attempt to recast their product liability claim in the language of contract law. The wrongs they allege—failure to warn and sale of a defective product—are products liability claims. Yet, the damages they assert—benefit of the bargain, out of pocket expenditures—are contract law damages. The plaintiffs apparently believe that if they keep oscillating between tort and contract law claims, they can obscure the fact that they have asserted no concrete injury. Such artful pleading, however, is not enough to create an injury in fact.

*Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319, 320-21 (5th Cir. 2002) (citation omitted) (no standing if no allegation the product "was ineffective" or "ha[d] any future health consequences"). The courts in *Gerber*, *Kimca I*, and *Plum* agreed and dismissed on standing grounds. *See Kimca I*, 2022 WL 1213488, at *10; *Gerber*, 2022 WL 10197651, at *15; *Plum*, 2022 WL 16552786, at *14; *see also Boysen*, 2012 WL 2953069, at *7 (no standing for purported economic injury).[9]

### B.      Plaintiffs Lack Standing to Seek Injunctive Relief.

Plaintiffs also lack standing to seek injunctive relief because they have no risk of future

---

[9] The court's two-page order in *In re Plum Baby Food Litig.*, No. 4:21-cv-913-YGR, 2022 WL 16640802, at *1 (N.D. Cal. Jan. 12, 2022), is an outlier and has been rejected by other courts due to its superficial analysis. As *Gerber* recognized, there, the court "found standing . . . [w]ith little explanation" and no discussion of whether the allegations rose beyond speculative assertions of potential future harm. 2022 WL 10197651, at *5, *10.

harm. Past injuries do not confer standing "unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016). "Consumers who were misled by deceptive . . . labels lack standing . . . because there is no danger that they will be misled in the future." *Alce v. Wise Foods, Inc.*, 2018 WL 1737750, at *6 (S.D.N.Y. Mar. 27, 2018) (quoting source omitted) (dismissing injunctive relief). As the Second Circuit explained, "next time they buy one of the [products], they will be doing so with exactly the level of information that they claim they were owed from the beginning." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 148 (2d Cir. 2020); *see also Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 688-89 (S.D.N.Y. 2021) (dismissing injunctive relief; plaintiff "obviously now is on notice"); *Gerber*, 2022 WL 10197651, at *11 ("there is no danger that they will be deceived . . . in the future."); *Plum*, 2022 WL 16552786, at *10 (dismissing injunctive relief).

The same is true here. At most, Plaintiffs allege that they "would be willing to purchase the Baby Foods in the future" if they "could be certain" that they do not contain trace elements. CAC ¶¶ 41, 47, 50, 59. That is insufficient for two reasons. First, they are now aware and cannot be misled again. Second, such a conditional statement admits that they will not buy the Products again in their current state. *See, e.g.*, *Izquierdo*, 2016 WL 6459832, at *5 ("[The plaintiff] will not purchase the Candy unless [the defendant] changes the Candy packaging. If the condition goes unfulfilled . . . [the plaintiff] will not purchase the Candy again. Therefore, he will not be injured."); *see also Alce*, 2018 WL 1737750, at *6 (dismissing injunctive relief). Since Plaintiffs have no risk of future harm, they have no standing to seek injunctive relief.

## III. THE FDA SHOULD DETERMINE SAFE LEVELS OF TRACE ELEMENTS UNDER THE PRIMARY JURISDICTION DOCTRINE.

The crux of Plaintiffs' claims is their belief that Nurture's baby foods "fail[] to disclose the presence (or material risk)" of trace elements "and/or other contaminants." CAC ¶ 1. Thus, this

Court must necessarily determine: (1) what levels of trace elements can be safely present in various foods; and (2) based on those levels, whether Nurture's products were, in fact, safe for babies and toddlers. This is the very same issue being addressed by the FDA through Closer to Zero. The FDA is actively determining whether and at what levels to set limits for trace elements in baby foods. *See* Beru Decl. ¶¶ 8-10. Trace elements "cannot be completely avoided in the fruits, vegetables, or grains that are the basis for baby foods." Ex. 2 at 1. The FDA has acknowledged the "complicated" nature of this question and the hard scientific, technical, and policy questions that must be addressed to answer this question. Ex. 23 at 3; *see also* Beru Decl. ¶ 12 ("When confronted with complex issues like reducing levels of naturally occurring heavy metals in baby foods, the FDA must weigh the various health, safety, and policy considerations at issue before making a determination."). For example, the FDA has already set the action level for inorganic arsenic in infant rice cereal, Ex. 36 at 6, and just recently released draft guidance for lead in juices, with additional draft guidance scheduled at intervals over the next two years, Ex. 23 at 6-8; *see* Beru Decl. ¶ 10.

Under the primary jurisdiction doctrine, courts can defer to the expertise of specialized regulatory agencies like the FDA. "[W]here the courts and an administrative agency have concurrent jurisdiction . . . involving issues 'beyond the conventional experience of judges,' the court will 'stay its hand until the agency has applied its expertise.'" *Engelhardt v. Consol. Rail Corp.*, 756 F.2d 1368, 1369 (2d Cir. 1985) (quoting *Far E. Conf. v. United States*, 342 U.S. 570, 574 (1952)). "[T]he agency should be given the first chance to exercise that discretion or apply that expertise." *McKart v. United States*, 395 U.S. 185, 194 (1969). "The doctrine's central aim is to allocate initial decisionmaking responsibility between courts and agencies and to ensure that they 'do not work at cross-purposes,'" as well as to "maintain[] uniformity in . . . an area entrusted

21

to a federal agency." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (quoting

source omitted). "[T]he 'doctrine seeks to produce better informed and uniform legal rulings.'" *Id.*

at 82 (quoting *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 673 (2003) (Breyer, J.,

concurring)). In the Second Circuit, courts evaluate four factors:

> (1) [W]hether the question at issue is within the conventional experience of judges
> or whether it involves technical or policy considerations within the agency's
> particular field of expertise; (2) whether the question at issue is particularly within
> the agency's discretion; (3) whether there exists a substantial danger of inconsistent
> rulings; and (4) whether a prior application to the agency has been made.

*Id.* at 82-83. Each of these factors weighs in favor of deferring to FDA's authority and allowing it

to complete its Closer to Zero work.

### A.   Determining Safe Levels for Trace Elements Are Technical and Policy Questions Best Addressed Utilizing the FDA's Expertise.

The FDA, the agency charged with the safety of our food supply, should determine in the

first instance the safe and acceptable levels of trace elements and any attendant labeling

requirements, as "enforcement of the claim requires the resolution of issues . . . placed within the

special competence of an administrative body." *Id*. at 81 (quoting source omitted).

Indeed, the FDCA charges the FDA with "protect[ing] the public health by ensuring that

. . . foods are safe, wholesome, sanitary, and properly labeled," and to promulgate and enforce

regulations through administrative proceedings. 21 U.S.C. § 393(b)(2); *see* 21 C.F.R. § 7.1 et seq.

The FDCA further "expressly authorizes the FDA to assess whether product labels are deceptive

or misleading." *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 140 (E.D.N.Y. 2018); *see*

Beru Decl. ¶ 12 ("FDA is ***obligated*** to consider the feasibility and achievability of any action levels

or other guidance it issues."). For this reason, courts have deferred to the FDA's expertise to

resolve the exact complex scientific and policy questions being raised here—the amount of trace

elements that can be safely present in baby foods. *Gerber*, 2022 WL 10197651, at \*11-15 (applying

primary jurisdiction); *Kimca II*, 2022 WL 3586095, at *3-4 (same).

*Gerber* applied the Fourth Circuit's test (identical to the Second Circuit's) for evaluating the primary jurisdiction doctrine's applicability. *Compare* 2022 WL 10197651, at *11, *with Ellis*, 443 F.3d at 82-83. The court acknowledged that "resolution of Plaintiffs' claims depends on technical and policy considerations within the FDA's field of expertise" as "no tolerance level has been set and no labeling requirement exists for Heavy Metals in Defendant's Baby Food Products," so the court was "unable to conclude whether Defendant's labeling was misleading without guidance from the FDA on the Heavy Metals' toxicity." 2022 WL 10197651, at *13; *see Kimca II*, 2022 WL 3586095, at *3 (noting "this case would require the Court to determine what levels of heavy metals in baby foods are safe and acceptable, and whether it is misleading for foods containing certain levels of heavy metals to make true labeling statements about their contents"); *Tran v. Sioux Honey Ass'n Coop.*, 2017 WL 5587276, at *2 (C.D. Cal. Oct. 11, 2017) (applying primary jurisdiction doctrine in food mislabeling case in part as "Tran's complaint . . . is really about what constitutes a safe level of glyphosate in honey"); *In re KIND LLC "Healthy and Natural" Litig.*, 209 F. Supp. 3d 689, 697 (S.D.N.Y. 2016) (staying claims against a food manufacturer that labeled its products "all natural" under the primary jurisdiction doctrine).[10]

Through Closer to Zero, the FDA is engaged in a comprehensive analysis of trace elements, with more than $30 million budgeted, seeking input from a multitude of stakeholders on these complex issues and the full potential impact of its actions. *See* Ex. 12 at 6 ($14 million funding in 2022); Ex. 33 at 17 ($18 million funding increase in 2023). Such a review necessarily implicates far more than resolving a dispute between private litigants. The FDA is employing teams of highly qualified experts in a variety of fields, including nutrition, risk analysis, pediatrics and medicine,

---

[10] *In re Kind* found this factor neutral, but the underlying claim there did not involve food safety allegations. *See id.*

toxicology, epidemiology, public outreach, policy, and law. *See* Ex. 16 at 1-7. It is conducting its own testing, "developing and validating analytical methods," conducting "toxicological research," and "developing new dose response models." Ex. 23 at 9. The FDA is collaborating with the U.S. Department of Agriculture, National Institutes of Health, and the Centers for Disease Control and Prevention on mitigation research. *Id.* Plaintiffs are invited and expected to participate. As the FDA emphasizes, Closer to Zero is a "collaboration with all of our stakeholders—industry, advocacy, policy makers, academia, and consumers" in the public interest. *Id.*

Nurture expects Plaintiffs will argue that courts are well-equipped to handle false advertising claims without the FDA's involvement. "But this is a false distinction. Plaintiffs' labeling claims are premised on the idea that any level of heavy metals in the products is unsafe." *Kimca II*, 2022 WL 3586095, at *3. "Accordingly, guidance from the FDA on what constitutes a safe level of heavy metals in baby food is ***integral*** to determining whether any of [defendant's] label statements were misleading." *Id.* (emphasis added); *see Gerber*, 2022 WL 10197651, at *13 ("Although the ultimate question of whether a company misled reasonable consumers by omitting material facts is routinely decided by courts . . . resolution of Plaintiffs' claims first requires a determination of whether the levels of Heavy Metals in Defendant's Baby Food Products were harmful."). This question also implicates "important policy considerations" the FDA has the expertise to weigh because "measures to limit toxic elements in foods may have 'unintended consequences—like limiting access to foods that have significant nutritional benefits by making them unavailable or unaffordable for many families.'" *Id.* (quoting source omitted); *see* Ex. 6 at 2; Beru Decl. ¶ 14 ("Setting action levels . . . at unfeasible and unachievable levels could negatively impact public availability of foods to low-income communities through programs such as WIC.").

Here, just as in *Gerber* and *Kimca II*, Plaintiffs allege that Nurture "fail[ed] to disclose the

presence (or material risk) of [heavy metals] in its baby food." CAC ¶ 1. Thus, any ruling would require the Court to determine what level of heavy metals in baby foods are "safe and acceptable." *Kimca II*, 2022 WL 3586095, at *3. The FDA itself has acknowledged that the "process of reducing levels of toxic elements in foods is complicated and multifaceted." Ex. 3 at 3; *see* Beru Decl. ¶ 11 ("The scientific and technical challenges posed by these issues are substantial."). It is the FDA, rather than the judiciary, that has "the requisite expertise to evaluate [the] research and determine what levels of [heavy metals] in [baby foods] can be considered 'safe' and whether consumers should be informed of [their] presence through labeling." *Tran*, 2017 WL 5587276, at *3. Thus, this Court should defer to FDA's expertise as to the appropriate levels of trace elements for these Products and what, if anything, should be disclosed on the Products regarding these trace elements.

**B.      Establishing Safe and Achievable Levels for Heavy Metals Falls Squarely Within the FDA's Discretion.**

It cannot be questioned that setting threshold levels of trace elements is "particularly within the FDA's discretion." *Gerber*, 2022 WL 10197651, at *13. The FDA is charged with regulating food safety and labeling and has the authority to set allowable thresholds for so-called "deleterious substances" in food and labeling requirements for food. 21 U.S.C. §§ 342-343, 346. The FDA also "has the power to enforce these regulations through product seizures, injunction, and mandatory recalls." *Kimca II*, 2022 WL 3586095, at *3; *see Doe v. Merck & Co.*, 803 F. App'x 559, 561 (2d Cir. 2020) (affirming dismissal of claim based on primary jurisdiction because "[t]he question of the efficacy and safety of Merck's vaccines 'involves technical or policy considerations within the [FDA's] particular field of expertise'" (quoting source omitted)). "The FDA has the expertise to evaluate research and determine what levels of Heavy Metals can be considered harmful." *Gerber*, 2022 WL 10197651, at *13; *accord Kimca II*, 2022 WL 3586095, at *3 ("These questions present 'technical matter[s] involving complex chemical considerations' that are uniquely within the

FDA's expertise." (quoting source omitted)).

If the court were to act before the FDA can set its action levels, "it would find itself in a position of either having no set standard to apply, or announcing a standard and thereby overstepping its proper role." *Haggag v. Welch Foods, Inc.*, 2014 WL 1246299, at *5 (C.D. Cal. Mar. 24, 2014) (quoting source omitted).

### C.  A Substantial Danger of Inconsistent Court Rulings Exists During and Pending the FDA's Determination of This Issue.

Pushing forward with class action litigation before the FDA decides what are safe and achievable trace element levels poses exactly the risk of inconsistent rulings the primary jurisdiction doctrine is designed to prevent. Inconsistent determinations also risk causing widespread consumer confusion. The FDA itself has warned that contradictory guidance would inevitably result in "unintended consequences" like "nutrient deficiencies and potential poor health outcomes" if science-based, nationwide standards are not set. Ex. 6 at 4.

Not surprisingly, courts addressing this exact issue have already acknowledged the "substantial danger of inconsistent rulings," which "weighs in favor of finding the FDA has primary jurisdiction." *Gerber*, 2022 WL 10197651, at *14; *see also Kimca II*, 2022 WL 3586095, at *2-4. "Congress did not want to allow states to impose disclosure requirements of their own on packaged food products, most of which are sold nationwide in order to avoid the need for manufacturers . . . to print 50 different labels." *KIND*, 209 F. Supp. 3d at 696 (alterations in original) (internal quotation marks omitted); *see also Tran*, 2017 WL 5587276, at *2 ("Congress plainly intended food labeling to be uniform."). Thus, "failing to defer to the FDA on the safe levels of heavy metals in baby foods, and the proper labeling, poses a danger that a court's determination 'will be inconsistent with that of other courts or with the FDA itself.'" *Kimca II*, 2022 WL 3586095, at *4 (quoting source omitted); *see also KIND*, 209 F. Supp. 3d at 696

(applying primary jurisdiction "would almost certainly help harmonize court rulings").

More than 100 cases asserting similar claims have been filed against baby food manufacturers nationwide, including Gerber, Plum, Hain, and Beech-Nut.[11] Thus,

> [a]ny decision by the Court regarding what level of Heavy Metals is harmful enough to require a warning label on Baby Food Products will likely result in a patchwork of decisions that vary by location, court, manufacturer, and product, resulting in different labeling standards for substantially similar baby food products produced by different manufacturers.

*Gerber,* 2022 WL 10197651, at *14. The substantial danger of inconsistent rulings created by these suits weighs heavily in favor of application of the doctrine.

### D.      Closer to Zero Is Actively Evaluating and Setting Action Levels.

Finally, the FDA is actively implementing Closer to Zero, which "identifies actions the agency ***will take*** to reduce exposure to [toxic elements] from foods eaten by babies and young children . . . to as low as possible," including by setting relevant "action levels" and "reference levels" for lead, arsenic, cadmium, and mercury. Ex. 23 at 2-4. "[A] reference level is a measure of exposure to a substance from food that the FDA may use to determine if the amount of exposure to an individual substance across foods could result in a specific health impact." *Gerber*, 2022 WL 10197651, at *14 (quoting source omitted). As the *Gerber* court acknowledged, the "FDA is presently working on its Closer to Zero Plan that identifies actions the agency will take . . . to reduce exposure to Heavy Metals."[12] *Id*.; *see also Kimca II*, 2022 WL 3586095, at *4 ("FDA is actively considering these issues"); *Canale*, 258 F. Supp. 3d at 325 (prior application factor favored application because of the agency's "ongoing investigation"); *In re Kind LLC "Healthy &*

---

[11] *See, e.g.*, *In re Hain Celestial Heavy Metals Baby Food Litig.*, No. 21-cv-678 (E.D.N.Y.); *Keeter v. Gerber Prods. Co.*, No. 21-cv-269 (E.D. Va.); *In re Plum Baby Food Litig.*, No. 21-cv-913 (N.D. Cal.); *Thomas v. Beech-Nut Nutrition Co.*, No. 21-cv-133 (N.D.N.Y.).

[12] The Plan includes establishing action levels for lead (proposed for juice products in April 2022), arsenic (FDA expects to propose between April 2022 and April 2024), and cadmium and mercury (FDA expects to propose after it sets action levels for lead and arsenic).

*All Natural" Litig.*, 287 F. Supp. 3d 457, 465 (S.D.N.Y. 2018) ("[T]he agency's work is underway . . . . Thus, this factor supports a stay . . . .").

The FDA is now in the second of the three phases it laid out. In this phase, it will finalize the action levels for lead, propose action levels for arsenic, and evaluate data about cadmium and mercury to propose appropriate action levels. Ex. 23 at 56-58. That the FDA needs years to complete Closer to Zero, despite substantial funding and expertise being brought to bear, underscores the complexity of scientific and policy issues involved. It is thus "appropriate to allow the FDA an opportunity to provide guidance" on these issues. *KIND*, 209 F. Supp. 3d at 693-94 n.2 (quoting source omitted). As the *Gerber* court noted, "any forthcoming FDA action would provide guidance on what constitutes a safe level of Heavy Metals in baby food." 2022 WL 10197651, at *11 n.18.

In opposition, Plaintiffs will likely cite the parallel case against Plum, pending in the Northern District of California, where the court in January 2022 declined to invoke primary jurisdiction because it believed that "uncertainty over how and when the FDA will act counsel[ed] against an indefinite stay." *In re Plum Baby Food Litig.*, 2022 WL 16640802, at *1. This is the only instance of a court refusing to apply the doctrine; the ruling was issued without any detailed analysis and was made nearly twelve months ago, before the FDA lowered the interim reference level for lead and issued the draft guidance for juices. *Compare id.*, *with* Ex. 23 at 1-2, 6.

Unlike in the Second Circuit, "efficiency is the deciding factor" in the Ninth Circuit. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753 (9th Cir. 2015) (internal quotation marks omitted). Efficiency is not one of the four factors considered in the Second Circuit, let alone the "deciding factor." Indeed, "the Second Circuit has **cautioned against** weighing such considerations too heavily in view of the fact that 'the Supreme Court has consistently held that

there are ***only two purposes to consider in determining whether to apply the primary jurisdiction doctrine—uniformity and expertise***,' and 'the Supreme Court has never identified judicial economy as a relevant factor.'" *KIND*, 209 F. Supp. 3d at 696 (emphases added) (quoting source omitted); *see also Doe*, 803 F. App'x at 561 (not evaluating delay as a factor in affirming application of the doctrine); *Ellis*, 443 F.3d at 90 (stating "judicial economy should not be considered"). As the Second Circuit noted, "[c]ourts should be ***especially solicitous*** in deferring to agencies that are simultaneously contemplating the same issues." *Id.* at 88 (emphasis added).

In summary, each of the four factors weighs in favor of application of the primary jurisdiction doctrine here so that the FDA, and not the courts in piecemeal fashion, will decide what levels of trace elements are safe in baby foods.

## IV.   PLAINTIFFS' ATTEMPT TO COMMANDEER FOOD SAFETY AND LABELING IS IMPLIEDLY PREEMPTED BY FEDERAL LAW.

Plaintiffs' claims and the underlying relief sought by the CAC (e.g., mandatory disclosures, enjoining sales "until the heavy metals and perchlorate are removed," and "recalling existing products") directly conflict with FDA's role under federal law to establish a uniform, national policy for food safety, including regulation of trace elements in the food supply. *See* CAC at 117-18, Prayer for Relief. Under the Supremacy Clause, conflicts that arise between state and federal law must be resolved in favor of federal law. *See* U.S. Const. art. VI, cl. 2. Implied conflict preemption applies where it is either "impossible . . . to comply with both state and federal requirements" or "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of the federal agency. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting source omitted); *see Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 607 (2d Cir. 1996). Under obstacle preemption, "[s]tate law may pose such an obstacle when it disturbs a balance the federal regulation has struck between 'conflicting policies that were committed to

the agency's care.'" *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (2022) (quoting source omitted).

Where a federal regulatory agency like the FDA has regulated in an area of its expertise pursuant to a legal mandate, state law may not be used to bar any conduct the agency has chosen not to prohibit. Otherwise, the threat of civil liability would erect an obstacle to the accomplishment of the comprehensive and carefully calibrated federal regulatory program. *See, e.g.*, *Cohen*, 46 F.4th at 1028-31 (preempting state regulation); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881-82 (2000) (federal law that required new cars to employ passive-restraint systems impliedly preempted state tort claims that would require auto manufacturers to install air bags); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156 (1982) (conflict preemption existed to bar state law to ensure federal agency's overall regulatory objectives); *Backus v. Nestlé USA, Inc.*, 167 F. Supp. 3d 1068, 1072-73 (N.D. Cal. 2016) (tort suit imposing liability for presence of ingredient in food preempted because federal law permitted the ingredient).

Plaintiffs' attempt here to commandeer the FDA's food safety role under the guise of state consumer protection law should also be preempted for the same reasons. The FDA "comprehensively" regulates food safety under the FDCA. *See Red v. Gen. Mills, Inc.*, 2015 WL 9484398, at *7 (C.D. Cal. Dec. 29, 2015). The FDCA's objectives include ensuring foods are "safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b). To achieve these objectives, the FDCA authorizes the FDA to determine appropriate national standards for food safety and labeling, which includes determining tolerance and defect action levels for harmful substances and for ensuring foods are accurately labeled about health risks. *Id.* §§ 342-343. And the FDA monitors and sets action levels for trace elements in foods.

Contrary to Plaintiffs' demand in this lawsuit, the FDA has ***not*** set a zero-tolerance threshold. Far from it. The FDA recognizes that trace elements "cannot be completely avoided in

the fruits, vegetables, or grains that are the basis for baby foods." Ex. 2 at 1. And when it has chosen to act, the FDA has set "action levels" rather than a ban, such as action levels for inorganic arsenic in rice cereal for infants and for lead in juice. *See* CAC ¶¶ 134, 137.

Moreover, the FDA clearly stated that it is "unwilling to require a warning statement [on a food label] in the absence of clear evidence of a hazard." Food Labeling; Declaration of Ingredients, 56 Fed. Reg. 28,592, 28,615 (June 21, 1991); *see also id.* ("If the agency were to require warnings for ingredients that only cause mild idiosyncratic responses, it is concerned that it would overexpose consumers to warnings."). That specific concern is particularly applicable here because, if Plaintiffs were to prevail, every food product—not just baby food—would need to carry a disclaimer about the potential presence of trace elements. But that type of warning on every food product would provide no benefit to consumers because it would both falsely suggest that the products are likely to cause significant adverse health effects and make consumers question if the products form part of a healthy diet, which the FDA has stated they do. *See* Ex. 3 at 2.

Permitting Plaintiffs to proceed here and ban trace elements under the guise of state law or to find retroactively that baby food products should not have been sold or should have a warning label would "disrupt the expert balancing underlying the federal scheme," especially where, as here, there is no scientific basis for such relief. *See Farina v. Nokia, Inc.*, 625 F.3d 97, 126 (3d Cir. 2010). A determination of what requirements, if any, should be mandated and what action levels, if any, should be set is squarely for the FDA to make. Thus, the CAC is preempted.

## V.    PLAINTIFFS' OMISSION-BASED FRAUD CLAIMS FAIL FOR ADDITIONAL REASONS.

Plaintiffs also assert omission-based fraud claims under the laws of New York, California,

Illinois, Minnesota, and Washington both under statutory and common law.[13] At their core, these claims allege that Nurture failed to disclose that the Products "contained (or were at material risk of containing) heavy metals, perchlorate, and/or other contaminants,"[14] despite the fact that these substances are unavoidable and have the same potential to be present in any foods that contain the same raw ingredients. This premise is faulty for numerous reasons as outlined below.[15]

### A. Plaintiffs Cannot Allege That Any Omission Was Deceptive Because the Potential Presence of Trace Elements in Foods Is in the Public Domain.

"In cases alleging a deceptive act based on an omission, it is not sufficient for a plaintiff to point solely to the omission." *Dimond v. Darden Rests., Inc.*, 2014 WL 3377105, at *13 (S.D.N.Y. July 9, 2014). "[T]he plaintiff must show why the omission was deceptive by alleging that the information omitted was solely within the defendant's 'possession or that a consumer could not reasonably obtain such information.'" *Id.* (dismissing statutory fraud claim) (quoting source omitted); *see also Kumandan v. Google LLC,* 2022 WL 103551, at *9 (N.D. Cal. Jan. 11, 2022) ("The public availability of this information undermines Plaintiffs' arguments that (1) their allegations . . . are sufficient to support [the defendant's] exclusive knowledge and (2) Plaintiffs had no reason to know of these facts."); *Cole v. Keystone RV Co.*, 2021 WL 3111452, at *4 (W.D. Wash. July 22, 2021) (dismissing WCPA claim because the information "w[as] posted on a public

---

[13] Counts XII and XIII overlap as both assert fraudulent omission. *Compare* CAC at 109 ("Fraudulent Misrepresentation by Omission"), *with id.* at 112 ("Fraud by Omission").

[14] These "other contaminants" are never identified and thus fail under Rule 8, let alone Rule 9(b)'s heightened standard, which applies here. *Miller v. Hyundia Motor Am.*, 2016 WL 5476000, at *13-14 (S.D.N.Y. Sept. 28, 2016).

[15] The CAC references Nurture statements regarding the quality and characteristics of its products. *E.g.*, CAC ¶¶ 13-17, 27, 106-107. But Plaintiffs do not bring claims for affirmative misrepresentations. *See id.* ¶¶ 272, 286, 292, 303, 318, 332, 347, 362, 378, 390, 404, 420, 441, 457(b) (alleging omissions only). In any event, similar statements advertising baby food as "organic," "non-GMO," "perfect," "nutritious," and "packed with essential vitamins and minerals" may all "be true even with the presence of heavy metals." *Plum*, 2022 WL 16552786, at *8; *see also Davidson*, 2022 WL 13801090, at *3 ("The California Court of Appeal has cautioned against permitting food labeling claims that rely on inferential leaps and which could ultimately 'place almost any advertisement truthfully touting a product's attributes at issue for litigation.'" (quoting source omitted)).

website"), *aff'd*, 2022 WL 4234958 (9th Cir. Sept. 14, 2022). "[T]he notion that [the defendant] could 'conceal' something that was so well covered in the media defies logic." *In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.*, 2009 WL 2940081, at *12 (D.N.J. Sept. 11, 2009).

While Plaintiffs allege in an entirely conclusory fashion that "Defendant alone possessed the knowledge" regarding trace elements in the food supply, CAC ¶ 117, that allegation conflicts with repeated FDA statements as well as numerous statements referenced in the CAC going back as far as 2012, *see, e.g.*, *id.* ¶¶ 113-114, 184-186 (Nurture's website); ¶ 126 n.94 (November 2014 study discussing health effects of heavy metals); ¶ 127 n.95 (August 2018 Consumer Reports study discussing potential presence of heavy metals in baby food); ¶ 132 n.101 (June 2012 study discussing the prenatal effects of arsenic); ¶ 164 n.141 (March 2015 ATSDR study discussing the potential health effects of cadmium); ¶ 164 n.142 (November 2012 study discussing heavy metal presence in products); ¶ 174 n.153 (December 2017 FDA FAQ discussing the potential presence of perchlorate); ¶ 176 n.156 (January 2018 FDA study on perchlorates). It is simply implausible that Nurture deceptively omitted the potential presence of trace elements here.

## B.   Plaintiffs Continued to Purchase Nurture's Products Long After They Admit the Information Was Publicly Available.

Plaintiffs' omission-based claims also fail because virtually all Plaintiffs continued to purchase Nurture's products after the potential presence of trace elements was publicly disclosed.[16]

---

[16] Plaintiffs' California statutory and common-law claims under the law of all five states require reliance. *E.g.*, *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326-27 (2011) (UCL); *Victor v. R.C. Bigelow, Inc.*, 2014 WL 1028881, at *5 (N.D. Cal. Mar. 14, 2014) (CLRA); *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 591 (7th Cir. 2017) (Illinois); *Ascente Bus. Consulting, LLC v. DR myCommerce*, 9 F.4th 839, 848 (8th Cir. 2021) (Minnesota); *Donahue v. Ferolito, Vultaggio & Sons*, 13 A.D.3d 77, 78 (N.Y. App. Div. 2004) (New York); *Wessa v. Watermark Paddlesports, Inc.*, 2006 WL 1418906, at *2 (W.D. Wash. May 22, 2006) (Washington).

Plaintiffs' remaining statutory claims require causation. *E.g.*, *Al Haj v. Pfizer Inc.*, 2020 WL 1330367, at *2-3 (N.D. Ill. Mar. 23, 2020) (IFCA); *Zachmann v. Coleman Co.*, 2022 WL 161480, at *4 (S.D.N.Y. Jan. 18, 2022) (New York GBL); *Young v. Toyota Motor Sales, U.S.A.*, 196 Wash. 2d 310, 321-22 (2020) (Washington); *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 776 (8th Cir. 2021) (Minnesota).

*See, e.g.*, *Forlenza v. Dynakor Pharmacal, LLC*, 2009 WL 10698476, at *3 (C.D. Cal. Dec. 15, 2009) (plaintiffs "must show reasonable reliance" and "cannot do so when they continued to purchase the products *after* they knew the advertisements were false"); *Wullschleger v. Royal Canin USA, Inc.*, 2022 WL 1164662, at *4 (W.D. Mo. Mar. 22, 2022) (dismissing consumer fraud claim where continued purchases undercut plausible allegation of causation).

Here, all but two Plaintiffs continued to purchase Nurture's products after the release of the HBBF Report. *See* CAC ¶¶ 37, 43, 46, 49, 55, 58, 61. For example, Plaintiff Margiotta ***only*** purchased Nurture's products starting in 2022, *id.* ¶ 40, after the Staff Report had also been issued and after more than 130 baby food suits had been filed. *See Gerber*, 2022 WL 10197651, at *14. Therefore, Plaintiffs cannot allege causation or reliance.

### C.    The Potential Existence of Low Levels of Trace Elements Is Immaterial.

Plaintiffs have also not alleged that the purported omission was material to a reasonable consumer. Courts routinely hold that the mere possibility of the presence of low levels of trace contaminants "is not likely to affect consumers' decisions." *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241, 248 (S.D.N.Y. 2019). There, the plaintiff challenged a dog food labeled "natural" for containing trace amounts of glyphosate, a herbicide. *Id.* at 244. The court held that the "presence of negligible amounts of glyphosate . . . [was] not likely to affect consumers' decisions in purchasing the product." *Id.* at 248; *see also Parks v. Ainsworth Pet Nutrition, LLC*, 2020 WL 832863, at *2 (S.D.N.Y. Feb. 20, 2020) (noting that the "level of glyphosate . . . [was] significantly lower than the FDA's limit" and "not likely to affect consumer choice"); *Herrington v. Johnson & Johnson Consumer Cos.*, 2010 WL 3448531, at *8 (N.D. Cal. Sept. 1, 2010) (trace amounts of formaldehyde and dioxane were immaterial); *In re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *5 (D. Minn. July 12, 2017) (not plausible that a reasonable consumer would be deceived by trace glyphosate in food product).

The same result follows here. Given the ubiquity of low levels of trace elements in the food supply and the absence of any health risks, Plaintiffs cannot plausibly allege that the omission is material. In fact, the vast majority of Plaintiffs themselves continued to purchase the products despite the media blitz, which further demonstrates that such knowledge did not, in fact, change purchasing decisions. *See* CAC ¶¶ 37, 40, 43, 46, 49, 55, 58, 61.

In a futile attempt to salvage their claims, Plaintiffs cite the purported results of a consumer survey as evidencing materiality. *See id.* ¶¶ 10-11, 195-199, 225. Facially implausible consumer deception claims, however, cannot be redeemed. *See Manuel v. Pepsi-Cola Co.*, 763 F. App'x 108, 110 (2d Cir. 2019) ("survey does not render Plaintiffs' allegations any more plausible"); *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1231 (9th Cir. 2019) ("The survey cannot, on its own, salvage [the] claim."); *Pichardo v. Only What You Need, Inc.*, 2020 WL 6323775, at *4 (S.D.N.Y. Oct. 27, 2020) (plaintiffs' "survey [did] not plausibly support [their] claim").[17] In sum, Plaintiffs do not plausibly allege that the purported omission is material.

### D.        Plaintiffs Do Not Plead Fraudulent Intent.

Plaintiffs' common-law fraudulent omission claims also fail because they have not pled fraudulent intent. Plaintiffs must allege sufficient facts that would "give rise to a *strong* inference of fraudulent intent." *Davis v. Yeroushalmi*, 985 F. Supp. 2d 349, 359 (E.D.N.Y. 2013) (quotation omitted). A "generalized motive to . . . increase sales and profits" does not. *Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 337 (E.D.N.Y. 2018) (quoting source omitted). And the "simple knowledge that a statement is false is not sufficient." *Id.*; *see Chiappetta v. Kellogg Sales Co.*, 2022 WL 602505, at *8 (N.D. Ill. Mar. 1, 2022) (allegations of intent insufficient).

---

[17] In any event, the survey is missing "important details" including "its methodology." *Puri v. Costco Wholesale Corp.*, 2021 WL 6000078, at *6–8 (N.D. Cal. Dec. 20, 2021) (granting dismissal). Only four of fifteen survey questions and results exist. *See* CAC ¶¶ 10-11, 195-199, 225. And none of those questions reference perchlorate.

Recently, this Court rejected analogous allegations that "fraudulent intent [was] evinced by [the defendant's] failure to accurately" label "when it knew its statements were not true" because "[c]ourts in this District regularly reject this exact language." *Bynum v. Fam. Dollar Stores, Inc.*, 2022 WL 837089, at *8 (S.D.N.Y. Mar. 21, 2022) (Vyskocil, J.) (quoting source omitted). So too here. Plaintiffs allege only that Nurture "knowingly . . . omitted . . . the true" characteristics of the Products, CAC ¶ 420, and sought to "induce . . . consumers to purchase its Baby Foods," *id.* ¶ 116. Such conclusory allegations of a general profit motive are insufficient.[18]

### E.    Plaintiffs Do Not Allege a Duty to Disclose.

Plaintiffs do not and cannot plead Nurture had a duty to disclose the potential presence of trace elements in its products, an element of their fraudulent omission claims and statutory claims under California and Minnesota law.[19] Typically, these states recognize a duty to disclose only if the defendant (1) is the plaintiff's fiduciary or other similar capacity; (2) has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) actively conceals the material fact; or (4) makes partial representations that are misleading.[20] The California claims also require that the omitted fact constitute an "unreasonable safety hazard." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141-42 (9th Cir. 2012). None of these bases for a duty to disclose apply here.

---

[18] For omissions-based claims, Plaintiffs must plausibly allege Nurture's pre-sale knowledge of the defect. *See, e.g.*, *Ahern v. Apple Inc*., 411 F. Supp. 3d 541, 564-66 (N.D. Cal. 2019) (California); *White v. DaimlerChrysler Corp*., 368 Ill. App. 3d 278, 285-86 (2006) (IFCA); *Alejandre v. Bull*, 159 Wash.2d 674, 689-90 (2007) (Washington); *Williams v. Yamaha Motor Corp., U.S.A.*, 106 F. Supp. 3d 1101, 1112-15 (C.D. Cal, 2015) (California), *aff'd*, 851 F.3d 1015 (9th Cir. 2017); *Woods v. Maytag Co.*, 2010 WL 4314313, at *16 (E.D.N.Y. Nov. 2, 2010) (New York). But there are no allegations Nurture had ***any knowledge*** of perchlorate, let alone ***at the time of purchase***. *See* CAC ¶¶ 98-101, 177.

[19] *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1142 (9th Cir. 2012); *see also Taleshpour v. Apple, Inc*., 2022 WL 1577802, at *1 (9th Cir. May 19, 2022); *Song v. ChampionPetfoods USA, Inc.*, 2020 WL 7624861, at *10-11 (D. Minn. Dec. 22, 2020), *aff'd*, 27 F.4th 1339 (8th Cir. 2022).

[20] *See LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (California); *Song*, 2020 WL 7624861, at *10-11, *aff'd*, 27 F.4th 1339 (8th Cir. 2022) (Minnesota); *Rydman v. Champion Petfoods USA, Inc*., 2020 WL 4347512, at *2 (W.D. Wash. July 29, 2020) (Washington); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017) (Illinois); *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995) (New York).

*First*, Plaintiffs are not in a "confidential or fiduciary relationship" with Nurture. "[A] closer degree of trust . . . than that of the ordinary buyer and seller is required." *Stoltz v. Fage Dairy Processing Indus., S.A.*, 2015 WL 5579872, at *24 (E.D.N.Y. Sept. 22, 2015). While Plaintiffs allege that "a baby food manufacturer" "is in a special position of trust," CAC ¶ 418, a food manufacturer does not owe a duty merely because "Defendant had 'special knowledge and experience.'" *Bynum*, 2022 WL 837089, at *6 (quoting source omitted).

*Second*, as outlined above, Plaintiffs do not plausibly allege that Nurture had exclusive knowledge or that consumers were unable to glean such information through ordinary diligence. *See, e.g.*, *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 972-73 (E.D. Ky. 2019) (reasonable consumer could have discovered products might contain heavy metals); *see also Rydman*, 2020 WL 4347512, at *3 (dismissing omission claim under Washington law because "Plaintiffs could have determined precisely what was in Defendants' dog food at any time").

*Third*, Plaintiffs fail to plausibly allege Nurture actively concealed any facts. "Mere nondisclosure does not constitute active concealment." *Ahern*, 411 F. Supp. 3d at 576 n.5 ("generalized allegations with respect to active concealment will not do"). The same result should apply here. Plaintiffs' legal conclusion that Nurture "intentionally . . . omitted the presence or material risk" of trace elements is insufficient. *See, e.g.*, CAC ¶ 116.

*Fourth*, Plaintiffs have not plausibly alleged a misleading partial statement that would require a corrective disclosure for the simple reason that Nurture did not speak to trace elements on its packaging. The analogous fact pattern in *Simpson* is instructive. There, the dog food label stated that the "products [we]re made from 'biologically appropriate,' 'high quality ingredients.'" 397 F. Supp. 3d at 972 (quoting source omitted). Like here, the label did not say the "products were free from *any* heavy metals" so there was no "duty to disclose every facet of the product's

makeup" because "a 'company is not required to volunteer information simply because it makes statements about the high quality of its products.'" *Id.* (quoting source omitted); *see also Song*, 27 F.4th at 1346 (affirming dismissal because defendant's label did not "require corrective disclosures" about the purported presence of heavy metals). Likewise, Nurture's labeling statements did not speak to heavy metals. *See, e.g.*, *Plum*, 2022 WL 16552786, at *8 ("perfect," "nutritious," and "packed with essential vitamins and minerals" did not "relate to heavy metals").

*Finally*, Plaintiffs do not plausibly allege an "unreasonable safety risk." They allege heavy metals *can* be adverse to health but do *not* identify the level of harm or any serious harm qualifying as an unreasonable safety risk. Thus, the "alleged safety risk is speculative and unsupported." *Yamaha Motor Co.*, 851 F.3d at 1028; *cf. Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 989 (1993) ("nearly everybody is exposed to carcinogens" in all food, but "ordinary consumption . . . is not substantially likely to result in cancer"). In sum, Nurture did not have a duty to disclose.

## VI.   PLAINTIFFS' UNJUST ENRICHMENT CLAIMS FAIL.

Plaintiffs' unjust enrichment claims fail for two reasons. First, "if [the] claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim" "stand[s] or fall[s] with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); *Bynum*, 2022 WL 837089, at *8; *Chuang v. Dr Pepper Snapple Grp., Inc.*, 2017 WL 4286577, at *8 (C.D. Cal. Sept. 20, 2017) (same); *Song*, 27 F.4th at 1346 (same). Here, Plaintiffs' unjust enrichment allegations are entirely dependent on their other claims and are duplicative.

The unjust enrichment claims also fail because Plaintiffs have not alleged that Nurture unjustly retained any benefit. They purchased baby food that was presumably consumed without incident. *See, e.g.*, *Lend Lease (US) Constr., Inc. v. Tech. Ins. Co.*, 2016 WL 147895, at *4 (N.D. Ill. Jan. 13, 2016) (plaintiff "fail[ed] to indicate that . . . [defendant] unjustly retained any benefit at [plaintiff's] expense"); *Water & Sanitation Health, Inc. v. Chiquita Brands Int'l, Inc.*, 2014 WL

2154381, at *2 (W.D. Wash. May 22, 2014) (allegations that defendant received revenue from the sale of its products not sufficient). Accordingly, their unjust enrichment claims fail.

## VII.   CERTAIN OF PLAINTIFFS' CLAIMS FAIL FOR ADDITIONAL STATE-SPECIFIC REASONS.

### A.   The California UCL, FAL, and Unjust Enrichment Claims Fail Because Plaintiffs Cannot Show Legal Remedies Are Inadequate.

As Plaintiffs' UCL, FAL, and unjust enrichment claims only allow for equitable relief, they must be dismissed because the Plaintiffs have adequate remedies at law—money damages. Equitable claims fail where: (1) "the operative complaint does not allege that [plaintiff] lacks an adequate legal remedy," or (2) the plaintiff alleges legal claims seeking money damages for the amount of available equitable restitution. *Sonner v. Premier Nutrition Corp.,* 971 F.3d 834, 844 (9th Cir. 2020). "It matters not that a plaintiff may have no remedy if her other claims fail." *Munning v. Gap, Inc.*, 238 F. Supp. 3d 1195, 1203-04 (N.D. Cal. 2017) (dismissing claims).

Here, Plaintiffs do not allege that legal remedies are inadequate. Nor could they. They are expressly seeking monetary damages for either the payment of a "price premium" or for the products being "worth less." *E.g.*, CAC ¶¶ 63, 243, 278. The monetary damages the Plaintiffs allegedly suffered arise from the same predicate facts underlying their equitable claims, and the CAC incorporates by reference those same allegations for the California equitable claims. *Id.* ¶¶ 388, 402, 454. Plaintiffs thus necessarily concede the availability of adequate remedies of law, which necessitates dismissal of their equitable claims. *Browning v. Am. Honda Motor Co.,* 549 F. Supp. 3d 996, 1013-14 (N.D. Cal. 2021) (dismissing equitable claims); *Gardiner v. Walmart Inc.,* 2021 WL 2520103, at *7 (N.D. Cal. Mar. 5, 2021) (collecting cases).

### B.   The Economic Loss Doctrine Bars the California Fraudulent Concealment Claim.

The economic loss doctrine "provides that certain economic damages are properly

remediable only in contract." *Giles v. Gen Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). "Economic losses include damages for inadequate value." *Williams v. Tesla, Inc.*, 2022 WL 899847, at *6 (N.D. Cal. Mar. 28, 2022) (dismissing claim); *see also Drake v. Toyota Motor Corp.*, 2020 WL 7040125, at *11-13 (C.D. Cal. Nov. 23, 2020) (same). Thus, the California fraudulent concealment claim fails.

### C.     Certain of Plaintiffs' Claims Are Untimely.

The CAC asserts that Micciche made her purchases many years ago—between August 2012 and April 2018. *See* CAC ¶ 52. Thus, her CLRA, FAL, and common-law fraud claims are untimely as they were not brought within three years. *Plumlee v. Pfizer, Inc.*, 2014 WL 695024, at *7 (N.D. Cal. Feb. 21, 2014) (dismissing claims). Similarly, the CAC asserts that Paris made purchases from "approximately 2015" to "approximately 2019," but did not become a named plaintiff until October 2022. CAC ¶ 61. As that was more than three years after her common-law fraud claim accrued, it is also untimely.[21] *See* Wash. Rev. Code § 4.16.080.

## CONCLUSION

Accordingly, Nurture respectfully requests that the Court dismiss the CAC in its entirety.

Dated: November 21, 2022                       Respectfully submitted,
       New York, New York
                                               DLA PIPER LLP (US)


                                                /s/ *Angela C. Agrusa*
                                               Angela C. Agrusa
                                               2000 Avenue of the Stars, Suite 400
                                               Los Angeles, CA 90067
                                               (310) 500-3591
                                               angela.agrusa@us.dlapiper.com

---

[21] Nurture expects Plaintiffs to argue that the discovery rule applies. This argument fails because they have not alleged any facts in support of application of this rule, *see* CAC ¶¶ 51-53, 60-62, and for all the reasons discussed in this brief, the potential presence of trace elements in food has been known and researched for decades, *see supra* Section V.A.

Colleen Carey Gulliver
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4500
colleen.gulliver@us.dlapiper.com

*Counsel for Defendant Nurture, LLC (f/k/a Nurture, Inc.)*

41