**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re NURTURE BABY FOOD LITIGATION**<br><br>This document relates to:<br><br>ALL ACTIONS | Case No. 1:21-cv-01217-MKV |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT NURTURE, LLC'S MOTION TO DISMISS**
<u>**PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u>

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND.....................................................................................5

    A.    Nurture Produces High-Quality, Organic Food for Babies and Toddlers. .............5

    B.    Trace Elements Are Present in All Foods and Cannot Be Completely Avoided..................................................................................................6

    C.    Public Reports Scare Parents About Trace Elements in Baby Foods.....................6

    D.    The FDA Reassures the Public That There Is No Immediate Health Risk to Children Consuming Baby Foods..........................................................7

    E.    The FDA Makes Clear Its Control and Supervision of This Issue by Launching Its Closer to Zero Initiative...................................................7

    F.    No Court Has Found that Baby Food is Harmful to Children. ...........................8

    G.    Plaintiffs' Allegations and Claims. ..........................................................9

LEGAL STANDARD...............................................................................................10

ARGUMENT ...........................................................................................................10

I.      PLAINTIFFS DO NOT PLAUSIBLY ALLEGE ARTICLE III STANDING. ...............10

    A.    Plaintiffs Do Not Plausibly Allege an Injury-in-Fact. ..........................................10

        1.    Plaintiffs Do Not Allege That the Products They Purchased Contained Trace Elements and What Those Levels Were...................11

        2.    Plaintiffs Do Not Allege That Their Children Suffered Any Risk of Physical Injury from Consuming Nurture's Products.................16

        3.    Plaintiffs Have Not Suffered an Economic Injury.............................18

    B.    Plaintiffs' Injuries Are Not Fairly Traceable to Nurture's Conduct.....................20

    C.    Plaintiffs Lack Standing to Seek Injunctive Relief...............................................20

II.     PLAINTIFFS CANNOT ALLEGE AN INJURY. ...........................................21

III.    THE FDA SHOULD DETERMINE SAFE LEVELS OF TRACE ELEMENTS UNDER THE PRIMARY JURISDICTION DOCTRINE. ...............................23

    A.    Determining Safe Levels for Trace Elements Are Technical and Policy Questions Best Addressed Utilizing the FDA's Expertise. ...................................24

    B.    Establishing Safe and Achievable Levels for Heavy Metals Falls Squarely Within the FDA's Discretion. ....................................................................26

    C.    A Substantial Danger of Inconsistent Court Rulings Exists During and Pending the FDA's Determination of This Issue......................................27

    D.    Closer to Zero Is Actively Evaluating and Setting Action Levels.........................28

i

IV.    PLAINTIFFS' ATTEMPT TO COMMANDEER FOOD SAFETY AND LABELING IS IMPLIEDLY PREEMPTED BY FEDERAL LAW. ..............................30

V.    PLAINTIFFS' OMISSION-BASED FRAUD CLAIMS FAIL FOR ADDITIONAL REASONS. ..............................................................................32

    A.    Plaintiffs Cannot Allege That Any Omission Was Deceptive Because the Potential Presence of Trace Elements in Foods Is in the Public Domain. .............32

    B.    Plaintiffs Continued to Purchase Nurture's Products Long After They Admit the Information Was Publicly Available. ....................................................34

    C.    The Potential Existence of Low Levels of Trace Elements Is Immaterial. ...........35

    D.    Plaintiffs Do Not Plead Fraudulent Intent. ..........................................................36

    E.    Plaintiffs Do Not Allege a Duty to Disclose. .........................................................37

VI.    PLAINTIFFS' UNJUST ENRICHMENT CLAIMS FAIL. .................................................39

VII.    CERTAIN OF PLAINTIFFS' CLAIMS FAIL FOR ADDITIONAL STATE-SPECIFIC REASONS. ....................................................................................................39

    A.    The California UCL, FAL, and Unjust Enrichment Claims Fail Because Plaintiffs Cannot Show Legal Remedies Are Inadequate. ....................................39

    B.    The Economic Loss Doctrine Bars the California Fraudulent Concealment Claim. ....................................................................................................................40

    C.    Certain of Plaintiffs' Claims Are Untimely. .........................................................40

CONCLUSION ...................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahern v. Apple Inc.*,
    411 F. Supp. 3d 541 (N.D. Cal. 2019) ......................................................................38

*Al Haj v. Pfizer Inc.*,
    2020 WL 1330367 (N.D. Ill. Mar. 23, 2020)...........................................................34

*Alce v. Wise Foods, Inc.*,
    2018 WL 1737750 (S.D.N.Y. Mar. 27, 2018) .........................................................21

*Alejandre v. Bull*,
    159 Wash.2d 674 (2007).........................................................................................37

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
    671 F.3d 140 (2d Cir. 2011)...................................................................................20

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
    823 F.3d 51 (2d Cir. 2016)........................................................................................2

*Ascente Bus. Consulting, LLC v. DR myCommerce*,
    9 F.4th 839 (8th Cir. 2021) ....................................................................................34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................10

*Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*,
    84 F.3d 602 (2d Cir. 1996).....................................................................................30

*Backus v. Nestlé USA, Inc.*,
    167 F. Supp. 3d 1068 (N.D. Cal. 2016) .................................................................30

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
    57 F.3d 146 (2d Cir. 1995).....................................................................................37

*Bauer v. Giannis*,
    359 Ill. App. 3d 897 (2005) ...................................................................................21

*Becerra v. Dr Pepper/Seven Up, Inc.*,
    945 F.3d 1225 (9th Cir. 2019) ...............................................................................36

*Benson v. Fannie May Confections Brands, Inc.*,
    944 F.3d 639 (7th Cir. 2019) .................................................................................21

iii

*Bermudez v. Colgate-Palmolive Co.*,
667 F. Supp. 3d 24 (S.D.N.Y. 2023)....................................................22

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
534 F. Supp. 3d 326 (S.D.N.Y. 2021)...................................................10

*Brown v. Coty, Inc.*,
2024 WL 894965 (S.D.N.Y. Mar. 1, 2024) .................................. *passim*

*Browning v. Am. Honda Motor Co.*,
549 F. Supp. 3d 996 (N.D. Cal. 2021) ..................................................39

*Bynum v. Fam. Dollar Stores, Inc.*,
592 F. Supp. 3d 304 (S.D.N.Y. 2022)........................................36, 37, 39

*Canale v. Colgate-Palmolive Co.*,
258 F. Supp. 3d 312 (S.D.N.Y. 2017).............................................2, 28

*Chiappetta v. Kellogg Sales Co.*,
2022 WL 602505 (N.D. Ill. Mar. 1, 2022)..............................................36

*Chuang v. Dr Pepper Snapple Grp., Inc.*,
2017 WL 4286577 (C.D. Cal. Sept. 20, 2017) ......................................39

*Cleary v. Philip Morris Inc*.,
656 F.3d 511 (7th Cir. 2011) .................................................................39

*Cleveland v. Whirlpool Corp*.,
550 F. Supp. 3d 660 (D. Minn. 2021) ....................................................21

*Cochrane v. Am. Guar. & Liab. Ins. Co*.,
471 F. Supp. 3d 1140 (W.D. Wash. 2020)..............................................21

*Cohen v. Apple Inc.*,
46 F.4th 1012 (2022)..............................................................................30

*Cole v. Keystone RV Co.*,
2021 WL 3111452 (W.D. Wash. July 22, 2021), *aff'd*, 2022 WL 4234958 (9th
Cir. Sept. 14, 2022) ...............................................................................33

*Colella v. Atkins Nutritionals, Inc.*,
348 F. Supp. 3d 120 (E.D.N.Y. 2018) ...................................................24

*Davidson v. Sprout Foods Inc.*,
2022 WL 13801090 (N.D. Cal. Oct. 21, 2022) ......................................32

*Davis v. Hain Celestial Grp., Inc.*,
297 F. Supp. 3d 327 (E.D.N.Y. 2018) ...................................................36

iv

*Davis v. Yeroushalmi,*
 985 F. Supp. 2d 349 (E.D.N.Y. 2013) .................................................................36

*DiFolco v. MSNBC Cable L.L.C.,*
 622 F.3d 104 (2d Cir. 2010).................................................................................2

*Dimond v. Darden Rests., Inc.,*
 2014 WL 3377105 (S.D.N.Y. July 9, 2014) ........................................................32

*Doe v. Merck & Co.,*
 803 F. App'x 559 (2d Cir. 2020) .........................................................................26

*Donahue v. Ferolito, Vultaggio & Sons,*
 786 N.Y.S.2d 153 (1st Dep't 2004) .....................................................................34

*Ellis v. Tribune TV Co.,*
 443 F.3d 71 (2d Cir. 2006)............................................................................23, 24

*Engelhardt v. Consol. Rail Corp.,*
 756 F.2d 1368 (2d Cir. 1985)...............................................................................23

*Esquibel v. Colgate-Palmolive Co.,*
 2023 WL 7412169 (S.D.N.Y. Nov. 9, 2023) ..................................................12, 14

*Fahey v. Deoleo USA, Inc.,*
 2018 WL 5840664 (D.D.C. Nov. 8, 2018) .............................................13, 14, 15

*Farina v. Nokia, Inc.,*
 625 F. 3d 97 (3d Cir. 2010)..................................................................................32

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
 458 U.S. 141 (1982).............................................................................................30

*Fladeboe v. Am. Isuzu Motors Inc.,*
 150 Cal. App. 4th 42 (2007) ................................................................................21

*Forlenza v. Dynakor Pharmacal, LLC,*
 2009 WL 10698476 (C.D. Cal. Dec. 15, 2009) ...................................................34

*Freightliner Corp. v. Myrick,*
 514 U.S. 280 (1995).............................................................................................30

*Gardiner v. Walmart Inc.,*
 2021 WL 2520103 (N.D. Cal. Mar. 5, 2021)........................................................40

*Geier v. Am. Honda Motor Co.,*
 529 U.S. 861 (2000).............................................................................................30

*In re Gen. Mills Glyphosate Litig.*,
  2017 WL 2983877 (D. Minn. July 12, 2017) ........................................................35

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*,
  2022 WL 10197651 (E.D. Va. Oct. 17, 2022) ................................................. *passim*

*Giles v. Gen Motors Acceptance Corp.*,
  494 F.3d 865 (9th Cir. 2007) ...............................................................................40

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016).................................................................................2

*In re Hain Celestial Heavy Metals Baby Food Litig.*,
  No. 21-cv-678 (E.D.N.Y.) ...................................................................................28

*Herrington v. Johnson & Johnson Consumer Cos.*,
  2010 WL 3448531 (N.D. Cal. Sept. 1, 2010) .......................................................35

*Hicks v. L'Oreal U.S.A., Inc.*,
  2023 WL 6386847 (S.D.N.Y. Sept. 30, 2023).....................................12, 13, 14, 16

*Housey v. Proctor & Gamble Co.*,
  2022 WL 17844403 (2d Cir. Dec. 22, 2022) ........................................................22

*Hudock v. LG Elecs. U.S.A., Inc.*,
  12 F.4th 773 (8th Cir. 2021) ...............................................................................34

*Ivie v. Kraft Foods Glob., Inc.*,
  961 F. Supp. 2d 1033 (N.D. Cal. 2013) ...............................................................21

*Izquierdo v. Mondelez Int'l, Inc.*,
  2016 WL 6459832 (S.D.N.Y. Oct. 26, 2016) ......................................................21

*John v. Whole Foods Mkt. Grp., Inc.*,
  858 F.3d 732 (2d Cir. 2017)................................................................................15

*Keeter v. Gerber Prods. Co.*,
  No. 21-cv-269 (E.D. Va.)....................................................................................28

*Kell v. Lily's Sweets, LLC*,
  2024 WL 1116651 (S.D.N.Y. Mar. 13, 2024) .........................................11, 13, 15

*Kimca v. Sprout Foods, Inc.*,
  2022 WL 1213488 (D.N.J. Apr. 25, 2022) ..................................................... *passim*

*Kimca v. Sprout Foods, Inc.*,
  2022 WL 3586095 (N.J. Super. Ct. Law Div. Aug. 5, 2022) .......................... *passim*

*In re KIND LLC "Healthy & All Nat." Litig.*,
    209 F. Supp. 3d 689 (S.D.N.Y. 2016) ................................................................27, 29

*In re Kind LLC "Healthy & All Nat." Litig.*,
    287 F. Supp. 3d 457 (S.D.N.Y. 2018) ...............................................................28

*Kinetic Co. v. Medtronic, Inc.*,
    672 F. Supp. 2d 933 (D. Minn. 2009) ................................................................21

*Kwikset Corp. v. Super. Ct.*,
    51 Cal. 4th 310 (2011) .......................................................................................34

*LaRoche v. Smith*,
    2016 WL 1365951 (W.D. Wash. Apr. 6, 2016) ..................................................21

*Lend Lease (US) Constr., Inc. v. Tech. Ins. Co.*,
    2016 WL 147895 (N.D. Ill. Jan. 13, 2016) ........................................................39

*LiMandri v. Judkins*,
    52 Cal. App. 4th 326 (1997) ..............................................................................37

*Lipton v. Chattem*,
    2012 WL 1192083 (N.D. Ill. Apr. 10, 2012) ......................................................21

*Lujan v. Defs. Of Wildlife*,
    504 U.S. 555 (1992) ...........................................................................10, 16, 20

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ..............................................................................10

*Manuel v. Pepsi-Cola Co.*,
    763 F. App'x 108 (2d Cir. 2019) .......................................................................36

*Munning v. Gap, Inc.*,
    238 F. Supp. 3d 1195 (N.D. Cal. 2017) .............................................................39

*N.C. v. Hain Celestial Grp., Inc.*,
    2023 WL 8261722 (Cal. Super. Sept. 1, 2023) ...................................................9

*NC v. Hain Celestial Grp., Inc.*,
    2023 WL 8261721 (Cal. Super. Aug. 24, 2023) ..................................................9

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ..............................................................................20

*In re Nurture Baby Food Litig.*,
    2022 WL 3155826 (S.D.N.Y. Aug. 8, 2022) ......................................................22

*Onaka v. Shiseido Ams. Corp.*,
    2024 WL 1177976 (S.D.N.Y. Mar. 19, 2024) ....................................................11, 12, 13, 14

*Paradowski v. Champion Petfoods USA, Inc.*,
    2023 WL 3829559 (2d Cir. June 6, 2023) .............................................................2, 33, 34, 38

*Parks v. Ainsworth Pet Nutrition, LLC*,
    2020 WL 832863 (S.D.N.Y. Feb. 20, 2020)........................................................................35

*Parks v. Ainsworth Pet Nutrition, LLC*,
    377 F. Supp. 3d 241 (S.D.N.Y. 2019)................................................................................35

*Pichardo v. Only What You Need, Inc.*,
    2020 WL 6323775 (S.D.N.Y. Oct. 27, 2020).......................................................19, 20, 35, 36

*In re Plum Baby Food Litig.*,
    2023 WL 3493319 (N.D. Cal. May 3, 2023)......................................................................29

*In re Plum Baby Food Litig.*,
    2024 WL 1354447 (N.D. Cal. Mar. 28, 2024)............................................................. *passim*

*In re Plum Baby Food Litig.*,
    637 F. Supp. 3d 210 (D.N.J. 2022) ........................................................................... *passim*

*In re Plum Baby Food Litigation*,
    No. 4:21-cv-00913 (N.D. Cal.) ...............................................................................22, 28

*Plumlee v. Pfizer, Inc.*,
    2014 WL 695024 (N.D. Cal. Feb. 21, 2014) .....................................................................40

*Puri v. Costco Wholesale Corp.*,
    2021 WL 6000078 (N.D. Cal. Dec. 20, 2021).....................................................................36

*Red v. Gen. Mills, Inc.*,
    2015 WL 9484398 (C.D. Cal. Dec. 29, 2015) ....................................................................31

*Robey v. PVH Corp.*,
    495 F. Supp. 3d 311 (S.D.N.Y. 2020)................................................................................21

*Roppo v. Travelers Com. Ins. Co.*,
    869 F.3d 568 (7th Cir. 2017) ...........................................................................................34

*Ross v. Axa Equitable Life Ins. Co.*,
    680 F. App'x 41 (2d Cir. 2017) .......................................................................................20

*Rydman v. Champion Petfoods USA, Inc.*,
    2020 WL 4347512 (W.D. Wash. July 29, 2020) ............................................................37, 38

*Simon v. Smith & Nephew, Inc.*,
  990 F. Supp. 2d 395 (S.D.N.Y. 2013)......................................................................2

*Simpson v. Champion Petfoods USA, Inc.*,
  397 F. Supp. 3d 952 (E.D. Ky. 2019) ....................................................................38

*Song v. Champion Petfoods USA, Inc.*,
  2020 WL 7624861 (D. Minn. Dec. 22, 2020), *aff'd*, 27 F.4th 1339 (8th Cir.
  2022) ..........................................................................................................37, 38, 39

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ................................................................................39

*Specialized Tours, Inc. v. Hagen*,
  392 N.W.2d 520 (Minn. 1986).............................................................................21

*Stephenson v. Citco Grp. Ltd.*,
  700 F. Supp. 2d 599 (S.D.N.Y. 2010)...................................................................10

*Stoltz v. Fage Dairy Processing Indus., S.A.*,
  2015 WL 5579872 (E.D.N.Y. Sept. 22, 2015) .....................................................37

*Taleshpour v. Apple, Inc.*,
  2022 WL 1577802 (9th Cir. May 19, 2022) .........................................................37

*Thomas v. Beech-Nut Nutrition Co.*,
  No. 21-cv-133 (N.D.N.Y.) ....................................................................................28

*Tonra v. Kadmon Holdings*,
  405 F. Supp. 3d 576 (S.D.N.Y. 2019)....................................................................2

*Toulon v. Cont'l Cas. Co.*,
  877 F.3d 725 (7th Cir. 2017) ...............................................................................37

*In re Toyota Motor Corp.*,
  790 F. Supp. 2d 1152 (C.D. Cal. 2011) ...............................................................21

*Tran v. Sioux Honey Ass'n, Coop.*,
  2017 WL 5587276 (C.D. Cal. Oct. 11, 2017).................................................26, 27

*Victor v. R.C. Bigelow, Inc.*,
  2014 WL 1028881 (N.D. Cal. Mar. 14, 2014)................................................34, 40

*Water & Sanitation Health, Inc. v. Chiquita Brands Int'l, Inc.*,
  2014 WL 2154381 (W.D. Wash. May 22, 2014)...................................................39

*Wessa v. Watermark Paddlesports, Inc.*,
  2006 WL 1418906 (W.D. Wash. May 22, 2006) ..................................................34

*White v. Beech-Nut Nutrition Co.*,
   2024 WL 194699 (2d Cir. Jan. 18, 2024) ...........................................................29

*White v. DaimlerChrysler Corp.*,
   368 Ill. App. 3d 278 (2006) ..............................................................................37

*Williams v. Tesla, Inc.*,
   2022 WL 899847 (N.D. Cal. Mar. 28, 2022).......................................................40

*Williams v. Yamaha Motor Corp., U.S.A.*,
   106 F. Supp. 3d 1101 (C.D. Cal, 2015), *aff'd*, 851 F.3d 1015 (9th Cir. 2017)......................37

*Wilson v. Walmart Inc.*,
   No. 3:21-cv-82 ................................................................................ *passim*

*Womack v. Evol Nutrition Assocs.*,
   2022 WL 3371213 (N.D.N.Y. Aug. 16, 2022) ....................................................33

*Woods v. Maytag Co.*,
   2010 WL 4314313 (E.D.N.Y. Nov. 2, 2010) ......................................................37

*Wullschleger v. Royal Canin USA, Inc.*,
   2022 WL 1164662 (W.D. Mo. Mar. 22, 2022), *vacated on other grounds by*
   75 F.4th 918 (8th Cir. 2023) .............................................................................34

*Young v. Toyota Motor Sales, U.S.A.*,
   196 Wash. 2d 310 (2020) ..................................................................................34

*Zachmann v. Coleman Co.*,
   2022 WL 161480 (S.D.N.Y. Jan. 18, 2022) .......................................................34

*Zottola v. Eisai Inc.*,
   564 F. Supp. 3d 302 (S.D.N.Y. 2021) ................................................................21

**Statutes**

21 U.S.C. §§ 342-343, 346 ............................................................................................26

21 U.S.C. § 393(b) ...................................................................................................24, 31

Food, Drug, and Cosmetic Act, 21 U.S.C. § 301...............................................5, 24, 31

Wash. Rev. Code § 4.16.080..........................................................................................40

**Other Authorities**

U.S. Const. art. III................................................................................3, 10, 21, 22

U.S. Const. art. VI, cl. 2...................................................................................30

21 C.F.R. § 7.1 ................................................................................................................24

56 Fed. Reg. 28, 592, 28,615 (June 21, 1991) .............................................................31

Federal Rule of Civil Procedure 12(b)(1) .....................................................................10

Federal Rule of Civil Procedure 12(b)(6) .....................................................................10

## PRELIMINARY STATEMENT

Plaintiffs' First Amended Consolidated Class Action Complaint ("FAC") pleads dramatic allegations of toxicity and theoretical harm to children but fails in equally dramatic fashion to state a single plausible claim that Nurture, LLC's ("Nurture") baby food products are unsafe, are inaccurately labeled, exceed any applicable regulatory standard, or have otherwise caused any harm to any consumer. The FAC fails to state even a single act or practice that could be legally cognizable under the law and, as a result, it must be dismissed.

Nurture is a company that manufactures baby food under the name Happy Family Organics. Nurture thoughtfully crafts organic meals and snacks made from ingredients grown and cultivated from the earth—fruits, grains, and vegetables—that are integral to the healthy development of children. Every product is certified USDA organic, which means its ingredients are grown without the use of toxic persistent pesticides, any artificial hormones, or GMOs. Some of these fruit, vegetable and grain ingredients contain elements at trace levels that cannot be completely eliminated, as they are inherently present in the water, air and soil in which crops are grown. For this reason, the finished products (as with all food) may also contain trace levels of these elements. But there is no dispute that Nurture is not adding lead, arsenic, cadmium, mercury, or perchlorate to any baby food product—and there is no allegation that it is.

The FAC carefully avoids the authoritative statements of the nation's foremost expert and regulator responsible for ensuring our country's food safety, the U.S. Foods and Drug Administration ("FDA"). The FDA publicly stated that it is "important to understand that toxic elements are present in the environment, including in our air, water and soil, and therefore are unavoidable in the general food supply." Declaration of Colleen M. Gulliver ("Gulliver Decl.") ¶

1

5, Ex. 4 at 2.[1] The Second Circuit similarly acknowledged that "measurable quantities of heavy metals occur naturally in the environment and are prevalent in a wide variety of food products." *Paradowski v. Champion Petfoods USA, Inc.,* 2023 WL 3829559 at *3 (2d Cir. June 6, 2023). The FDA has also expressly "reassure[d] parents and caregivers that, at the levels we have found through our testing, children are not at an immediate health risk." Ex. 4 at 1.

The director of the Office of Analytics and Outreach at the FDA's Center for Food Safety and Applied Nutrition confirmed this point: "The crops that are used to produce baby foods are also the crops that are used to fill the produce aisle [in the supermarket] or . . . canned goods in stores, so you're going to find contamination with lead and arsenic and the others across all of those types of foods, including organically grown foods. . . . [M]anufacturers are not able to meet [a threshold of] zero." Ex. 11 at 2-3. If successful here, Plaintiffs would impose on Nurture an unwarranted and scientifically impossible "zero tolerance" standard for unavoidable elements. No baby food manufacturer would be able to meet it, and the FDA imposes no such requirement.

The FAC fails to provide the necessary and plausible facts that would render anything about Nurture's baby foods actionable under applicable law—a holding reached by numerous courts considering similar claims. Indeed, this consolidated putative class action is one of hundreds

---

[1] The exhibits cited herein are attached to the Gulliver Declaration. Virtually all of the exhibits are publicly available government materials or statements. The lone exceptions are Ex. 59 (Nurture website), Ex. 60 (October 2019 HBBF Report), and Ex. 62 (August 2022 HBBF Report), which are incorporated into the FAC. *Compare* FAC ¶¶ 98, 113-114, 141, 184-86, *with DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (documents incorporated by reference); *Tonra v. Kadmon Holdings*, 405 F. Supp. 3d 576, 587 n.4 (S.D.N.Y. 2019) (same); *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (documents integral to the complaint).

The Court may take judicial notice of matters of public record such as the FDA materials. *See Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60, 60 n.3 (2d Cir. 2016) (FDA guidance document); *Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 401 n.2 (S.D.N.Y. 2013) (FDA website "public records"). It is also notable that the FAC repeatedly cites, quotes, and relies on numerous "cherry-pick[ed]" FDA documents, statements, and standards. *Compare* FAC ¶¶ 89, 121, 134-35, 137-38, 145, 157, 161, 165, 172, 174 n.154, 176, 214, *with Kimca v. Sprout Foods, Inc.* ("*Kimca I*"), 2022 WL 1213488, at *7 n.10 (D.N.J. Apr. 25, 2022) (it is "appropriate to take judicial notice of the FDA's statements regarding the toxicity of baby food" to "provide[] the Court with a more complete picture").

Finally, "matters outside the pleadings are properly considered" on a primary jurisdiction motion. *See, e.g.*, *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 324 n.11, 326 (S.D.N.Y. 2017).

of cases that were brought against this country's largest baby food companies since early 2021. Yet three years later, not a single court has found that baby food is harmful. Instead, identical claims in actions against Gerber, Plum Organics, Sprout Foods, and Walmart have been dismissed. *See, e.g.*, *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.* ("*Gerber*"), 2022 WL 10197651, at *15 (E.D. Va. Oct. 17, 2022); *In re Plum Baby Food Litig.* ("*Plum I*"), 637 F. Supp. 3d 210, 231-32 (D.N.J. 2022); *Kimca I*, 2022 WL 1213488 at *2; *Kimca v. Sprout Foods, Inc.* ("*Kimca II*"), 2022 WL 3586095, at *4-5 (N.J. Super. Ct. Law Div. Aug. 5, 2022); *Wilson v. Walmart Inc.*, No. 3:21-cv-82 (ECF Nos. 168 & 174). And, in the one case where the claims against Plum Organics survived a motion to dismiss, the Court ultimately ***dismissed*** as a matter of law because "the theory that regular consumption of [baby food] over a period of time ***may lead*** to potentially dangerous accumulations of these chemicals [was] simply ***too conjectural***." *In re Plum Baby Food Litig.* ("*Plum II*"), 2024 WL 1354447, at *5 (N.D. Cal. Mar. 28, 2024) (emphasis added). A dismissal is warranted here for each of the below reasons.

*First*, this is not a personal injury case, and no Plaintiff alleges actual physical harm. This is a putative class action lawsuit primarily seeking the return of money previously paid to purchase Nurture products. Plaintiffs claim only that Nurture's products "may" have included traces of heavy metals and—contrary to the FDA's position—those traces "can" cause future harm. *See, e.g.*, FAC ¶¶ 123, 127, 231. Plaintiffs indiscriminately sue on nearly every baby and toddler product Nurture makes, on behalf of a putative multistate class. Plaintiffs, however, have not tested the products their children consumed (without injury). Instead, they seek to improperly rely on third-party testing that is divorced from the products they purchased, and which fails to show any widespread pattern of the presence of trace elements that could establish Article III standing. Plaintiffs do not allege that: (a) Nurture's baby food could not be consumed, (b) failed to provide

nutrition, or (c) caused any personal injury. Instead, Plaintiffs seek to manufacture an injury by alleging money damages for purportedly paying more than what the products were worth. Nor do Plaintiffs plausibly allege the presence or level of trace elements in the products they themselves purchased or any comparator products that meet their zero-tolerance threshold or less expensive competitors with the disclosures they seek here. Multiple courts addressing analogous allegations against others baby food manufacturers have dismissed the claims on these grounds.[2]

*Second*, as Plaintiffs do not have standing, they cannot meet the higher bar for an injury to state a claim. Plaintiffs cannot rely on inapposite regulatory standards or third-party reports to evidence their purported injuries, particularly where none of those standards or reports actually state that Nurture's products caused any harm. And they present no other evidence of injury.

*Third*, Plaintiffs' claims necessarily require this Court to determine what level of trace elements can be safely present in baby food and what, if anything, manufacturers should say about their presence—a question the FDA is answering now. The FDA, not the courts, is the regulatory body charged with the public's food safety and the regulation of food labels. The FDA itself has described this question as "complicated and multifaceted" and rife with policy considerations to ensure access for all to safe, nutritious food for their families. Ex. 3 at 3; Declaration of Nega Beru ("Beru Decl.") ¶ 9. It has monitored and tested trace levels in baby foods for many years. Ex. 4 at 1. And the FDA has been examining this issue anew under its "Closer to Zero Action Plan" ("Closer to Zero"). Ex. 5 at 1. It should be allowed to complete this important work rather than having courts set piecemeal and potentially conflicting standards due to meritless class action litigation. *See Gerber*, 2022 WL 10197651, at *14 ("Plaintiffs ask the Court to substitute its

---

[2] *E.g.*, *Gerber*, 2022 WL 10197651, at *15 (dismissing complaint); *Plum I*, 637 F. Supp. 3d at 231-32 (same); *Kimca I*, 2022 WL 1213488, at *2 (same); *Wilson*, No. 3:21-cv-82, ECF No. 174 (same).

judgment on what levels of Heavy Metals in baby food are safe for the FDA's judgment. This type of scientific determination is particularly within the FDA's discretion and expertise.").

*Fourth*, Plaintiffs' claims are preempted by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"), as they do not allege Nurture failed to meet any FDA standards. They ask the Court to set standards based on their personal beliefs of the risk trace elements may present to children. As this would be inconsistent with FDA standards, the claims are preempted.

*Fifth*, Plaintiffs' omission-based claims fail. They do no allege that (a) any omission was deceptive, (b) any omission was material, (c) they pled either reliance or causation, (d) Nurture had fraudulent intent, or (e) Nurture had a duty to disclose the potential presence of trace elements.

*Sixth*, Plaintiffs' unjust enrichment claims fail because they have not alleged that Nurture unjustly retained any benefit from them, and these claims are duplicative of their other claims.

Finally, Plaintiffs' claims fail for additional reasons: (a) their California injunctive relief claims fail because they have an adequate remedy at law; (b) their California omission claim is barred by the economic-loss doctrine; and (c) certain Plaintiffs' claims are untimely.

## FACTUAL BACKGROUND

### A.    Nurture Produces High-Quality, Organic Food for Babies and Toddlers.

Since its founding, Nurture has sold only certified USDA organic foods grown without using toxic persistent pesticides, artificial hormones or GMOs, and with fruit and vegetable ingredients sourced only from organic farms. *See* Ex. 59 at 2; FAC ¶ 13. Since 2011, Nurture has been a certified B Corporation—a for-profit corporation that meets "rigorous standards of social and environmental performance, accountability, and transparency." Ex. 59 at 10. Nurture's mission is and always has been to positively impact children's health through nutrition, setting the stage for healthy eating habits early in life. Nurture's organic infant and toddler foods include purees sold in jars and pouches, cereals, puffs (solid grain snacks), snackers (baked snacks), teethers,

teether crackers, yogis (freeze-dried yogurt snacks), creamies (freeze-dried veggie and fruit snacks), bars, bowls, sticks, pudding, baking mixes, and cookies. *See, generally, id.*

**B.     Trace Elements Are Present in All Foods and Cannot Be Completely Avoided.**

All plant-based foods—whether raw or processed—contain trace concentrations of metals as trace elements are found in fruits, vegetables, and grains, whether they are sold in the supermarket produce aisle or baby food aisle or grown in backyard gardens. *See* Ex. 2 at 1. According to the FDA, trace elements "are present in the environment and may enter the food supply through soil, water or air" and thus "***cannot be completely avoided in the fruits, vegetables, or grains that are the basis for baby foods.***" *Id.* (emphasis added). "[Y]ou're going to find contamination . . . across all of those types of foods, including organically grown foods. . .. [M]anufacturers are not able to meet [a threshold of] zero." Ex. 11 at 2-3.

**C.     Public Reports Scare Parents About Trace Elements in Baby Foods.**

In October 2019, HBBF, an activist group, issued a report ("HBBF Report") claiming that it found "unsafe" levels of trace elements in prominent baby foods, including Nurture's, and called on the FDA to "establish and finalize health-protective standards for heavy metals." Ex. 60 at 4; *see also* FAC ¶¶ 98-99. But HBBF later admitted that "the answer is not switching to homemade purees." Ex. 60 at 8, 2 ("foods beyond the baby food aisle are equally affected"). HBBF conceded, there was "no evidence to suggest that homemade baby food has lower heavy metal levels" because "[h]eavy metal levels varied widely by food type, ***not who made the food***." Ex. 62 at 1.

On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy issued a report (the "Staff Report")—which relied heavily on the original HBBF Report—purportedly identifying the presence of trace amounts of heavy metals inherently present in certain baby and toddler foods. *See* FAC ¶ 85. The Staff Report's authors did not study the risk of harm to children from exposure at the levels found nor consult with the FDA, but asserted that

baby food products made by most major manufacturers for decades might all be "unsafe" and called on the FDA to set action levels. *See* FAC ¶¶ 4-5, 86. The FDA, however, made several public statements ***contradicting*** the conclusions drawn by the Staff Report. *See* Ex. 4 at 1.

### D.   The FDA Reassures the Public That There Is No Immediate Health Risk to Children Consuming Baby Foods.

The FDA—which has, for years, monitored the levels of trace elements—quickly responded to the Staff Report and refuted its findings. It informed the public that "testing shows that children are ***not at an immediate health risk*** from exposure to" the levels of trace elements present in baby foods. Ex. 6 at 3 (emphasis added). The FDA reassured the public that it "routinely monitors" levels of trace elements and, when necessary, will "take steps to remove" the affected foods from the market. *Id.* at 4. For example, in 2016, it proposed an action level of 100 ppb inorganic arsenic in rice cereal, which took effect in August 2020. *See* Ex. 46 at 6. The FDA explained that since 2011 "manufacturers have made significant progress in reducing arsenic in infant rice cereal products through selective sourcing and testing" of ingredients. Ex. 2 at 1.

The FDA confirmed it "takes exposure to toxic elements in the food supply extremely seriously, especially when it comes to protecting the health and safety" of children. *Id.* It seeks to "***reduce*** exposure to toxic elements . . . to the greatest extent feasible," *id.* (emphasis added), but mandating levels that are neither justified nor feasible "could result in significant reductions in the availability of nutritious, affordable foods that many families rely on." Ex. 5 at 1.

### E.   The FDA Makes Clear Its Control and Supervision of This Issue by Launching Its Closer to Zero Initiative.

On April 8, 2021, just two months after the Staff Report, the FDA announced Closer to Zero—a comprehensive plan identifying actions the agency is taking "to help continually reduce toxic elements to the ***lowest levels possible***," including setting action levels for various trace elements. Ex. 6 at 1 (emphasis added). Closer to Zero recognizes that "[r]educing levels of toxic

elements in foods is complicated and multifaceted" and that it is "crucial" that measures taken not have unintended harmful consequences such as eliminating from the marketplace certain foods and, therefore, the nutrients in those foods. Ex. 23 at 2. The FDA is committed to its "science-driven, transparent, and inclusive process that . . . include[s] . . and public sharing of data." *Id.*

The FDA is: (1) evaluating the scientific basis for action levels; (2) proposing action levels; (3) consulting with stakeholders regarding the proposed action levels; and (4) finalizing those levels. *Id*. at 3-5. The FDA has already set the action level for inorganic arsenic in infant rice cereal (Ex. 61 at 6), released draft guidance for lead in juices (Ex. 26 at 5) and in certain foods for babies and young children (Ex. 46 at 8), with additional draft guidance for arsenic and cadmium to be released in December 2024. Ex. 23 at 4-5; *see* Beru Decl. ¶ 10. Further, the FDA effectively monitors the food supply and will recall products when appropriate. For example, in 2023, the FDA initiated an investigation into a WanaBana product that reportedly caused acute lead toxicity in children. Ex. 63. The FDA confirmed the lead levels in the product could result in acute toxicity and Wanabana agreed to voluntarily recall the products. Ex. 63 at 17.

A full chronology of the ongoing advancement of this work is provided in Ex. 1.

**F.   No Court Has Found that Baby Food is Harmful to Children.**

Plaintiffs around the country filed more than 100 lawsuits against every major baby food manufacturer since the release of the Staff Report. However, in the intervening three years, no court has found that baby food is harmful to children. *See, e.g.*, *Gerber*, 2022 WL 10197651, at *5 (dismissing complaint); *Kimca I*, 2022 WL 1213488 at *6-8 (same); *Kimca II*, 2022 WL 3586095 at *5 (same); *Plum I*, 637 F. Supp. 3d at 226-27 (same); *Wilson*, No. 3:21-cv-82, ECF No. 174 (same); *Plum II*, 2024 WL 1354447, at *5 (granting judgment as a matter of law to defendant). Further, on September 1, 2023, a California state court granted Nurture and others' motion for summary judgment in a case alleging that a child's developmental disorders were caused by

exposure to trace elements because the plaintiff "ha[d] no evidence whatever from which a jury could find that *any particular defendant's products* were" a "substantial factor in causing [plaintiff's] injuries." *N.C. v. Hain Celestial Grp., Inc*., 2023 WL 8261722, at *1, *5 (Cal. Super. Sept. 1, 2023) (citation omitted); *see also NC v. Hain Celestial Grp., Inc.,* 2023 WL 8261721, at *1 (Cal. Super. Aug. 24, 2023) (excluding plaintiff's experts); Ex. 64 at 14 (acknowledging that "given that the heavy metals at issue here are found widely distributed throughout the environment . . . it seems a fact that virtually all neo-nates and infants are exposed to and have a dose of these metals in their bodies. Yet not all children have these disorders.").

### G.    Plaintiffs' Allegations and Claims.

Plaintiffs consist of nine parents alleging that consumers "expect the food they feed their infants and toddlers to be ***free*** from" trace elements and that Nurture "fail[ed] to disclose" their mere "presence (or material risk)." FAC ¶¶ 1, 6 (emphasis added). They assert claims under New York, Minnesota, California, Illinois and Washington law for statutory fraud and common-law fraud by omission and unjust enrichment. They seek to represent a class of nationwide purchasers from February 4, 2015 to February 4, 2021 (the day the Staff Report was released).

Yet none of Plaintiffs alleges that trace elements ***were*** present in their purchases—let alone the specific amount—as they did not test the products they purchased (and their children consumed without incident). *See, e.g.*, *id.* ¶¶ 9, 231, 237. Instead, they seek to rely on limited testing of other products without a meaningful link to their purchases. *See, e.g.*, *id.* ¶¶ 2-6.

Moreover, three Plaintiffs did not even identify the specific products purchased. *See, e.g.*, *id.* ¶ 36 ("various flavors" of Yogis); ¶ 54 ("various flavors" of Pouches); ¶ 60 ("various flavors" of Puffs). And seven of the nine Plaintiffs continued to purchase Nurture's Products after the HBBF Report was publicized in 2019. *See id.* ¶¶ 37, 40, 43, 46, 49, 55, 58. Most tellingly, Plaintiff Margiotta is not even a member of the class she seeks to represent as she purchased only in 2022—

long after both the HBBF and Staff Reports were released. *See id.* ¶ 40.

## LEGAL STANDARD

Nurture brings this motion pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "A case is properly dismissed for lack of subject-matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Courts lack jurisdiction when the plaintiff does not have Article III standing. *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 334 (S.D.N.Y. 2021). The plaintiff bears the burden of establishing standing. *Makarova*, 201 F.3d at 113. Under Rule 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The Court "should not credit 'mere conclusory statements[.]'" *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 619 (S.D.N.Y. 2010) (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

## I.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE ARTICLE III STANDING.

The Court should dismiss the FAC because Plaintiffs do not (and cannot) allege Article III standing. Plaintiffs must allege: (1) an "injury-in-fact" that is "concrete and particularized" and not "'conjectural' or 'hypothetical,'" (2) that is "fairly [] traceable" to the alleged unlawful conduct, and (3) likely to be redressed by the requested relief. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted). They have not done so here.

### A.    Plaintiffs Do Not Plausibly Allege an Injury-in-Fact.

Plaintiffs seek to manufacture an injury by layering speculation on speculation. Plaintiffs first speculate that the largely unspecified products they purchased contained some undetermined amount of trace elements. They further speculate that whatever amount of trace elements may have been present were "potentially dangerous" to the point that they "can" cause future physical harm.

10

*See, e.g.*, FAC ¶¶ 9, 127 ("[e]xposure to heavy metals . . . *can* lead to life-long effects") (emphasis added). Following this chain of speculative inferences, Plaintiffs then allege, in an entirely conclusory fashion, that they must have paid less than the baby food was worth. None of this speculation is sufficient and Plaintiffs have not plausibly pled an injury-in-fact.

> ### 1. *Plaintiffs Do Not Allege That the Products They Purchased Contained Trace Elements and What Those Levels Were.*

Plaintiffs do not plausibly allege an injury-in-fact because they do not allege that any of the products they purchased actually contained any trace elements, let alone at what level. Plaintiffs must "allege facts making it at least plausible" that they "purchased a [p]roduct that was misbranded." *Onaka v. Shiseido Ams. Corp.*, 2024 WL 1177976, at *2 (S.D.N.Y. Mar. 19, 2024) (citation omitted); *Kell v. Lily's Sweets, LLC*, 2024 WL 1116651, at *3 (S.D.N.Y. Mar. 13, 2024) ("Her theory of standing is that lead-contaminated chocolate is worth less . . .; unless she has a basis to allege that her chocolate contained lead, she has no basis to allege that she overpaid[.]").

Where plaintiffs do not test their own purchases, they must "meaningfully link" testing results to their actual purchases. *Onaka*, 2024 WL 1177976, at *2 (plaintiffs must "allege plausibly" that they purchased contaminated products) (quoting *Hicks v. L'Oreal U.S.A., Inc.*, 2023 WL 6386847, at *9 (S.D.N.Y. Sept. 30, 2023)). Under Second Circuit precedent, courts may only "infer that the plaintiff purchased a specific product with a defect that had been plausibly reported by third-party tests to be widespread, systematic, routine, or uniform." *Kell*, 2024 WL 1116651, at *4-5 (citing *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736-38 (2d Cir. 2017)). Thus, courts within this District have consistently dismissed claims as "impermissible conjecture" where plaintiffs rely on limited and vague testing to plead that their products were contaminated. *See Kell*, 2024 WL 1116651, at *3-4; *see also Brown v. Coty, Inc.*, 2024 WL 894965, at *4 (S.D.N.Y. Mar. 1, 2024) (cannot "plausibly infer that the few tubes purchased by Plaintiffs over a span of

years contain[ed the contaminant]); *Esquibel v. Colgate-Palmolive Co.*, 2023 WL 7412169, at *2-3 (S.D.N.Y. Nov. 9, 2023); *Onaka*, 2024 WL 1177976, at *2-3; *Hicks*, 2023 WL 6386847, at *9.

The same result is compelled here. Plaintiffs do not allege they tested any products they purchased and found trace elements present. *See generally* FAC. Instead, they allege only that their purchases "contained ***or may have*** contained" trace elements through limited spot testing of some of the many products at issue. *See* FAC ¶ 1 ("material risk" of heavy metals); *see also id.* ¶¶ 14 n.11, 237; Ex. 1 to FAC. Plaintiffs rely on two sets of test results: (a) data that Nurture provided to the House Subcommittee, *see* FAC ¶¶ 92, 142, 160, 167, 171, and (b) the HBBF Report that sampled products from multiple companies including Nurture ("HBBF Testing"). *See id.* ¶¶ 99, 212; Ex. 60 at 32. Plaintiffs, however, do not plausibly allege that their purchases contained trace elements for five reasons: (1) they have not adequately pleaded the HBBF Testing findings; (2) the vast majority of Plaintiff's purchased products were not tested at all; (3) Plaintiffs have not plausibly alleged that any of their purchases were "reasonably near in time" to the testing; (4) Plaintiffs fail to allege any source consistency between their purchases and tested products; and (5) since the absorption of trace elements varies by ingredient to ingredient and season to season, it is improper to extrapolate presence even by product type or time period.

First, Plaintiffs' allegations regarding the HBBF Testing "are deficient because they are 'murky'" as to the testing's "actual findings." *Brown*, 2024 WL 894965, at *3 (citation omitted). Courts within this District have repeatedly held that "sparse" allegations of third-party testing are insufficient. *See, e.g.*, *Esquibel*, 2023 WL 7412169, at *2 (rejecting testing where plaintiffs failed to allege "how many units of the Product were tested," or "where those units were acquired"); *Brown*, 2024 WL 894965, at *4 (rejecting "vague" allegations that did not allege "how many total" products were tested and "what percentage" were contaminated); *Hicks*, 2023 WL 6386847, at *8-

12

9 (rejecting testing). The same result is compelled here. Plaintiffs have not alleged for the HBBF

Testing how the tested products were sourced, when they were tested, how many of Nurture's

products were tested, whether multiple samples of the same product line were tested, or what

percentage of the products contained trace elements. *See* FAC ¶¶ 99, 212; Ex. 60 at 32 (stating

only that it "received 168 baby food containers in April and May 2019").[3]

Second, Plaintiffs do not have an injury-in-fact for the vast majority of their purchased

products (let alone the 142 products they seek to include in their class), which were not tested. *See,*

*e.g.*, *Hicks*, 2023 WL 6386847, at *9 (dismissing claims because plaintiffs' purchased products

were not tested); *Onaka*, 2024 WL 1177976, at *3 (dismissing claims); *Brown*, 2024 WL 894965,

at *3 (same). In *Kell*, the plaintiff did not have an injury-in-fact for her chocolate purchases that

she alleged contained lead because the testing "examined just two or three samples," and it "would

be impermissible conjecture to extrapolate those findings to . . . the specific Products [she]

purchased.". 2024 WL 1116651, at *4; *see also Fahey v. Deoleo USA, Inc.*, 2018 WL 5840664, at

*2-3 (D.D.C. Nov. 8, 2018) (declining to make the "methodological" assumption that plaintiff's

bottle of olive oil was mislabeled on the basis of testing of three bottles of olive oil).

So too here. Only nine of Plaintiffs' approximately 60 different products purchased were

tested between 2017 and 2019.[4] *See* FAC ¶¶ 92, 142, 160, 167, 171. Yet, Plaintiffs seek to

improperly extrapolate these results to every batch of each product sold for a more than a six-year

---

[3] The HBBF Report also references another third-party study that HBBF commissioned, which tested five of Nurture's products for perchlorate. FAC ¶ 99. Yet the HBBF Report concedes that "[t]his limited perchlorate testing is … not necessarily representative of perchlorate levels. HBBF Report at 37. This testing should also be rejected given the minuscule number of products tested and that perchlorate was found in little over half of Nurture's products.

[4] This figure accounts for Plaintiff's purchases of products tested by Nurture only as the HBBF Testing is inadequately pled. This figure is also approximate because Plaintiff's allegations fail to include product numbers or sufficient identifying information for many products.

period beginning two years prior and ending two years after the testing.[5] *See id.* ¶ 14 n.11; *id.*
¶¶ 253-258 ("February 4, 2015 to February 4, 2021"). That extrapolation is facially improper.

Third, Plaintiffs have not plausibly alleged that any of their nine tested products were
purchased "reasonably near in time" to the testing. Test results cannot be extrapolated to purchases
that occurred "well before" or after the testing. *See, e.g.*, *Onaka*, 2024 WL 1177976 at *3-4
(plaintiff's allegations that they "purchased" and "'most recently' purchased them in 2021" were
"a far cry from the repeated purchases within a specified period . . . that have allowed courts to
infer a plausible likelihood of a past injury" (citation omitted)); *see also Esquibel*, 2023 WL
7412169 at *2-3; *Brown*, 2024 WL 894965, at *3-4; *Hicks*, 2023 WL 6386847 at *9; *Fahey*, 2018
WL 5840664, at *2-3 (rejecting the "temporal" assumption that plaintiff's 2018 purchase was
mislabeled based on 2010 testing). A court faced with this issue for another baby food
manufacturer ordered the plaintiffs to identify the lot numbers for their purchases. *Wilson*, No.
3:21-cv-82, ECF No. 174. When plaintiffs were "unable to identify lot numbers" for their
purchases, *id.*, the court held that their "claims regarding inorganic arsenic in infant rice cereal"
were dismissed "for lack of standing." *See id.* (citing *Wilson*, No. 3:21-cv-82, ECF No. 173).

Here, Plaintiffs allege only generalized purchase years without any detail as to frequency;
for example, Plaintiff Barbu alleges she purchased HappyBABY Puffs (Banana & Pumpkin flavor)
sometime between approximately February 2017 and January 2020. FAC ¶ 43. Yet Plaintiffs allege
that flavor of HappyBABY Puffs was tested only once, on October 31, 2017.[6] *Id.* ¶ 92. To find a
temporal connection, the Court must infer that Plaintiff Barbu purchased this product "reasonably
near in time" to October 2017, when based on the facts alleged, she could have done so any time

---

[5] Two Plaintiffs fail to allege they purchased ***any*** of the specific tested products. *Compare* FAC ¶ 54 (generic classes
of products), ¶ 60 (purchases of "various flavors") *with id.* ¶¶ 92, 99, 142, 160, 167, 171, 212.

[6] Plaintiffs allege only dates of the "testing report," not the test. *See, e.g.*, FAC ¶ 92.

during that three-year range. That finding would be pure speculation. And Plaintiff Barbu's alleged date range is relatively narrow, as many other Plaintiffs allege up to six-year periods, *see, e.g.*, *id.* ¶¶ 51-52. Moreover, many of Plaintiffs' purchases occurred well outside of the date ranges of Nurture's testing. *Compare, e.g.*, *id.* ¶¶ 92, 142, 160, 167, 171, *with id.* ¶¶ 36-62.

Fourth, Plaintiffs fail to plead that they regularly obtained products from the same sources as those tested. In *Kell*, the plaintiff failed to plead an injury-in-fact for her chocolate purchases where she did not allege she "regularly obtained her chocolate from the same source" of the tested chocolate containing lead. 2024 WL 1116651, at *4. This failure "underscore[d] why Kell has not alleged a sufficient factual basis to support a conclusion that her Products exhibited the same defects as the two or three chocolate bars tested by *Consumer Reports*." *Id.* Similarly, in *Fahey*, the court declined to make the "geographic" assumption that a bottle of olive oil purchased in D.C. was mislabeled due to testing of bottles purchased in California. 2018 WL 5840664, at *3. So too here. Plaintiffs do not allege where Nurture's tested products were ultimately sold. *See* FAC ¶ 92.[7]

Finally, trace elements are inherently variable such that Plaintiffs cannot use the limited testing to allege their uniform presence. *See John*, 858 F.3d 736 (mislabeling was "uniform" where testing of eighty types of pre-packaged foods revealed that 89% were mislabeled); *Brown*, 2024 WL 894965, at *4 (rejecting plaintiff's claims of systemic contamination because they failed to allege that "degradation and impurities occur at a predictable and systemic rate"). The FDA has explained that the presence and levels of trace elements in the "food supply" "depend on many factors," including: "growing conditions; manufacturing and agricultural processes; past or current environmental contamination; and the genetic capacity of food crops to take up elements." Ex. 3

---

[7] And while the HBBF Testing should not be considered, there is no congruity of sourcing with Plaintiff's purchases. *See* Ex. 60 at 32. For example, Plaintiff McKeon alleges that she purchased products only in Minnesota, but one product she purchased, HappyBABY Puffs (Sweet Potato & Carrot flavor) was sourced in Washington, D.C. *Compare id.* at 26, *with* FAC ¶ 57.

at 1. Thus, whether trace elements are present and in what amounts is inherently not uniform. For example, two lines of HappyBABY Puffs—the Banana & Pumpkin flavor versus the Apple & Broccoli flavor—contain entirely different ingredients. Therefore, testing of one product from a product line or even one batch of one product cannot be used to extrapolate to another, let alone to establish widespread and uniform contamination.

Because no "meaningful link" exists between Plaintiffs' purchases and Nurture's testing, all that remains is generalized allegations about the potential presence of trace elements in baby foods, which cannot sustain their claims. *See Hicks*, 2023 WL 6386847, at *8-9 ("[G]eneral allegations about the widespread use of [a contaminant] in the cosmetics industry writ large cannot fill that gap and 'nudge' their allegation that [the contaminant] was in the [plaintiffs'] Purchased Products 'from conceivable to plausible.'" (citation omitted)). Dismissal is therefore proper.

### 2. Plaintiffs Do Not Allege That Their Children Suffered Any Risk of Physical Injury from Consuming Nurture's Products.

Plaintiffs also fail to allege an injury-in-fact because they cannot show a "certainly impending" risk of future physical harm from consuming the Products. *See Lujan*, 504 U.S. at 564, 564 n.2. At most, they allege that "potentially dangerous contents" could have been present in their children's baby food and "may" "over time" "accumulate" "to their detriment." FAC ¶¶ 9, 26, 115.

After nearly three years of litigation involving numerous lawsuits claiming that baby foods contain trace elements, not a single court has held that baby food is harmful. *See Kimca I*, 2022 WL 1213488, at *2; *Gerber*, 2022 WL 10197651, at *5 ("fear and apprehension about a possible future physical or medical consequence . . . is not enough" (alteration in original) (citation omitted)); *Plum I*, 637 F. Supp. 3d at 231-32 (same); *see also Kimca II*, 2022 WL 3586095, at *5 (holding no injury in a merits assessment); *Plum II*, 2024 WL 1354447, at *5 ("[T]he theory that regular consumption of defendant's Baby Food over a period of time may lead to potentially

dangerous accumulations of these chemicals is simply too conjectural.").

In *Kimca I*, the court rejected the plaintiff's argument "that the quantities of heavy metals in the Baby Food Products pose an increased risk of injury." 2022 WL 1213488 at *6. There, like here, the plaintiffs argued that testing of Sprout's products "'exceed[ed] accepted standards' for exposure to [] heavy metals" by relying on water standards. *Id.* But "water and baby food are two fundamentally different products which are ingested and processed by the human body differently and consumed in different amounts." *Id.* In fact, the complaint acknowledged the FDA would set a "much higher" level "than those used for bottled and drinking water" based on the level set for inorganic arsenic in rice cereal. *Id.* Thus, "the use of water benchmarks in the baby food context is arbitrary and unexplained." *Id.* at *7; *see Gerber*, 2022 WL 10197651, at *1, *14 (same).

Similarly, the plaintiffs asserting claims against Plum Organics failed to allege that "the levels present in the baby foods at issue are at dangerous levels and therefore are likely to cause physical harm." *Plum I*, 637 F. Supp. 3d at 226-27. There were no allegations that the plaintiffs' "children ha[d] suffered physical harm" by "starv[ing] or becom[ing] nutrient deficient." *Id.* at *224. As the plaintiff had not pled a "causal link" between "the levels present in the baby foods at issue" and the resulting harm to children's health, they could not allege an injury. *Id.* at 226-27.

Dismissal is also proper here. Plaintiffs' FAC is replete with references to "toxic" trace elements and asserts Nurture's products purportedly contain "dangerously high" levels of these trace elements. FAC ¶ 87. To do so, Plaintiffs cite inapplicable standards for trace elements in drinking and bottled water.[8] *See id.* ¶¶ 134-35, 145, 156, 160-61, 165-67, 170-71. Yet, they acknowledge that the FDA's threshold for such elements, such as for infant rice cereal (which is

---

[8] For perchlorate, Plaintiffs do not even attempt to cite any safety level. *See* FAC ¶ 99.

not Puffs), is significantly higher.[9] *See id.* And multiple courts have rejected reliance on these water standards as a proxy for evaluating levels of trace elements in baby food. *See Kimca I*, 2022 WL 1213488, at *6-7; *Gerber*, 2022 WL 10197651, at *1, *14.

Finding no support in these regulatory standards, Plaintiffs attempt to allege that Nurture must meet a zero-tolerance threshold for trace elements because *any* amount poses a risk of harm. See FAC ¶ 6 (consumers "expect the food . . . to be ***free*** from heavy metals") (emphasis added); *id.* ¶ 152 ("no safe level"). But again, these unfounded statements are directly contradicted by the FDA's guidance, which state that trace elements "cannot be completely avoided in the fruits, vegetables, or grains that are the basis for baby foods," *see* Ex. 3 at 1, and that "at the levels we have found through our testing . . . children ***are not at an immediate health risk***." Ex. 4 at 1. Courts have "declined to find injury . . . based partly" on statements by the FDA "indicat[ing] that the products at issue were safe." *Kimca I*, 2022 WL 1213488 at *7 (citations omitted). Such a pronouncement "[a]t the very least . . . weakens the inference that the amount of heavy metals in the Baby Food Products creates a substantial risk of danger to children." *Id.* at *7. Therefore, Plaintiffs fail to meet their pleading burden, like in every other case alleging analogous claims.

### 3.    *Plaintiffs Have Not Suffered an Economic Injury.*

Unable to assert a physical injury, Plaintiffs attempt to assert an economic one—that "the Baby Foods . . . were worth less than . . . they paid" because they "contained . . . heavy metals." FAC ¶ 279. Regardless of whether Plaintiffs' purported injury is viewed as losing the benefit of their bargain or paying a premium price, they have not plausibly alleged an injury-in-fact.

"[W]hen a plaintiff purchases a consumable good and uses it to her benefit, there is no

---

[9] To the extent that Plaintiffs argue that Nurture did not adhere to its own goal thresholds, any requirement that is different than the FDA requirement would be preempted. *See infra* Section V.

economic injury unless . . . the product 'failed to work for its intended purpose or was worth objectively less[.]'" *Gerber*, 2022 WL 10197651, at *5-6 (citation omitted) (rejecting the plaintiffs' theory of economic injury because "Plaintiffs' *only* purported basis for economic injury stems from their allegation that the Baby Food Products posed a threat of future harm" and they had not demonstrated an "actual or imminent" risk of future physical harm (citation omitted)); *see also Kimca I*, 2022 WL 1213488, at *9 (same); *Kimca II*, 2022 WL 3586095, at *5 (same); *Plum I*, 637 F. Supp. 3d at 223-24 (same). So too here. Plaintiffs do not plausibly allege they did not receive the benefit of their bargain for the same reason that their purported risk of injury argument fails: they received baby food that was consumed without incident and these products were not unsafe. They did not bargain for disclosures about trace elements. They bargained for, and Nurture sold them, baby foods that are "organic, nutritious, high-quality." FAC ¶ 14.

Even if characterized as a price-premium injury, *see id.* ¶ 32 ("at premium prices"), Plaintiffs' theory still fails because they have not plausibly alleged that alternative comparable products were available without ***any*** heavy metals or that products with the purported trace-element disclosures Plaintiffs seek were sold at a ***lower price*** than Nurture's Products. *See id.* ¶¶ 12-32. Nor could they—because no such products exist. While Plaintiffs allege in an entirely conclusory fashion that baby food can be produced with no detectable levels of heavy metals, *see id.* ¶¶ 200-09, the products they cite ***still contain*** trace elements and so do not meet Plaintiffs' own zero-tolerance threshold. *See id.* ¶ 201 ("lowest levels"). This is not surprising as the FDA has repeatedly stated that, "currently they cannot be ***completely avoided***."[10] Ex. 2 at 1 (emphasis added). Thus, Plaintiffs cannot plausibly plead an economic injury.

---

[10] FDA's plan is titled Closer to Zero because the objective is to achieve the "lowest possible" level. Ex. 5 at 1.

**B.      Plaintiffs' Injuries Are Not Fairly Traceable to Nurture's Conduct.**

Plaintiffs also fail to establish "a causal connection between the injury and the conduct complained of" that is "fairly traceable" to the defendant's action. *See Lujan*, 504 U.S. at 560 (citation omitted). "The mere fact that [a defendant] may make a misleading representation does not . . . lead to the necessary conclusion that the misleading representation is material or even likely to cause harm." *Ross v. Axa Equitable Life Ins. Co.*, 680 F. App'x 41, 45 (2d Cir. 2017) (affirming dismissal for lack of standing because plaintiff had not plausibly "allege[d] that they would not have purchased the [product] provided by [defendant] had they known of" the deceptive practice).

Because almost all Plaintiffs continued to make purchases after they admit knowledge of trace elements was in the public domain, their allegations that they "would not have purchased" products absent Nurture's alleged omissions are contradicted outright. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) ("In reviewing a facial attack to the court's jurisdiction, we draw all facts—which we assume to be true unless contradicted by more specific allegations[.]"). All but two Plaintiffs continued to purchase Nurture's products after the release of the HBBF Report in 2019 touting "unsafe" levels of heavy metals in prominent brands of baby foods, including Nurture's. *See* FAC ¶¶ 37, 40, 43, 46, 49, 52, 55, 58, 61. Two Plaintiffs also allege that they continued to make purchases in "approximately February 2021," after the close of the class period on February 4, 2021, *id.* ¶¶ 49, 58, and, most remarkably, Plaintiff Margiotta *only* purchased in 2022 outside the class period. *Id.* ¶ 40. For these Plaintiffs, it not plausible that Nurture's alleged concealment of the risk of trace elements caused them to make their purchases.

**C.      Plaintiffs Lack Standing to Seek Injunctive Relief.**

Plaintiffs also lack standing to seek injunctive relief because they have no risk of future harm. Past injuries do not confer standing "unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239

(2d Cir. 2016). "Consumers who were misled by deceptive . . . labels lack standing . . . because there is no danger that they will be misled in the future." *Alce v. Wise Foods, Inc.*, 2018 WL 1737750, at *6 (S.D.N.Y. Mar. 27, 2018) (citation omitted) (dismissing injunctive relief); *Gerber*, 2022 WL 10197651, at *11; *Plum I*, 637 F. Supp. 3d at 227.

The same is true here. At most, Plaintiffs allege that they "would be willing to purchase the Baby Foods in the future" if they "could be certain" that they do not contain trace elements. FAC ¶¶ 41, 47, 50, 59. That is insufficient. They are now aware and cannot be misled again. In addition, Plaintiffs admit that they will not buy the Products again in their current state. *See, e.g*., *Izquierdo v. Mondelez Int'l, Inc.*, 2016 WL 6459832, at *5 (S.D.N.Y. Oct. 26, 2016); *see also Alce*, 2018 WL 1737750, at *6 (dismissing injunctive relief). Since Plaintiffs have no risk of future harm, they have no standing to seek injunctive relief.

## II.    PLAINTIFFS CANNOT ALLEGE AN INJURY.

As Plaintiffs do not allege an injury-in-fact, they cannot plausibly allege an injury, a necessary element for their claims.[11] Evaluating injury under failure to state a claim "is a more stringent requirement than Article III standing." *Kimca II*, 2022 WL 3586095, at *4 (citing *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)). Courts routinely "'reject[] misrepresentation claims based solely on a theory that the defendant's misrepresentation deprived the plaintiff of an opportunity to make a better-informed choice whether to buy the product.'"

---

[11] All Plaintiffs' claims require an injury: *Zottola v. Eisai Inc.*, 564 F. Supp. 3d 302, 310, 316 (S.D.N.Y. 2021) (NY statutory claims); *Cleveland v. Whirlpool Corp*., 550 F. Supp. 3d 660, 675-76 (D. Minn. 2021) (Minn. statutory claims); *Kinetic Co. v. Medtronic, Inc*., 672 F. Supp. 2d 933, 945-46 (D. Minn. 2009); *Cochrane v. Am. Guar. & Liab. Ins. Co*., 471 F. Supp. 3d 1140, 1154 (W.D. Wash. 2020) (Wash. statutory claim); *Benson v. Fannie May Confections Brands, Inc*., 944 F.3d 639, 647 (7th Cir. 2019) (Ill. statutory claim); *Ivie v. Kraft Foods Glob., Inc.,* 961 F. Supp. 2d 1033, 1046 (N.D. Cal. 2013) (Cal. statutory claims); *In re Toyota Motor Corp*., 790 F. Supp. 2d 1152, 1168-69 (C.D. Cal. 2011); *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986) (common-law fraud); *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902-03 (2005) (common-law fraud); *LaRoche v. Smith*, 2016 WL 1365951, at *5 (W.D. Wash. Apr. 6, 2016) (common-law fraud); *Fladeboe v. Am. Isuzu Motors Inc*., 150 Cal. App. 4th 42, 65 (2007); *Lipton v. Chattem*, Inc., 2012 WL 1192083, at *4 (N.D. Ill. Apr. 10, 2012) (unjust enrichment).

*Robey v. PVH Corp.*, 495 F. Supp. 3d 311, 321 (S.D.N.Y. 2020) (citation omitted).

Moreover, the Second Circuit has expressly rejected plaintiffs' attempts to rely on inapposite scientific authority to allege a product's purported risk of harm. *See Housey v. Proctor & Gamble Co.*, 2022 WL 17844403 (2d Cir. Dec. 22, 2022). There, the plaintiff alleged that labeling of charcoal toothpaste was deceptive because charcoal "may" be harmful. *Id.* at *2. The Second Circuit affirmed the district court's dismissal because even if the articles plaintiff relied on could "raise some inference that charcoal may be harmful," the "articles do not suggest that the Crest toothpaste or any similar charcoal toothpaste" was "harmful." *Id.*; *see also Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 33 (S.D.N.Y. 2023) (same).

So too here. Plaintiffs do not allege that their children's consumption of the baby food caused any physical harm or that it was not healthy and nutritious. *See generally* FAC. Indeed, many Plaintiffs purchased it for periods up to six years. *See supra* § I.A.1. Plaintiffs instead rely on inapposite regulatory standards and third-party reports, but none of this purported authority states that Nurture's products "actually caused harm to any consumers" or that such products "cannot safely" feed babies. *See Housey*, 2022 WL 17844403, at *2.

Other courts have rejected on the merits analogous claims involving baby food after finding no injury. The lone court that allowed such a case to proceed past the pleadings recently dismissed all claims at summary judgment because "the theory that regular consumption of defendant's Baby Food over a period of time may lead to potentially dangerous accumulations of these chemicals ***is simply too conjectural***."[12] *See Plum II*, 2024 WL 1354447, at *5. (emphasis added). Likewise, after the federal court rejected claims against Sprout for failing to allege an injury-in-fact for

---

[12] Plaintiffs' counsel in this case is counsel in *Plum II. See In re Nurture Baby Food Litig.*, 2022 WL 3155826, at *2 (S.D.N.Y. Aug. 8, 2022) ("Of significance to this case, Ms. Peterson was recently appointed interim co-lead counsel in *In re Plum Baby Food Litigation*, No. 4:21-cv-00913 (N.D. Cal.).").

Article III standing, the plaintiffs re-filed in state court where that court also held plaintiffs were not injured because they "never specify at what level heavy metals become unsafe," thus "render[ing] Plaintiffs' claims of injury implausible." *Kimca II*, 2022 WL 3586095, at *4.

### III.   THE FDA SHOULD DETERMINE SAFE LEVELS OF TRACE ELEMENTS UNDER THE PRIMARY JURISDICTION DOCTRINE.

Plaintiffs claim that Nurture's baby foods "fail[] to disclose the presence (or material risk)" of trace elements. FAC ¶ 1. Thus, this Court must determine: (1) what levels of trace elements can be safely present in various foods, and (2) based on those levels, whether Nurture's products were, in fact, safe. The FDA is addressing these exact issues through Closer to Zero. The FDA has already set the action level for inorganic arsenic in infant rice cereal (Ex. 61 at 6), released draft guidance for lead in juices (Ex. 26 at 5) and in certain foods for babies and young children (Ex. 46 at 8), with additional draft guidance for arsenic and cadmium to be released in December 2024. Ex. 23 at 4-5; *see* Beru Decl. ¶ 10.

Under the primary jurisdiction doctrine, courts can defer to the expertise of specialized regulatory agencies like the FDA. *Engelhardt v. Consol. Rail Corp.*, 756 F.2d 1368, 1369 (2d Cir. 1985). "The doctrine's central aim is to allocate initial decision[-]making responsibility between courts and agencies and to ensure that they 'do not work at cross-purposes,'" as well as to "maintain[] uniformity in . . . an area entrusted to a federal agency." *Ellis v. Tribune TV Co.*, 443 F.3d 71, 81-82 (2d Cir. 2006) (citation omitted). In the Second Circuit, courts evaluate four factors in applying the primary jurisdiction doctrine:

> (1) [W]hether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Id.* at 82-83 (citation omitted). Each factor weighs in favor of application of primary jurisdiction.

A.     **Determining Safe Levels for Trace Elements Are Technical and Policy Questions Best Addressed Utilizing the FDA's Expertise.**

The FDA, the agency charged with the safety of our food supply, should determine in the first instance the safe and acceptable levels of trace elements and any attendant labeling requirements, as "enforcement of the claim requires the resolution of issues . . . placed within the special competence of an administrative body." *Id*. at 81 (citation omitted).

Indeed, the FDCA charges the FDA with "protect[ing] the public health by ensuring that . . . foods are safe . . . and properly labeled," and promulgating and enforcing regulations. 21 U.S.C. § 393(b)(2); *see* 21 C.F.R. § 7.1 *et seq.* The FDCA also "expressly authorizes the FDA to assess whether product labels are deceptive." *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 140 (E.D.N.Y. 2018); *see* Beru Decl. ¶ 12 ("FDA is ***obligated*** to consider the feasibility and achievability of any action levels or other guidance it issues."). For this reason, courts have deferred to the FDA to resolve the exact complex scientific and policy questions being raised here—the amount of trace elements that can be safely present in baby foods. *Gerber*, 2022 WL 10197651 at *11-15 (applying primary jurisdiction); *Kimca II*, 2022 WL 3586095, at *3-4 (same).

*Gerber* applied the Fourth Circuit's test (identical to the Second Circuit's) to determine application of the doctrine. *Compare* 2022 WL 10197651, at *11, *with Ellis*, 443 F.3d at 82-83. The court applied the doctrine because "resolution of Plaintiffs' claims depend[] on technical and policy considerations within the FDA's field of expertise" and the court was "unable to conclude whether Defendant's labeling was misleading without guidance from the FDA on the Heavy Metals' toxicity." 2022 WL 10197651, at *13; *see also Kimca II*, 2022 WL 3586095, at *3 (noting "this case would require the Court to determine what levels of heavy metals in baby foods are safe and acceptable, and whether it is misleading for foods containing certain levels of heavy metals to make true labeling statements about their contents").

Through Closer to Zero, the FDA is engaged in a comprehensive analysis of trace elements, with more than $42 million budgeted, seeking input from a multitude of stakeholders on these complex issues and the full potential impact of its actions. *See* Ex. 12 at 6; Ex. 43 at 17; Ex. 55 at 53. Such a review necessarily implicates far more than resolving a dispute between private litigants. The FDA is employing teams of highly qualified experts in a variety of fields to conduct its own testing, "develop[e] and validat[e] analytical methods," conduct "toxicological research," and "develop[e] new dose response models." Ex. 23 at 11-12.

Nurture expects Plaintiffs will argue that courts are well-equipped to handle false advertising claims without the FDA's involvement. "But this is a false distinction. . . . [because] Plaintiffs' labeling claims" assume "that any level of heavy metals in the products is unsafe." *Kimca II*, 2022 WL 3586095 at *3. "Accordingly, guidance from the FDA on what constitutes a safe level of heavy metals in baby food is ***integral*** to determining whether any of [defendant's] label statements were misleading." *Id.* (emphasis added); *see also Gerber*, 2022 WL 10197651 at *13. This question also implicates "important policy considerations" the FDA has the expertise to weigh because "measures to limit toxic elements in foods may have unintended consequences—like limiting access to foods that have significant nutritional benefits by making them unavailable or unaffordable for many families." *Id*. (citation omitted); *see also* Ex. 6 at 2; Beru Decl. ¶ 14 ("Setting action levels . . . at unfeasible and unachievable levels could negatively impact public availability of foods to low-income communities through programs such as WIC.").

Here, just as in *Gerber* and *Kimca II*, Plaintiffs allege that Nurture "fail[ed] to disclose the presence (or material risk) of [heavy metals] in its baby food." FAC ¶ 1. Thus, any ruling would require the Court to determine what level of heavy metals in baby foods are "safe and acceptable." *Kimca II*, 2022 WL 3586095 at *3. The FDA itself has acknowledged that the "process of reducing

levels of toxic elements in foods is complicated and multifaceted." Ex. 3 at 3; *see* Beru Decl. ¶ 11. It is the FDA, rather than the judiciary, that has "the requisite expertise to evaluate [the] research and determine what levels of [heavy metals] in [baby foods] can be considered 'safe' and whether consumers should be informed of [their] presence through labeling." *Tran v. Sioux Honey Ass'n, Coop.*, 2017 WL 5587276, at *3 (C.D. Cal. Oct. 11, 2017). Thus, this Court should defer to FDA's expertise as to the appropriate levels of trace elements for these Products and what, if anything, should be disclosed regarding these trace elements.

### B. Establishing Safe and Achievable Levels for Heavy Metals Falls Squarely Within the FDA's Discretion.

Setting threshold levels of trace elements is "particularly within the FDA's discretion." *Gerber*, 2022 WL 10197651, at *13. The FDA is charged with and has the authority to set allowable thresholds for so-called "deleterious substances" in food and food labeling requirements. 21 U.S.C. §§ 342-343, 346. The FDA also "has the power to enforce these regulations through product seizures, injunction, and mandatory recalls." *Kimca II*, 2022 WL 3586095, at *3. "The FDA has the expertise to evaluate research and determine what levels of Heavy Metals can be considered harmful[.]" *Gerber*, 2022 WL 10197651, at *13; *accord Kimca II*, 2022 WL 3586095, at *3 ("These questions present 'technical matter[s] involving complex chemical considerations' that are uniquely within the FDA's expertise." (alteration in original) (citation omitted)); *see also Doe v. Merck & Co.*, 803 F. App'x 559, 561 (2d Cir. 2020) (affirming application of primary jurisdiction because "[t]he efficacy and safety of Merck's vaccines 'involves technical or policy considerations within the [FDA's] particular field of expertise'" (citation omitted)).

Recent actions by the FDA illustrate the need to rely on its expertise. In issuing its draft lead guidance, the FDA proposed different levels depending upon food type—20 parts per billion ("ppb") for single ingredient root vegetable baby food and dry cereals, and 10 ppb for others. Ex.

46 at 8. Courts lack the expertise to adopt such a detailed, highly technical standard. Thanks to years of testing data, the expertise of thousands of scientists, and the millions of dollars that Congress appropriates to the agency each year to study and address these specific issues, the FDA has far greater resources, experience, and technical knowledge to determine appropriate action levels and labeling. The FDA can also consider broader policy factors, such as ensuring the supply of affordable baby food so that infants are assured of proper nutrition. *Gerber*, 2022 WL 10197651, at \*13. Similarly, the FDA has recalled baby food products when necessary. For example, in 2023, the FDA initiated an investigation into a WanaBana product and initiated a recall. Ex. 63.

### C.    A Substantial Danger of Inconsistent Court Rulings Exists During and Pending the FDA's Determination of This Issue.

Pushing forward with class action litigation before the FDA decides what are safe and achievable trace element levels poses exactly the risk of inconsistent rulings the primary jurisdiction doctrine is designed to prevent. Inconsistent determinations also risk causing widespread consumer confusion. The FDA itself has warned that contradictory guidance would inevitably result in "unintended consequences" like "nutrient deficiencies and potential poor health outcomes" if science-based, nationwide standards are not set. Ex. 6 at 2, 4.

Not surprisingly, courts addressing this exact issue have already acknowledged the "substantial danger of inconsistent rulings," which "weighs in favor of finding the FDA has primary jurisdiction." *Gerber*, 2022 WL 10197651, at \*14; *see also Kimca II*, 2022 WL 3586095, at \*2-4. "'Congress [did] not want to allow states to impose disclosure requirements of their own on packaged food products, most of which are sold nationwide' in order to avoid the need for 'manufacturers . . . to print 50 different labels." *In re KIND LLC "Healthy & All Nat." Litig.*, 209 F. Supp. 3d 689, 696 (S.D.N.Y. 2016) (alterations in original) (citation omitted); *see also Tran*, 2017 WL 5587276, at \*2 ("Congress plainly intended food labeling to be uniform[.]"). Thus,

"failing to defer to the FDA on the safe levels of heavy metals in baby foods, and the proper labeling, poses a danger that a court's determination 'will be inconsistent with that of other courts or with the FDA itself.'" *Kimca II*, 2022 WL 3586095, at *4 (citation omitted).

More than 100 cases asserting similar claims have been filed against baby food manufacturers nationwide, including Gerber, Plum Organics, Hain, and Beech-Nut.[13] Thus,

> [a]ny decision by the Court regarding what level of Heavy Metals is harmful enough to require a warning label on Baby Food Products will likely result in a patchwork of decisions that vary by location, court, manufacturer, and product, resulting in different labeling standards for substantially similar baby food products produced by different manufacturers.

*Gerber,* 2022 WL 10197651 at *14. This factor weighs heavily in favor of the doctrine.

### D.    Closer to Zero Is Actively Evaluating and Setting Action Levels.

Finally, the FDA is actively implementing Closer to Zero, which "identifies actions the agency ***will take*** to reduce exposure to [toxic elements] from foods eaten by babies and young children . . . to as low as possible," including by setting relevant "action levels" and "reference levels" for lead, arsenic, cadmium, and mercury. Ex. 23 at 2-4. *see also Kimca II*, 2022 WL 3586095, at *4 ("FDA is actively considering these issues[.]"); *Canale v. Colgate-Palmolive Co*., 258 F. Supp. 3d 312, 325 (S.D.N.Y. 2017) (prior application factor favored application because of the agency's "ongoing investigation"); *In re Kind LLC "Healthy & All Nat." Litig*., 287 F. Supp. 3d 457, 465 (S.D.N.Y. 2018) (same).

The FDA is now in the second of the three phases it laid out. The FDA already issued guidance for lead in juice and in certain foods for babies and young children in April 2022 and January 2023, respectively, and is scheduled to issue guidance for arsenic and cadmium in

---

[13] *See, e.g.*, *In re Hain Celestial Heavy Metals Baby Food Litig.*, No. 21-cv-678 (E.D.N.Y.); *Keeter v. Gerber Prods. Co.*, No. 21-cv-269 (E.D. Va.); *In re Plum Baby Food Litig.*, No. 21-cv-913 (N.D. Cal.); *Thomas v. Beech-Nut Nutrition Co.*, No. 21-cv-133 (N.D.N.Y.).

December 2024. Ex. 23 at 4-5. The fact the FDA needs years to complete Closer to Zero, despite substantial funding and expertise, underscores the complexity of the scientific and policy issues involved. It is thus "appropriate to allow the FDA an opportunity to provide guidance" on these issues. *KIND*, 209 F. Supp. 3d at 693-94 n.2 (citation omitted); *see also Gerber*, 2022 WL 10197651 at *11 n.18 ("[A]ny forthcoming FDA action would provide guidance on what constitutes a safe level of Heavy Metals in baby food[.]").

In opposition, Plaintiffs may cite a case against Beech-Nut, where the Second Circuit in a summary order vacated a dismissal under the primary jurisdiction doctrine because "the FDA ha[d] abandoned the[] previously announced timelines" of Closer to Zero and had "no timelines for when it expects to *finalize* action levels." *White v. Beech-Nut Nutrition Co.*, 2024 WL 194699, at *2 (2d Cir. Jan. 18, 2024). However, the facts supporting this decision have since changed. The FDA has since set deadlines of December 2024 to issue final guidance for lead and December 2025 to issue final guidance for arsenic and cadmium. Ex. 23 at 4-5.

Plaintiffs will also likely cite a case against Plum Organics where the court in January 2022 declined to invoke primary jurisdiction. *In re Plum Baby Food Litig.*, 2023 WL 3493319, at *1 (N.D. Cal. May 3, 2023). However, in ruling on a motion for reconsideration of the *Plum* order, the court distinguished its ruling from *Gerber* and *Kimca II* because "these other cases directly challenge[d] the safety of the product, making the FDA's guidance more relevant than the present case." *Id.* at *3. This action is more similar to *Gerber* and *Kimca II* because Plaintiffs directly challenge the safety of Nurture's products. *See, e.g.*, FAC ¶ 86 (alleging Nurture "sold baby foods even when they or their ingredients contained unsafe levels"). Accordingly, the facts and rationale for denying Plum Organics' motion to dismiss on primary jurisdiction grounds is inapplicable here.

In summary, each factor weighs in favor of application of the primary jurisdiction doctrine.

IV.    **PLAINTIFFS' ATTEMPT TO COMMANDEER FOOD SAFETY AND LABELING IS IMPLIEDLY PREEMPTED BY FEDERAL LAW.**

Plaintiffs' claims and the underlying relief sought by the FAC (e.g., mandatory disclosures, enjoining sales "until the heavy metals and perchlorate are removed," and "recalling existing products") directly conflict with FDA's role under federal law to establish a uniform, national policy for food safety, including regulation of trace elements in the food supply. *See* FAC at 125-26, Prayer for Relief. Under the Supremacy Clause, conflicts that arise between state and federal law must be resolved in favor of federal law. *See* U.S. Const. art. VI, cl. 2. Implied conflict preemption applies where it is "impossible . . . to comply with both state and federal requirements" or "state law 'stands as an obstacle to the accomplishment and execution of [the] full purposes and objectives'" of the federal agency. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (citations omitted); *see Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 607 (2d Cir. 1996). Under obstacle preemption, "[s]tate law may pose such an obstacle when it disturbs a balance the federal regulation has struck between 'conflicting policies that were committed to the agency's care.'" *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (2022) (citation omitted).

Where a federal regulatory agency like the FDA has regulated in an area of its expertise pursuant to a legal mandate, state law may not be used to bar any conduct the agency has chosen not to prohibit. Otherwise, the threat of civil liability would erect an obstacle to the accomplishment of the comprehensive and carefully calibrated federal regulatory program. *See, e.g.*, *Cohen*, 46 F.4th at 1028-31 (preempting state regulation); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881-86 (2000) (federal law that required new cars to employ passive-restraint systems impliedly preempted state tort claims seeking to have auto manufacturers install air bags); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156-59 (1982) (conflict preemption existed to bar state law to ensure federal agency's overall regulatory objectives); *Backus v. Nestlé*

*USA, Inc.*, 167 F. Supp. 3d 1068, 1072-74 (N.D. Cal. 2016) (tort suit imposing liability for presence of ingredient in food preempted because federal law permitted the ingredient).

Plaintiffs' attempt here to commandeer the FDA's food safety role under the guise of state consumer protection law should also be preempted for the same reasons. The FDA "comprehensively" regulates food safety under the FDCA. *See Red v. Gen. Mills, Inc.*, 2015 WL 9484398 at *7 (C.D. Cal. Dec. 29, 2015). The FDCA's objectives include ensuring foods are "safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b). The FDCA authorizes the FDA to determine appropriate national standards for food safety and labeling, which includes determining tolerance and action levels for harmful substances and ensuring accurate labels. *Id.* §§ 342-343. And the FDA monitors and sets action levels for trace elements in foods.

Contrary to Plaintiffs' demand in this lawsuit, the FDA has ***not*** set a zero-tolerance threshold. Far from it. The FDA recognizes that trace elements "cannot be completely avoided." Ex. 2 at 1. And when it has chosen to act, the FDA has set "action levels" rather than a ban (*see* FAC ¶¶ 89, 134, 137) and only recalled certain products when levels warranted. Ex. 63.

Moreover, the FDA clearly stated that it is "unwilling to require a warning statement [on a food label] in the absence of clear evidence of a hazard." Food Labeling; Declaration of Ingredients, 56 Fed. Reg. 28, 592, 28,615 (June 21, 1991); *see also id.* ("If the agency were to require warnings for ingredients that only cause mild idiosyncratic responses, it is concerned that it would overexpose consumers to warnings."). That specific concern is particularly applicable here because, if Plaintiffs were to prevail, every food product—not just baby food—would need to carry a disclaimer about the potential presence of trace elements. But that type of warning on every food product would provide no benefit to consumers because it would both falsely suggest that the products are likely to cause significant adverse health effects and make consumers question

if the products form part of a healthy diet, which the FDA has stated they do. *See* Ex. 3 at 2.

Permitting Plaintiffs to proceed here and ban trace elements under the guise of state law or to find retroactively that baby food products should not have been sold or should have a warning label would "disrupt the expert balancing underlying the federal scheme," especially where, as here, there is no scientific basis for such relief. *See Farina v. Nokia, Inc.*, 625 F. 3d 97, 126 (3d Cir. 2010). A determination of what requirements, if any, should be mandated and what action levels, if any, should be set is squarely for the FDA to make. Thus, the FAC is preempted.

## V.   PLAINTIFFS' OMISSION-BASED FRAUD CLAIMS FAIL FOR ADDITIONAL REASONS.

Plaintiffs also assert omission-based fraud claims under New York, California, Illinois, Minnesota, and Washington statutory and common law.[14] These claims allege that Nurture failed to disclose that the Products "contained (or were at a material risk of containing) heavy metals, [and] perchlorate," despite the fact that these substances are unavoidable and have the potential to be present in any foods that contain the same raw ingredients, none of which contain such a disclosure. This premise is faulty for numerous reasons as outlined below.[15]

### A.   Plaintiffs Cannot Allege That Any Omission Was Deceptive Because the Potential Presence of Trace Elements in Foods Is in the Public Domain.

"In cases alleging a deceptive act based on an omission, it is not sufficient for a plaintiff to point solely to the omission." *Dimond v. Darden Rests., Inc.*, 2014 WL 3377105, at *13 (S.D.N.Y.

---

[14] Counts XII and XIII overlap as both assert fraudulent omission. *Compare* FAC at 119 ("Fraudulent Misrepresentation by Omission"), *with id.* at 122 ("Fraud by Omission").

[15] The FAC references Nurture's statements regarding the quality and characteristics of its products. *E.g.*, FAC ¶¶ 13-17, 27, 106-07. But Plaintiffs do not bring claims for affirmative misrepresentations. *See id.* ¶¶ 273, 287, 293, 304, 319, 333, 347-48, 363, 379, 391, 405, 421, 442, 458 (alleging omissions only). In any event, similar statements advertising baby food as "organic," "non-GMO," "perfect," "nutritious," and "packed with essential vitamins and minerals" may all "be true even with the presence of heavy metals." *Plum I*, 637 F. Supp. 3d at 224-25; *see also Davidson v. Sprout Foods Inc.*, 2022 WL 13801090, at *3 (N.D. Cal. Oct. 21, 2022) ("The California Court of Appeal has cautioned against permitting food labeling claims that rely on inferential leaps and which could ultimately 'place almost any advertisement truthfully touting a product's attributes at issue for litigation.'" (citation omitted)).

July 9, 2014). "[A] plaintiff bringing an omission-based claim . . . must show that 'the business alone possesses material information that is relevant to the consumer and fail[ed] to provide this information,' or that plaintiffs could not 'reasonably have obtained the relevant information they now claim the [defendant] failed to provide.'" *Paradowski*, 2023 WL 3829559, at *2 (second & third alterations in original) (citation omitted). "[P]ublic discussion" tends to "undercut and render implausible" the contention that the defendant alone knew of the products' defect and "that consumers could not reasonably obtain that information." *Womack v. Evol Nutrition Assocs.*, 2022 WL 3371213, at *5 (N.D.N.Y. Aug. 16, 2022) (citation omitted).

In *Paradowski*, the Second Circuit upheld a district court's grant of summary judgment as a matter of law to a dog food manufacturer against claims it "fail[ed] to disclose that its recipes 'contained and/or had a material risk of containing' detectable amounts of heavy metals." 2023 WL 3829559, at *1 (citation omitted). The Second Circuit determined based on "publicly available" information that "'nearly all pet food contains measurable quantities of heavy metals' because measurable quantities of heavy metals occur naturally in the environment and are prevalent in a wide variety of food products." *Id.* at *3. Thus, "[t]he fact that Champion's pet foods contained heavy metals was information reasonably obtainable to the Plaintiff" such that any omission-based deception claim failed. *Id.* Similarly, in *Plum II*, the court held that Plum Organics "did not maintain exclusive knowledge of the material risk that its products would contain heavy metals and perchlorate" because "the presence of heavy metals and perchlorate in the food supply, including in ingredients used in defendant's product, has been the subject of media coverage for years prior to this lawsuit." 2024 WL 1354447, at *8; *see also Cole v. Keystone RV Co.*, 2021 WL 3111452, at *4-5 (W.D. Wash. July 22, 2021) (dismissing WCPA claim because the information was posted on a public website), *aff'd*, 2022 WL 4234958 (9th Cir. Sept. 14, 2022).

The same result is compelled here. While Plaintiffs allege in an entirely conclusory fashion that Defendant alone possessed the knowledge of trace elements in the food supply, FAC ¶ 117, courts—including the Second Circuit—have repeatedly held that the public had knowledge of the presence of trace elements in the food supply, which is used to make food products. *Paradowski*, 2023 WL 3829559, at *3; *Plum II*, 2024 WL 1354447, at *8. Moreover, Plaintiffs' own FAC references publicly available information going back as far as 2012, *see, e.g.*, FAC ¶¶ 112-13, 185-87, 126 n.95, 127 n.96, 132 n.102, 164 n.142, 164 n.143, 174 n.154, 176 n.157. It is simply implausible that Nurture deceptively omitted the potential presence of trace elements here.

## B. Plaintiffs Continued to Purchase Nurture's Products Long After They Admit the Information Was Publicly Available.

Plaintiffs' omission-based claims also fail because virtually all Plaintiffs continued to purchase Nurture's products after the potential presence of trace elements was publicly disclosed.[16] *See, e.g.*, *Forlenza v. Dynakor Pharmacal, LLC*, 2009 WL 10698476, at *3 (C.D. Cal. Dec. 15, 2009) (plaintiffs "must show reasonable reliance" and "cannot do so when they continued to purchase the products *after* they knew the advertisements were false"); *Wullschleger v. Royal Canin USA, Inc.*, 2022 WL 1164662, at *4 (W.D. Mo. Mar. 22, 2022) (dismissing consumer fraud claim where continued purchases undercut plausible allegation of causation), *vacated on other grounds by* 75 F.4th 918 (8th Cir. 2023).

Here, all but two Plaintiffs continued to purchase Nurture's products after the release of

---

[16] Plaintiffs' California statutory and all five states' common law claims require reliance. *E.g.*, *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326-27 (2011) (UCL); *Victor v. R.C. Bigelow, Inc.*, 2014 WL 1028881, at *5 (N.D. Cal. Mar. 14, 2014) (CLRA); *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 591 (7th Cir. 2017) (Illinois); *Ascente Bus. Consulting, LLC v. DR myCommerce*, 9 F.4th 839, 848 (8th Cir. 2021) (Minnesota); *Donahue v. Ferolito, Vultaggio & Sons*, 786 N.Y.S.2d 153, 155 (1st Dep't 2004) (New York); *Wessa v. Watermark Paddlesports, Inc.*, 2006 WL 1418906, at *2 (W.D. Wash. May 22, 2006) (Washington). Plaintiffs' remaining statutory claims require causation. *E.g.*, *Al Haj v. Pfizer Inc.*, 2020 WL 1330367, at *2-3 (N.D. Ill. Mar. 23, 2020) (IFCA); *Zachmann v. Coleman Co.*, 2022 WL 161480, at *4 (S.D.N.Y. Jan. 18, 2022) (New York GBL); *Young v. Toyota Motor Sales, U.S.A.*, 196 Wash. 2d 310, 321-22 (2020) (Washington); *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 776 (8th Cir. 2021) (Minnesota).

the HBBF Report in 2019, publicizing that it found "unsafe" levels of heavy metals in prominent brands of baby foods, including Nurture's. *See* FAC ¶¶ 37, 40, 43, 46, 49, 52, 55, 58, 61. And Plaintiff Margiotta is not even part of her own class as she **only** purchased Nurture's products starting in 2022, *id.* ¶ 40, after the proposed class period ended on February 4, 2021. *See id.* ¶ 65. Therefore, Plaintiffs cannot allege causation or reliance.

### C.   The Potential Existence of Low Levels of Trace Elements Is Immaterial.

Plaintiffs have also not alleged that the purported omission was material to a reasonable consumer. Courts routinely hold that the mere possibility of the presence of low levels of trace contaminants "is not likely to affect consumers' decisions." *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241, 248 (S.D.N.Y. 2019). There, the plaintiff challenged a dog food labeled "natural" for containing trace amounts of glyphosate, an herbicide. *Id.* at 244. The court held that the "presence of negligible amounts of glyphosate . . . [was] not likely to affect consumers' decisions in purchasing the product." *Id.* at 248; *see also Parks v. Ainsworth Pet Nutrition, LLC*, 2020 WL 832863, at *2 (S.D.N.Y. Feb. 20, 2020) (noting that the "level of glyphosate … [was] significantly lower than the FDA's limit" and "not likely to affect consumer choice"); *Herrington v. Johnson & Johnson Consumer Cos.*, 2010 WL 3448531, at *8 (N.D. Cal. Sept. 1, 2010) (trace amounts of formaldehyde and dioxane were immaterial); *In re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *5 (D. Minn. July 12, 2017) (not plausible that a reasonable consumer would be deceived by trace glyphosate in food product).

The same result follows here. Low levels of trace elements are ubiquitous in the food supply, and without health risks, Plaintiffs cannot plausibly allege that the omission is material. Plaintiffs themselves have continued to purchase the products despite the "media coverage for years prior to this lawsuit" about "the presence" of trace elements "in the food supply, including in [baby food] ingredients," *Plum II*, 2024 WL 1354447, at *8, which evidences that such

knowledge did not, in fact, change purchasing decisions. *See* FAC ¶¶ 37, 40, 43, 46, 49, 58, 61.

Finally, Plaintiffs cite the purported results of a consumer survey as evidencing materiality (*see id.* ¶¶ 10-11, 195-19, 225), but courts regularly hold that alleged survey results do not redeem facially implausible consumer deception claims. *See Manuel v. Pepsi-Cola Co.*, 763 F. App'x 108, 110 (2d Cir. 2019) ("survey does not render Plaintiffs' allegations any more plausible"); *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1231 (9th Cir. 2019) ("The survey cannot, on its own, salvage [the] claim."); *Pichardo v. Only What You Need, Inc.*, 2020 WL 6323775, at *4 (S.D.N.Y. Oct. 27, 2020) (plaintiffs' "survey [did] not plausibly support [their] claim").[17] In sum, Plaintiffs do not plausibly allege that the purported omission is material.

### D.    Plaintiffs Do Not Plead Fraudulent Intent.

Plaintiffs' common-law fraudulent omission claims also fail because they have not pled fraudulent intent. Plaintiffs must allege sufficient facts that would "give rise to a *strong* inference of fraudulent intent." *Davis v. Yeroushalmi*, 985 F. Supp. 2d 349, 359 (E.D.N.Y. 2013) (citation omitted). A "generalized motive to . . . increase sales and profits" does not. *Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 337 (E.D.N.Y. 2018) (citation omitted). And the "simple knowledge that a statement is false is not sufficient." *Id.*; *see Chiappetta v. Kellogg Sales Co.*, 2022 WL 602505, at *8 (N.D. Ill. Mar. 1, 2022) (allegations of intent insufficient).

This Court rejected analogous allegations that the defendant's failure to accurately label a product, despite knowing the statements were not true, evidenced fraudulent intent. *See Bynum v. Fam. Dollar Stores, Inc.*, 592 F. Supp. 3d 304, 316 (S.D.N.Y. 2022) (Vyskocil, J.) ("Courts in this District regularly reject this exact language[.]"). So too here. Plaintiffs allege only that Nurture

---

[17] In any event, the survey is missing "important details" including "its methodology." *Puri v. Costco Wholesale Corp.*, 2021 WL 6000078, at *6–8 (N.D. Cal. Dec. 20, 2021) (granting dismissal). Only four of fifteen survey questions and results exist. *See* FAC ¶¶ 10-11, 195-199, 225. And none of those questions reference perchlorate.

knowingly omitted the true characteristics of the Products, FAC ¶ 421, and sought to induce consumers to purchase its products. *Id.* ¶ 116. This is insufficient.[18]

### E.     Plaintiffs Do Not Allege a Duty to Disclose.

Plaintiffs' fraudulent omission claims and statutory claims under California and Minnesota law fail because Nurture did not have a duty to disclose the potential presence of trace elements in its products.[19] Typically, a duty to disclose exists only if the defendant (1) is the plaintiff's fiduciary; (2) has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) actively conceals the material fact; or (4) makes partial representations that are misleading.[20] The California claims also require that the omitted fact constitute an "unreasonable safety hazard." *Wilson*, 668 F.3d at 1141-42. None of these bases apply here.

*First*, Plaintiffs are not in a confidential or fiduciary relationship with Nurture. *See Stoltz v. Fage Dairy Processing Indus., S.A.*, 2015 WL 5579872, at *24 (E.D.N.Y. Sept. 22, 2015) (mere buyer-seller relationship is insufficient). While Plaintiffs allege that a baby food manufacturer is in a special position of trust, FAC ¶ 419, a food manufacturer does not owe a duty merely because it had special knowledge and experience. *Bynum*, 592 F. Supp. 3d at 314.

*Second*, as outlined above in Sections VI.A-B, Plaintiffs do not plausibly allege that Nurture had exclusive knowledge or that consumers were unable to glean such information through

---

[18] Plaintiffs must plausibly allege Nurture's pre-sale knowledge for omission claims. *See, e.g.*, *White v. DaimlerChrysler Corp.*, 368 Ill. App. 3d 278, 285-86 (2006) (IFCA); *Alejandre v. Bull*, 159 Wash.2d 674, 689-90 (2007) (Washington); *Williams v. Yamaha Motor Corp., U.S.A.*, 106 F. Supp. 3d 1101, 1112-16 (C.D. Cal, 2015) (California), *aff'd*, 851 F.3d 1015 (9th Cir. 2017); *Woods v. Maytag Co.*, 2010 WL 4314313, at *16 (E.D.N.Y. Nov. 2, 2010) (New York). But they do not allege Nurture had *any knowledge* of perchlorate. *See* FAC ¶ 98-101, 177.

[19] *See Taleshpour v. Apple, Inc.*, 2022 WL 1577802, at *1 (9th Cir. May 19, 2022); *Song v. Champion Petfoods USA, Inc.*, 2020 WL 7624861, at *10-11 (D. Minn. Dec. 22, 2020), *aff'd*, 27 F.4th 1339 (8th Cir. 2022).

[20] *See LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (California); *Song*, 2020 WL 7624861, at *10-11 (Minnesota); *Rydman v. Champion Petfoods USA, Inc.*, 2020 WL 4347512, at *2 (W.D. Wash. July 29, 2020) (Washington); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017) (Illinois); *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995) (New York).

ordinary diligence. *See, e.g.*, *Rydman*, 2020 WL 4347512, at \*3 (dismissing omission claim under Washington law because the plaintiffs could have determined what was in the defendants' dog food at any time); *Paradowski*, 2023 WL 3829559, at \*3.

*Third*, Plaintiffs fail to plausibly allege Nurture actively concealed any facts. "[G]eneralized" nondisclosure allegations, alone, do not constitute active concealment. *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 576 n.5 (N.D. Cal. 2019) (citation omitted). The same applies here. Plaintiffs' legal conclusion that Nurture intentionally omitted the risk of trace elements is insufficient. *See, e.g.*, FAC ¶ 116.

*Fourth*, Plaintiffs do not plausibly allege a misleading partial statement that would require a corrective disclosure for the simple reason that Nurture did not speak to trace elements on its packaging. The analogous fact pattern in *Simpson v. Champion Petfoods USA, Inc.* is instructive, where the dog food label stated that the "products [we]re made from 'biologically appropriate,' 'high quality ingredients[,]'" and did not affirmatively state the products were free from any heavy metals. 397 F. Supp. 3d 952, 972 (E.D. Ky. 2019) (citation omitted). The *Simpson* Court concluded that a company is not required to volunteer information simply because it makes statements about the high quality of its products. *Id.*; *see also Song*, 27 F.4th at 1346 (affirming dismissal because defendant's label did not require corrective disclosures about the purported presence of heavy metals). The same is true here, where Nurture's label did not speak to heavy metals. *See, e.g.*, *Plum I*, 637 F. Supp. 3d at 224 ("perfect," "nutritious," and "packed with essential vitamins and minerals" did not "relate to heavy metals").

*Finally*, Plaintiffs do not plausibly allege an unreasonable safety risk as they do not identify any serious harm. As *Plum II* held, "the theory that regular consumption of defendant's Baby Food … may lead to potentially dangerous accumulations … is simply too conjectural." 2024 WL

1354447, at *5. Thus, Nurture did not have a duty to disclose.

## VI.   PLAINTIFFS' UNJUST ENRICHMENT CLAIMS FAIL.

Plaintiffs' unjust enrichment claims fail for two reasons. First, they depend on the same conduct underlying Plaintiffs' other insufficiently alleged claims, such that they must "stand or fall" together. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); *Bynum*, 592 F. Supp. 3d at 316-17; *Chuang v. Dr Pepper Snapple Grp., Inc.*, 2017 WL 4286577, at *8 (C.D. Cal. Sept. 20, 2017) (same); *Song*, 27 F.4th at 1346 (same). Second, they fail because Plaintiffs have not alleged that Nurture unjustly retained any benefit. Plaintiffs purchased baby food that was presumably consumed without incident. *See, e.g.*, *Lend Lease (US) Constr., Inc. v. Tech. Ins. Co.*, 2016 WL 147895, at *4-5 (N.D. Ill. Jan. 13, 2016) (dismissing claim); *Water & Sanitation Health, Inc. v. Chiquita Brands Int'l, Inc.*, 2014 WL 2154381, at *2 (W.D. Wash. May 22, 2014) (same).

## VII.   CERTAIN OF PLAINTIFFS' CLAIMS FAIL FOR ADDITIONAL STATE-SPECIFIC REASONS.

### A.   The California UCL, FAL, and Unjust Enrichment Claims Fail Because Plaintiffs Cannot Show Legal Remedies Are Inadequate.

Plaintiffs' UCL, FAL, and unjust enrichment claims only allow for equitable relief. They must be dismissed because Plaintiffs have adequate remedies at law—money damages. Equitable claims fail where: (1) the operative complaint does not allege that plaintiff lacks an adequate legal remedy, or (2) the plaintiff alleges legal claims seeking money damages for the amount of available equitable restitution. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). "It matters not that a plaintiff may have no remedy if her other claims fail." *Munning v. Gap, Inc.*, 238 F. Supp. 3d 1195, 1203-04 (N.D. Cal. 2017) (dismissing claims).

Here, Plaintiffs do not allege that legal remedies are inadequate. Nor could they. They are expressly seeking monetary damages for either the payment of a "price premium" or for the products being "worth less." *E.g.*, FAC ¶¶ 63, 243, 279. The monetary damages sought arise from

the same predicate facts underlying their equitable claims as evidenced by those allegations being incorporated by reference for the California equitable claims. *Id.* ¶¶ 389, 403, 455. Plaintiffs thus necessarily concede adequate remedies are available and their equitable claims fail. *Browning v. Am. Honda Motor Co.*, 549 F. Supp. 3d 996, 1013-14 (N.D. Cal. 2021) (dismissing claims); *Gardiner v. Walmart Inc.*, 2021 WL 2520103, at *7 (N.D. Cal. Mar. 5, 2021) (collecting cases).

### B. The Economic Loss Doctrine Bars the California Fraudulent Concealment Claim.

The economic loss doctrine provides that Plaintiffs' purely "economic [damages]" are properly remedial "only in contract." *Giles v. Gen Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). "Economic losses include damages for inadequate value[.]" *Williams v. Tesla, Inc.*, 2022 WL 899847, at *6 (N.D. Cal. Mar. 28, 2022). Thus, this claim fails.

### C. Certain of Plaintiffs' Claims Are Untimely.

The FAC asserts that Plaintiff Micciche made her purchases from August 2012 to April 2018. *See* FAC ¶ 52. Thus, her CLRA, FAL, and common-law fraud claims are untimely as they were not brought within three years. *Plumlee v. Pfizer, Inc.*, 2014 WL 695024, at *7 (N.D. Cal. Feb. 21, 2014) (dismissing claims). Similarly, Plaintiff Paris made purchases until 2019 but did not become a named Plaintiff until October 2022. FAC ¶ 61. As that was more than three years after her common-law fraud claim accrued, it is also untimely.[21] *See* Wash. Rev. Code § 4.16.080.

## <u>CONCLUSION</u>

Accordingly, Nurture respectfully requests that the Court dismiss the FAC in its entirety.

---

[21] Nurture expects Plaintiffs to argue the discovery rule applies. It does not. Plaintiffs have not alleged any facts in support of application of this rule, *see* FAC ¶¶ 51-53, 60-62, and for all the reasons discussed in this brief, the potential presence of trace elements in food has been known and researched for decades, *see supra* at Factual Background § D.

Dated: June 5, 2024
      New York, New York

Respectfully submitted,

DLA PIPER LLP (US)


 /s/ *Angela C. Agrusa*
Angela C. Agrusa
2000 Avenue of the Stars, Suite 400
Los Angeles, CA 90067
(310) 500-3591
angela.agrusa@us.dlapiper.com

Colleen Carey Gulliver
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4500
colleen.gulliver@us.dlapiper.com

*Counsel for Defendant Nurture, LLC (f/k/a Nurture, Inc.)*