# Exhibit 22

11/18/22, 4:05 PM                Remarks by Leslie Kux Deputy Center Director for Regulatory Policy, Nutrition, and Engagement, Center for Food Safety and Ap…

Case 1:21-cv-01217-MKV   Document 227-22   Filed 06/05/24   Page 2 of 10

SPEECH

# Remarks by Leslie Kux Deputy Center Director for Regulatory Policy, Nutrition, and Engagement, Center for Food Safety and Applied Nutrition to the Food and Drug Law Institute (FDLI)

**MARCH 30, 2022**

Food and Drug Law Institute
Food and Dietary Supplement Safety and Regulation Conference
Leslie Kux
Remarks as prepared for delivery

Thank you for the kind introduction. I'm very glad to be here today to talk about FDA's food program priorities. Because I have a captive audience, I also want to reflect on my 30 plus years at FDA before I retire in September to help you understand what's changed since I walked in the door of the lovely Parklawn building in 1988 and how that has impacted the Foods Portfolio and how we do things.

Before I dive in, I want to recruit for FDA by asking all of you to take a moment to think about spending some - or all - of your career at FDA - or even better - CFSAN. I think there is no better place to work with smart – incredibly smart – dedicated – really dedicated – hardworking, enjoyable colleagues on public health and consumer protection issues that matter to you, your family, the rest of the U.S., and indeed, to people all around the world. At CFSAN, we really are a family, it's a wonderful place to work, and I am going to miss my work family tremendously.

October 3rd of 2021 marked the beginning of my 33rd year at FDA and my excruciatingly difficult decision to retire. My long tenure and my retirement decision have prompted lots of reflection on my part. I also have tremendous gratitude to the many people who supported my long and varied career at FDA, especially Dr. Susan Mayne who brought me to CFSAN in a new role to support her very clear vision of a forward moving, science-grounded, priority-driven CFSAN and, in the Office of Chief Counsel, Margaret Porter and Ann Wion who let me change work assignments about every four years, giving me a big picture perspective on FDA and all the different people and operations it takes to regulate everything FDA has jurisdiction over.

Finally, I want to thank Dr. Peggy Hamburg for giving me the opportunity to serve in the Office of Commissioner as the Associate Commissioner for Policy where I was able to learn not only even more about FDA, but also more about the business of the federal government.

One of my most vivid memories is from my second week at FDA when ACT UP held a demonstration at FDA that shut the agency down for the day. This demonstration was part of a larger and ultimately successful effort to reframe the way drugs for the treatment and prevention of AIDS were developed, tested, and approved. OCC's offices were right over the main entrance at FDA, so those of us who made it into work that day had a stunning view of the demonstration. For me, remembering that day and the changes it catalyzed, always helps me reflect that FDA is here to serve the interests of consumers and we ALWAYS need to be willing to examine and re-examine our regulatory approaches -- the regulatory status quo -- with that in mind. We need to actively seek input and not just wait for it to come to us. Sometimes that reflection is easier said than done, given everything on CFSAN's plate, so we very much value opportunities like this to share and engage with our stakeholders. I said stakeholders on purpose — not just consumers: consumers are our touchstone, but at CFSAN we know we have a place in a bigger enterprise which includes all the players in food production - from farm to fork — as we used to say, AND cosmetics. I've left time for questions and look forward to taking them when I am done.

While FDA has a unique set of tools within our remit to influence the areas we regulate, we recognize the need to coordinate, leverage and amplify the work with another set of stakeholders - our federal partners, including USDA, CDC, and NIH. The levers and authorities we have can help create healthier defaults across the food supply, helping to improve the healthfulness of foods served across all settings, including schools, early care and education, nutrition assistance for older adults, healthcare and more. And we've already done just that on sodium, which I'll say more about later.

I started working on food safety issues in the mid-90s when I joined the CVM counseling team, and then joined the CFSAN counseling team in 1997. As I worked on an increasing variety of food safety issues it became clearer and clearer that the food safety provisions of the Federal Food, Drug, and Cosmetic Act were sadly outdated and inadequate. In 2011, all that changed when the FDA Food Safety Modernization Act or FSMA — the most sweeping reform of US food safety laws in more than 70 years — was signed into law by President Obama. Having just marked the 10-year anniversary last year, we are continuing our keen focus on FSMA and building on FSMA through the vision outlined in the New Era of Smarter Food Safety blueprint (/food/new-era-smarter-food-safety/new-era-smarter-food-safety-blueprint).

Today, I will be using this venue, in front of this august audience, to provide updates on some of the key areas we are working on, relay new, exciting tools that offer promise, impart strategic opportunities we are taking advantage of, and convey our top priorities. I will touch upon resources and spend a few minutes discussing our regulations and guidance agenda, as well as

11/18/22, 4:05 PM  Remarks by Leslie Kux, Deputy Center Director for Regulatory Policy, Nutrition, and Engagement, Center for Food Safety and Ap…

Case 1:21-cv-01217-MKV   Document 227-22   Filed 06/05/24   Page 4 of 10

the inter-agency review process. And as I do so, each of these areas will serve as touchstones, colored by my reflections as I contemplate my 30+ years at the Agency, the contributions I've made, and the hurdles I have had to overcome – all in the interest of protecting, promoting, and advancing the public health.

As I said a few minutes ago, I couldn't be prouder to finish my public service at CFSAN where so much has been accomplished in the last 10 years to make the American food supply as safe as it's ever been, and where our focused nutrition efforts allow consumers to make more informed, healthy decisions than ever before.

This year, we are continuing our progress on key areas in FSMA, which includes work on agricultural water – comments are due on the proposed rule on April 5. We recently released the Ag Water Plan Builder, and later this year (Nov) will release our final Food Traceability rule. We also intend to continue to conduct inspections of importers subject to the Foreign Supplier Verification Program requirements under FSMA, examining records to help ensure that importers are taking necessary steps to ensure foreign food suppliers are meeting U.S. safety standards. These assessments have provided valuable information to assist with regulatory decisions and resource targeting, especially during the pandemic when conducting foreign inspections was much more challenging.

With respect to New Era, we are moving forward with our priority areas. The two primary areas of food safety here are traceability and our prevention and response work, especially as it relates to produce. We are also building on our engagement with partners, stakeholders, and industry on key public health issues such as ensuring the safety of foods ordered online and delivered directly to consumers. For example, we held a very successful meeting last fall on e-commerce.

We have also significantly increased our efforts to reduce consumer exposure to toxic elements and harmful chemicals in foods to the greatest extent possible. We believe this focus is imperative for ensuring consumer confidence in the safety of foods and to helping to prevent long-term risks to human health – especially for vulnerable populations like infants and toddlers. As part of our [Closer to Zero action plan (/food/metals-and-your-food/closer-zero-action-plan-baby-foods)](/food/metals-and-your-food/closer-zero-action-plan-baby-foods), we have been working hard toward meaningful reductions in exposure to toxic elements from foods for babies and young children and have announced our intention to issue three guidances in 2022 via our FDA Foods Program guidance agenda:

- Draft guidance on Action Levels for Lead in Juice; Draft Guidance for Industry;
- Final guidance on Action Levels for Inorganic Arsenic in Apple Juice; and
- Draft guidance on Action Levels for Lead in Food Intended for Babies and Young Children.

11/18/22, 4:05 PM
Case 1:21-cv-01217-MKV   Document 227-22   Filed 06/05/24   Page 5 of 10
Remarks by Leslie Kux, Deputy Center Director for Regulatory Policy, Nutrition and Engagement Center for Food Safety and Ap…

This first two are listed on www.reginfo.gov (http://www.reginfo.gov/) as under review at the Office of Information and Regulatory Affairs (OIRA) at the Office of Management and Budget (OMB), and we hope they issue soon.

In addition, scientific advances and innovation in food technology mean we need to identify and implement new approaches to integrate and assess information relevant to the safety of the food supply. We want to better understand, and address risks related to food additives and chemical contaminants in our food supply. Thus, we are expanding our research, surveillance, and consultation with states to better understand dietary exposure to polyfluoroalkyl substances (PFAS) and working with our federal partners to continue to ensure that the U.S. food supply remains among the safest in the world.  We now have a 2022 budget which will allow for some investments in modernization and innovation of our approaches, and tools that will allow us to better keep pace with developments and enhance our infrastructure and capacity for addressing these emerging chemical and toxicological issues.  Recognizing the need for new tools, we've been developing something called the "Expanded Decision Tree," which is a modernized version of the original Cramer decision tree tool for screening chemicals based on the latest toxicology data and risk. To date, we have curated safety data on over 1,900 chemicals to build the decision tree, but we need more resources to help develop and validate an IT platform to make it a fully functional tool, and to help us prioritize our work on those of greatest risk. We want to promote understanding and adoption of the EDT by the larger scientific community and interested stakeholders.

Most impactful for public health is a generational opportunity to focus on nutrition to help turn the tide on diet-related chronic diseases.  Hundreds of thousands of people die each year from diet-related chronic diseases. According to the CDC, more than 650,000 people in the United States die each year from heart disease – that's 1 in every 4 deaths. This statistic, coupled with the nearly 850,000 deaths attributed to the toll of the COVID-19 pandemic over the last two years, is staggering. The pandemic has only emphasized the need to focus on better nutrition. People with obesity, diabetes, and cardiovascular disease are at much higher risk for hospitalization or death from COVID and we're seeing a roll back in our progress on diet-related chronic diseases because of the new lifestyles we're having to adapt to in the pandemic. Unfortunately, also, the burden of diet-related chronic diseases is experienced at higher rates by some racial and ethnic groups as well as those with lower socioeconomic status; it's a widespread problem that is continuing to grow. Doing what FDA can to improve nutrition is urgently needed and one of our top priorities to address these health disparities.

Looking forward, we are focusing on three areas to help improve nutrition in the U.S. and advance health equity. First, fostering a healthier food supply and giving consumers more choices to eat healthier. Second, establishing a healthy start to set the foundation for a long, healthy life.  Third, empowering consumers through labeling and tailored education for specific subgroups. While FDA has a unique set of tools to influence this area, we again recognize the

11/18/22, 4:05 PM    Remarks by Leslie Kux, Deputy Center Director for Regulatory Policy, Nutrition, and Engagement, Center for Food Safety and Ap…

Case 1:21-cv-01217-MKV    Document 227-22    Filed 06/05/24    Page 6 of 10

need to coordinate, leverage and amplify the work of our other federal partners, including USDA, CDC, and NIH. The levers and authorities we have can help create healthier defaults across the food supply, helping to improve the healthfulness of foods served across all settings, including schools, early care and education, nutrition assistance for older adults, healthcare and more. And we've already done just that on sodium.

As you know, we took an important step in helping to support a healthier food supply in October when we published our final guidance establishing voluntary short-term sodium reduction targets. The short-term targets aim to help reduce people's average sodium intake by 12% - this modest reduction over the next several years is predicted to yield substantial public health improvements across the population. This is a critical first step of a gradual, iterative approach to reducing sodium intake to recommended limits. Such an approach has been successful in other countries as it allows for our taste buds to adjust slowly to an overall lower sodium food supply. We also have been closely collaborating with USDA staff on their updates to the school meals' nutrition standards and its sodium targets to drive alignment between such a major source of nutrition for children and FDA's sodium reduction targets. We plan to engage with you and other stakeholders extensively on these voluntary targets in a number of ways to gauge impact and next steps.

The publication of the targets followed up on less attention-getting sodium reduction efforts when we issued guidance on what to call potassium salt when used as an ingredient in food, with more user-friendly terminology to support/encourage substitution with this lower sodium ingredient. We are also continuing our work on food standards of identity to identify ways to support sodium reductions and allow for innovation and flexibility.

We see modernization of labeling as another tool that we are leveraging to create a healthier food supply and empower consumers. Publishing the "healthy" proposed rule is our immediate priority. The proposed rule is currently at OMB for review – the last stage of clearance. We hope to have it out very soon given the urgent need to update the outdated definition of "healthy" to reflect current nutrition science. We're also continuing to explore a "healthy" symbol and are currently reviewing the input we received on that thus far.

We're also looking to expand our work to help establish healthy starts in young children. Focusing on younger populations is critical because healthy dietary patterns early in life can influence the trajectory of eating habits and health behaviors throughout life. One of these areas is infant formula premarket review. Infant formula is a significant or even sole source of nutrition for many infants during a critical period of growth and development. The majority of infants in the U.S. receive infant formula by 6 months of age. The FDA requires certain nutrients in infant formulas, and infant formula manufacturers are required to make a submission containing detailed information on the safety and nutritional adequacy of a new infant formula to the FDA before introducing new infant formulas in interstate commerce. These submissions

11/18/22, 4:05 PM	Remarks by Leslie Kux, Deputy Center Director for Regulatory Policy, Nutrition, and Engagement, Center for Food Safety and Ap…

Case 1:21-cv-01217-MKV    Document 227-22    Filed 06/05/24    Page 7 of 10

are increasing in both quantity and complexity. Currently, our infant formula staff is actively engaged in looking at the latest science on novel infant formula ingredients, including new "bioactive" ingredients that are similar to components of human milk.

Another element of our holistic approach encompasses some of our work on toxic elements in our Closer to Zero action plan that I mentioned earlier. We see great value in addressing our work on toxic elements and nutrition in young children holistically because many foods that can be higher in toxic elements, such as fruits, vegetables, and grains, are the foundation of healthy eating patterns. We held a public meeting on our Closer to Zero action plan in November and plan to have additional meetings and ongoing opportunities for stakeholder engagement on our Closer to Zero activities. As we implement our Closer to Zero action plan, we will work to provide parents and caregivers, as well as healthcare providers, with accessible, science-based information to help make nutritious choices to ensure their children's healthy development, while also reducing their exposure to toxic elements from foods to as low as possible.

We're working closely and collaboratively with our federal partners, including USDA, CDC, and NIH, on many nutrition-related efforts, including calls nearly every week, and are exploring new ways to coordinate, leverage and amplify each other's nutrition work. For example, we are working closely with FSIS on a proposed rule outlining modern principles for revising, revoking, or establishing food standards – nutrition and innovation being a big part of our dialogue. Moreover, it is encouraging that the FY22 budget allocated funds directing HHS to convene a White House conference on food, hunger, and nutrition as well as develop a national nutrition plan.

Our current nutrition funding accounts for 7 percent, I'll just emphasize, 7 percent of the CFSAN budget, or 23.5 million dollars per year. This allows us to have JUST 67 people directly supporting nutrition work in the center. By comparison, tobacco and nutrition similarly contribute to the chronic disease burden that I spoke about earlier. However, the Center for Tobacco Products budget is nearly 30 times larger than the budget allotted to our nutrition work. Considering the severity of the problem related to diet-related chronic diseases, there is no question that we could do more, much more, to move the needle with a more robustly resourced program.

Next, I want to talk about cosmetics. Sadly, the extent of my remarks is longer than our statutory authority over them which dates from 1938 and 1960. First, I hope you all are aware how tiny our Cosmetics Program is relative to our responsibility for regulating a huge industry. At CFSAN, the staff tasked with regulating a $70 billion industry consists of only 31 employees with $7.6 million in base funding, despite the fact that these products are used daily by virtually every American every day. Yes – our Cosmetics Program funding is worse off than our Nutrition Program, which is saying something. Just like we all eat and make nutrition choices every day, we also use and make cosmetic choices every day. According to the Environmental Working Group (https://www.ewg.org/skindeep/contents/why-skin-deep/)

11/18/22, 4:05 PM   Remarks by Leslie Kux, Deputy Center Director for Regulatory Policy, Nutrition and Engagement, Center for Food Safety and Ap…

Case 1:21-cv-01217-MKV   Document 227-22   Filed 06/05/24   Page 8 of 10

(http://www.fda.gov/about-fda/website-policies/website-disclaimer) , men use an average of 6 personal care products each day that contain 85 different chemicals; while women use a daily average of 12 personal care products that contain 168 different chemicals.

Our current statutory authority in the Federal Food, Drug, and Cosmetic Act (FD&C Act) prohibits "adulteration," e.g., if it contains "poisonous or deleterious substances which may render [the cosmetic] injurious" under conditions of use, it consists of a "filthy, putrid, or decomposed substance", it has been "prepared, packed or held under insanitary conditions," or bears or contains an unsafe/unapproved color additive. The FD&C Act also prohibits "misbranding," e.g., false, or misleading labeling, and the 1966 Fair Packaging and Labeling Act requires ingredient listing for cosmetics sold at retail with some critical exceptions, e.g., fragrances.

What current law doesn't provide for is:

- Manufacturer registration – in other words, we don't know who's making cosmetics? Or where such manufacturers are located?
- Product listing - in other words, we don't know what's being manufactured and what ingredients are being used?
- Explicit authority to require Good Manufacturing Practices
- Mandatory reports to FDA of serious or recurring adverse events
- FDA access to records, Including safety substantiation data for ingredients or product formulation
- FDA mandatory product recall authority

These are all well-accepted parts of a modern regulatory system, and FDA already has some form of each of them for all, if not most, of the other products we regulate.

We do know that cosmetics and their ingredients can present risks. Some examples of acute risks are burns, hair loss, eye injury, scarring, infections, pigmentation changes. Some examples of chronic risks are neurological problems, endocrine disruption, developmental toxicity, and cancer. As I noted, CFSAN's cosmetics program is also one of the agency's smallest and is severely under-resourced to provide adequate oversight to help ensure the safety of cosmetics products. So not only is modernizing the statute warranted; new dedicated resources to support the modernized authorities and cosmetics program are critical.

Consumers expect that the cosmetics they use every day are safe. They assume FDA has the basic tools to ensure their safety as we do for medical products or foods. However, FDA is no longer viewed as the international "gold standard" for cosmetics safety. It's been over 80 years since the FD&C Act was passed. Americans deserve a modern, adequately funded FDA

11/18/22, 4:05 PM   Remarks by Leslie Kux, Deputy Center Director for Regulatory Policy, Nutrition and Engagement, Center for Food Safety and Ap…

Case 1:21-cv-01217-MKV   Document 227-22   Filed 06/05/24   Page 9 of 10

cosmetics program that will protect consumers from unsafe cosmetic products.

I have touched on a few important priorities. We look forward to continuing to work with you and our other stakeholders as we move forward on these priorities.

Now, if you will indulge me, I want to focus on what I earlier called the business of the federal government. Since I started at FDA, the agency has made great strides in transparency with respect to rules and guidance documents. First, we have Good Guidance Practices (or GGPs) which put in place a predictable process open to all for how FDA will issue policy documents. Indeed, we were the first agency to adopt GGPs. When I started, we had no such thing – we had podium policy, points to consider, and any other number of ways of sharing policy with stakeholders which not everyone had access to and were mostly developed without broad stakeholder input. All that changed with GGPs, and at their core the changes have been great, though sometimes at the cost of slowing things down. Part of GGPs that the Foods Program has adopted is posting its Guidance Agenda (/food/guidance-documents-regulatory-information-topic-food-and-dietary-supplements/foods-program-guidance-under-development) twice a year. The Foods Program Guidance Agenda tells our stakeholders which key guidances we plan to issue in the calendar year. In this regard, it is similar to the Unified Agenda for Rules (https://www.reginfo.gov/public/do/eAgendaMain) that is issued government-wide by OMB twice a year. The Unified Agenda lists all the "informal" rules planned to issue in the coming year with a target issue month. At CFSAN, under Dr. Mayne's leadership, we've successfully instituted significant internal process improvements to make sure the rules and guidance documents will generally leave FDA on time. However, as I'm sure you know, FDA is not an "independent agency," and we are part of HHS. This means that we operate under EO 12866 (https://www.reginfo.gov/public/jsp/Utilities/EO_12866.pdf) and EO 13563 (https://www.reginfo.gov/public/jsp/Utilities/EO_13563.pdf) , which set out a process for interagency review of "significant regulatory actions" run by the Office Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB). So once we are done with a document there may still be further steps to take before it hits the *Federal Register*.

OIRA review under EO 12866 is a big part of the business of federal regulation – often the hardest part. Increasing review by OIRA has been one very steady thread through my time at FDA. It is no secret that OIRA review is no longer limited to rules, but also guidance documents. and that many of the rules OIRA chooses to review are not particularly significant. (By the terms of EO 12866, review is required only when a rule is economically significant in terms of costs and benefits – most FDA regulations do not meet this threshold.) It is also not a secret that OIRA often falls short of meeting its 90 day review deadline set out in EO 12866. Finally, it is not a secret that OIRA controls when a rule is accepted into its review system and becomes public on www.reginfo.gov (//www.reginfo.gov). If you are interested in more reflection about OIRA and the role it plays I refer you to two law journal articles as a starting point. The first is by Cass Sunstein (https://harvardlawreview.org/2013/05/the-office-of-information-and-

11/18/22, 4:05 PM    Remarks by Leslie Kux, Deputy Center Director for Regulatory Policy, Nutrition, and Engagement Center for Food Safety and Ap…

Case 1:21-cv-01317-MKV   Document 227-22   Filed 06/05/24   Page 10 of 10

regulatory-affairs-myths-and-realities/) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) who headed up OIRA during parts of the Obama Administrations and the second is by Lisa Hienzerling (https://digitalcommons.pace.edu/pelr/vol31/iss1/5/) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) who was a senior official at EPA during part of the Obama years. Read together they present a fascinating (at least to me) picture of an OIRA/agency relationship and they do bring home what I noted earlier – sometimes rules and guidance take a long time because they can't get into or out of OIRA review.

I am not here to weigh in on the relative merits of OIRA review. Nor am I here to tell you whether CFSAN has rules and guidance in the queue waiting to be accepted by OMB. Unfortunately, despite all the improvements CFSAN has made to be transparent about its priorities and engage with stakeholders, which has been a sea change in my time at working with and at CFSAN, there are sometimes countervailing trends that impact how quickly we can share our hard work.

In closing, as I think back on my FDA career, and as my remarks illustrate, I am struck that FDA is only one part of a complex, vast ecosystem – yet how important the role of the agency is in that ecosystem. And as I conclude my career in the Center for Food Safety and Applied Nutrition, I am humbled by the profound impact my current organization has on the lives of each and every person in this country. For just $1.04 per year for every consumer, CFSAN employees assure the safety of nearly 80% of the food supply, including dietary supplements, and cosmetics. It truly is an enormous mandate that accomplishes so much every day, despite such a modest cost to consumers. As impressive as the return on this investment is, we all know there is more to be done. As I prepare for retirement, I will continue, with the legion of my dedicated colleagues, to work to promote improved health through better nutrition, each and every day. And once I am retired, I will wait for, embrace, and welcome all that is yet to be accomplished as science and technology advances, the promise of additional resources looms, and the support of our stakeholders continues. I can't wait.

Thank you very much, and I am happy to take questions.

 More Speeches by
FDA Officials (/news-events/speeches-fda-officials)