# EXHIBIT 1

2024 WL 5239510
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

IN RE HAIN CELESTIAL HEAVY METALS BABY FOOD LITIGATION

21-cv-00678 (NRM) (AYS)
|
Signed December 27, 2024

### MEMORANDUM AND ORDER

NINA R. MORRISON, United States District Judge:

**\*1** Plaintiffs bring this putative class action against Hain Celestial, Inc. ("Hain" or "Defendant"), a baby food manufacturer. Plaintiffs are consumers who purchased Hain's baby food and allege that Hain deceptively marketed its baby food products as "pure, quality products," "Nurturing Baby the Purest Way" and "Made with Superior Ingredients," when they in fact contained dangerous amounts of lead, arsenic, cadmium, mercury, perchlorate, and other undesirable toxins or contaminants. Plaintiffs allege twenty-five causes of action including breach of express warranty, breach of the implied warranty of merchantability, negligent misrepresentation, unjust enrichment, fraudulent concealment, and false advertising or unfair practices under statutes in sixteen states and the District of Columbia.

Defendant moves to dismiss under Rule 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim. *See* Def. Mot. to Dismiss ("Def.'s Mot."), ECF No. 202-1. The Court held oral argument on the motion on August 1, 2024.

For the reasons that follow, the Court finds that Plaintiffs have adequately alleged that they have standing to bring this lawsuit because they have suffered the requisite injury-in-fact. The more difficult question is whether Plaintiffs have met their burden of plausibly pleading their labelling claims on the merits. In particular, to resolve the motion, the Court must determine whether anything about Hain's labelling could be found to be materially misleading, given that Hain's products contained what Plaintiffs refer to throughout their complaint as "Toxic Heavy Metals." Plaintiffs repeatedly assert that an array of potential toxins in Hain's products are "dangerous" to babies and toddlers. Yet at the same time, Plaintiffs have not disputed that these heavy metals are to some extent naturally occurring in all baby foods which, like Hain's, contain fruit, vegetables, rice, and/or other natural ingredients that are grown in soil or water — thus making it critical for Plaintiffs to plead facts that would lead a reasonable consumer to view the particular levels of any heavy metal found in Hain's baby food as actually unsafe and therefore material to a reasonable consumer.

Ultimately, as discussed *infra*, the Court finds that Plaintiffs have met their pleading burden with respect to one category of so-called heavy metals: arsenic. These claims survive because Plaintiffs have plausibly alleged that at least some of Hain's products exceed specific, recognized safe thresholds for arsenic in baby food products, and that this information would have been material to reasonable consumers who purchased Hain's baby food for their children and were willing to pay a premium for healthy and safe products. The Court finds, however, that Plaintiffs have not plausibly alleged that a reasonable consumer would be misled into believing that Hain's baby food products were free from lead, cadmium, mercury, perchlorate, or what Plaintiffs call "other undesirable toxins or contaminants." It is compelled to so find because Plaintiffs have not pled any benchmark or threshold at which the presence or concentration of these other contaminants in baby food would be unsafe for young children to consume. Instead, Plaintiffs have only broadly alleged that the products Hain sold were likely "dangerous" or "toxic" because of the trace amounts of these metals that they contain. Without any specific allegations as to *why* a reasonable consumer would find the particular composition of the products that contain these heavy metals to be "dangerous" for this reason, and thus at odds with Hain's labeling, they have failed to state a claim.

**\*2** The Court therefore grants Defendant's motion to dismiss as it relates to Plaintiffs' claims involving all "heavy metals" other than arsenic. However, their claims related to alleged misrepresentations as they relate to the levels of arsenic in Hain's baby food products may proceed to discovery.

**FACTUAL BACKGROUND**

**I. Judicial Notice**

As a preliminary matter, Defendant asks the Court to take judicial notice of eleven documents in support of its motion to dismiss. Def.'s Request for Judicial Notice ("Def.'s Request"), ECF No. 203. Plaintiffs do not oppose this request with respect to Defendant's Exhibit 1 but argue that the Court should not take judicial notice of the other exhibits because they are, in Plaintiffs' view, not integral to the Amended complaint and contain facts in dispute. Pl.'s Opp. to Def.'s Request at 4, ECF No. 207.[1]

"On a motion to dismiss, 'the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents "integral" to the complaint and relied upon in it." *Becker v. Cephalon, Inc.*, No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3 (S.D.N.Y. Sept. 15, 2015) (quoting *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014)); *Chambers v. Time Warner*, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002) (holding that a district court may consider certain documents attached to complaint or incorporated by reference that a plaintiff relied on in drafting its complaint). In addition, under Federal Rule of Evidence 201(b)(2), a court may take judicial notice of any fact that is "not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "Under Rule 201(b)(2), courts may take judicial notice of publicly available documents such as regulatory filings." *Levy v. Hu Prods. LLC*, No. 23 Civ. 1381 (AT), 2024 WL 897495, at *2 (S.D.N.Y. Mar. 1, 2024) (quoting *Lewis v. M&T Bank*, No. 21-933, 2022 WL 775758, at *1 (2d Cir. Mar. 15, 2022) (summary order)); *see also Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020) (AJN) ("Courts have also taken judicial notice of materials in the public record, such as federal copyright registrations, newspaper articles, and regulatory filings ...."). "But they must do so to determine what statements the documents contained ... and not for the truth of the matters asserted in the documents." *Levy*, 2024 WL 897495 at *2 (quoting *Lewis*, 2022 WL 775758, at *1); *see also Hesse*, 463 F. Supp. 3d at 463 (noting that even when a court takes judicial notice of documents, "their purposes at the motion-to-dismiss stage are limited" and "[t]hey may be used only for 'determining what the documents state,' and [defendant] cannot rely on them to 'prove the truth of their contents' " (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007))).

For their part, Plaintiffs attach or reference, *inter alia*, a February 2021 Staff Report by the U.S. House of Representatives Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform titled *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* ("Subcomm. Rep."), Amended Complaint ("AC") Ex. B, ECF No. 160-2; Def.'s Request Ex. 1, ECF No. 203-1; an August 2019 PowerPoint by Defendant Hain Celestial titled *FDA Testing Result Investigation* ("2019 PowerPoint"), AC Ex. D, ECF No. 160-4; an August 2020 U.S. Food and Drug Administration ("FDA") report titled *Guidance for Industry: Action Level for Inorganic Arsenic in Rice Cereals for Infants* ("2020 FDA Arsenic Guidance"),[2] AC ¶ 51 n.12; a December 2017 report published by Healthy Babies Bright Futures ("HBBF") titled *Arsenic in 9 Brands of Infant Cereal* ("2017 HBBF Arsenic Rep."), AC ¶ 83 n.44; Def.'s Request Ex. 9, ECF No. 203-9; and an October 2019 HBBF report titled "What's in my baby's food?" ("2019 HBBF Rep."), AC ¶ 73 n.33.

**\*3** The Subcommittee Report is Defendant's Exhibit 1 and Plaintiffs' Exhibit B. Plaintiff also cites Defendant's Exhibit 9, the 2017 HBBF Arsenic Report, AC ¶ 83 n.44, and Defendant's Exhibit 10, a report by Consumer Reports published August 16, 2018, titled *Heavy Metals in Baby Food: What You Need to Know*, ("2018 Consumer Reports Rep.") AC ¶ 57 n.18. The Court, thus, takes judicial notice of these documents, which are incorporated by reference and which Plaintiffs "knew about and relied upon in bringing the suit." *Levy*, 2024 WL 897495, at *2. In addition, because they are also referenced and incorporated in the Amended Complaint, the Court will also take judicial notice of the 2019 PowerPoint, the 2020 FDA Arsenic Guidance, and the 2019 HBBF report. However, although Defendant claims that the findings of Exhibit 8 — an August 2022 HBBF report titled "Is Homemade Baby Food Better?," — are referenced in the Amended Complaint, the report does not appear to be cited or referenced in the Amended Complaint, so the Court will not take judicial notice of it.

Defendant's Exhibits 2, 3, 4, 5, 6, 7, and 11 are documents publicly available on the FDA's website and "can be judicially noticed because their accuracy cannot reasonably be questioned." *Levy*, 2024 WL 897495, at *2 (citing *Becker*, 2015 WL 5472311, at *3 (collecting cases taking judicial notice of FDA documents)).

**II. Plaintiffs' Allegations Related to "Heavy Metals"**

The following facts are taken from the Amended Complaint, ECF No. 160, and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim," *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 398 (2d Cir. 2015), and for considering a motion to dismiss for lack of standing, see *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010).

Plaintiffs' allegations relate to so-called heavy metals — lead, arsenic, cadmium, mercury, perchlorate, "and/or other undesirable toxins or contaminants" (collectively, "heavy metals"). AC 1. The term "heavy metals" is used throughout, but not defined in the Amended Complaint. Plaintiffs identified fifty-eight baby food products at issue in this case and "reserve their rights to modify" the list of products after opportunity for discovery. See AC ¶ 4 n.2; Ex. A (list of products). Plaintiffs pled twenty-five causes of action including breach of express warranty, breach of the implied warranty of merchantability, negligent misrepresentation, unjust enrichment, fraudulent concealment, and false advertising or unfair practices under statutes in New York, California, Idaho, Indiana, Kentucky, Maine, Massachusetts, Missouri, Nevada, New Hampshire, New Jersey, North Carolina, Pennsylvania, Rhode Island, Virginia, and Washington and the District of Columbia. *Id.* ¶¶ 151–468.

As discussed in more detail below, Plaintiffs have not identified any federal limit (whether mandatory or advisory) for heavy metals in baby foods, except for arsenic in infant rice cereal. See AC ¶¶ 54 (citing 2020 FDA Arsenic Guidance). According to the Subcommittee Report, the only guidelines from the FDA indicating what may constitute unsafe levels of these heavy metals in baby food are for arsenic in infant rice cereal and apple juice. Subcomm. Rep. at 52;[3] *see also* AC ¶¶ 54, 74. This is reflected in the pleadings, which for the most part cite recommended limits for heavy metals in water, or reference limits from the European Union or World Health Organization. It bears noting that because Hain only tests the levels of heavy metals in its raw materials (*i.e.*, ingredients) and not its finished products, Plaintiffs have not pled any specific allegations regarding the actual levels of heavy metals present in Defendant's finished baby food products. See AC ¶¶ 88–90. The only exception is arsenic.

In 2019, Defendant submitted a PowerPoint to the FDA that demonstrated the levels of inorganic arsenic in the raw materials used in their baby foods compared to the finished products and revealed that the levels of arsenic in its finished products were higher than the levels in the raw ingredients. *Id.* ¶ 81; Table, AC at 23 (citing 2019 Power Point). Four products identified had levels greater than the FDA's limit of 100 ppb.[4] Table, AC at 23. For example, the highest tested at 129.0, which was a 93% increase of inorganic arsenic compared to the test result of 67.0 ppb in the raw materials. Table, AC at 23; Subcomm. Rep. at 55.

**\*4** Plaintiffs extrapolate from the increase in inorganic arsenic in finished products in the 2019 PowerPoint to allege generally that "[f]inished products test at higher levels of Toxic Heavy Metals and/or other toxins than raw ingredients." AC ¶ 10. However, the specific allegations (and supporting Subcommittee Report) only refer to an increase of arsenic in Defendant's finished products. Despite the fact that the Subcommittee Report's findings were limited to arsenic, Plaintiffs allege that Defendant's labeling failed to disclose that its 58+ baby food products contain "dangerous amounts" of heavy metals. *Id.* ¶¶ 5, 13.

To support these broad allegations, Plaintiffs allege that Defendant's baby food products contain an increased level of heavy metals by pleading the following for each heavy metal.

**A. Organic and Inorganic Arsenic**

Organic arsenic refers to arsenic molecules that contain carbon. Inorganic arsenic molecules do not contain carbon. *See* 2020 FDA Arsenic Guidance at 4 n.4. Plaintiffs plead: "Organic arsenic is found in plant and animal tissues. Inorganic arsenic is found in soil and groundwater." AC ¶ 49 (citing a CDC Factsheet from 2009 that is no longer accessible at the provided link).[5] According the 2020 FDA Arsenic Guidance, inorganic arsenic is generally considered more toxic than organic arsenic. 2020 FDA Arsenic Guidance at 4. Plaintiffs refer to both inorganic and organic arsenic as "dangerous forms" of arsenic. AC ¶ 49.

In support of their allegations related to the dangerousness of inorganic and organic arsenic in Hain's products, Plaintiffs plead the below.

*a. Inorganic Arsenic*

Plaintiffs allege that "[a]ccording to the FDA, children are likely to be 'particularly susceptible to neurotoxic effects

of inorganic arsenic.' " AC ¶ 51 (quoting 2020 FDA Arsenic Guidance). Although not stated in the Amended Complaint, the Subcommittee Report further states: "This negative effect is most pronounced in Full Scale IQ, and more specifically, in verbal and performance domains as well as memory. For every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children." Subcomm. Rep. at 11.

Acknowledging that "there is no established safe level for inorganic arsenic consumption by babies," Plaintiffs reference the following guidelines related to inorganic arsenic: FDA's guidance to not exceed inorganic arsenic levels in "baby food" for 100 ppb;[6] FDA's guideline for inorganic arsenic in bottled water at 10 ppb; EPA, EU, WHO guidelines for inorganic arsenic in drinking water at 10 ppb; and FDA, EPA, WHO, and EU "maximum level of inorganic arsenic at 10 ppb." AC ¶¶ 52–54. Plaintiffs do not explain what they mean by "maximum levels." In a footnote, they simply state, "Health experts, including the AAP and Consumer Reports, advocated for a maximum level of 1 ppb instead of 10 ppb." *Id.* ¶ 53 n.14. Affording them the benefit of all reasonable inferences from their factual allegations, however, it appears that Plaintiffs mean "maximum levels" to refer to the uppermost limit on the presence of arsenic, as measured by parts per billion, before consumption of the product is unsafe for babies and/or toddlers.

To support their allegations that Defendant's baby food products contain "dangerous" levels of inorganic arsenic, Plaintiffs allege that Defendant "used brown rice flour that had tested at 309 ppb arsenic, a vitamin pre-mix containing 223 ppb arsenic, ... raisin and wheat flour containing 200 ppb arsenic," and at least twenty-four ingredients containing more than 100 ppb arsenic. *Id.* ¶ 73. Although the allegations do not refer to inorganic arsenic, the Subcommittee Report that Plaintiffs cite references inorganic arsenic. *See* Subcomm. Rep. at 14–16. The Court notes that Plaintiffs cited "*Id.*" which would refer to the 2019 HBBF Report but seems to be a typo; it appears that Plaintiffs meant to cite to the Subcommittee Report since it is referenced in the paragraph and corresponds with the page numbers cited. In addition, Plaintiffs allege that Defendant's "ingredient testing showed concentrations of as much as 129 ppb of inorganic arsenic." *Id.* ¶ 95.

**\*5** Although Hain only tests raw materials and not finished products, *id.* ¶¶ 88–90, Plaintiffs have pointed to inorganic arsenic levels above the 100-ppb threshold for infant rice cereal in some of its products. *Id.* ¶ 95. In 2019, Hain submitted a PowerPoint to the FDA that demonstrated the levels of inorganic arsenic in the raw materials used in their baby foods compared to the finished products and revealed that the levels of inorganic arsenic in its finished products were higher than the levels in the raw ingredients. *Id.* ¶ 81; *see also* Table, AC at 23; 2019 PowerPoint, at 10. The Subcommittee Report refers to the presentation as a "secret." Subcomm. Rep. at 47–48 ("In the summer of 2019, FDA received a secret presentation from a baby food manufacturer that revealed that the commercial process of preparing finished baby foods increases their levels of toxic heavy metals."). As mentioned above, four products identified had levels over the FDA's infant rice cereal limit of 100 ppb. Table, AC at 23. For example, the highest tested at 129.0, which was a 93% increase of inorganic arsenic compared to the test result of 67.0 ppb in the raw materials. Table, AC at 23; *see also* Subcomm. Rep. at 55.

It bears noting that neither the 2019 PowerPoint nor Plaintiffs' table at page 23 reproducing the findings identify *which* products contain the inorganic arsenic at levels above the recommended threshold; instead, the products are identified by FDA Sample Number and Lot Number. *See* 2019 PowerPoint, at 10. In addition, HBBF tested at least some of Hain's infant cereal products for inorganic arsenic, including the rice-based ones, and the tested products all tested under the 100-ppb threshold. *See* 2017 HBBF Arsenic Rep., at 10–11. However, although not specifically referenced in the Amended Complaint, HBBF reported in its 2019 investigation that "six of 30 rice-based baby foods tested by HBBF contained inorganic arsenic above the 100-ppb limit proposed for infant rice cereal — four infant rice cereals and two puff snacks." 2019 HBBF Rep. at 15.

Plaintiffs further allege that Hain exceeded its own internal specifications of 100 ppb for inorganic arsenic. AC ¶¶ 93, 97–98. Specifically, Plaintiffs allege that Defendant exceeded its own limits of inorganic arsenic by using, *inter alia*: a vitamin pre-mix with 223 ppb of arsenic, brown rice flour containing 309 ppb of arsenic, and raisin and wheat flour containing 200 ppb of arsenic. *Id.* ¶¶ 94–95.[7]

*b. Organic Arsenic*

Plaintiffs allege that "the FDA requires bottled water manufacturers to monitor the levels of arsenic in both their source and their finished goods annually" and refer to "[t]he allowable level established by FDA for arsenic in bottled water [of] 10 micrograms (0.010 milligrams) per liter of water." *Id.* ¶ 55.

To support their contention that organic arsenic is dangerous in baby food, Plaintiffs plead, generally, that "[s]cientific studies determining the long-term health effects of exposure to organic arsenic are ongoing" and that "there are scientific studies that demonstrate potential health concerns associated with the organic arsenic found in foods." *Id.* ¶ 56.

### B. Lead

Plaintiffs allege that the FDA set a 5 ppb of lead standard for bottled water, 50 ppb in certain juices, and 100 ppb in candy; that the WHO has set 10 ppb of lead as a provisional guideline for drinking water; that the EPA has set an action level of 15 ppb for lead in drinking water; and that the EU has set the maximum lead level in infant formula to 20 ppb. AC ¶ 46. To support their allegation that Hain's baby food products contain "dangerous" levels of lead, Plaintiffs allege that Hain's raw material testing revealed that 6 ingredients contained more than 200 ppb lead, 88 ingredients contained more than 20 ppb lead, 115 ingredients contained more than 15 ppb lead, and 27% of ingredients contained more than 5 ppb lead, *id.* ¶ 71; Defendant's pre-mix contained lead concentrations of up to 352 ppb, *id.*; none of Defendant's test results showed an ingredient with lead concentrations at or below 1 ppb, *id.* ¶ 94; and that Hain accepted ingredients that exceeded its own internal allowable caps for lead. *Id.* ¶ 99. To support their contention that lead is dangerous in baby food, Plaintiffs plead, generally, that "[h]igh levels of lead exposure can seriously harm children's development and health, specifically the brain and nervous system" and that "because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time." *Id.* ¶ 48.

### C. Cadmium

*6 Acknowledging that "[t]here is no federal standard for cadmium in baby food," Plaintiffs alleged that the FDA set a limit of 5 ppb of cadmium in bottled water; the EPA set a limit of 5 ppb in drinking water; that the WHO set a limit of 3 ppb for cadmium in drinking water; and the EU set a limit ranging from 5–20 ppb of cadmium for infant formula. *Id.* ¶¶ 58–59. To support their allegation that Hain's baby food products contain "dangerous" levels of cadmium, Plaintiffs allege that Hain's testing of raw ingredients revealed that 14 ingredients contained more than 100 ppb cadmium, barley flour contained 260 ppb cadmium, and 102 ingredients contained more than 20 ppb cadmium (*id.* ¶¶ 77, 96); Hain approved a "deviation" for "Org Cinnamon Powder" where the cadmium spec limit was 100 ppb and the February 2019 lab result indicated 102 ppb cadmium in this product; and Hain accepted ingredients even though they exceeded its own internal allowable limits, such as June 2018 lab results finding 102 ppb cadmium in "org[anic] oat flour" to a spec of 100 ppb cadmium, January 2018 thirteen lab results finding as much as 260 ppb cadmium in various products, and 2017 lab results finding levels of cadmium. *Id.* ¶¶ 98–99 (alteration in original).

To support their contention that cadmium is dangerous in baby food, Plaintiffs plead, generally, that it "can be toxic for everyone and pose particular risks for young children." *Id.* ¶ 57 (quoting 2018 Consumer Reports Rep.). Plaintiffs also plead that cadmium is recognized by international bodies as a "Group 1 carcinogen" and a major public health concern." *Id.* ¶ 61. Plaintiffs also plead that "Cadmium has no physiological function in the human body and is a known neurotoxin" and that "[c]onsumption of cadmium is associated with decrease in IQ and development of ADHD." *Id.* ¶ 62.

### D. Mercury, Perchlorate, and other undesirable toxins or contaminants

Plaintiffs acknowledge that "[t]here is no federal standard for mercury in baby food[.]" *Id.* ¶ 65. Instead, they reference the EPA's mandated limit of 2 ppb of mercury in drinking water. *Id.* ¶ 65. Plaintiffs allege that "while Hain products are suspected to contain mercury, there is no way for consumers to know at what level the dangerous toxin is present." *Id.* ¶ 78. And Plaintiffs plead, generally, that mercury "may have toxic effects on the nervous, digestive and immune systems, and on lungs, kidneys, skin and eyes." *Id.* ¶ 66.

Again, while acknowledging that "a guideline has not explicitly been set," Plaintiffs allege that the "dangers of perchlorate in human food are recognized by the FDA," *id.* ¶ 69. They reference the EPA's setting of the maximum contaminate level goal for perchlorate in drinking water to 56 µg/L. 85 F.R. 43990. *Id.* Plaintiffs allege that a consumer group "tested some of Defendant's finished products and found perchlorate present." *Id.* ¶ 80 (citing 2019 HBBF Rep. at 34–35). To support their contention that perchlorate is dangerous in baby food, Plaintiffs plead, generally, that it "is a neurotoxic chemical compound linked to critical growth and development functions in infants and young children," *id.*

¶ 68, and that it has "been linked to IQ loss among children born."

Finally, the phrase "other undesirable toxins or contaminants" is not defined in the Amended Complaint. Nor does the Amended Complaint reference any potentially applicable guidelines or limits for what may constitute safe (or unsafe) levels of these other unspecified metals in baby food products.

## LEGAL STANDARD

Under Rule 12(b)(1), a district court must dismiss a complaint if it lacks subject matter jurisdiction, including if plaintiffs have not established standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); Fed. R. Civ. P. 12(b)(1). "At the pleading stage, [the plaintiffs] have the burden of alleging facts that affirmatively and plausibly suggest that they have standing to sue." *In re Lindt & Sprüngli (USA), Inc., Dark Chocolate Litig.*, No. 23-cv-1186 (AMD) (JAM), 2024 WL 4107244, at *3 (E.D.N.Y. Sept. 6, 2024) (alteration in original) (quoting *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 154 (E.D.N.Y. 2018) (NGG) (VMS)); *see also Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("[T]he party invoking federal jurisdiction bears the burden of establishing the[ ] elements' of Article III standing." (second alteration in original) (quoting *Lujan*, 504 U.S. at 561)).

**\*7** "A plaintiff has standing if she has pleaded a case or controversy in which she has a personal stake in the outcome." *Levy*, 2024 WL 897495, at *3 (citing *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l*, 790 F.3d 411, 417 (2d Cir. 2015)). "To satisfy the " 'irreducible constitutional minimum" of standing,' a plaintiff 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.' " *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Each element of standing " 'must be supported ... with the manner and degree of evidence required at the successive stages of the litigation,' and at the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice.' " *Id.* (quoting *Lujan*, 504 U.S. at 561). Because Defendants' Rule 12(b)(1) motion is facial, Plaintiffs have no evidentiary burden. As the Second Circuit has explained, "[t]he task of the district court is to determine whether the Pleading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.' " *John*, 858 F.3d at 736 (alterations in original) (quoting *Carter*, 822 F.3d at 56).

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). " '[W]here a document is referenced in a complaint, the documents control' and the Court 'need not accept as true the allegations' in the complaint that are inconsistent with these documents.' " *Housey v. Proctor & Gamble Co.*, No. 22-888, 2022 WL 17844403, at *2 (2d Cir. Dec. 22, 2022) (summary order) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016)).

## DISCUSSION

For the reasons that follow, Plaintiffs have standing to bring this suit. On the merits, Plaintiffs have stated a claim that Hain's baby food product labels would be misleading to a reasonable consumer and/or omitted information that would be material to a reasonable consumer, but only insofar as they have alleged that Hain's products contain dangerous levels of arsenic, *i.e.*, levels that exceed recommended safe thresholds. But as to the allegations related to concentrations of lead, cadmium, mercury, perchlorate, or what Plaintiffs call "other undesirable toxins or contaminants," Plaintiffs have failed to plausibly plead that a reasonable consumer would be misled by Defendant's food-product labels.

### I. Standing

Defendant's motion to dismiss for lack of standing turns on its claim that Plaintiffs have failed to allege that they have suffered a cognizable injury in fact when they purchased Hain's products for their children. Def.'s Mot. at 13–25.

The Second Circuit has "repeatedly described" the injury-in-fact "requirement as 'a low threshold,' which

'helps to ensure that the plaintiff has a personal stake in the outcome of the controversy.' " *John*, 858 F.3d at 736 (first quoting *WC Cap. Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 329 (2d Cir. 2013); then quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "[O]ne method of demonstrating actual injury in the consumable goods context is by showing that the plaintiff paid a 'price premium' — that is, as a result of the defendant's deception, the plaintiff paid more for a product than he otherwise would have." *In re Lindt & Sprüngli*, 2024 WL 4107244, at *3 (quoting *Eidelman v. Sun Prods. Corp.*, No. 21-1046, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022)) (summary order); *see Axon v. Fla.'s Nat. Growers, Inc.*, 813 F. App'x 701, 703–04 (2d Cir. 2020) (summary order) (finding that plaintiff "suffered an injury-in-fact because she purchased products bearing allegedly misleading labels and sustained financial injury — paying a premium — as a result"); *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 92 (2d Cir. 2018) (noting that named plaintiff had standing because she alleged that she paid a premium for baby products represented as "natural"); *John*, 858 F.3d at 737–38 (finding that plaintiff plausibly alleged that he suffered injury in fact by pleading the frequency of his purchases and the systematic overcharging of products); *Torres v. Kohlberg, Kravis, Roberts & Co. L.P.*, No. 20-cv-5025 (MKV), 2023 WL 2051163, at *4 (S.D.N.Y. Feb. 16, 2023) (collecting cases).

*8 Plaintiffs have adequately pled a "price premium" theory. They assert that if they knew the information set forth in the Amended Complaint about the elevated levels of heavy metals in Hain's baby food products, they would have paid less for those products or not purchased them at all. *See* AC ¶ 212 ("Plaintiffs and members of the class would not have purchased Defendant's Baby Foods, would have bought less of the Baby Foods, or would have paid less for the Baby Foods, had they known that the products were unsafe and unsuitable for babies ...."). Plaintiffs also allege that Hain markets its baby food as "pure, quality products" that are "made with superior ingredients" (*id.* ¶¶ 4, 104) — statements that Plaintiffs allege were intended "to induce consumers to purchase its Baby Foods" at "a premium for these products over what consumers would have paid had Defendant disclosed that its Baby Foods contained dangerous levels of Toxic Heavy Metals and/or other toxins." *Id.* ¶ 189. Plaintiffs allegations thus "permit the inference 'that the [Products] sell[ ] for a higher price than a comparable product because of [their] use of the deceptive claim.' " *In re Lindt & Sprüngli*, 2024 WL 4107244, at *3 (alterations in original) (quoting *Eidelman*, 2022 WL 1929250, at *1); *see McAuley v. Honey Pot Co.*, No. 23-cv-1986 (AT), 2024 WL 898715, at *2 (S.D.N.Y. Mar. 1, 2024) ("Such an allegation that a plaintiff would not have purchased a product or would not have paid the same amount comfortably satisfies the injury-in-fact prong of Article III standing.") (quoting *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (JPC) (collecting cases)).

Moreover, contrary to Defendant's argument that Plaintiffs lack standing because they fail to identify products that were "cheaper," Def.'s Mot. at 14, Plaintiffs' "failure 'to identify the prices of competing products to establish the premium that [they] paid is not fatal' at the motion-to-dismiss stage." *McAuley*, 2024 WL 898715, at *2 (quoting *Axon*, 813 F. App'x at 704); *see Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014) (NSR) ("[W]hile identifying the prices of competing products in the [c]omplaint would strengthen [p]laintiff's allegation of injury, the failure to do so is not fatal to [p]laintiff's claim." (internal citation omitted)) (collecting cases).

Defendant also argues that "[g]iven the ubiquity of heavy metals in baby foods, Plaintiffs cannot establish that there are comparable options that are free of heavy metals — as they must to allege that those products would command a 'price premium.' " Def. Mot. at 22. Plaintiffs counter that they have indeed identified competitors' products that contain lower levels of heavy metals, and that had they known that Hain's baby food products contained the levels of heavy metals they now understand to be present, they would not have paid a price premium for them or bought them at all. Pls.' Mem. in Opp. ("Pls.' Opp.") at 14–15, ECF No. 206. For example, Plaintiffs allege that the manufacturer Yumi "takes numerous proactive steps to ensure its products are safe for infants and children" and that it "does not use ingredients such as rice and fruit juice, both known to contain high levels of arsenic." AC ¶ 120.

Moreover, as it relates to arsenic, according to the 2016 HBBF testing, HappyBABY organic brown rice cereal had products with a range of 51–123 ppb while Hain's brown rice cereal products had from 60–96 ppb. 2017 HBBF Arsenic Rep. at 10. Although Hain's regular rice products were not tested, Gerber's organic rice cereal had 28 ppb of inorganic arsenic. *Id.* at 9. In addition, according to the 2017 HBBF Arsenic Report, the FDA and "other experts" have identified the following steps manufactures can take to lower the level of arsenic in their products: sourcing rice from fields with lower arsenic levels in soil, growing it with natural soil additives that reduce arsenic uptake by the roots, growing rice

strains less prone to arsenic uptake, preparing rice with excess water that is poured off, and blending it with lower arsenic grains in multi-grain products. 2017 HBBF Arsenic Rep. at 4.

Accordingly, Plaintiffs have sufficiently alleged an injury-in-fact based on their payment of a premium price for Hain's baby food products and have met the "low threshold" required to establish standing. *John*, 858 F.3d at 736 (quoting *WC Cap. Mgmt.*, 711 F.3d at 329); *see also Castillo v. Prime Hydration LLC*, No. 23-cv-03885, 2024 WL 4133815 (AMO), at *3 (N.D. Cal. Sept. 9, 2024) ("By alleging that she purchased the product during the class period and that independent testing showed unsafe levels of PFAS, [plaintiff] has established standing.").

**II. Whether Hain's labels are materially misleading**

*9 Plaintiffs brings claims for relief under consumer protection statutes in sixteen states and the District of Columbia. AC ¶¶ 151–468. The parties agree the critical inquiry underlying these statutes is whether Defendant's labeling is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013); *see Bustamante v. KIND, LLC*, 100 F.4th 419, 426 (2d Cir. 2024) (noting that "[w]hile the required elements of claims under each statute vary, the parties do not dispute the District Court's conclusion that there is substantial overlap between the elements of the claims, and that to prevail on *any* of their claims, plaintiffs must demonstrate: [ ] a deceptive act," which "is governed by the reasonable consumer standard" (emphasis in original) (internal quotation marks omitted)); *Harris v. Mondelēz Global LLC,* No. 19-cv-2249 (ERK) (RER), 2020 WL 4336390, at *2 (E.D.N.Y. July 28, 2020) (applying "consumer protection statutes from forty states and the District of Columbia" and finding that the "critical issue" for each was "whether a reasonable consumer would be misled by [d]efendant's statement"); *Dorris v. Danone Waters of Am.*, 711 F. Supp. 3d 179, 187–93 (S.D.N.Y. 2024) (NSR) (analyzing whether a "reasonable consumer" would have purchased products under New York, California, and Massachusetts consumer protection statutes); Def.'s Mot., at 25; Pls.' Opp. at 21.

By way of example, under New York law, "[t]o successfully assert a claim under either [N.Y. G.B.L. §§ 349 or 350], a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Henry v. Nissin Foods (U.S.A.) Co.*, No. 22-cv-363 (NGG) (RER), 2023 WL 2562214, at *3 (E.D.N.Y. Mar. 17, 2023) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)). "The New York Court of Appeals has adopted an objective standard of 'materially misleading' whereby the complained-of conduct must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.' " *Id.* (quoting *Orlander*, 802 F.3d at 300). Similarly, "[c]laims brought under California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumer Legal Remedies Act ("CLRA") 'are governed by the "reasonable consumer" test.' " *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 280 (S.D.N.Y. 2022) (NRB), *aff'd sub nom. Bustamante*, 100 F.4th 419 (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). "Under the reasonable consumer standard, [plaintiffs] must show that members of the public are likely to be deceived." *Id.* (alteration in original) (quoting *Williams*, 552 F.3d at 938).

**A. The Reasonable Consumer Standard**

As a preliminary matter, Plaintiffs contend that the "reasonable consumer standard" is "generally a question of fact not suited for resolution at the motion to dismiss stage." Pls.' Opp. at 22 (quoting *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 95–96 (S.D.N.Y. 2021) (KMK)). However, "[i]t is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Fink*, 714 F.3d at 741; *see also Jessani v. Monini N. Am., Inc.*, 744 F. App'x 18, 19 (2d Cir. 2018) (summary order) (favorably citing *Fink* and rejecting plaintiff's argument that the reasonable consumer standard is not suited for resolution at the motion to dismiss stage); *Balistreri v. McCormick & Co.*, No. 22-cv-349 (EJD), 2023 WL 5988600, at *9 (N.D. Cal. Sept. 13, 2023) ("[T]here are instances where the court can conclude as a matter of law that members of the public are not likely to be deceived by the product packaging." (collecting cases) (internal quotation marks omitted)). Thus, in order to survive Defendant's motion to dismiss, Plaintiffs "must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers," but rather "Plaintiffs must plausibly

allege that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Jessani*, 744 F. App'x at 19 (quotation marks omitted); *see also Brumfield v. Trader Joe's Co.*, No. 17 Civ. 3239 (LGS), 2018 WL 4168956, at *2 (S.D.N.Y. Aug. 30, 2018) ("A consumer deception case may be dismissed under Rule 12(b)(6) where it is clear that reasonable consumers would not be deceived by a product's packaging.").

**\*10** Hain argues that Plaintiffs fail to adequately plead that a reasonable consumer would be misled by its labeling and packaging because: (1) the Amended Complaint contains no plausible allegations that Defendant misled consumers about the presence of heavy metals in its foods, since those metals naturally occur in the environment; (2) Defendant did not have exclusive knowledge of the presence of heavy metals in its products; (3) Defendant's labeling misrepresentations are puffery and therefore non-actionable; and (4) that the "organic" label is not actionable because it is preempted by the Organic Foods Production Act of 1990, 7 U.S.C. §§ 6501–6524 (the "OFPA"). Def.'s Mot. at 26–35. Plaintiffs counter that: (1) Hain's labels are misleading because even if each individual statement is true, taken as a whole, the labels imply that the products are safe and do not contain dangerous levels of heavy metals; (2) Hain's products contain "higher-than-normal" amounts of heavy metals, exceeding their own standards, which is material to customers; (3) the claims that the products are organic are not preempted because they should be taken as a whole; (4) Hain's descriptive terms are not puffery because they are affirmative misstatements about the product's qualities; and (5) Hain had exclusive knowledge of the "dangerous" levels of heavy metals in its products because those levels exceeded its own internal thresholds. Pl.'s Opp. at 22–27.

The Court will address these arguments under the following umbrellas: (1) whether Plaintiffs have plausibly pleaded that the labels themselves are (or are not) misleading, and (2) whether Plaintiffs have stated a claim for fraud by omission because Defendant's labels omit material information.

**B. Whether Plaintiffs Have Pled Sufficient Facts to Support a Claim of Material Deception**

Plaintiffs contend that a reasonable interpretation of "USDA Organic" and "Organic"; "Non-GMO," "Free of GMOs," and "No Genetically Engineered Ingredients;" "Free of Preservatives;" "Free of Pesticides or Herbicides" and "Grown Without Potentially Harmful Pesticides or Herbicides;" "Pure;" "Nurturing Baby the Purest Way;" "made with superior ingredients," "All Natural," and "Earth's Best" could lead reasonable consumers to believe that Hain's baby food products were free of heavy metals, especially in excessive quantities, and that its baby food products were "safe." AC ¶¶ 4, 8, 103, 104; Pl.'s Opp. at 23. Plaintiffs argue that the challenged terms, taken as a whole, build consumer trust in the safety of Hain's products and mislead consumers into believing that Hain's baby food products do not contain heavy metals. ¶¶ 103–04; Pl.'s Opp. at 22–23.

"A 'material' deception is one involving information that is important to consumers and likely to affect their choice of product." *Braynina v. TJX Cos.*, No. 15 Civ. 5897 (KPF), 2016 WL 5374134, at *5 (S.D.N.Y. Sept. 26, 2016) (collecting cases); *see In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 360 (S.D.N.Y. 2016) (GBD) (observing that a "material claim is one that involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product") (quoting *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004) (WHP)). Plaintiffs argue that the challenged terms, taken as a whole, build consumer trust in the safety of Hain's products and mislead consumers into believing that its baby food products do not contain heavy metals. AC ¶¶ 103–04; Pl.'s Opp. at 22–23. Specifically, Plaintiffs contend that the terms "pure, quality products" and "made with superior ingredients" could mislead consumers to believe that Hain's baby food products did not contain high levels of heavy metals and that those statements, paired with "Grown without Potentially Harmful Pesticides or Herbicides," lead reasonable consumers to believe that Hain's products were entirely free of heavy metals, or at least what Plaintiffs allege are "excessive" quantities. Pl.'s Opp. at 23. They also argue that consumers may reasonably perceive labels touting "natural goodness" and "gentle" qualities to mean safe, not dangerous, or free of heavy metals. *Id.*

Before addressing whether these terms are misleading, the Court will first address whether the challenged terms are actionable at all. Hain argues that the terms "Pure," "Nurturing Baby the Purest Way," and "Made with Superior Ingredients" are non-actionable puffery. Def.'s Mot. at 32–33. "[S]tatements and practices that are mere puffery are not actionable." *Lugones v. Pete and Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 241 (S.D.N.Y. 2020) (KPF) (quoting *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011) (LTS)

(KNF)). "Puffery includes generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely." *Id.* (internal quotation marks omitted). "It can also include an exaggeration or overstatement expressed in broad, vague, and commendatory language, as distinguished from misdescriptions or false representations of specific characteristics of a product." *Id.* (internal quotation marks omitted); *see also Colangelo v. Champion Petfoods USA, Inc.*, No. 18-CV-1228 (LEK) (ML), 2020 WL 777462, at *8 (N.D.N.Y. Feb. 18, 2020) ("Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007))).

**\*11** In this context, the word terms "Pure," "Nurturing Baby the Purest Way," and "Made with Superior Ingredients" are not puffery. The Court agrees with the analysis in *In re Lindt & Sprüngli (USA), Inc., Dark Chocolate Litigation,* a false advertisement case regarding the presence of lead in dark chocolate, where the court, "[c]onsidering the packaging as a whole," found that the statements "[e]xpertly crafted with the finest ingredients" and the word "excellence," were not "puffery because a reasonable customer could interpret [the] statements as representations about the quality of the chocolate's ingredients, and, more specifically, an absence of lead." 2024 WL 4107244, at *6 (collecting cases). Here, too, a reasonable consumer could interpret the terms "Pure," "Nurturing Baby the Purest Way," and "Made with Superior Ingredients" as representations about the quality of the baby food's ingredients, and, more specifically, the absence of dangerous amounts of heavy metals. *See Dopico v. IMS Trading Corp.*, No. 14-cv-1874 (BRM) (DEA), 2018 WL 4489677, at *3–5 (D.N.J. Sept. 18, 2018) (concluding statement on dog treats label that they were made with "only the finest ingredients" not inactionable puffery in express warranty breach claim); *Levy*, 2024 WL 897495, at *7 (finding the word "simple" used to describe chocolate bar ingredients not inactionable puffery); *Balistreri*, 2023 WL 5988600, at *10 ("The statements 'nutritious,' 'safe,' '100% Complete and Balanced Nutrition,' 'undoubtably safe,' and 'pure' are statements specific to the products' characteristic, specifically the products' health and safety."); *In re Theos Dark Chocolate Litig.*, No. 23-cv-2739 (HSG), 2024 WL 4336631, at *10 (N.D. Cal. Sept. 27, 2024) (finding that "pure" and "quality cacao bean" could "plausibly mislead consumers about the Products' Heavy Metal contents" but noting that defendants did not challenge the term as puffery); *Johnson-Jack v. Health-Ade LLC*, 587 F. Supp. 3d 957, 968 (N.D. Cal. 2022) (noting that courts have found "that words like 'healthy,' 'nutritious,' or 'wholesome' do not constitute puffery because consumers may rely on those terms").

Hain also argues that Plaintiffs' challenges to the phrases "USDA Organic" and "Organic" are preempted by the OFPA because the claims necessarily challenge the USDA's decision to authorize Hain's use of the phrase "Organic." Def.'s Mot. at 34–35. The Court agrees and will not consider those phrases as part of its analysis. *See Marentette v. Abbott Lab'ys, Inc.*, 201 F. Supp. 3d 374, 385 (E.D.N.Y. 2016) (PKC) (RLM), *aff'd*, 886 F.3d 112 (2d Cir. 2018) ("Once the federal government, through a USDA-accredited certifying agent, permits a manufacturer to label a product as 'Organic' because it has met that standard, any allegation that the product is not truthfully labeled as such is a challenge to the certifying agent's decision, *not* the manufacturer's representation ...."). Thus, the Court will not consider Hain's use of the terms "Organic" or "USDA Organic" as part of its analysis of whether the labels are misleading.

Now the Court will turn to the challenged terms. "[C]ourts view misleading advertisement claims in light of the context of the whole label or advertisement — 'the entire mosaic should be viewed rather than each tile separately.' " *Hesse*, 463 F. Supp. 3d at 466 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001)). The Court agrees with Plaintiffs that the terms "pure, quality products," "Nurturing Baby the Purest Way" and "made with superior ingredients", taken in context of the whole label, and combined with the name of "Earth's Best," give reasonable consumers the impression that its baby food is safe, healthy, nutritious, and made with high quality ingredients. *See, e.g., Levy*, 2024 WL 897495, at *6–7 (finding "that [plaintiff] has plausibly alleged that a reasonable consumer could be misled into believing the Products do not contain unsafe amounts of lead" based in part on the chocolate bar's name "Simple," the ingredient list not containing lead, and the packaging including a "long list of undesired items that the Product boastfully does not contain"); *In re Lindt & Sprüngli*, 2024 WL 4107244, at *5 (finding that "[t]aking the packaging as a whole, these allegations are sufficient to allege that a reasonable consumer could be misled into purchasing or overpaying for [defendant's] dark chocolate because the consumer believed that the bars did not contain unsafe amounts of lead" based, in part, on representations the chocolate was made with "the finest ingredients" and that they are "safe").

However, although Plaintiffs' allegations hinge on the

"dangerousness" of heavy metals in Hain's baby food products, Plaintiffs do not reference any specific guidelines or limits for what constitutes a "dangerous" level of these contaminants that are specific to baby food products — except for arsenic. Instead, apart from arsenic, Plaintiffs only reference the general *potential* for harm that could result from consumption of unsafe levels of each specific heavy metal; and where they cite any benchmarks or thresholds for what actually constitutes a harmful concentration of these contaminants, they almost exclusively cite those thresholds as they apply to drinking water, not solid baby foods. Nor do Plaintiffs allege that the safety thresholds of each heavy metal in water actually translate to what is an unsafe level of heavy metals in baby food — that is, that what is unsafe for people to consume in drinking water necessarily indicates that the same concentration is unsafe if consumed in a solid baby food product. This disconnect — between the broad allegations of these metals as "toxic," and the absence of any specific allegations as to *why* they are toxic if present in the same parts-per-billion ratio found in Hain's baby foods — is fatal to the majority of their claims. *See, e.g.*, *Hayden v. Bob's Red Mill Nat. Foods, Inc.*, No. 23-cv-3862, 2024 WL 1643696, at *8 (N.D. Cal. Apr. 16, 2024) ("Absent allegations explaining why cadmium poses a health threat *at the levels that it appears in the Products* rather than at undefined 'high' levels, the complaint fails to plead that the Product's label representations — even assuming they give rise to an impression of healthfulness — are misleading ...."); *In re Trader Joe's Co. Dark Chocolate Litig.*, 726 F. Supp. 3d 1150, 1170 (S.D. Cal. 2024) ("[T]here is a disconnect in the [complaint] between Plaintiffs' allegations about the potential harms posed by Heavy Metals as a general matter and whether these Heavy Metals are unreasonably hazardous at the particular levels in the specific Products at issue in this case."); *Arroyo v. Chattem, Inc.*, 926 F. Supp. 2d 1070, 1079 (N.D. Cal. 2012) ("While Plaintiff makes general allegations that hexavalent chromium is unsafe, she does not plead with the required particularity what level of hexavalent chromium makes [the product] unsafe."); *cf. Kimca v. Sprout Foods, Inc.*, No. 21-12977, 2022 WL 1213488, at *6 (D.N.J. Apr. 25, 2022) ("[I]t is not clear that the 'accepted standards' identified in the [complaint] are applicable to baby food. The [complaint] borrows standards promulgated in different contexts .... However, the [complaint] does not contain any background information or explanation indicating that these are apt comparisons for use in the context of baby food.").

**\*12** In other words, without plausibly alleging what concentration of various heavy metals in baby food products would actually be unsafe for babies and toddlers to consume, Plaintiffs have failed to allege why the levels of these naturally-occurring heavy metals (other than arsenic) that are found in Hain's finished products would be material to the reasonable consumer. *See, e.g.*, *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241, 248 (S.D.N.Y. 2019) (LLS) (dismissing case due to pleading's lack of "inference that there was a material amount of glyphosate in [defendant's] [p]roducts" after finding that "[t]he presence of negligible amounts of glyphosate in a dog food product that do not have harmful, 'toxic,' or 'carcinogenic' effects is not likely to affect consumers' decisions in purchasing the product and is thus not material").

Indeed, Plaintiffs' own cited sources recognize that it is not realistic for baby food to not have *any* heavy metals. Specifically, the Subcommittee Report — which Plaintiffs heavily rely on in framing their pleadings — notes that there is no "federal standard" related to heavy metals in baby foods. Subcomm. Rep. at 10 ("According to documents obtained from baby food manufacturers, toxic heavy metals, such as arsenic, cadmium, lead, and mercury are present at substantial levels in both organic and conventional baby foods. Currently, there is no federal standard on, or warning to parents and caregivers about, these toxins."). And the Healthy Babies Bright Futures October 2019 report *What's in my baby's food?* states that "parents can't shop their way out of the[ ] exposures [to heavy metals] by choosing organic foods or by switching from store-bought brands to homemade purees" because "[h]eavy metals are naturally occurring in soil and water ...." HBBF 2019 Rep. at 2; *cf. Paradowski v. Champion Petfoods USA, Inc.*, No. 22-962-cv, 2023 WL 3829559, at *3 (2d Cir. June 6, 2023) (summary order) (noting that "measurable quantities of heavy metals occur naturally in the environment and are prevalent in a wide variety of food products"); *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019) (noting that "*[a]ll* pet (and human) foods contain at least some tiny amount of heavy metals"). Although Plaintiffs generally imply that the mere presence of these metals are necessarily dangerous, " '[w]here a document is referenced in a complaint, the documents control' and the Court 'need not accept as true the allegations' in the complaint that are inconsistent with these documents." *Housey*, 2022 WL 17844403, at *2 (quoting *Tongue*, 816 F.3d, at 206 n.6).

As discussed below, because Plaintiffs have only alleged that the guidelines related to arsenic in baby food products as compared to Hain's actual levels of arsenic in its finished products would be material to a reasonable consumer, only the claims related to arsenic may proceed

to discovery.

*i. Lead, cadmium, mercury, perchlorate, or the undefined "other undesirable toxins"*

Plaintiffs do not allege that Defendant's products exceed a "safe threshold" for lead, cadmium, mercury, perchlorate, or the undefined "other undesirable toxins" in baby foods. Nor do they allege that the thresholds for water or other foods can be translated to baby food. Indeed, the sources on which Plaintiffs rely imply that they do not. For example, as to lead, Plaintiffs point to the FDA's 5 ppb of lead standard for bottled water, and the agency's guidance of 50 ppb of lead for certain juices, and 100 ppb of lead for candy; the WHO's provisional guideline of 10 ppb of lead for drinking water; the EPA's action level of 15 ppb for lead in drinking water; and the EU's maximum lead level in infant formula, set to 20 ppb. AC ¶¶ 45–46. To support their allegation that Defendant's baby food products contain "dangerous" levels of lead, Plaintiffs allege that Defendant's raw material testing revealed that 6 ingredients contained more than 200 ppb lead, 88 ingredients contained more than 20 ppb lead, 115 ingredients contained more than 15 ppb lead, and 27% of ingredients contained more than 5 ppb lead. (*id.* ¶ 72); Defendant's vitamin pre-mix contained lead concentrations of up to 352 ppb (*id.* ¶ 94); none of Defendant's test results showed an ingredient with lead concentrations at or below 1 ppb (*id.* ¶ 94); and that Defendant accepted ingredients that exceeded the Defendant's own internal allowable caps for lead. *Id.* ¶ 99. Plaintiffs plead that that lead is dangerous in baby food, because "[h]igh levels of lead exposure can seriously harm children's development and health, specifically the brain and nervous system. Additionally, because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time." *Id.* ¶ 48. However, at no point do Plaintiffs allege why or how a reasonable consumer would consider the recommended amount of lead allowed in water or candy to be material to that consumer's choice of whether to purchase a baby food product for their babies and toddlers.

*13 As one court explained in a case challenging the labeling on flax seed products, where a plaintiff alleged — as here — that the labels on a defendant's products were misleading because they were advertised as healthy and nutritious but contained high levels of cadmium:

Plaintiff notably has not pled that the presence of cadmium at *any* level is unhealthy; his allegations instead focus on the risks of the "high" levels of cadmium found in the Products. But he does not allege any plausible standard for what constitutes "high." In discussing the litany of apparent cadmium-related health risks, the allegations do not make any connection between the levels of cadmium at issue in the cited scientific studies and the amounts of cadmium allegedly contained in the Products. Without this connection, there is no plausible basis to conclude that the health risks discussed could result from consuming the per-serving amount of cadmium contained in the Products.

*Hayden*, 2024 WL 1643696, at *8 (citations omitted). The court then found that "[a]bsent allegations explaining why cadmium poses a health threat *at the levels that it appears in the Products* rather than at undefined 'high' levels, the complaint fails to plead that the Product's label representations — even assuming they give rise to an impression of healthfulness — are misleading ...." *Id.*

The same is true here. Plaintiffs have failed to allege how or why a reasonable consumer would consider the recommended amount of lead concentrations in water or candy when reading the label or purchasing Hain's baby food products, even if the labels promote those products as made from "superior ingredients," or as nutritious and healthy for babies. Accordingly, because Plaintiffs have failed to allege that the concentrations of lead, cadmium, mercury, perchlorate, or the undefined "other undesirable toxins" in Hain's baby foods would be material to a reasonable consumer, the claims related to those heavy metals are dismissed.

*ii. Arsenic*

Plaintiffs' pleadings as it relates to arsenic in Hain's products are a different story. Plaintiffs allege that the FDA issued a guidance for manufacturers of infant rice cereal to not exceed arsenic levels of 100 ppb. AC ¶¶ 54 & 52 n.13.[8] In 2019, Defendant submitted a PowerPoint to

the FDA that demonstrated the levels of arsenic in the raw materials used in their baby foods compared to the finished products and revealed that the levels of arsenic in their finished products were higher than the levels in the raw ingredients. AC ¶ 81; *see also* AC, at page 23 (table with data from Defendant's presentation to FDA). Four products identified had levels over the 100 ppb threshold. AC at 23 (table).

The Court agrees with Plaintiffs that the terms "pure, quality products," "Nurturing Baby the Purest Way" and "made with superior ingredients," taken in context of the whole label, and combined with the title of "Earth's Best," give reasonable consumers the impression that Hain's baby food is safe, healthy, nutritious, and made with high quality ingredients. In addition, Plaintiffs have adequately alleged that a reasonable consumer could be misled by this labeling into believing that Hain's baby food products contain safe levels of arsenic. *See, e.g.*, *Levy*, 2024 WL 897495, at *6–7 (finding "that [plaintiff] has plausibly alleged that a reasonable consumer could be misled into believing the Products do not contain unsafe amounts of lead" based in part on the chocolate bar's name "Simple," the ingredient list not containing lead, and the packaging including a "long list of undesired items that the Product boastfully does not contain"); *In re Lindt & Sprüngli*, 2024 WL 4107244, at *5 (finding that "[t]aking the packaging as a whole, [the plaintiffs'] allegations are sufficient to allege that a reasonable consumer could be misled into purchasing or overpaying for [defendant's] dark chocolate because the consumer believed that the bars did not contain unsafe amounts of lead" based, in part, on representations that the chocolate was made with "the finest ingredients" and that "[p]remium chocolate products are safe").

**\*14** Accordingly, the Court denies Hain's motion to dismiss Plaintiffs' claims related to the concentrations of arsenic in Defendant's baby food products and whether Hain's labeling materially misrepresents the nature of those products.

### C. Fraud by Omission

Another way to demonstrate that Hain misled Plaintiffs under the various consumer protection statutes is through an omission theory, sometimes referred to as fraud by omission. *See, e.g.*, *Castillo*, 2024 WL 4133815, at *7 ("California consumer protection laws also allow for 'omission theor[ies]' of consumer fraud.'") (quoting *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir.

2018)); *Womack v. EVOL Nutrition Assocs., Inc.*, No. 6:21-cv-332, 2021 WL 5906340, at *9 (N.D.N.Y. Dec. 14, 2021) ("An omission may form the basis of a claim under NYGBL § 349."); *Cole v. Keystone RV Co.*, No. C18-5182, 2021 WL 3111452, at *5 (W.D. Wash. July 22, 2021) (noting that under Washington consumer protection statute "[d]eception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer.") (quoting *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 895 (Wash. 2009)), *aff'd*, 2022 WL 4234958 (9th Cir. Sept. 14, 2022).

*a. Whether an Alleged Omission is Materially Misleading*

As previously mentioned, "[a] 'material' deception is one involving information that is important to consumers and likely to affect their choice of product." *Braynina*, 2016 WL 5374134, at *5. "An omission is materially misleading, for example, where the plaintiff would have acted differently had the defendant disclosed the information in its possession." *Id.* Under California law specifically, "the omission must either (1) 'be contrary to a representation actually made by the defendant,' or (2) 'an omission of a fact the defendant was obliged to disclose.'" *In re Theos Dark Chocolate Litig.*, 2024 WL 4336631, at *10 (quoting *Hodsdon*, 891 F.3d at 865).[9]

Because Plaintiffs have failed to allege that the alleged concentrations of lead, cadmium, mercury, perchlorate, or the undefined "other undesirable toxins" in Hain's products are material to a reasonable consumer, the claims related to those heavy metals fail for the same reasons as discussed above. *See, e.g.*, *Hayden*, 2024 WL 1643696, at *9 ("Because the Court already determined that Plaintiff has not adequately alleged that the Products are not healthy or safe to consume on account of the alleged cadmium content, it finds that Defendant's omission of the cadmium disclosure is not actionable.") (emphasis omitted)); *Herrington v. Johnson & Johnson Consumer Cos.*, No. 09-1597, 2010 WL 3448531, at *8 (N.D. Cal. Sept. 1, 2010) ("Because [plaintiffs] have not averred facts that show that the levels of these substances caused them or their children harm, under the objective test for materiality, the alleged non-disclosures are not actionable.").

**\*15** By contrast, Plaintiffs have plausibly pled that their claims related to the omission of any indication as to the potentially dangerous levels of arsenic in Hain's baby

food products are misleading. *See, e.g., In re Trader Joe's Co. Dark Chocolate Litig.*, 726 F. Supp. 3d at 1167–1168 (finding that plaintiffs plausibly alleged that a reasonable consumer could be misled by the absence of disclosure of heavy metals in dark chocolate and noting that "[a]t this stage of the case, it is sufficient that [p]laintiffs allege the Products all contain Heavy Metals and at least some exceed [California's Maximum Allowable Dose Levels] in one or two Heavy Metals").

### b. Exclusively in Defendant's possession

In addition, "the plaintiff must show either that the business alone possessed the relevant information, or that a consumer could not reasonably obtain the information." *Levy*, 2024 WL 897495, at *5 (internal quotations omitted); *Castillo*, 2024 WL 4133815, at *7 (noting that "[t]o be actionable [under California consumer protection laws] the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose" and that "[t]o establish a duty to disclose under California law, a plaintiff must plead," *inter alia*, that "the defendant ha[s] exclusive knowledge of material facts not known to the plaintiff" (internal quotations and citations omitted)).[10]

The Second Circuit's decision in *Paradowski v. Champion Petfoods USA, Inc.* is instructive.[11] There, the plaintiff alleged that she would not have purchased defendant's dog food products at their retail prices if she knew they contained heavy metals. 2023 WL 3829559, at * 1. The plaintiff argued that the dog food producer "should have disclosed that its products contained — or had a material risk of containing — *any* amount of heavy metals." *Id.* at *3. Affirming the district court's dismissal on summary judgment, the *Paradowski* court disagreed; it found that "[t]he fact that [defendant's] pet foods contained heavy metals was information reasonably obtainable to the [p]laintiff." *Id.* The court relied on "[t]he undisputed record evidence" that demonstrated that "nearly all pet food contains measurable quantities of heavy metals because measurable quantities of heavy metals occur naturally in the environment and are prevalent in a wide variety of food products." *Id.* (internal quotations and citations omitted).

However, the court also clarified that the plaintiff did not plead "an omissions claim based on the specific *quantities* of heavy metals present in [defendant's] products" but that "[i]f [p]laintiff had claimed that [defendant's] pet foods contained quantities of heavy metals in excess of safe thresholds, then that could be information that 'the business alone' possessed." *Id.* Here, then, even if Plaintiffs had pled that the non-arsenic heavy metals were material to a reasonable consumer, they would fail for the same reasons in *Paradowski*: a reasonable consumer would be able to determine that baby food products would likely contain *some* amount of naturally occurring heavy metals.

**\*16** However, the same cannot be said about the specific levels of arsenic in Hain's baby food products. Relying on *Paradowski*, Defendant argues that because a report published as early as 2017 stated that Defendant's products had heavy metals, including arsenic, Plaintiffs fraud-by-omission claims fail. Def.'s Mot. at 29–30. As cited in the Amended Complaint, a 2017 report by Happy Babies Bright Futures found "rice-based infant cereals, including Defendant's cereals, contained 84% more arsenic than non-rice multigrain products ...." AC ¶ 83. Defendant further points to public documents, including a Consumer Reports article from 2018, cited in the Amended Complaint that also found heavy metals in Hain's products. Def.'s Mot. at 29–30. Plaintiffs counter that, regardless of the 2017–18 reports and documents, Hain had unique access to the fact that it was selling baby food that had higher levels of dangerous toxins (including arsenic) than were outlined in Hain's *own standards*. Pl.'s Opp. at 24, 26–27; AC ¶¶ 91–100.

First, the Second Circuit's statement in *Paradowski* that "[i]f [p]laintiff had claimed that [defendant's] pet foods contained quantities of heavy metals in excess of safe thresholds, then that could be information that 'the business alone' possessed," weighs in favor for the Plaintiffs here. 2023 WL 3829559, at *3. Plaintiffs have pled that Hain was selling infant rice cereal products with levels of arsenic above safe thresholds — and as Plaintiffs point out, including levels above Hain's own internal thresholds, which were in its exclusive possession. *See, e.g., In re Lindt & Sprüngli*, 2024 WL 4107244, at *6–7 (applying *Paradowski* in denying motion to dismiss where plaintiff "cite[d] data showing that the defendant's chocolate contained lead and cadmium in excess of [California Maximum Allowable Dose Levels]"); AC ¶¶ 93–98 (alleging that Defendant exceeded its own internal specifications of 100 ppb for arsenic by using, *inter alia*: a vitamin premix with 223 ppb of arsenic, brown rice flour containing 309 ppb of arsenic, and raisin and wheat flour containing 200 ppb of arsenic).

Moreover, "other courts have found that a plaintiff 'claiming an omission constitutes actional deception must

show *either* that the business alone possessed the relevant information, *or* that a consumer could not reasonably obtain the information." *Clinger v. Edgewell Pers. Care Brands, LLC*, No. 3:21-cv-1040, 2023 WL 2477499, at *16 (D. Conn. Mar. 13, 2023) (first citing *Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 360 (E.D.N.Y. 2022) (AMD) (VMS); then citing *Braynina*, 2016 WL 5374134, at *6); *Favors v. Matzke*, 770 P.2d 686, 690 (Wash. Ct. App. 1989) ("In Washington, the court will find a duty to disclose ... where a seller has knowledge of a material fact not easily discoverable by the buyer ...."). Accordingly, some courts have found where testing for particular chemicals or metals, the plaintiffs have met their burden at the motion to dismiss case. *See, e.g.*, *Levy*, 2024 WL 897495, at *6 ("[E]xamining only the materials properly considered on a motion to dismiss, the [c]ourt finds that [plaintiff] has alleged that a consumer could not reasonably determine how much lead [defendant's chocolate products] contained, as detecting these chemicals requires expensive scientific testing" (internal quotation marks and citations omitted)); *In re Trader Joe's Co. Dark Chocolate Litig.*, 726 F. Supp. 3d, at 1173 ("The [complaint] sufficiently alleges Plaintiffs did not have knowledge that the Products contained Heavy Metals and that Defendant did. At this stage of the proceeding, the Court is not inclined to find as a matter of law that Plaintiffs should have known about the Heavy Metals in the Products."); *Clinger*, 2023 WL 2477499, at *16 ("Testing is prohibitively expensive, and impractical at the point of purchase. It is certainly plausible that consumers lack the ability to test or independently ascertain whether their own bottles of sunscreen contain benzene."). Here, although Plaintiffs have access to some data (principally that provided by Hain to federal officials on a confidential basis) on the levels of heavy metals found in some of Hain's ingredients and/or products, the Court agrees that it would be an undue and inappropriate burden to require them to have obtained test results for all of Hain's finished products at the time of purchase.

### D. Pleadings under 9(b)

**\*17** Plaintiffs' claims under the California statutes "must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b)." *Castillo*, 2024 WL 4133815, at *4 (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)); *Braynina*, 2016 WL 5374134, at *6 ("[D]eceptive practice claims under [New York GBL] §§ 349 and 350 — unlike analogous claims under California law, for example — are not subject to the heightened pleading requirements of Rule 9(b)."); *Daniel v. Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 186 (E.D.N.Y. 2018) (MKB) ("Claims under [New York] GBL sections 349 and 350 are not subject to the pleading-with-particularity requirements of Rule 9(b)."). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

"To satisfy this standard, the complaint must 'identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.' " *Castillo*, 2024 WL 4133815, at *4 (quoting *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013)). "The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 844 (N.D. Cal. 2018) (quoting *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). Plaintiffs' allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)). Because the Court has already determined that the pleadings failed to show that the presence of heavy metals other than arsenic are material to a reasonable consumer, the Court will only address whether Plaintiffs claims related to dangerous amounts of arsenic in Hain's products meet the requirements of Rule 9(b).

On these claims, Plaintiffs have pled the necessary "who," "when," "what," "where," and "how" to survive Rule 9(b). The Amended Complaint clearly names each plaintiff and defendant (the "who"), and alleges when each plaintiff began purchasing the products, how frequently, and when they stopped (the "when"). Plaintiffs describe from where they each purchased the products, as well as the specific products and package labels at issue (the "where"). They also describe and provide photographs of the claims on Hain's products that they contend are false or misleading (the "what"). Finally, they describe why these claims are false or misleading due to the presence of dangerous amounts of arsenic,

which is undisclosed by Defendant, and allege that Plaintiffs would not have purchased the products had they known of the presence of dangerous amounts of arsenic (the "how"). *See, e.g.*, *Rice-Sherman v. Big Heart Pet Brands, Inc.*, No. 19-cv-03613, 2020 WL 1245130, at *8–9 (N.D. Cal. Mar. 16, 2020) (finding that plaintiffs met the 9(b) requirements for similar reasons in consumer protection claims case); *Zeiger*, 304 F. Supp. 3d at 849–850 (same).

### III. Other claims

Plaintiffs also bring common law claims for negligent misrepresentation, breach of express and implied warranty, and unjust enrichment. Hain argues, in a single footnote, that "[b]ecause these claims are premised on Plaintiffs' core allegation that Hain Celestial's labeling is materially misleading, 'all of Plaintiffs' claims must be dismissed' if Plaintiffs have not plausibly alleged 'that the labeling of the [products] is misrepresentative or misleading.' " Def.'s Mot. at 25 n.6 (quoting *Cosgrove v. Blue Diamond Growers*, No. 19 Civ. 8993 (VM), 2020 WL 7211218, at *3 (S.D.N.Y. Dec. 7, 2020)). Because the Court has found that at least some of Hain's labeling is misleading, in the absence of any other stated grounds to dismiss these other claims, the Court will not do so here.

### CONCLUSION

**\*18** For the foregoing reasons, the Court denies in part and grants in part Defendant's motions to dismiss.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 5239510

### Footnotes

1     All page references use ECF pagination except where noted.

2     The link in the Amended Complaint is broken. This report can now be found at: https://www.fda.gov/media/97234/download [https://perma.cc/7UW3-FXDV]. It is also now titled: *Inorganic Arsenic in Rice Cereals form Infants: Action Level Guidance for Industry*.

3     Citations to the Subcommittee Report and the reports not filed as part of the Amended Complaint refer to the page numbers in those reports.

4     The unit "ppb" refers to parts per billion.

5     The report appears to be accessible at the following link: https://www.epa.gov/sites/default/files/2014-03/documents/arsenic_factsheet_cdc_2013.pdf.

6     Although the Amended Complaint refers to "baby food," the corresponding footnote makes clear that the FDA guidance is limited to infant rice cereal. AC ¶ 54 n.13.

7       Although there are no citations for these claims, the source appears to be pages 39–43 of the Subcommittee Report.

8       It bears noting that "packaging is not rendered materially misleading ... by virtue of its noncompliance with FDA regulations. It is well established that 'acts cannot be re-characterized as "deceptive" simply on the grounds that they violate another statute [or regulation] which does not allow for private enforcement.' " *Wallace v. Wise Foods, Inc.*, No. 20-cv-6831 (JPO), 2021 WL 3163599, at *3 (S.D.N.Y. July 26, 2021) (quoting *Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 127 (2d Cir. 2017)).

9       Under California law, "[a] defendant only has a duty to disclose when either (1) the defect at issue relates to an unreasonable safety hazard or (2) the defect is material, 'central to the product's function,' and the plaintiff alleges one of the four *LiMandri* factors." *Id.* (quoting *Hammerling v. Google LLC,* 615 F. Supp. 3d 1069, 1085 (N.D. Cal. 2022)). "The *LiMandri* factors are (1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes partial representations but also suppresses some material facts." *Hammerling,* 615 F. Supp. 3d at 1085 (citing *LiMandri v. Judkins*, 52 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997)).

10      Plaintiffs do not dispute Defendant's contention that under the various consumer protection statutes, "courts around the country have dismissed fraud-by-omission claims where the plaintiff failed to allege that the defendant had 'exclusive knowledge' of the allegedly concealed information." Def. Mem. at 28 n.7 (collecting cases). *See* Pl. Opp. at 26–27 (responding that Defendant did have exclusive knowledge).

11      Although *Paradowski* is an unpublished opinion, the Court must consider it "as highly persuasive authority." *Hahn v. JetBlue Airways Corp.,* No. 1:21-cv-06867 (NRM) (LB), 2024 WL 3422391, at *22 (E.D.N.Y. June 24, 2024); *see also Guida v. Home Sav. of Am., Inc.*, 793 F. Supp. 2d 611, 616 n.5 (E.D.N.Y. 2011) (JFB) (ARL); *LaSala v. Bank of Cyprus Pub. Co.*, 510 F. Supp. 2d 246, 274 n.10 (S.D.N.Y. 2007) (CSH) (finding an unpublished Second Circuit opinion "highly persuasive ... and eminently predictive of how the Court would in fact decide a future case such as this one") (quoting *Harris v. United Fed'n Teachers, N.Y.C. Local 2*, No. 02-Civ. 3257 (GEL), 2022 WL 1880391, at *1 n.2 (S.D.N.Y. Aug. 14, 2022)).

**End of Document**                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.