**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re NURTURE BABY FOOD LITIGATION** | Case No. 1:21-cv-01217-MKV |
| This document relates to: | Hon. Mary Kay Vyskocil |
| ALL ACTIONS | |

**JOINT DECLARATION OF PLAINTIFFS' INTERIM CO-LEAD COUNSEL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CONDITIONAL CERTIFICATION OF CLASS**

We, Lori G. Feldman and Rebecca A. Peterson, declare as follows:

1.      I, Lori G. Feldman, am an attorney licensed to practice before this Court and all courts of the State of New York, am a partner at the law firm of Hecht Partners LLP, and was appointed by this Court as Interim Co-Lead Counsel for Plaintiffs in the above-captioned matter. (Dkt. 150.)

2.      I, Rebecca A. Peterson, am an attorney licensed to practice in this Court *pro hac vice*. I am a partner at the law firm of Hecht Partners LLP, and was appointed by this Court as Interim Co-Lead Counsel for Plaintiffs in the above-captioned matter. (Dkt. 150.)

3.      We respectfully submit this joint declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement (the "Motion"). We have personal knowledge of the matters pertaining to the Action and the proposed Settlement and are competent to testify with respect thereto.

4.      We are pleased to submit for the Court's preliminary approval the proposed Settlement of this Action, as set forth in the Settlement Agreement and Release ("Settlement" or "Settlement Agreement").[1] The proposed Settlement, if approved, will confer valuable benefits on the proposed Settlement Class. As discussed herein, the Settlement was reached as the result of the extensive arm's-length negotiations with the assistance of a well-respected and experienced mediator after years of hard-fought litigation.

5.      The Settlement is fair, reasonable and adequate, provides substantial benefits for the members of the proposed Settlement Class, and merits this Court's preliminary approval. The Settlement Agreement, together with its exhibits, is attached hereto as Exhibit 1.

## I.    BACKGROUND

6.      Plaintiffs brought this class action alleging that Defendant sold baby food products without disclosing the potential presence or risk of arsenic, cadmium, lead, or mercury ("Heavy

---

[1] Unless otherwise indicated, capitalized terms have the meaning given to them in the Settlement Agreement. *See* Settlement Agreement §I.

Metals") or perchlorate to consumers. Plaintiffs also allege that the potential presence of Heavy Metals rendered Defendant's marketing of the Products as high quality, nutritious, made with superior and clean ingredients, and subject to testing false and misleading. Defendant expressly denies these allegations and denies any liability or wrongdoing.

7. On February 4, 2021, a Congressional Subcommittee released a report that purported to describe the presence of Heavy Metals in certain baby foods, including some foods manufactured and sold by Defendant.

8. Following the report, various lawsuits were filed against baby food companies, including Nurture, alleging these companies sold their baby foods without disclosing the risk of Heavy Metals and perchlorate in violation of various state statutes and common law.

9. On August 30, 2021, this Court consolidated actions before the Honorable Mary Kay Vyskocil under the caption, *In re Nurture Baby Food Litigation*, Master File Number 1:21-cv-01217-MKV. (Dkt. 47.)

10. On August 8, 2022, the Court appointed Lori G. Feldman and Rebecca A. Peterson as Interim Co-Lead Counsel for the proposed class. (Dkt. 150.)

11. On October 7, 2022, Plaintiffs filed their Consolidated Class Action Complaint ("CCAC"), where they asserted claims on behalf of nine individuals and similarly situated putative class members who purchased the Baby Foods between February 4, 2015, and the present for alleged violations of: (1) various state consumer protection statutes; (2) fraudulent misrepresentation by omission; (3) fraud by omission; and (4) unjust enrichment.

12. On November 21, 2022, Defendant filed a Motion to Dismiss Plaintiffs' CCAC (Dkt Nos. 162-164) and the Declaration of Nega Beru in Support of its Motion to Dismiss Plaintiffs' CCAC. (Dkt. Nos. 165, 165-1.) On January 5, 2023, Plaintiffs filed their Opposition to Defendant's Motion to Dismiss (Dkt. No. 173), along with their Motion to Strike the Declaration of Nega Beru in Support of

2

Defendant's Motion to Dismiss. (Dkt. Nos. 174-177.) On January 19, 2023, Defendant filed its Memorandum of Law in Opposition to Plaintiffs' Motion to Strike the Declaration of Nega Beru. (Dkt. No. 179.) On January 26, 2023, Defendant filed its Reply in Further Support of its Motion to Dismiss (Dkt. No. 182-183-3) and Plaintiffs filed their Reply in Further Support of their Motion to Strike the Declaration of Nega Beru. (Dkt. Nos. 180-181-5.) On March 27, 2024, the Court denied Defendant's Motion to Dismiss and Plaintiffs' Motion to Strike the Declaration of Nega Beru "without prejudice based on the apparent lack of subject matter jurisdiction as pleaded in the Consolidated Class Action Complaint." (Dkt. No. 207.)

13.     On March 27, 2024, the Court issued an Order to Show Cause, ordering each party to file a letter showing cause why this Action should not be dismissed for lack of federal subject matter jurisdiction, or in the alternative, the Parties could show cause by filing an amended complaint curing the jurisdictional allegations or a stipulation of facts establishing subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA"). (Dkt. No. 209.)

14.     On April 10, 2024, Defendant filed its letter claiming that Plaintiffs' CCAC does not adequately allege jurisdiction under CAFA. (Dkt. No. 212.) Plaintiffs filed their letter outlining facts sufficient to meet CAFA's jurisdictional requirements (Dkt. No. 213) along with their First Amended Consolidated Class Action Complaint ("FACC"). (Dkt. No. 214.) In their FACC, Plaintiffs asserted the same claims on behalf of the same plaintiffs and similarly situated putative class members as they did in the CCAC. (*Id*.)

15.     On June 5, 2024, Defendant filed a Motion to Dismiss Plaintiffs' FACC. (Dkt. Nos. 225-227.) Plaintiffs filed their Opposition to Defendant's Motion to Dismiss on July 3, 2024. (Dkt. Nos. 231-232.) Defendant filed its Reply in Further Support of its Motion to Dismiss on August 7, 2024. (Dkt. Nos. 236-237.) On March 26, 2025, after hearing oral argument from counsel for the Parties, the Court entered its Order, denying in part and granting in part Defendant's Motion to

Dismiss. (Dkt. No. 265.) The Court dismissed Plaintiffs' unjust enrichment and California statutory False Advertising Law and Unfair Competition Law claims and allowed all remaining claims to proceed. (Dkt. No. 265.)

16.     On April 9, 2025, Defendant filed a Motion for Partial Reconsideration of the Court's Order Denying in Part and Granting in Part Nurture's Motion to Dismiss the FACC. (Dkt. Nos. 268-270.) Plaintiffs filed their Opposition to Defendant's Motion for Partial Reconsideration on April 23, 2025. (Dkt. No. 271.) Defendant filed its Reply in Support of its Motion for Partial Reconsideration on April 30, 2025. (Dkt. No. 274.) The Court did not rule on Defendant's Motion for Partial Reconsideration prior to the Parties requesting a stay pending mediation, as detailed below.

17.     On April 23, 2025, Defendant filed an Answer to the FACC, largely denying Plaintiffs' allegations. (Dkt. No. 272.)

18.     Thereafter, the Parties engaged in fast paced and extensive written and documentary discovery. Starting in late May 2025, the Parties held several meet and conferrals and exchanged e-mail communications and multiple drafts of the Protective Order and 502(d) Order and on June 20, 2025, filed the Proposed Stipulated Protective Order (Dkt. No. 285) and the Proposed 502(d) and Clawback Order. (Dkt. No. 296.) On July 24, 2025, the Court approved both the Stipulated Protective Order (Dkt. No. 287) and Rule 502(d) and Clawback Order. (Dkt. No. 288.) Beginning in mid-June 2025, the Parties also met and conferred several times and exchanged numerous e-mail communications and drafts of the Discovery and ESI Agreement before finalizing it on July 21, 2025. Plaintiffs served four sets of Requests for Production with fifty-seven requests, two sets of Interrogatories with five interrogatories, and one set of Requests for Admission with four requests. Plaintiffs based Request for Admissions and Interrogatories in part on evidence produced and strategy for evidence required for factual determination later in this Action by the trier of fact.

19.     Defendant served on Plaintiffs two sets of Requests for Production with 56 to 66 total

4

requests and one set of Interrogatories with 22 interrogatories. Plaintiffs and their counsel responded substantively to the discovery after collecting documents and confirming information.

20.    The Parties responded to the discovery requests, with both Parties producing thousands of pages of documents. The Parties exchanged over twenty meet and confer letters in addition to holding more than seven meet and conferral discussions regarding custodians, search terms, depositions, and other discovery disputes and issues.

21.    Plaintiffs served four third-party subpoenas to testify on individuals who had previously been employed by Defendant, who served its objections to the subpoenas on Plaintiffs. Plaintiffs also served third-party subpoenas to testify and to produce documents on Defendant's founder and previous Chief Executive Officer, Ms. Shazi Visram. The scheduling of all third-party depositions was postponed while the parties mediated the Action.

22.    The Parties also met and conferred various times to schedule the depositions of Defendant's employees and Plaintiffs. No depositions occurred, but the Parties noticed or scheduled depositions of the seven Plaintiffs and at least ten of Defendant's current and former employees. Plaintiffs began preparing for the depositions, including reviewing documents and identifying potential exhibits and were in the process of finalizing the scheduling of the depositions with Defendant when the Parties agreed to participate in mediation. Plaintiffs served a Notice of Deposition Pursuant to Federal Rule of Civil Procedure 30(b)(6) on Defendant, and Defendant served its Responses and Objections. The Parties also discussed and exchanged communications regarding the 30(b)(6) deposition.

23.    After agreeing to schedule a mediation in good faith to consider a class wide resolution that would resolve the Action in its entirety, on October 8, 2025, the Parties submitted a joint letter motion to the Court to temporarily stay the current deadlines and adjourn the in-person status conference scheduled for October 28, 2025, pending the upcoming mediation. (Dkt. No. 293.) On

October 8, 2025, the Court granted the Parties' motion. (Dkt. No. 294.)

## II.    MEDIATION AND SETTLEMENT NEGOTIATIONS

24.    On January 16, 2026, Defendant and Plaintiffs submitted confidential mediation statements to the Honorable Margaret A. Nagle (Retired) of JAMS, former U.S. Magistrate Judge for the U.S. District Court, Central District of California, from 1997 to 2015. To ensure a productive and fruitful mediation, Plaintiffs conducted extensive legal research to identify cases to support their position and to address Defendant's potential defenses. Plaintiffs also reviewed public documents and documents they produced and those produced by Defendant to identify the strongest exhibits to include with their mediation statement that supported their arguments based on the merits and for class certification considerations.

25.    On January 23, 2026, the Parties participated in a full day in-person mediation with Judge Nagle. The Parties were unable to reach an agreement during the mediation, but with Judge Nagle's assistance, continued negotiations.

26.    On March 26, 2026, the Parties submitted a joint request to further stay the Action to the Court, to allow for their work towards a resolution of the Action to continue. (Dkt. No. 306.) On March 26, 2026, the Court granted the Parties' motion. (Dkt. No. 307.)

27.    Once an agreement in principle was reached, the Parties began drafting and finalizing the Settlement Agreement and related exhibits now before the Court, including the comprehensive Settlement Class notice program.

## III.    THE SETTLEMENT

28.    Between mediation and the filing of this joint declaration, the Parties continued to engage in good faith, arms'-length negotiations and voluntarily reached a settlement. The Parties negotiated and finalized the formal Settlement Agreement. The Settlement, occurring more than five

6

years after Plaintiffs filed the initial complaints, will resolve this Action in its entirety. The Parties did not discuss attorneys' fees and reimbursement of costs prior to agreement on the material terms of the Settlement Agreement.

29.     For Settlement purposes only, the Parties agreed to the establishment of a conditional certification of the nationwide Settlement Class, pursuant to Federal Rule of Civil Procedure 23(b)(3). Settlement Agreement §III(A). The Class Period is from February 4, 2015, to the date the Preliminary Approval Order is entered. Settlement Agreement §I(F).

30.     Under the Settlement, Defendant has agreed to pay $3.4 million into a non-reversionary Cash Settlement Fund in exchange for a full release of claims that were and could have been brought in this Action. The Cash Settlement Fund will be used to first pay all Settlement Costs that exceed $400,000, Plaintiffs' service awards, and class counsel fees and costs, with any remaining amounts to pay all Cash Settlement Awards to Settlement Class Members. Settlement Agreement §III(C)(1).

31.     Defendant will also establish a Voucher Settlement Program with a retail value of up to $3.4 million to provide Voucher Settlement Awards to those Settlement Class Members who submit a valid Claim Form and elect a Voucher Settlement Award. Settlement Agreement §III(C)(2). To the extent the total number of vouchers claimed through the Voucher Settlement Program is less than 210,266 vouchers, Defendant will donate the remaining product *cy pres* so that the number of vouchers claimed by Settlement Class Members and product donated by Defendant totals 210,266 vouchers and products, combined.

32.     As part of the Settlement, Defendant will pay $300,000 into the Administration Fund and if necessary, up to an additional $100,000. The Administration Fund will be used to pay Settlement Costs, which includes all costs and fees charged by the Settlement Administrator to administer this class action settlement pursuant to this Agreement and any orders of the Court. If Settlement Costs exceed $400,000, the remaining Settlement Costs will be paid from the Cash Settlement Fund.

Settlement Agreement §III(C)(3).

33.     Any funds remaining in the Cash Settlement Fund as of sixty days after the Cash Settlement Awards have been paid will be awarded *cy pres*. Settlement Agreement §III(E). To the extent the total number of vouchers claimed through the Voucher Awards Program is less than 210,266 vouchers, Defendant will donate the remaining product *cy pres*. Settlement Agreement §III(E)(2).

## IV.    SETTLEMENT ADMINISTRATOR AND NOTICE PROGRAM

34.     The Notice Program is described in detail in the Settlement Agreement and the Notice Plan submitted contemporaneously herewith. *See* Settlement Agreement §IV; Exhibits A, B, and C to Settlement Agreement .

35.     After agreeing to the Settlement, the Parties procured bids from multiple settlement administrators and ultimately determined that Epiq Class Action & Claims Solutions, Inc. ("Epiq"), a well-respected and reputable third-party administrator with extensive experience in consumer fraud cases, was the third-party Settlement Administrator that would best serve the Class (subject to Court approval).

36.     In selecting the Settlement Administrator, Class Counsel were particularly concerned about finding an administrator that would prevent claims made by AI and/or bots, which has become prevalent in recent class action settlements. Epiq has confirmed it will address these issues and prevent false claims. *See* Declaration of Cameron R. Azari, Esq. Regarding Notice Plan, attached hereto as Exhibit 2. If approved, Epiq will oversee implementation of the Notice Plan.

37.     The detailed and comprehensive Notice Plan set forth in the Settlement Agreement provides the best notice to Class Members that is practicable under the circumstances and satisfies all applicable requirements of law and due process.

38.     The Notice Plan will properly inform Settlement Class Members of the Settlement's substantive terms. The notices contain sufficient information to apprise recipients of the Settlement,

8

and of their right to submit a claim, opt out of the Settlement Class, or object to the Settlement. The Notice Plan provides the Class Members with all of the relevant information, including: the terms of the Settlement; who is a member of the Settlement Class; the date, time, and place of the hearing for final approval; the proposed allocation of the Cash Settlement Fund and details regarding the Voucher Settlement Program; the procedures and deadlines for submitting a claim; the procedures and deadlines for objecting to the Settlement; the terms relating to attorneys' fees and costs; the terms relating to fees and expenses of the Settlement Administrator; the proposed service awards and how the Class Members can obtain additional information about the Settlement. *See* Exhibits A, B, and C to the Settlement Agreement.

## V.    ATTORNEYS' FEES, COSTS, AND CLASS SERVICE AWARDS

39.    The Parties agreed that Class Counsel may apply to the Court for attorneys' fees and costs in an amount up to, but not exceeding, $2,266,666 from the Cash Settlement Fund, which is one-third of the combined value of the Cash Settlement Fund and Voucher Settlement Program. Settlement Agreement §III(F)(1).

40.    Class Counsel will apply to the Court for service awards to each Class Representative in an amount up to, but not exceeding, $5,000, for their participation as Class Representatives, taking on the risks of litigation, and for Settlement of their individual claims as Settlement Class Members in this Action.

## VI.    ANTICIPATED REQUEST FOR ATTORNEYS' FEES AND COSTS

41.    Class Counsel will move for an award of reasonable attorneys' fees and reimbursement of their litigation expenses for work performed and expenses incurred in furtherance of this litigation. Fed. R. Civ. P. 23(e)(2)(C)(iii). At this time, Class Counsel anticipate they will ask the Court to award up to 33.3% of the $6.4 million Cash Settlement Fund and Voucher Settlement Program combined value in attorneys' fees and reasonable costs.

9

42.     Class Counsel's forthcoming motion for attorneys' fees and costs will provide the Court with the rationale and necessary detail to assess the requested fees, expenses, and service awards, along with a lodestar crosscheck. The requested fee is warranted under the facts and history of this Action, including the significant work, effort, and expense that Class Counsel put into this Action and in reaching a favorable resolution of the Settlement Class's claims against Defendant.

## VII.    TIME AND EXPENSE SUBMISSION

43.     This is a large and complex case.  Several law firms assisted Interim Co-Lead Counsel during the litigation.  As Interim Co-Lead Counsel, we are charged in overseeing the work performed and ensuring compliance with the rules and guidelines for work performed and expenses incurred for the common benefit of all Plaintiffs in this Action.

44.     In our capacity as Interim Co-Lead Counsel, we have ensured the reasonable, effective, and efficient prosecution of this litigation and the Plaintiffs' and Class Members' claims. We have encouraged the attorneys working on this Action to perform assignments efficiently, including by using the resources and guidance of experienced attorneys. We believe this approach has saved time spent on this Action overall, with the benefit of insight, guidance, and experience of discrete litigation and strategy issues.

45.     Pursuant to the Order Regarding Time and Expense Reporting Protocol ("Time and Expense Protocol"), each participating firm ("Participating Counsel") submitted monthly time and expense reports to our firm. (Dkt. No. 152 at 5.)

46.     The Time and Expense Protocol imposed a limitation on the hourly rate for document reviewers at $350 per hour. (Dkt. No. 152 at 3.)

47.     The Time and Expense Protocol imposed limitations on reimbursable expenses. (Dkt. No. 152 at 4-5.)

## VIII.    QUALIFICATIONS OF PROPOSED CLASS COUNSEL

48.     I, Lori Feldman, am an experienced attorney with more than 30 years of experience in complex litigation and class actions. My practice is primarily focused on consumer protection, data privacy and cybersecurity incidents, and financial services litigation.

49.     My experience in complex litigation includes having been appointed as lead counsel or to other leadership positions in several settled class action cases, including *In re Shields Health Care Group, Inc.*, No. 1:22-cv-10901 (D. Mass.) (Co-Lead Counsel, settled for $15.35million); *Bowen v. Paxton Media Group, LLC*, No. 5:21-cv-00143-GNS-LLK (W.D. Ky) (Co-Lead Settlement Class Counsel); *In re Morgan Stanley Data Security Litig.*, No. 1:20-cv-05914-MKV (S.D.N.Y.) (Executive Committee Member, settled for $60 million); *Skurauskis v. NationsBenefits Holdings, LLC*, Case No. 23-cv-60830-RAR (S.D. Fla.) (Executive Committee Member in *In re Fortra Data Breach MDL*) (settled for $20 million); *Wahab v. Boston Children's Health Physician, et al.*, Case No. 73692/2024 (Westchester Cty, N.Y.) (Liaison Counsel, settled for $5.15 million); *In re Fidelity Investments Data Breach Litigation*, Civil No. 24-12601-LTS (D. Mass.) (Co-Lead counsel, preliminarily approved settlement of $2.5 million); *In re EyeMed Vision Care, LLC Data Sec., Litig.*, Case No. 1:20-cv-00036 (S.D. Ohio) (Co-Lead counsel, preliminarily approved settlement of $5 million).

50.     Separately, I hold numerous leadership roles in pending complex litigation actions, including *In re Meta Tax Filing Cases*, No. 2-07557-(SI) (N.D. Cal.) (Co-Chair of Plaintiffs' Steering Committee); *Smith v. Google*, No. 23-cv-03527 (N.D. Cal.) (Co-Chair of Plaintiffs' Steering Committee); *In re Laboratory Services Cooperative Data Breach Litig.*, No. 2:25-cv-00685 (W.D. Wash) (Plaintiffs' Steering Committee); *Doe v. Highmark, Inc.*, Case No. 2:23-cv-00250 (W.D. Pa.) (Executive Committee Member in data breach case); *Morill v. Lakeview Loan Servicing, LLC*, Case No. 1:22-cv-20955-DPG (S.D. Fla.) (supporting lead counsel in data breach case, settlement pending approval); *In re MOVEit Customer Data Security Breach Litig.*, MDL No. 1:23-md-03083-ADB (representing named plaintiffs in Master Complaint); and *Garcia v. Set Forth, Inc.*, Case No. 1:24-cv-

11

11688 (N.D. Ill) (Executive Committee Member). I have also played a key role in developing cases concerning privacy. *See In re Meta AI Glass Litig.*, No, 3:26-cv-01897-EMC (N.D. Cal.); *Schwarz v. Google LLC*, Case No. 3:25-cv-03125 (N.D. Cal.); *M.C. 1 v. Curriculum Associates, LLC*, Case No. 1:00-cr-10008 (D. Mass.).

51.     I, Rebecca Peterson, am an experienced litigator with twenty years of experience in complex litigation and class actions. My practice is primarily focused on consumer protection, greenwashing, product liability, data privacy, and accompanying regulatory issues.

52.     My experience in complex litigation includes having been appointed as lead counsel or to other leadership positions in several class action cases, including *Zeiger v. WellPet LLC*, Case No. 3:17-cv-04056 (N.D. Cal.); *In re Big Heart Pet Brands Litigation*, Case No. 4:18-cv-00861-JSW (N.D. Cal.); *In re Plum Baby Food Litigation*, Case No. 4:21-cv-00913-YGR (N.D. Cal.); *In re Meta Pixel Tax Filing Cases*, Case No. 3:22-cv-07557 (N.D. Cal.); and *In re Huel Heavy Metal Litigation*, Case No. 1:25-cv-5783-AMD-JAM (E.D.N.Y.). I am currently on the Plaintiffs' Leadership Committee in *In re Allianz Life Insurance Company of North America Data Incident Litigation*, Case No. 25-cv-02777 (D. Minn.), which seeks to certify a nationwide class and several state subclasses of customers of defendant's whose private information was compromised in a data breach.

53.     These appointments reflect the confidence that other federal courts have expressed regarding our skills and professionalism in handling large and important complex litigation. A copy of Hecht Partners LLP's resume is attached hereto as Exhibit 3.

54.     Interim Co-Lead Counsel are well positioned to assess the benefits of the proposed Settlement and do hereby fully endorse it as fair, reasonable, and adequate.

55.     Interim Co-Lead Counsel have vigorously represented the proposed Settlement Class. Their representation has included: (1) investigation and preparation of initial complaints, the CCAC (Dkt. No. 157), and the FACC (Dkt. No. 214); (2) extensive research and analysis to address and

12

oppose Defendant's comprehensive motions to dismiss this Action in its entirety; (3) substantial written discovery and discovery negotiations; (4) management of considerable amounts of document productions; (5) gathering of Plaintiffs' documents and relevant information to respond to Defendant's discovery requests; (6) extensive correspondence with defense counsel relating to numerous discovery issues; (7) hiring of experts; (8) participation in mediation and extensive subsequent settlement discussions; and (9) achievement of a favorable Settlement on behalf of the Settlement Class.

56.    The risks faced by Plaintiffs in litigating this Action are not hypothetical or minimal. Further litigation would result in significant additional expenses and delays to the Settlement Class's recovery. By reaching a settlement prior to class certification, summary judgment, or trial, Plaintiffs seek to avoid significant expense and delay and ensure recovery for the Settlement Class. However, Plaintiffs were fully prepared to advance with litigation if a settlement that was in the best interest of the Class Members could not be reached.

57.    In agreeing to the proposed Settlement, Interim Co-Lead Counsel judiciously balanced the strength of the Class Members' claims with the relevant litigation risks and concluded that the Settlement is an excellent result as it provides immediate and valuable benefits to the Class Members. The costs and risks involved in continuing to litigate this Action is far outweighed by the relief provided under the Settlement.

58.    Interim Co-Lead Counsel believe the Settlement is an outstanding result for the Settlement Class as it provides them guaranteed monetary relief in an efficient and timely manner on terms that are fair, reasonable, and adequate to the Class. Accordingly, we respectfully request that the Court grant preliminary approval of the proposed Settlement and direct notice of the Settlement to the Class.

59.    We declare under penalty of perjury that the foregoing is true and correct.

13

Dated: July 1, 2026

_Lori G. Feldman_

———————————————————
Lori G. Feldman

———————————————————
Rebecca A. Peterson

*Plaintiffs' Interim Co-Lead Counsel*

14